No. 22-1286

# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

TERADATA CORPORATION, TERADATA US, INC., and TERADATA OPERATIONS, INC.,

*Plaintiffs-Appellants*,

v.

SAP SE, SAP AMERICA, INC., and SAP LABS LLC,

*Defendants-Appellees.*

Appeal from the United States District Court for the Northern District of California, Case No. 3:18-cv-03670, Hon. William H. Orrick

## TERADATA CORPORATION, TERADATA US, INC., AND TERADATA OPERATIONS, INC.'S NON-CONFIDENTIAL OPENING BRIEF

JAMES R. SIGEL
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105

DEANNE E. MAYNARD
BRIAN R. MATSUI
MARK L. WHITAKER
DAVID D. CROSS
MARY PRENDERGAST
MICHAEL F. QIAN
SAMUEL B. GOLDSTEIN
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Telephone: (202) 887-8740
DMaynard@mofo.com

*Counsel for Plaintiffs-Appellants Teradata Corporation, Teradata US, Inc., and Teradata Operations, Inc.*

MAY 18, 2022

# CERTIFICATE OF INTEREST

Counsel for Teradata Corporation, Teradata US, Inc., and Teradata Operations, Inc. certify under Federal Circuit Rule 47.4 that the following information is accurate and complete to the best of their knowledge:

1.     **Represented Entities.** Provide the full names of all entities represented by undersigned counsel in this case.

Teradata Corporation; Teradata US, Inc.; Teradata Operations, Inc.

2.     **Real Parties in Interest.** Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.

None.

3.     **Parent Corporations and Stockholders.** Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

Teradata Corporation has no parent corporation, and no publicly-held corporation owns 10% or more of its stock.  Teradata US, Inc. and Teradata Operations, Inc. are wholly-owned subsidiaries of Teradata Corporation.

4.     **Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court.

MORRISON & FOERSTER LLP:  Corinna J. Alanis (no longer with firm); Christian G. Andreu-von Euw (no longer with firm); Shouvik Biswas; Aaron David Dakin Bray; Eileen M. Brogan (no longer with firm); G. Brian Busey; Jayson L. Cohen; Fitz B. Collings; James R. Hancock; Brian L. Hazen (no longer with firm); Mary G. Kaiser; Sean W. Kang; Jack W. Londen; Bradley S. Lui; Robert W. Manoso; Natasha G. Menell (no longer with firm); Daniel P. Muino; Erik J. Olson; Wesley E. Overson, Jr. (no longer with firm); Fahd H. Patel; Aaron D. Rauh (no longer with the firm); Wendy J. Ray; Mathieu Swiderski; Roman A. Swoopes; Bryan J. Wilson; Michelle L. Yocum

CHARIS LEX P.C.:  Sean P. Gates

TODD B. CARVER, ATTORNEY AT LAW:  Todd B. Carver

5.     **Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case.

None.

6.     **Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).

Not applicable.

Dated:  May 18, 2022                            /s/ Deanne E. Maynard
                                                                    Deanne E. Maynard

## TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF CONTENTS ........................................................................ iii

TABLE OF AUTHORITIES ................................................................. vii

TABLE OF ABBREVIATIONS ............................................................. xiii

STATEMENT OF RELATED CASES ....................................................1

JURISDICTIONAL STATEMENT .........................................................1

INTRODUCTION ..................................................................................2

STATEMENT OF ISSUES ....................................................................3

STATEMENT OF THE CASE................................................................4

    A.    Factual Background..............................................................4

        1.    Teradata developed Batched Merge for database queries ..........4

        2.    Teradata and SAP began the Bridge Project with agreements to protect Teradata's intellectual property..............5

        3.    After Teradata confidentially disclosed Batched Merge, SAP used it to develop a competing product, HANA ...............7

        4.    SAP tied HANA to S/4HANA....................................................9

    B.    Procedural History.............................................................11

        1.    Teradata sued SAP for antitrust and trade-secret violations ..................................................................................11

        2.    SAP added patent-infringement counterclaims ........................11

        3.    The district court granted SAP summary judgment .................12

        4.    This Court denied transfer .......................................................13

SUMMARY OF ARGUMENT ..............................................................13

ARGUMENT ...................................................................................15

I.    UNDER A CORRECT UNDERSTANDING OF THE LAW,
      NUMEROUS FACTUAL DISPUTES REQUIRE REVERSAL ON
      TERADATA'S ANTITRUST CLAIM ..........................................15

      A.    In Excluding Asker's Testimony, The District Court Misapplied
            Antitrust Law And Overstepped Its Gatekeeping Role .....................16

            1.    Antitrust law forbids coercive ties ...........................................16

            2.    Courts cannot exclude testimony based on mere
                  disagreement with the expert's conclusions ...........................19

            3.    Asker's tying-market-definition testimony is admissible.........20

                  a.    Asker defined the tying market with reliable
                        qualitative analysis .......................................................20

                  b.    Additional reliable analyses support Asker's tying-
                        market definition............................................................25

                        i.     Customer-relationship-management data
                               analysis ................................................................25

                        ii.    Aggregate-diversion-ratio analysis .....................26

                        iii.   Price-discrimination analysis ..............................30

            4.    Asker's tied-market-definition testimony is admissible..........33

            5.    Asker's harm-to-competition testimony is admissible ............35

      B.    With Or Without Asker's Testimony, Reversal Is Required .............39

            1.    SAP's tie is per se unlawful .....................................................40

                  a.    Teradata's evidence of SAP's market power creates
                        a triable dispute...............................................................40

                        i.     Asker's testimony creates a material factual
                               dispute ..................................................................40

                        ii.    Teradata's other evidence independently
                               creates a material factual dispute ........................41

                  b.    The per se rule applies here ...........................................44

           i.      Purported procompetitive justifications cannot avoid per se condemnation .......................44

           ii.     Material factual disputes preclude crediting SAP's justification.................................................46

           iii.    Hois's declaration should have been excluded because Teradata never changed its theory ...............................................................47

   2.    SAP's tie violates the rule of reason ........................49

      a.    Asker's excluded testimony creates a material factual dispute on the tie's substantial anticompetitive effects....................................49

      b.    Teradata's other evidence creates a material factual dispute on the tie's substantial anticompetitive effects..............................................................50

II.   A CORRECT INTERPRETATION OF THE PARTIES' AGREEMENTS REQUIRES REVERSAL FOR TRIAL ON TERADATA'S TRADE-SECRET CLAIM....................................53

   A.   Teradata Marked Its Trade Secret .........................................53

      1.    Teradata marked Batched Merge confidential.........................53

      2.    SAP waived any "details" requirement ....................................58

   B.   The Agreements Protect Teradata's Rights To Batched Merge .........60

      1.    SAP obtained no broad license to use Teradata's trade secrets for a competing database..............................................60

      2.    The district court misread the agreement and found facts in giving SAP a license to Batched Merge ...............................64

        a.    The district court's interpretation makes other provisions superfluous....................................64

        b.    No other provision gives SAP a license to Batched Merge ...........................................................67

III.  THIS COURT HAS JURISDICTION.............................................69

CONCLUSION ..................................................................................................70

## CONFIDENTIAL MATERIAL OMITTED

In the non-confidential version of this brief, pages 4-5 and 56-58 omit material describing Teradata's Batched Merge trade secret.  Pages 35-36 and 43 omit material describing SAP's pricing and financial data.

# TABLE OF AUTHORITIES

## Cases

*Ajdler v. Province of Mendoza,*
  890 F.3d 95 (2d Cir. 2018) ................................................................66

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp.,*
  738 F.3d 960 (9th Cir. 2013) ....................................................19, 20

*American Ad Mgmt., Inc. v. GTE Corp.,*
  92 F.3d 781 (9th Cir. 1996) ............................................................50

*Brantley v. NBC Universal, Inc.,*
  675 F.3d 1192 (9th Cir. 2012) ............................................17, 36, 44

*Cascade Health Sols. v. PeaceHealth,*
  515 F.3d 883 (9th Cir. 2008) ..............................16, 35, 40, 42, 44

*Christian Dior-N.Y., Inc. v. Koret, Inc.,*
  792 F.2d 34 (2d Cir. 1986) ........................................................59, 60

*City of Pomona v. SQM N. Am. Corp.,*
  750 F.3d 1036 (9th Cir. 2014) ............................................19, 23, 30

*Convolve, Inc. v. Compaq Computer Corp.,*
  527 F. App'x 910 (Fed. Cir. 2013) ..............................................57, 60

*Dial Corp. v. News Corp.,*
  165 F. Supp. 3d 25 (S.D.N.Y. 2016) ..............................................28

*Digidyne Corp. v. Data Gen. Corp.,*
  734 F.2d 1336 (9th Cir. 1984) ............................................16, 43, 44

*Eastman Kodak Co. v. Image Tech. Servs., Inc.,*
  504 U.S. 451 (1992).......................................................................16, 44

*Elosu v. Middlefork Ranch, Inc.,*
  26 F.4th 1017 (9th Cir. 2022) ............................................19, 23, 30, 37

*In re Friedman,*
  64 A.D.2d 70 (N.Y. App. Div. 1978) ..............................................66

*FTC v. Actavis, Inc.*,
   570 U.S. 136 (2013)..............................................................43

*FTC v. Sysco Corp.*,
   113 F. Supp. 3d 1 (D.D.C. 2015)..........................................29

*FTC v. Whole Foods Mkt., Inc.*,
   548 F.3d 1028 (D.C. Cir. 2008)............................................30

*FTC v. Wilh. Wilhelmsen Holding ASA*,
   341 F. Supp. 3d 27 (D.D.C. 2018)..........................27, 28, 29, 30

*Gen. Motors Acceptance Corp. v. Clifton-Fine Cent. Sch. Dist.*,
   647 N.E.2d 1329 (N.Y. 1995)..........................................58, 59

*Hardeman v. Monsanto Co.*,
   997 F.3d 941 (9th Cir. 2021) ...............................................15

*Hoyt v. Andreucci*,
   433 F.3d 320 (2d Cir. 2006) .......................................56, 57, 67

*Ill. Tool Works Inc. v. Indep. Ink, Inc.*,
   547 U.S. 28 (2006)...............................................................15

*Image Tech. Serv., Inc. v. Eastman Kodak Co.*,
   903 F.2d 612 (9th Cir. 1990) ...............................................18

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
   466 U.S. 2 (1984)...........................................16, 17, 44, 51

*JL Bev. Co. v. Jim Beam Brands Co.*,
   828 F.3d 1098 (9th Cir. 2016) .............................................49

*Kaneka Corp. v. Xiamen Kingdomway Grp. Co.*,
   790 F.3d 1298 (Fed. Cir. 2015) .....................................15, 52

*Lowy & Donnath, Inc. v. City of N.Y.*,
   98 A.D.2d 42 (N.Y. App. Div. 1983) ...................................66

*McWane, Inc. v. FTC*,
   783 F.3d 814 (11th Cir. 2015) .......................................20, 24

*Moore v. Jas. H. Matthews & Co.*,
  550 F.2d 1207 (9th Cir. 1977) ............................................................42

*Natale v. Ernst*,
  63 A.D.3d 1406 (N.Y. App. Div. 2009) ........................................59, 60

*NFL Enters. v. Comcast Cable Commc'ns, LLC*,
  51 A.D.3d 52 (N.Y. App. Div. 2008) ...................................................62

*O'Bannon v. Nat'l Collegiate Athletic Ass'n*,
  802 F.3d 1049 (9th Cir. 2015) ............................................................17

*Oahu Gas Serv., Inc. v. Pac. Res., Inc.*,
  838 F.2d 360 (9th Cir. 1988) ..............................................................39

*Obrey v. Johnson*,
  400 F.3d 691 (9th Cir. 2005) ..............................................................29

*Ohio v. Am. Express Co.*,
  138 S. Ct. 2274 (2018).................................................................51, 52

*Olin Corp. v. FTC*,
  986 F.2d 1295 (9th Cir. 1993) ...........................................17, 21, 24, 41

*Oltz v. St. Peter's Cmty. Hosp.*,
  861 F.2d 1440 (9th Cir. 1988) ..................................................18, 35, 39

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
  20 F.4th 466 (9th Cir. 2021) .....................................................18, 20, 27

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Glaser*,
  945 F.3d 1076 (9th Cir. 2019) ............................................................49

*Primiano v. Cook*,
  598 F.3d 558 (9th Cir. 2010) ........................................................37, 39

*Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*,
  752 F.3d 807 (9th Cir. 2014) ..............................................................25

*In re Rearden LLC*,
  841 F.3d 1327 (Fed. Cir. 2016) ..........................................................69

*Rebel Oil Co. v. Atl. Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) ...........................................................17, 18, 21, 26

*Rogath v. Siebenmann*,
  129 F.3d 261 (2d Cir. 1997) ...............................................................................63

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*,
  778 F.3d 775 (9th Cir. 2015) ..............................................................................18

*Syngenta Crop Prot., LLC v. Willowood, LLC*,
  944 F.3d 1344 (Fed. Cir. 2019) ..........................................................................15

*Syufy Enters. v. Am. Multicinema, Inc.*,
  793 F.2d 990 (9th Cir. 1986) ..............................................................................20

*United States v. Dentsply Int'l, Inc.*,
  399 F.3d 181 (3d Cir. 2005) ...............................................................................43

*United States v. H & R Block, Inc.*,
  833 F. Supp. 2d 36 (D.D.C. 2011)......................................................................29

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001)..........................................................44, 45, 46, 50

*United States v. Phila. Nat'l Bank*,
  374 U.S. 321 (1963)............................................................................................23

*Wendell v. GlaxoSmithKline LLC*,
  858 F.3d 1227 (9th Cir. 2017) ...................................................19, 23, 32, 34, 36

*Zullo v. Varley*,
  57 A.D.3d 536 (N.Y. App. Div. 2008) ...............................................................56

**Statutes and Rules**

15 U.S.C. § 1 ...........................................................................................................11

15 U.S.C. § 14 .........................................................................................................11

18 U.S.C. § 1836(c) ..................................................................................................1

18 U.S.C. § 1839(5)(B)(ii)(II)................................................................................53

28 U.S.C. § 1295(a)(1)........................................................................................1, 69

28 U.S.C. § 1331 ........................................................................1

28 U.S.C. § 1337(a) ...................................................................1

28 U.S.C. § 1338(a) ...................................................................1

28 U.S.C. § 1367 ........................................................................1

Cal. Civ. Code § 3426.1(b)(2)(B)(ii) ........................................53

Fed. R. Civ. P. 13(a)(1)(A) .......................................................69

Fed. R. Civ. P. 54(b) .............................................................1, 12

Fed. R. Evid. 702 ................................................................19, 29

## Other Authorities

2A Areeda & Hovenkamp, *Antitrust Law* (5th ed.) ........................21, 23, 24, 39, 42

American Bar Ass'n, *Market Definition in Antitrust* (2012) ...................................27

Baker & Bresnahan, "Economic Evidence in Antitrust: Defining Markets and Measuring Market Power," *Handbook of Antitrust Economics* (Paolo Buccirossi ed., 2008) ........................20

Chen & Schwartz, *Churn Versus Diversion in Antitrust: An Illustrative Model*, 83 ECONOMICA 564 (2016) ..................................28

Conlon & Mortimer, *Empirical Properties of Diversion Ratios*, 52 RAND J. ECON. 693 (2021) ...................................28

2 Kaplow & Shapiro, "Antitrust," *Handbook of Law and Economics* (2007) ...........................27, 28, 30

Katz & Shapiro, *Critical Loss: Let's Tell the Whole Story*, ANTITRUST (Spring 2003). .......................................26, 27

Shapiro, *The 2010 Horizontal Merger Guidelines: From Hedgehog to Fox in Forty Years*, 77 ANTITRUST L. J. 701 (2010)..........................28

*Summarize*, Oxford English Dictionary (3d ed. 2019) ............................................55

U.S. Dep't of Justice & FTC, *Horizontal Merger Guidelines*
(2010) ...................................................................... 18, 21, 23, 24, 30, 31, 32, 35

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| ADR | Aggregate diversion ratio |
| CRM | Customer relationship management |
| EDAW | Enterprise data analytics and warehousing |
| EDW | Enterprise data warehouse |
| ERP | Enterprise resource planning |
| MNDA | Mutual Non-Disclosure Agreements between Teradata Corporation and SAP AG, signed December 17, 2008, and July 20, 2009 |
| OLAP | Online analytical processing |
| OLTP | Online transaction processing |
| SDCA | Software Development Cooperation Agreement between Teradata Corporation and SAP AG, signed March 24, 2009 |
| SSNIP | Small but significant non-transitory increase in price |

## STATEMENT OF RELATED CASES

No appeal from this proceeding has previously been before this Court or any other court.  Counsel for plaintiffs-appellants Teradata Corporation, Teradata US, Inc., and Teradata Operations, Inc. (collectively "Teradata") know of no other cases pending in this Court or any other court that will directly affect or be affected by this Court's decision in this appeal involving Teradata and defendants-appellees SAP SE, SAP America, Inc., and SAP Labs LLC (collectively "SAP").

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. §1836(c) and 28 U.S.C. §§1331, 1337(a), 1338(a), and 1367.  It entered judgment under Federal Rule of Civil Procedure 54(b) on November 22, 2021.  Teradata timely appealed on December 17, 2021.  This Court has jurisdiction under 28 U.S.C. §1295(a)(1).  *Infra* Part III.

**INTRODUCTION**

Teradata is a leading provider of highly innovative enterprise data warehouse ("EDW") database products that provide valuable analytics for large enterprises. Teradata's massively parallel databases analyze immense amounts of data for the world's largest businesses and governments.

SAP has long been a market-dominant provider of software applications called enterprise resource planning ("ERP") solutions, which manage various business processes. For years, SAP tried to develop an EDW database to compete with Teradata's. But SAP's clumsy solutions failed. So SAP tried a different approach: it entered a collaboration with Teradata to develop software bridging Teradata's innovative database with SAP's applications.

Before sharing its technological expertise with SAP, Teradata required agreements expressly protecting Teradata's intellectual property. But SAP disregarded those agreements—pilfering what Teradata shared to solve a problem thwarting SAP's efforts to develop a competing database—and then cancelled the collaboration. In granting summary judgment against Teradata, the district court concluded the agreements did the opposite of what the parties intended: rather than protect Teradata's intellectual property, they granted unrestricted licenses to key Teradata trade secrets.

Even after SAP misappropriated Teradata's trade secrets, problems plagued SAP's competing database, HANA, and customers still preferred Teradata's solution. Unable to compete on the merits, SAP decided to exploit its power as the dominant ERP software provider for large enterprises, requiring that all customers purchasing its latest ERP version *also* purchase HANA. Although such a tie is a quintessential antitrust violation, the district court refused to let Teradata's claim go to trial.

In granting summary judgment, the district court misapplied the law and resolved factual disputes. Reversal and remand for trial is required.

## STATEMENT OF ISSUES

1.     Whether summary judgment on Teradata's tying claim should be reversed because the district court erroneously (a) excluded testimony from Teradata's expert economist; (b) refused to apply the per se rule governing tying claims; (c) relied on a late-filed declaration on the tie's purported procompetitive benefits; and/or (d) disregarded material factual disputes.

2.     Whether summary judgment on Teradata's trade-secret claim should be reversed because the court misconstrued the parties' agreements and resolved material factual disputes.

CONFIDENTIAL MATERIAL OMITTED

## STATEMENT OF THE CASE

### A.    Factual Background

#### 1.    *Teradata developed Batched Merge for database queries*

Teradata is a leading provider of EDW software.  Appx10362.  An EDW is a type of database that can integrate data from across an enterprise for complex analysis (for example, finding unexpected patterns in sales and financial data).  Appx10362.  Teradata's flagship EDW product is Teradata Database, which uses massively parallel processing to provide data analytics.  Appx15394-15402 at Appx15395-15396; Appx15201-15221 at Appx15208.

Teradata's customers—including nearly all the world's top telecommunications companies, banks, and retailers—need to analyze large data sets.  Appx796-797.  But numerous requests to access individual database entries can be slow and inefficient.  Appx15399-15402.  Teradata developed an elegant solution to this problem:  its Batched Merge method.  Appx15396, Appx15399-15400; Appx15202.  Batched Merge permits efficient retrieval of large amounts of data.  Appx15396; Appx15208; Appx10613-10614.  It sends ▮procedure▮ in ▮procedure▮ and searches for the corresponding data in ▮procedure▮, leveraging Teradata's massively parallel processing architecture, rather than sending ▮procedure▮ ▮procedure▮ and ▮procedure▮ at a ▮procedure▮. Appx15322-15358 at Appx15348-15350.

Teradata has used Batched Merge for decades to enhance performance of Teradata

CONFIDENTIAL MATERIAL OMITTED

Database, which significantly outperforms ████████ data retrieval techniques in other databases. Appx15396-15397, Appx15399-15402; Appx15202, Appx15207-15208.

### 2. Teradata and SAP began the Bridge Project with agreements to protect Teradata's intellectual property

SAP has long been the dominant provider of ERP software applications, which enable companies to manage various business processes. Appx15359-15393, at Appx15367-15368. At an ERP system's core are the enterprise's financial records, allowing management of financial and accounting tasks. Appx15368-15369. Because large enterprises have sophisticated needs, ERP providers design software around them. Appx15369-15384. SAP has different products, at different pricing, for large, medium, and small customers. Appx19359.

SAP lacked the expertise to develop a database like Teradata's. Appx15729-15730; Appx16228. SAP's customers relied on third-party solutions to handle the data SAP's applications used. Appx15729.

Teradata, seeing opportunities for integrating and marketing its technology to SAP's ERP customer base, entered a collaboration with SAP called the Bridge Project to "bridge" SAP's front-end application to Teradata's back-end database. Appx15222-15321 at Appx15229-15231. This collaboration was needed because SAP's application could not natively communicate with the Teradata Database. Appx15204; Appx15231-15232. SAP needed Teradata's tools and expertise to

develop the communication software, which would be called Teradata Foundation. Appx469; Appx15204-15205; Appx15232.

Before sharing information with SAP, Teradata sought to protect its intellectual property, including trade secrets. The parties entered two nearly identical Mutual Non-Disclosure Agreements (collectively, "MNDA") that protect confidential information. Appx456-466. The MNDA includes a marking requirement. For example, confidential information disclosed in writing must be "clearly identified as confidential or proprietary at the time of disclosure marked with an appropriate legend indicating that the information is deemed confidential or proprietary by the Disclosing Party." Appx457 (also discussing oral confidential-information disclosures, which require written summaries). No provision requires that the information be described in detail; the only requirement is that the disclosing party "clearly identif[y]" the information as confidential. Appx457.

Both parties also executed a Software Development Cooperation Agreement ("SDCA") to limit use of the other's intellectual property to the duration of the Bridge Project. Appx467-490 at Appx474-476. The agreement defined many of Teradata's most important assets as "Partner Materials," expressly including "any and all Intellectual Property Rights in any programs, tools, systems, data or materials utilized or made available by Partner" Teradata. Appx468, Appx476. The SDCA stated Partner Materials "shall remain vested exclusively in Partner." Appx476. In

6

contrast to these "programs, tools, systems, data or materials" that remained exclusively Teradata property, the agreement gave SAP a license to other shared information—essentially programming tips. SAP obtained a license to "Input," defined as "suggestions, comments, and feedback (whether in oral or written form), including any included ideas and know-how, provided by one Party to the other Party with respect to the work performed under this Agreement." Appx468, Appx475.

### 3.    *After Teradata confidentially disclosed Batched Merge, SAP used it to develop a competing product, HANA*

Soon after the Bridge Project began, SAP encountered significant difficulties with critical data-retrieval steps taking too long. Appx15205-15208; Appx20345-20346. Teradata's lead technical architect on the Bridge Project, John Graas, sent SAP a confidential design document that proposed using Teradata's Batched Merge to solve SAP's Bridge Project problem. Appx15203, Appx15208-15211; Appx20351; Appx14560. Consistent with the MNDA, the document was "clearly identified" as confidential. Each page was marked "Teradata Confidential." Appx14560-14578. The document contained a subheading "Batched Merge," which (along with other parts of the document and an embedded spreadsheet) provided details of that method. Appx14570, Appx14578; Appx15521-15528 at Appx15525; Appx20377; Appx15209-15211.

Graas subsequently continued to explain how Batched Merge would solve this Bridge Project problem, referring back to "the confidential design document and

embedded spreadsheet." Appx15211. Ultimately, Batched Merge became "the best method tested so far," overcoming the "showstopper" performance problem. Appx15218-15220; Appx14520; Appx20453-20456; Appx15255-15272; Appx15405; Appx15407-15408; Appx15415.

SAP engineers knew they could not use Teradata confidential information, including Batched Merge, outside the Bridge Project. Appx15593-15601 at Appx15595; Appx16323; Appx17199. But SAP did so anyway in developing SAP's own database, HANA.

HANA has analytical functionalities enabling use as an EDW in competition with Teradata's flagship EDW product. Appx16352. SAP had been working on HANA for years before the Bridge Project. Appx16236; Appx16217; Appx15724; Appx20722; Appx15423. Despite the SAP board chairman's instruction "to separate the teams" (Appx16157), SAP never walled off the Bridge Project from HANA. Of the 48 SAP personnel working on the Bridge Project, 34 worked on HANA—many simultaneously. Appx15280-15287; Appx15467; Appx15475-15476. In internal SAP meetings, Bridge Project details were discussed just before HANA. Appx15430; Appx15437; Appx15444. SAP's Bridge Project team forwarded Teradata emails—some discussing Batched Merge—to HANA engineers. *E.g.*, Appx15284-15286.

With the Bridge Project information from Teradata, SAP saw an opportunity to bring HANA to life.  Appx15484; Appx15486; Appx16093-16096.  SAP planned to exploit this information then terminate the Bridge Project.  SAP executives instructed employees to "[p]ush HANA to every Teradata customer that has SAP." Appx15491.  A senior SAP HANA executive instructed his Bridge Project colleagues "to get as much as we can out of the relationship" with Teradata "over the next 9 months." Appx15488.  SAP did so: engineers who learned about Batched Merge in the Bridge Project used it to fix HANA's critical defect—the same problem encountered in the Bridge Project.  Appx15280-15291; Appx15343-15346.

Less than a month after Teradata and SAP publicly released Teradata Foundation (Appx15716), SAP launched HANA (Appx15638).  Several months later, SAP terminated the Bridge Project and stopped selling or supporting Teradata Foundation.  Appx15520.

### 4.    *SAP tied HANA to S/4HANA*

With HANA, SAP sought to become an EDW market leader.  Appx19869. But for years, HANA sales were "very, very poor." Appx15652-15653.  HANA was perceived as overpriced and underperforming.  Appx16243-16246; Appx15826-15828.

In response, SAP tied HANA to its dominant ERP product.  Because SAP has limited competition in providing core ERP for large enterprises, and because

changing core ERP software is costly and disruptive, SAP's ERP customers rarely leave.  Appx15377-15380; Appx19244; Appx20895.  SAP planned to "[h]arvest" HANA sales from that "locked in" customer base by forcing them to purchase HANA.  Appx17600; Appx18268.  SAP sought to induce its ERP customers to stop using third-party EDWs, directing HANA sales campaigns at Teradata customers.  Appx18557.

Thus, when SAP launched its latest-generation ERP software for large enterprises, S/4HANA, it required S/4HANA customers *also* to license HANA.  Appx15928-15929; Appx16115-16116.  All customers must purchase at least the "runtime" license, which restricts customers from using competitors' EDW databases with HANA.  Appx17698-17699.  To avoid those restrictions, customers must buy expensive "full use" licenses.  Appx19140

Customers objected to SAP's tie.  Appx16172-16173.  Yet SAP persisted, for obvious reasons:  strong demand for S/4HANA substantially increased HANA sales, causing customers to abandon competitor databases offering EDW functionalities. *E.g.*, Appx18470, Appx18476; Appx16079-16082.  Although HANA remains an inferior product, it costs significantly more than comparable databases.  Appx19140.

**B.     Procedural History**

*1.     Teradata sued SAP for antitrust and trade-secret violations*

Teradata sued, alleging (among other things) that SAP violated federal antitrust laws by tying HANA to S/4HANA—coercing its locked-in customers to purchase an inferior product rather than other databases with EDW functionalities like Teradata's.  Appx808-818, Appx822-824; *see* 15 U.S.C. §§1, 14.  Teradata also asserted SAP misappropriated Teradata's trade secrets involving Batched Merge, violating federal and California law.  Appx804-805, Appx818-821.

*2.     SAP added patent-infringement counterclaims*

SAP asserted counterclaims alleging Teradata infringed U.S. Patent Nos. 9,626,421; 8,214,321; 7,617,179; 7,421,437; and 7,437,516 relating to database technology.   Appx2870, Appx2873;  *see* Appx8635 (abandoning '516 counterclaim).  SAP argued its counterclaims involve "many of the same underlying facts" as Teradata's trade-secret claims.   Appx1802; *see* Appx1798, Appx1800-1801; Appx2037-2039.

Teradata moved to sever these counterclaims.  SAP opposed, arguing they presented "substantial overlap" with Teradata's claims (Appx4094-4096) and "[a]rise [o]ut of the [s]ame [t]ransaction" (Appx8879).   *See* Appx2041-2042; Appx8879-8882, Appx8884-8885.  Teradata disagreed, but the district court severed only the '437 counterclaim.  Appx9523.  The court concluded SAP's remaining

counterclaims "arise out of the same transaction or occurrence as Teradata's trade secret and antitrust claims," as "[t]here are common questions of fact between both." Appx9523.

### 3.    *The district court granted SAP summary judgment*

Shortly before trial, the court granted summary judgment for SAP on Teradata's antitrust and technical trade-secret claims, entered judgment under Rule 54(b) on those claims, and stayed SAP's patent counterclaims. Appx68; Appx77; *see* Appx22122-22192; Appx22081-22119.

The court's decision on Teradata's tying claim rested largely on its partial exclusion of expert testimony from Dr. John Asker, a University of California, Los Angeles economist. Appx21-38; *see* Appx13876-14064; Appx14065-14175. Although the court did not question Asker's qualifications, it disagreed with certain of his conclusions. Appx25-38. Having excluded those conclusions and ignoring other evidence, the court granted summary judgment. Appx46-49.

On Teradata's technical trade-secret claim, the court believed the marked design document discussing Batched Merge contained insufficient "details of the Batched Merge method" to protect that trade secret under the MNDA. Appx11. The court also found the parties' agreements gave SAP the right "to use the alleged Batched Merge method in its products outside of the Bridge Project" (Appx17),

despite the SDCA providing SAP only a "limited license" to use "programs, tools, or other materials" Teradata provided.  Appx15-16 (quoting Appx474-475).

### 4.    *This Court denied transfer*

This Court denied SAP's transfer motion, directing briefing.  ECF 16.

## SUMMARY OF ARGUMENT

I.    A jury must resolve Teradata's antitrust claim.  In excluding testimony of Teradata's economics expert, the district court misapplied antitrust law and misapprehended its gatekeeping role.  The court committed legal error in excluding Asker's testimony based on its disagreement with Asker's *conclusions* rather than the reliability of his *methodologies*—as demonstrated, for example, by the court's acceptance of one component of Asker's tying-market definition while rejecting another based on the same methodology.  Even in disagreeing with Asker's conclusions, the court committed independent legal errors, including demanding excessive precision in market definition, misunderstanding the relevance of potential price discrimination, and ignoring the differing purposes served by defining the tying and tied markets.

With or without Asker's testimony, Teradata proffered evidence requiring a trial.  Under the per se rule governing tying arrangements, Teradata need demonstrate only SAP's power to coerce S/4HANA customers into purchasing HANA—a burden Teradata met.  The court departed from blackletter antitrust law

in deeming the per se rule inapplicable based on SAP's belated, supposed procompetitive justification for its tie. In any event, Teradata's evidence of the tie's anticompetitive effects creates a triable dispute under the rule of reason.

II.    The trade-secret ruling misinterpreted governing agreements and improperly resolved factual disputes. The MNDA requires only that a legend "clearly identif[y]" information as confidential. Appx457. Teradata did that, identifying Batched Merge and explaining its important properties in a document with a "Teradata Confidential" legend on every page. And even if the MNDA required more detail about the confidential information itself, factual disputes exist about whether SAP waived any such requirement.

Nor did Teradata do the unthinkable: give SAP a license to use Batched Merge to develop a competing database. Teradata expressly retained rights to its key programs, tools, and other intellectual property related to its flagship database. Batched Merge fits squarely within that provision. The court instead found Batched Merge merely a suggestion or comment subject to a broader license. That both improperly finds facts and renders superfluous Teradata's broad reservation of rights.

III.    This Court has jurisdiction because SAP's patent counterclaims were compulsory.

# ARGUMENT

Summary judgment is reviewed under the Ninth Circuit's de novo standard and is appropriate only when, drawing all reasonable inferences in the non-movant's favor, no material factual dispute exists.  *Kaneka Corp. v. Xiamen Kingdomway Grp. Co.*, 790 F.3d 1298, 1303 (Fed. Cir. 2015).  Expert testimony's admissibility is reviewed under Ninth Circuit law.  *Syngenta Crop Prot., LLC v. Willowood, LLC*, 944 F.3d 1344, 1355 (Fed. Cir. 2019).  Although admissibility is reviewed for abuse of discretion, "[w]hether the district court applied the correct legal standard under *Daubert* is reviewed de novo."  *Hardeman v. Monsanto Co.*, 997 F.3d 941, 960 (9th Cir. 2021).

## I.   UNDER A CORRECT UNDERSTANDING OF THE LAW, NUMEROUS FACTUAL DISPUTES REQUIRE REVERSAL ON TERADATA'S ANTITRUST CLAIM

"'[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms.'"  *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 34-35 (2006) (citation omitted).  SAP's requirement that its S/4HANA customers purchase HANA is just such an illegal tie—as a jury should be allowed to decide.

**A.    In Excluding Asker's Testimony, The District Court Misapplied Antitrust Law And Overstepped Its Gatekeeping Role**

The district court's contrary decision hinged on excluding much of the testimony of Teradata's expert economist, Asker.  Appx48-49.  Understanding the court's errors requires a brief overview of the law governing (1) tying claims and (2) the court's gatekeeping role.  The court misapplied both.

### *1.    Antitrust law forbids coercive ties*

The Supreme Court has long recognized that requirements forcing purchasers of one product to purchase another "pose an unacceptable risk of stifling competition and therefore are unreasonable 'per se.'" *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 9 (1984).  Tying thus "suffer[s] per se condemnation" if (1) "the defendant tied together the sale of two distinct products," (2) "the defendant possesses enough economic power in the tying product market to coerce its customers into purchasing the tied product," and (3) "the tying arrangement affects a 'not insubstantial volume of commerce' in the tied product market." *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 913 (9th Cir. 2008).  Possessing the requisite "economic power" does not require monopoly, but merely "'leverage'"— the defendant's "'ability to induce his customers for one product to buy a second product from him that would not be purchased solely on the merit of that second product.'" *Digidyne Corp. v. Data Gen. Corp.*, 734 F.2d 1336, 1341 (9th Cir. 1984); *see Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 464 (1992).

"When such 'forcing' is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated." *Jefferson Parish*, 466 U.S. at 12.

Coercive ties are thus subject to per se condemnation. But even where the per se elements cannot be shown, tying can violate the rule of reason. *Id.* at 17-18. Under that rule, a "three-step framework" applies. *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1070 (9th Cir. 2015). First, the plaintiff must show "'the restraint produces significant anticompetitive effects within a relevant market'"; second, the defendant must produce "'evidence of the restraint's procompetitive effects'"; third, "'[t]he plaintiff must then show that any legitimate objectives can be achieved in a substantially less restrictive manner.'" *Id.* A tie's typical anticompetitive effects are "exclud[ing] other sellers … from the market" and "caus[ing] consumers to for[]go the purchase of substitutes for the tied product." *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1201 (9th Cir. 2012).

Both market power and competitive harm are often shown by "circumstantial evidence pertaining to the structure of the market," which begins with defining a relevant market. *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995). "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Olin Corp. v. FTC*, 986 F.2d 1295, 1298 (9th Cir. 1993).

"[T]here is no requirement to use any specific methodology in defining the relevant market." *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 482 (9th Cir. 2021).  One common approach is the hypothetical-monopolist test: products form a relevant market if "a hypothetical monopolist in the proposed market would be able to profitably make a small but significant non-transitory increase in price ('SSNIP')." *Id.* at 482 & n.1.  The federal government's Horizontal Merger Guidelines use that framework.  U.S. Dep't of Justice & FTC, *Horizontal Merger Guidelines* ("Guidelines") §4.1.1-4.1.3 (2010); *see Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 784 n.9 (9th Cir. 2015) (Guidelines "'persuasive authority'").

But "[d]efining the market is not the aim of antitrust law; it merely aids the search for competitive injury." *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1448 (9th Cir. 1988).  Plaintiffs can also rely on "direct evidence of the injurious exercise of market power." *Rebel*, 51 F.3d at 1434.  Thus, even without "market analysis," tying claims can "withstand summary judgment" where the plaintiff provides "evidence of actual events from which a reasonable trier of fact could conclude" the defendant can coerce purchases of the tied product. *Image Tech. Serv., Inc. v. Eastman Kodak Co.*, 903 F.2d 612, 617 (9th Cir. 1990), *aff'd*, 504 U.S. 451 (1992).

**2.    *Courts cannot exclude testimony based on mere disagreement with the expert's conclusions***

Federal Rule of Evidence 702 is "meant to exclude" "junk science" and "should be applied with a 'liberal thrust' favoring admission." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1237 (9th Cir. 2017). "[T]he judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*, 738 F.3d 960, 969 (9th Cir. 2013). Thus, "[t]he focus of the district court's analysis 'must be solely on principles and methodology, not on the conclusions that they generate.'" *Wendell*, 858 F.3d at 1232. Failure to adhere to these limits is legal error. *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044, 1048 (9th Cir. 2014).

*Elosu v. Middlefork Ranch, Inc.* illustrates these principles. 26 F.4th 1017 (9th Cir. 2022). There, an investigator opined on a fire's cause. *Id.* at 1022-23. Without questioning his qualifications or methodology, the district court excluded the expert's testimony because it was "speculative," "relied too heavily on the testimony of the plaintiffs," and "conflicted" with other evidence. *Id.* at 1023-24. The Ninth Circuit reversed: "Rule 702 does not license a court to engage in freeform factfinding, to select between competing versions of the evidence, or to determine the veracity of the expert's conclusions at the admissibility stage." *Id.* at 1026. Because the concerns about the evidence the expert relied on went to "'the weight

of the testimony and its credibility, not its admissibility,'" the district court exceeded its "gatekeeping function." *Id.* at 1028 (citation omitted).

### 3. *Asker's tying-market-definition testimony is admissible*

Here, the district court committed that same error, and misapplied antitrust law, in excluding Asker's tying-market definition: a core-ERP-for-large-enterprises market dominated by SAP and Oracle. Appx25-33.

### a. *Asker defined the tying market with reliable qualitative analysis*

To define this market, Asker first applied the hypothetical-monopolist framework using ordinary-course documents and testimony—called qualitative evidence—to identify "alternative products to which buyers would switch in response to a price increase." Appx13904-13905. This methodology is well-established: "[T]he market definition inquiry commonly looks first and often exclusively to qualitative evidence." Baker & Bresnahan, "Economic Evidence in Antitrust: Defining Markets and Measuring Market Power," *Handbook of Antitrust Economics* 6 (Paolo Buccirossi ed., 2008).

"[C]ourts routinely rely on qualitative economic evidence to define relevant markets." *McWane, Inc. v. FTC*, 783 F.3d 814, 829 (11th Cir. 2015) (citation omitted); *e.g.*, *Optronic*, 20 F.4th at 482-83; *Syufy Enters. v. Am. Multicinema, Inc.*, 793 F.2d 990, 994-95 (9th Cir. 1986). As the Guidelines explain, the hypothetical-monopolist framework "take[s] into account any reasonably available

and reliable evidence," assessing customer substitution "[e]ven when the evidence necessary to perform the hypothetical monopolist test quantitatively is not available." Guidelines §4.1.3. Quantitative (or empirical) measurement of demand cross-elasticity is not always necessary or possible, as other means exist for determining "whether consumers view the products as substitutes for each other." *Rebel*, 51 F.3d at 1435; *e.g.*, *Olin*, 986 F.2d at 1299 ("relevant" factors include "industry or public recognition," "the product's peculiar characteristics and uses," "distinct customers," "distinct prices," and "specialized vendors") (citation omitted); 2A Areeda & Hovenkamp, *Antitrust Law*, ¶533 (5th ed.) ("Areeda") (similar); *see* Appx20257 (SAP's expert acknowledging unavailability of data to quantitatively measure cross-price elasticities).

Here, Asker analyzed evidence of "sellers' informed beliefs" concerning demand substitution, "objective information about product characteristics," and consumer beliefs and buying patterns. Guidelines §4.1.3; *see* Appx13913-13916. For example, Asker observed SAP's planning documents showed SAP recognized a market for "core ERP" products (with financial functionality as a central feature) geared towards large enterprises (generally those with over 1,000 or 1,500 employees and over 125 ERP users). Appx13907-13916. SAP saw itself as competing primarily with Oracle in that market. Appx13916-13917. Asker also identified evidence that large enterprises have different core ERP needs, preventing

them from switching to products for smaller businesses.    Appx13912-13914.
Indeed, SAP designs and sells different ERP products for enterprises based on their
size.  Appx13915-13916.  Applying economic principles to this and other evidence,
Asker concluded that "[l]arge enterprises substitute between a small number of core
ERP providers," indicating a "core ERP for large enterprises market that consists of
products supplied by SAP and Oracle."  Appx13916, Appx13920.

The district court rejected only the "large enterprises" aspect of Asker's
qualitative analysis.  Appx25-28.  The court expressly concluded that "Asker's
definition of 'core ERP'" was "proper."  Appx26.  It also acknowledged that Asker's
large-enterprises definition was supported by "documents that show that [SAP]
markets different ERP products based on customer size," namely those with "over
1,000 employees."  Appx28.  The court nevertheless excluded this testimony
because Asker supposedly "ignore[d] the other SAP documents" purportedly
demonstrating "no commonly accepted categorization" of customer size.
Appx27-28.  The court committed multiple legal errors.

*First*, the court exceeded its authority by evaluating Asker's large-enterprise
*conclusion* rather than his qualitative-analysis *methodology*.  Asker applied the
same, well-established methodology in limiting the tying market to "core ERP,"
which the court rightly accepted as "proper."  Appx13907-13912, Appx13916-
13920, Appx13928-13942; Appx26.  That acceptance highlights the court's

fundamental error: It focused not on "'principles and methodology,'" but rather "'the conclusions that they generate.'" *Wendell*, 858 F.3d at 1232.

Indeed, the court ultimately rejected "[Asker's] conclusion" regarding large enterprises, despite acknowledging evidence supporting it, because of unspecified "documents that indicate otherwise." Appx28. But the presence of purportedly conflicting evidence "'go[es] to the weight of the testimony and its credibility, not its admissibility.'" *Elosu*, 26 F.4th at 1028; *e.g.*, *Pomona*, 750 F.3d at 1044, 1049. The court recognized as much in admitting SAP's expert's testimony, explaining whether he ignored "particular documents" was "not grounds for excluding his opinions." Appx41. For the same reason, the court erred in excluding Asker's testimony.

*Second*, the court misapplied antitrust law in disagreeing with Asker's tying-market conclusion. The court cited documents purportedly suggesting that no precise number of employees separates large enterprises from smaller ones, adopting SAP's argument that product markets are invalid where "'no clear line separat[es] those companies or the products they buy from others.'" Appx27-28. But "[r]elevant markets need not have precise metes and bounds." Guidelines §4. Rather, some "fuzziness" is "inherent." *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 360 n.37 (1963); *see* Areeda ¶530d (usually "[u]navoidable" that "dividing lines" can be attacked as "arbitrary"). And "even if there is no discrete gap in size

23

between the classes of large and small buyers," suppliers can distinguish the two. Guidelines §3. Here, Asker identified evidence—far more than the "two SAP documents" the court acknowledged (Appx28), although they would suffice—that core ERP suppliers distinguish large enterprises from smaller ones, and that large enterprises substitute narrowly among core ERP products. Appx13912-13916. No more precise line is required.

*Finally*, while the court did not appear to fault Asker's qualitative methodology (as it accepted his "core ERP" analysis), it misapplied governing antitrust principles to the extent it adopted SAP's argument that Asker had to empirically "'calculate the cross elasticities for demand among various ERP products.'" Appx22. The court suggested "practical indicia" are relevant only in defining "submarket[s]." Appx23-24. But no distinction exists in this context between markets and submarkets. *E.g.*, *Olin*, 986 F.2d at 1299 ("'practical indicia'" can define "submarkets" and "the primary market"); Areeda ¶533c ("nothing would be lost by deleting the word 'submarket' from the antitrust lexicon"). And as explained (*supra* pp.20-21), courts "routinely" rely on qualitative evidence in defining markets. *McWane*, 783 F.3d at 829. While the district court suggested Asker had not considered factors like "'industry or public recognition,'" the "'product's peculiar characteristics and uses,'" "'distinct customers,'" and "'distinct

24

prices,'" Asker's report shows otherwise. *Compare* Appx23 n.4, *with* Appx13907-13920, Appx13925-13927 (addressing each).

> **b.    *Additional reliable analyses support Asker's tying-market definition***

Asker's qualitative analysis alone sufficed.  But Asker bolstered it with quantitative analyses that further support reversal.

> **i.    Customer-relationship-management        data analysis**

Asker buttressed his tying-market definition using SAP and Oracle customer-relationship-management ("CRM") data, which records which firms competed for a given core-ERP sales opportunity.  Appx13920-13921, Appx14002-14003.  In both CRM datasets, SAP and Oracle were each other's most frequent competitors by far.  Appx13922-13923, Appx14002-14003.  Asker found this data "corroborate[d] the patterns" from other evidence:  SAP and Oracle are the main competitors in a core-ERP-for-large-enterprises market.  Appx13920-13923.  Confirming this method-ology's soundness, SAP's economics expert used the same CRM data in the same way.  Appx20219, Appx16112-16113; *see Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 815 (9th Cir. 2014) (expert's analysis reliable because opposing expert "relied on the same data").

The district court misunderstood the experts' agreement on this point.  It stated Asker used CRM data to define markets while SAP's expert sought to show

25

"substitutability." Appx32 n.8. But substitutability is used to define markets. *Rebel*, 51 F.3d at 1435. The court also stated SAP's expert "look[ed] at 'win/loss' data." Appx32 n.8. But like Asker, SAP's expert relied on the same "CRM data" to see when suppliers were "listed as a competitor"; he simply referred to it as win/loss data. Appx20219; *see* Appx16112-16113.

Regardless, the court did not exclude Asker's substitutability analysis based on the CRM data. Indeed, the court relied on Asker's CRM analysis in overruling another of SAP's objections. Appx33-34. It erred in ignoring that this CRM analysis supported Asker's tying-market definition.

### ii.    Aggregate-diversion-ratio analysis

Asker further supported his tying-market definition with a quantitative method known as aggregate-diversion-ratio ("ADR") analysis. Appx13923, Appx14004-14007. ADR analysis (sometimes called critical-loss analysis) assesses whether a hypothetical monopolist controlling all the products in a proposed market could profitably impose a SSNIP on one product. Katz & Shapiro, *Critical Loss: Let's Tell the Whole Story*, ANTITRUST, 49-50 (Spring 2003). ADR analysis uses information on suppliers' margins and the aggregate diversion ratio—the "percentage of the total sales lost by a product when its price rises that are captured by all of the other products in the candidate market"—to calculate whether the hypothetical monopolist's additional profits per sale would overcome its lost sales.

*Id.* at 50, 55.  If the SSNIP would be profitable, the market is relevant.  *Id.* at 49-50; *see Optronic*, 20 F.4th at 482 & n.1.

Asker's ADR analysis used SAP and Oracle financial data to estimate margins.  Appx14004-14007.  Asker used the CRM data to estimate the aggregate diversion ratio.  Appx14004-14007.  The CRM data identified the competitors to which buyers would likely switch if their first choice increased prices:  if, for example, SAP's CRM data listed Oracle as the competitor for a sale, that customer would likely turn to Oracle if SAP raised prices.  Appx14004-14007.  Asker's analysis demonstrated that a core-ERP–for-large-enterprises market easily satisfies the hypothetical-monopolist test.  Appx14004-14007.

The district court excluded this ADR analysis because Asker used CRM data that "did not and cannot consider pricing" and therefore "cannot measure … cross-elasticity of demand."  Appx30-32.  That conclusion rested on multiple reversible errors.

*First*, if the court determined ADR analysis is categorically unreliable, it had no basis for repudiating the extensive economics literature.  *E.g.*, Katz & Shapiro, *supra*, at 49-50; 2 Kaplow & Shapiro, "Antitrust," *Handbook of Law and Economics* 1174 (2007); American Bar Ass'n, *Market Definition in Antitrust*, ch. I.C.1.a (2012).  Courts have consistently accepted ADR analysis as a market-definition methodology.  *E.g.*, *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27,

57-58 (D.D.C. 2018); *Dial Corp. v. News Corp.*, 165 F. Supp. 3d 25, 35, 41-42 (S.D.N.Y. 2016).

*Second*, if the court concluded Asker needed pricing data to conduct ADR analysis, that was legal error. As explained, non-price evidence informs market definition by showing how customers substitute among competing products; empirical estimates of cross-price elasticity are not required. *Supra* pp.20-21; *see, e.g.*, Conlon & Mortimer, *Empirical Properties of Diversion Ratios*, 52 RAND J. ECON. 693, 696-700 (2021) (diversion ratios often better for defining markets than cross-price elasticities). Relying on non-price data is accepted practice for ADR analysis. *E.g.*, *Market Definition in Antitrust*, *supra*, ch.I.C.1.a ("qualitative information or experience"). Diversion ratios can be estimated from ordinary-course documents "identifying the rivals to which [firms] lose business, or from which they can gain business." Shapiro, *The 2010 Horizontal Merger Guidelines: From Hedgehog to Fox in Forty Years*, 77 ANTITRUST L. J. 701, 732 (2010); *accord, e.g.*, Chen & Schwartz, *Churn Versus Diversion in Antitrust: An Illustrative Model*, 83 ECONOMICA 564 (2016). That is what the CRM data here captured. Appx13920-13923, Appx14002-14003.

Courts have thus admitted ADR analyses using non-price data, and no authority supports the district court's novel price-data requirement. *Compare* Appx31, *with*, *e.g.*, *Wilhelmsen*, 341 F. Supp. 3d at 57 (market shares based on

revenue, Salesforce data, and win-loss data, not pricing data); *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 35-36 (D.D.C. 2015) (ADR using data not reflecting whether buyer acted "for a price-based reason or some reason having nothing to do with price"); *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 63-65 (D.D.C. 2011) (ADR using data "not necessarily indicative of what products consumers would switch to in response to a price increase"). The ADR analyses in *Sysco* and *Wilhelmsen* used the same type of "customer relations management" data Asker used. *Sysco*, 113 F. Supp. 3d at 35; *see Wilhelmsen*, 341 F. Supp. 3d at 57 ("salesforce data"); Appx13944 ("Teradata's Salesforce system … is its CRM data").

*Third*, if the court excluded Asker's ADR analysis because the datasets were limited, that too was legal error. "[S]o long as the evidence is relevant and the methods employed are sound, neither the usefulness nor the strength of statistical proof determines admissibility under Rule 702." *Obrey v. Johnson*, 400 F.3d 691, 696 (9th Cir. 2005). The CRM data reflects SAP's competitive landscape by measuring the comparative frequency with which core ERP buyers considered SAP and other sellers. Appx13920-13923; Appx20219 (SAP expert acknowledging this). Asker corroborated his ADR analysis against other evidence and accounted for data limitations, explaining "the CRM data would have to overstate aggregate diversion by a factor of 2.5 to 4.2" to affect his ultimate conclusion. Appx13920-13921,

Appx14007-14008; Appx14120-14121; *see Wilhelmsen*, 341 F. Supp. 3d at 57 (noting similar margin of error in admitting ADR analysis). Any gaps in the data could be addressed through "'cross examination, contrary evidence, and attention to the burden of proof, not exclusion.'" *Elosu*, 26 F.4th at 1027; *see, e.g.*, *Pomona*, 750 F.3d at 1048-49 (improper to exclude expert's analysis because "database [was] too limited").

### iii.    Price-discrimination analysis

Asker also confirmed the large-enterprise aspect of his tying-market definition by examining price discrimination. Price discrimination is feasible when sellers can "profitably rais[e] price to certain targeted customers but not to others." Guidelines §3. "[T]wo conditions typically must be met": suppliers "must be able to price differently to targeted customers," and arbitrage opportunities must be limited. *Id.* "If a hypothetical monopolist could profitably target a subset of customers for price increases," a relevant market can be "defined around those targeted customers." Guidelines §4.1.4; *see Market Definition in Antitrust*, *supra*, ch. I.B.2.b.3; *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1037-39 (D.C. Cir. 2008).

Asker applied those principles. Examining price data and documentary evidence, Asker determined SAP and Oracle can price differently to large enterprises: as the Guidelines contemplate, "prices are individually negotiated," and

sellers have detailed information about customer needs.   Guidelines §4.1.4; Appx13925; Appx14114.   Asker also identified "substantial variation" among customers in prices.  Appx13925-13927.  Large enterprises are targets for price discrimination, Asker observed, because they are "'less concerned about cost than'" functionality.  Appx13925 & n.160.  "There is no prospect for arbitrage" because users cannot "purchas[e] through a reseller."  Appx13906, Appx13925-13927.  And, Asker determined, large enterprises in fact spend more for their ERP than small enterprises.  Appx14115.

Nevertheless, the district court excluded this testimony.  Appx32-33.  It reasoned "'SAP charges equivalent prices for large, mid-sized, and small companies,'" and "in the absence of evidence of actual current price discrimination against large customers there is no basis to assume that future price discrimination is feasible or likely."  Appx32-33.  That was legal error for two reasons.

*First*, the court again overstepped its gatekeeping role.  It accepted Asker's methodology:  identifying differential pricing and limited arbitrage.  Appx32.  But it disagreed with Asker's conclusion that "price discrimination is feasible or likely."

Appx32-33.  This disagreement cannot justify exclusion.  *Wendell*, 858 F.3d at 1232.[1]

*Second*, the court misapplied antitrust law in requiring "current price discrimination" and examining only whether current "differential pricing is unrelated to customer size."  Appx32-33.  The proper focus is on "[t]he *possibility* of price discrimination" because that informs whether "a *hypothetical* monopolist" can profitably increase prices for targeted customers.    Guidelines §§3, 4.1.4 (emphases added); Appx14114-14115.  The Guidelines offer this example:  "In response to a price increase for glass containers, some users would substitute substantially to plastic or metal containers, but baby food manufacturers would not."  Guidelines §4.1.4.  "If a hypothetical monopolist *could*" price differently to baby food manufacturers, there would be "a distinct market for glass containers used to package baby food."  *Id.* (emphasis added).  That holds true even if baby food manufacturers currently pay the same prices as other glass-container users.  So too here.  Because core ERP suppliers can charge large enterprises different prices, and large enterprises have unique needs preventing substitution of different products, the

---

[1] Nor did Asker "flip-flop" between two metrics (Appx32 n.9); he made two distinct points.  Asker used per-user prices to show SAP's general ability to price differentially.  Appx14115-14117.  He used total spend to explain that large enterprises pay far more in "total cost of ownership"—which, because SAP's product is the same regardless of the number of users, confirms the ability to price discriminate against large entities.  Appx14114-14115.

possibility of price discrimination supports defining a market around them. Appx13925-13926; Appx14115-14117.

### 4. *Asker's tied-market-definition testimony is admissible*

The district court committed similar errors in excluding Asker's testimony that the tied product, HANA, competes in a market for EDW products with analytical capabilities for large enterprises. Appx35-37.

Asker again applied multiple methodologies to reach this conclusion. Asker principally relied on qualitative analysis, finding a "consistent pattern" in documents and testimony that SAP, Teradata, and others "provide products that are substitutes and compete for customers." Appx13928-13942. He supported that conclusion by examining CRM data, conducting an ADR analysis, and evaluating potential price discrimination. Appx13942-13948, Appx14008-14010. He also performed a regression analysis showing that buying HANA causes customers to leave Teradata's EDW product, which confirms those products are substitutes. Appx13993-13997, Appx14018-14023; Appx14093. Ultimately, Asker defined a tied market that included SAP, Teradata, and other competitors. Appx14004-14007, Appx14011-14015.

Ignoring the bulk of Asker's analysis, the district court concluded his ADR analysis was "unreliable" because it was conducted on CRM data and because Asker had not applied it "to determine the minimum number of market participants" in the

tied market, as he had for the tying market. Appx35. Having excluded the ADR analysis, the court held "Asker's testimony regarding the tied market should be excluded." Appx35.

*First*, even assuming the ADR analysis could be excluded, that would not justify excluding the rest of Asker's tied-market testimony. Asker's ADR analysis was confirmatory; he premised his market definition on multiple other analyses. Appx13945. Indeed, the court expressly rejected SAP's challenges to Asker's tied-market qualitative analysis, relying on Asker's CRM analysis in doing so. Appx33-34. The court erred by inexplicably excluding *all* of Asker's tied-market testimony because *one* methodology was purportedly unreliable. *Wendell*, 858 F.3d at 1233 (reversing where district court failed to "tak[e] into account the broader picture of the experts' overall methodology").

*Second*, excluding Asker's tied-market ADR analysis was wrong, both for the same reasons excluding the tying-market ADR analysis was wrong (*supra* pp.27-30) and because the court misconstrued antitrust law in condemning Asker's tied-market-ADR analysis as "inconsistent" with his tying-market analysis. Appx35. For each market, Asker properly chose a definition relevant to the pertinent issue. A narrow definition is appropriate for the tying market because the purpose of defining that market is to determine market power, which is generally assessed "in the smallest relevant market satisfying the hypothetical monopolist test."

CONFIDENTIAL MATERIAL OMITTED

Guidelines §4.1.1; *see* Appx14006-14007; Appx14139. By contrast, Teradata had no need to show SAP's market power in the tied market. *See Cascade*, 515 F.3d at 912-13. The purpose of defining that market is to determine the tied-product competitors harmed by SAP's tie—making a definition encompassing more than the minimum number of participants appropriate. Appx14011-14015; *see Oltz*, 861 F.2d at 1448 (evaluating competitive effect in two relevant markets, one narrow and one broad).

###### 5. *Asker's harm-to-competition testimony is admissible*

The district court likewise erred in excluding Asker's testimony that SAP's tie harms competition in the tied market. To form that opinion, Asker evaluated documents and sales data to determine whether SAP uses S/4HANA as leverage (Appx13968-13975), analyzed SAP's market gains (Appx13975-13978), assessed the effects of SAP's licensing strategy (Appx13978-13982), evaluated entry barriers (Appx13982-13985), and conducted a regression analysis showing the tie's impact on Teradata (Appx13993-13997). As Asker explained, the evidence demonstrated SAP's strategy to use the tie to take share from EDW competitors. Appx13968-13973. Documents, revenue data, and regression analysis showed SAP was succeeding. Appx13971-13978, Appx13993-13997. Moreover, customers objected to SAP's tie (Appx13974), and SAP sold HANA at high prices—between # and # times the price of comparable products (Appx13975-13976, Appx13982). Asker

CONFIDENTIAL MATERIAL OMITTED

also noted that whether consumers purchase HANA with runtime licenses (which diminish the value of competitor EDWs by prohibiting direct export of SAP data) or more expensive full-use licenses, they cannot "use S/4HANA and a third-party EDW without also purchasing HANA." Appx13979. Asker concluded that by forcing S/4HANA customers to purchase HANA, SAP's tie "distorts purchasers' choices of EDW products, which harms purchasers and competitors competing for those sales." Appx13883. These are the "types of injuries to competition that are typically alleged to flow from tying arrangements." *Brantley*, 675 F.3d at 1201.

The court questioned none of Asker's methodology. Instead, it excluded this testimony for two erroneous reasons.

*First*, because the court believed the rule of reason governed Teradata's claim, it thought "de minimis harm" to competition insufficient and concluded Asker "presented no evidence of harm." Appx36-37. But the court improperly substituted its conclusions for the expert's. *Wendell*, 858 F.3d at 1232. Indeed, the court recited some of the evidence illustrating the tie's competition-distorting effect, including data showing %age of HANA revenues are from SAP's (locked-in) ERP customers. Appx36-37; *see* Appx13971-13974. That was just the iceberg's tip: Asker identified substantial evidence confirming the tie forced customers to purchase a product they would have otherwise purchased elsewhere—quintessential anticompetitive harm. *Supra* pp.35-36; *see* Appx13967-13986, Appx13993-13997.

"A court cannot exclude expert testimony for lacking sufficient facts or data while openly disregarding the foundation of the expert's opinion." *Elosu*, 26 F.4th at 1027 (quotation marks omitted). That is what the court did here.

The court's reliance on the rule of reason underscores its misunderstanding of its gatekeeping role. As explained below, the court erred in rejecting the per se rule, and Asker's testimony on anticompetitive effects satisfies the rule-of-reason standard anyway. *Infra* pp.44-53. But whatever standard applies, Asker's testimony is admissible. Whether Teradata must show "substantial" instead of "de minimis" harm (Appx36-37) has no bearing on whether Asker applied reliable methodologies in concluding SAP's tie harms competition. Appx13883. "Reliable expert testimony need only be relevant, and need not establish every element that the plaintiff must prove, in order to be admissible." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010).

*Second*, the court declared Asker's opinion "unreasonable" because HANA supposedly does not compete with EDWs like Teradata's. Appx37. But the court again improperly "select[ed] between competing versions of the evidence." *Elosu*, 26 F.4th at 1026. Whether HANA is an EDW, or at least *competes* with EDWs, is a hotly disputed factual issue. Teradata amassed, and Asker relied on, extensive evidence showing HANA's analytical capabilities allow use as an EDW competing with Teradata (whose sole database product is an EDW). *E.g.*, Appx13929-13930;

Appx13993-13997; Appx14103-14105.    Indeed, SAP published a textbook explaining how to use HANA as an EDW.  Appx21116-21130.  SAP documents touted SAP's "'considerable experience in supporting and executing Teradata to HANA migration,'" declared SAP's intent to "'gradually replace Teradata,'" and described a "'Data Warehousing market … dominated by five major vendors (SAP, ORACLE, IBM, Microsoft, and Teradata).'" Appx14103-14104, Appx14140 n.327.  An SAP witness who oversaw HANA's development affirmed that "HANA provide[s] features or functions that customers look for in enterprise data warehouse products."  Appx13929-13930 n.170.  And even SAP's answer asserted "HANA … is successfully competing against product offerings from Teradata."  Appx831.

The court seized on evidence that most customers purchase HANA with "'runtime'" licenses, which purportedly "preclude[] use of HANA as an EDW." Appx37.  But whether a runtime license does so is a contested factual question:  As both Asker and Teradata detailed, evidence showed customers with runtime licenses could use HANA and complementary SAP applications to analyze enterprise-wide data, as SAP itself touted.  *E.g.*, Appx14078-14081; Appx21110 (detailing how SAP's products allow use of HANA's analytics for data from non-SAP applications).  While the court cited SAP's contrary assertions, these are hardly "undisputed facts."  *Contra* Appx37.  In any event, as Asker explained, evidence indicated SAP was increasingly successful in inducing customers to buy full-use

licenses (which SAP cannot dispute allow EDW use) (Appx13981; Appx14164 n.409), and confirmed customers were substituting HANA for Teradata's EDW products. *E.g.*, Appx13993-13997. Resolving these disputes is for the jury. *Primiano*, 598 F.3d at 565.

*Finally*, if the court accepted SAP's argument that Asker needed to measure the "impact of SAP's alleged conduct" on particular "major competitors" (Appx35-36), it committed legal error. Harm to competition can be diagnosed at the market-wide level by examining, as Asker did, the "defendant's tied-product sales" and customer "coercion." Areeda ¶1729h; *see* Appx13968-13982. In any event, Asker *did* identify evidence of harm to other major "EDW providers." Appx13981 & n.370 (SAP strategy to "take sales away from" "Oracle, Microsoft, IBM & Teradata"); Appx14104-14105 (SAP describing switching Oracle "Data Warehousing" to SAP).

### B.    With Or Without Asker's Testimony, Reversal Is Required

Summary judgment on Teradata's tying claim must be reversed if this Court reverses the exclusion of even a subset of Asker's testimony—or if it does not. Market definition, market power, and harm to competition are "factual inquir[ies] ordinarily reserved for the jury." *Oltz*, 861 F.2d at 1446; *see Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 363 (9th Cir. 1988). Teradata's evidence creates factual disputes on all three—far more than necessary to require a trial.

### 1.    SAP's tie is per se unlawful

SAP's tie is unlawful per se if SAP (1) "tied together the sale of two distinct products," (2) had the power "to coerce its [S/4HANA] customers into purchasing" HANA, and (3) that arrangement "affects a 'not insubstantial volume of commerce.'" *Cascade*, 515 F.3d at 912.  Of these elements, SAP disputed only the second on summary judgment.  Appx10160-10162; Appx21965-21966.  The district court refused to apply the per se rule because (1) Teradata supposedly had no evidence of SAP's tying-market power, and (2) SAP proffered procompetitive justifications for its tie.  Appx47-48.  On each point, the court erred in multiple ways.

### a.    Teradata's evidence of SAP's market power creates a triable dispute

#### i.    Asker's testimony creates a material factual dispute

The admission of Asker's tying-market definition (or even just some of his excluded tying-market analyses, *supra* pp.20-33) would alone present a jury question on market power.  As Asker detailed, SAP's sizeable share of the market for core ERP products for large enterprises, SAP's substantial profit margins, the significant barriers to entry, and large enterprises' considerable switching costs, all established SAP's power.  Appx13949-13966.  This raises a triable market-power dispute.  *E.g.*, *Cascade*, 515 F.3d at 915-16 (similar evidence did so for tying claim).

ii.    **Teradata's other evidence independently creates a material factual dispute**

Even without Asker's excluded testimony, Teradata's market-power evidence suffced.   The district court summarily declared "there is no triable issue of fact whether SAP has market power" because "Teradata has failed to properly define a tying market."  Appx48.  That was wrong for two independent reasons.

*First*, Teradata's remaining evidence supported a core-ERP-products-for-large-enterprises market.  The court did not exclude Asker's testimony on the "core ERP" aspect of this definition, agreeing with Asker's reading of the evidence.  Appx26.  Ample evidence besides Asker's testimony supports the distinct large-enterprises market.  SAP actually sells *different* products to large enterprises than to smaller ones:  while SAP targets S/4 HANA to businesses with more than 1,000 employees, it markets "SAP Business One" and "SAP Business ByDesign" to others.  Appx19359.  As another SAP document demonstrated, that is because "there is a need for large organizations to support additional core administrative processes."  Appx19636.  Teradata's industry expert confirmed other products would not meet large enterprises' core ERP needs.  Appx15367-15384.  SAP itself characterized the ERP market this way, viewing Oracle as the "only real competitor" for large enterprises.  Appx19244; *accord, e.g.*, Appx20895; Appx14912.  And unlike with large enterprises, SAP did not even sell ERP products directly to small and medium enterprises, instead relying on others.  Appx15672-15673; *see Olin*, 986 F.2d at 1299

41

("'specialized vendors'" support recognizing distinct market). This evidence creates a triable dispute: while market definition may be complex, expert testimony is not required. Areeda ¶531; *supra* pp.20-21 (qualitative evidence can establish antitrust market).

*Second*, Teradata had no need to precisely define the tying market: it could rely on direct evidence of SAP's power "to coerce its customers into purchasing the tied product." *Cascade*, 515 F.3d at 913 (identifying requisite coercion without requiring market definition); *see supra* pp.17-18. Teradata produced substantial evidence of coercion. Before the tie, HANA sales were "very, very poor." Appx15652-15653. When SAP imposed the tie, customers objected; SAP's largest customer group, for example, repeatedly asked that S/4HANA "promptly" be "able to be operated on alterative databases." Appx18193; *e.g.*, Appx15822; Appx16173, Appx16189. But SAP successfully required S/4HANA customers to buy HANA, sending HANA sales soaring. Appx20459. As one internal document concluded, "[a]t SAP, we most often sell … to customers that have no choice but to use our products (e.g. HANA Runtime)." Appx19676. This evidence of "the existence of substantial numbers of buyers accepting the tie-in terms" indicates "sufficient economic power." *Moore v. Jas. H. Matthews & Co.*, 550 F.2d 1207, 1216 (9th Cir. 1977).

CONFIDENTIAL MATERIAL OMITTED

Other evidence confirmed SAP's power.  As Asker explained (in testimony independent of his tying-market definition and thus not excluded), customers face high costs in switching core ERP products, which directly enhances SAP's power and deters entry by competitors that might reduce this power.  Appx13970-13976. Where, as here, "customers [are] 'locked in'" to the tying product, a seller has the "power to coerce." *Digidyne*, 734 F.2d at 1342.  SAP itself recognized it could take advantage of its "locked in" ERP customers.  Appx18268; *see, e.g.*, Appx20062; Appx17600.

Eliminating any doubt, Asker further determined (again in unexcluded testimony) that SAP's high profit margins on core ERP products for large enterprises—over ▮%age▮, substantially higher than its margins on ERP products for smaller enterprises—indicated it "sustained prices" at "supra-competitive levels." Appx13956-13960; Appx14131.  These "higher-than-competitive profits" are also "a strong indication of market power." *FTC v. Actavis, Inc.*, 570 U.S. 136, 157 (2013).  And that HANA customers paid as much as ▮#▮ times the price of comparable products confirms SAP used this power to coerce purchases.  Appx13975; Appx19140; *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191 (3d Cir. 2005) ("set[ting] prices with little concern for its competitors" indicates market power).

### b.   *The per se rule applies here*

#### i.   Purported procompetitive justifications cannot avoid per se condemnation

The district court contravened blackletter law in concluding SAP could avoid per se condemnation by offering procompetitive justifications for its tie. Appx47-48.   The per se rule is intended to avoid the complex inquiry into competitive justifications and harms required for rule-of-reason analysis. *Jefferson Parish*, 466 U.S. at 15-18 & n.25.   As the Supreme Court and Ninth Circuit have held, where plaintiffs prove a tie of two products, by a seller with market power, that affects commerce, tying arrangements are necessarily unlawful.   *E.g.*, *Eastman Kodak*, 504 U.S. at 462; *Cascade*, 515 F.3d at 913; *Brantley*, 675 F.3d at 1197 n.7.

In departing from this rule, the district court relied on a single tying decision: *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (en banc per curiam). *See* Appx47-48.  Yet no other appellate court has ever applied *Microsoft*'s deviation from the per se rule in a tying case.  *Microsoft* cannot displace binding circuit (let alone Supreme Court) precedent.  *See, e.g.*, *Cascade*, 515 F.3d at 913 (applying per se rule post-*Microsoft*); *Digidyne*, 734 F.2d at 1338 (applying per se rule to tie of operating-system-software license to central processing units).

In any event, *Microsoft* is inapplicable here.   *Microsoft*'s rejection of "standard per se analysis" was "confined to the tying arrangement before [the court], where the tying product is software whose major purpose is to serve as a platform

44

for third-party applications and the tied product is complementary software functionality." 253 F.3d at 89, 94-95. Considering procompetitive benefits was necessary in that context, *Microsoft* held, because integrating functionality into platform software "is a common practice" and increases consumer welfare. *Id.* at 95. *Microsoft* expressly warned it should not "be interpreted as setting a precedent for switching to the rule of reason every time a court identifies an efficiency justification for a tying arrangement." *Id.*

But that is what the district court did here, extending *Microsoft*'s already-anomalous exception. *Microsoft* is limited to "physically and technologically" integrating "functionality" with "*platform* software"; it does not apply to all "software markets." *Id.* at 90, 95. This case does not involve "platform software" like that at issue in *Microsoft*, and HANA is not some mere "functionality" integrated into S/4HANA. SAP can and does sell HANA separately. Appx17786 (SAP manager admitting HANA "is not bundled with [S/4HANA] (neither technically nor commercially)"); Appx16125; Appx16174-16175; Appx17763. And unlike in *Microsoft*, SAP's tying arrangement is far from the "ubiquit[ous]" practice of "nearly all" vendors. 253 F.3d at 93. SAP's tie is unique in the industry: competitors neither require ERP customers to license analytical database capabilities nor inhibit customers from using competitors' EDWs, as SAP does. Appx20748-20749; Appx16055. The per se rule thus governs here; at the least, these disputed

predicate facts could not be resolved at summary judgment. *Cf. Microsoft*, 253 F.3d at 83, 90 (relying on undisputed findings that products were "physically and technologically integrated").

### ii. Material factual disputes preclude crediting SAP's justification

Even if *Microsoft* supported rejecting the per se rule whenever defendants proffer some procompetitive justification for a novel tie (Appx47-48), SAP identified no justification that could support summary judgment. SAP contended that using S/4HANA and HANA together "improves functionality." Appx10154. Those purported improvements come, as SAP's expert admitted, from using HANA's *transactional* capabilities to support S/4HANA. Appx15650-15651; Appx12186-12207. But that does not justify requiring S/4HANA customers to license HANA's *analytical* capabilities: SAP identified no benefit from this requirement. Appx15190-15191.

Recognizing this deficiency, SAP submitted a belated declaration from its executive Rudolf Hois asserting it was impossible to license HANA's analytical and transactional capabilities separately because SAP could not "accurately audit" customers' use of those capabilities. Appx21278; Appx21961. The evidence belies that assertion. SAP repeatedly touted its ability to audit HANA usage, and competitors with comparable databases license analytical and transactional

functionalities separately. Appx17755; Appx17751; Appx20748-20749; Appx15391. That alone creates a triable dispute on this issue.

> ### iii. Hois's declaration should have been excluded because Teradata never changed its theory

In any event, the sole evidence ultimately supporting SAP's purported justification, Hois's declaration, should never have been considered. SAP sprang it after Teradata's summary-judgment opposition, asserting that because Teradata had changed its tying theory, the district court should either consider the declaration or, if not, grant summary judgment. Appx22057. Believing Teradata had not previously challenged a tie "between S/4HANA and HANA's analytical capabilities," the court considered the declaration. Appx44-46.

But Teradata's tying theory has always challenged HANA's analytical capabilities, which is what competes with Teradata's product. Teradata's complaint alleges that SAP is "coercing its customers into leaving Teradata" because "HANA purports to offer some or all of the functionality offered by Teradata." Appx817. That functionality is analytical: Enterprise Data Analytics and Warehousing ("EDAW") functionality. *E.g.*, Appx805 ("SAP now positions itself as a direct competitor in the EDAW market" because of HANA's "EDAW functionality that SAP claims can enable enterprise analytics similar to those offered by Teradata"); Appx813. Indeed, the tying count identifies the tie as between "SAP Top-Tier ERP Applications and EDAW Products for SAP Top-Tier ERP Applications Customers,"

alleging SAP is "coercing" customers "into adopting HANA, to the exclusion of *other* EDAW products" by "conditioning upgrades of SAP's ERP Applications on customers' adoption of HANA," which "possesses EDAW product functionality." Appx822-823 (emphasis added).

Nor did Teradata initially challenge only "the technological integration of the ERP application and HANA." Appx45-46. Teradata's complaint alleges SAP requires S/4HANA customers to buy HANA as a matter of both technology *and* licensing. Appx791, Appx816. Teradata expressly alleged that "*[i]n addition* to making S/4HANA incompatible with any other transactional database (unlike prior versions of its ERP Applications), SAP has combined the two distinct products, its ERP Application and HANA, into a single offering (in contrast to its prior sales practice of offering both products separately)." Appx816 (emphasis added). The new sales practice Teradata's complaint challenges—SAP's requiring ERP customers also to purchase HANA—was thus not just "a design change," as the district court concluded. Appx45-46. It was "[i]n addition" to that alleged design change. Appx816; *see* Appx818, Appx822-823, Appx825.

At the very least, SAP had notice of Teradata's theory well before SAP's summary-judgment reply. Asker's initial report and (as SAP acknowledged, Appx21959) his reply report made clear well before SAP even moved for summary judgment that Teradata asserted SAP harmed competition by requiring S/4HANA

customers to license HANA's analytical capabilities.    *E.g.*, Appx13928; Appx14071-14072; *see Pac. Coast Fed'n of Fishermen's Ass'ns v. Glaser*, 945 F.3d 1076, 1086-87 (9th Cir. 2019) (although "complaint did not specifically allege" certain liability theories, defendants had notice where "expert witness reports" made theories clear).

Finally, even assuming *arguendo* Teradata did change its theory, that might support admission of Hois's declaration but could not itself support summary judgment.   Just as SAP requested, the district court "cure[d]" any supposed "prejudice" by considering the declaration and went on to decide Teradata's claim on the merits.  Appx22057; *see* Appx44-46; *JL Bev. Co. v. Jim Beam Brands Co.*, 828 F.3d 1098, 1108 (9th Cir. 2016) (claim preserved where district court addresses its merits).

### 2.    *SAP's tie violates the rule of reason*

Even if the rule of reason applies, Teradata presented more than enough evidence to require a trial.

### a.    *Asker's excluded testimony creates a material factual dispute on the tie's substantial anticompetitive effects*

If this Court reverses the exclusion of Asker's tied-market or harm-to-competition testimony, that testimony creates a triable dispute.

The district court believed Asker's testimony could not establish "substantial" anticompetitive effects sufficient for a rule-of-reason case.  Appx36-37, Appx49

n.16. That conclusion rested on its failure to consider the evidence that SAP's tie has the anticompetitive effects associated with impermissible ties. *Supra* pp.35-37. By compelling S/4HANA customers to purchase HANA, SAP limited EDW suppliers' ability to compete and diminished customer welfare. Appx13967-13968; *see Microsoft*, 253 F.3d at 87 (when tying product is "sold only in a bundle with the tied product," "[d]irect competition on the merits of the tied product is foreclosed").

Asker made clear this harm was "substantial" by any measure. He estimated SAP's tie would foreclose competition in "48-73 percent of the relevant EDW market." Appx14097; *see* Areeda ¶1729e2 (tie foreclosing 30 percent of market presumptively unreasonable under rule of reason). And Asker determined that HANA's high prices and profit margins demonstrated SAP could exploit this lack of competition to harm customers. Appx14096. "Because it is difficult to imag[ine] a more typical example of anti-competitive effect than higher prices," Asker's opinion "create[s] a genuine issue of material fact." *American Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 791 (9th Cir. 1996).

### b.    Teradata's other evidence creates a material factual dispute on the tie's substantial anticompetitive effects

Even without Asker's excluded testimony, Teradata's evidence creates a triable dispute. The district court held otherwise, concluding "Teradata has failed to properly define a tied market." Appx49. Again, the court erred.

*First*, Teradata amply supported its tied-market definition. SAP moved for summary judgment on the ground that HANA does not compete with Teradata's EDW. *See* Appx21962-21965. But as detailed (*supra* pp.37-39), Teradata produced extensive contrary evidence. *See, e.g.*, Appx21115-21330 (SAP textbook showing how to use HANA as an EDW); Appx831 (SAP admission HANA was "competing against product offerings from Teradata"); Appx16079-16082 (identifying Teradata customers that shifted to HANA); Appx13993-13997 (regression analysis showing lost Teradata sales). Indeed, SAP's expert acknowledged SAP's tie would "reduce [S/4HANA] customers' demand for using Teradata Database"—statements necessarily about Teradata's EDW. Appx20220; *contra* Appx36; *see* Appx16126-16127 (similar acknowledgment). Only a jury can resolve these factual disputes.

*Second*, regardless of the tied-market definition, Teradata could prevail with direct evidence of competitive harm. *Supra* p.18. Tying arrangements have anticompetitive effects where firms use tying-market power to impede competition in another market. *E.g.*, *Jefferson Parish*, 466 U.S. at 9.[2] Teradata's evidence demonstrated SAP's tie foreclosed S/4HANA customers from buying competitor

---

[2] This distinguishes tying from rule-of-reason challenges to other vertical restraints, for which market definition is "usually" required because they "often pose no risk to competition" unless the defendant has power in the market where competition is harmed. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 & n.7 (2018).

EDWs.  SAP's internal documents revealed that was the tie's purpose:  SAP sought to "[d]rive HANA runtime into install base via S4H."  Appx20052; *see, e.g.*, Appx18405 ("[i]f an SAP Customer use the S/4HANA strategy" in targeting Teradata customers).  As a result, Teradata and competitors such as Oracle lost customers.  *Supra* p.51; *e.g.*, Appx18560.  Even SAP's expert acknowledged Oracle lost database sales—an admission that was by no means restricted to transactional databases.  Appx16126; *Kaneka*, 790 F.3d at 1303 (all "reasonable inferences" must be drawn "in favor of the non-moving party"); *contra* Appx36.  This foreclosure occurs under both versions of the HANA license:  the runtime license prevents customers from using competitors' EDWs with HANA, and the full-use license requires customers to pay far more to use competitors' EDWs.  Appx17698-17699.

Such foreclosure causes the prototypical anticompetitive harms:  "decreased quality" and "increased prices."  *Ohio*, 138 S. Ct. at 2284.  The evidence shows HANA performs poorly.  *E.g.*, Appx17441-17444; Appx17399.  It also shows HANA is not competitively priced.  Appx19140.  As one customer put it, HANA is "10x the price of Teradata and not as stable."  Appx17427.  Customers avoided purchasing HANA when they could—sales were "very, very poor" before the tie.  Appx15652-15653.  But once SAP imposed the tie on its locked-in S/4HANA customers, depriving them of the "choice" to use the better, cheaper alternatives from SAP's competitors, HANA sales soared.  Appx19676; Appx20459.  This

evidence creates a material factual dispute about whether SAP's conduct substantially harms competition.

* * * * *

For these reasons, summary judgment on Teradata's tying claim should be reversed and the case remanded for trial.

## II.  A CORRECT INTERPRETATION OF THE PARTIES' AGREEMENTS REQUIRES REVERSAL FOR TRIAL ON TERADATA'S TRADE-SECRET CLAIM

Under federal and California law, trade-secret misappropriation includes unauthorized use of a trade secret where there is "a duty to maintain its secrecy or limit its use." Cal. Civ. Code §3426.1(b)(2)(B)(ii); *see* 18 U.S.C. §1839(5)(B)(ii)(II) (similar).  In holding that a document discussing Batched Merge and marked "confidential" created no duty of confidentiality and that SAP misappropriated no trade secrets, the district court misconstrued the parties' agreements and improperly found facts.

### A.  Teradata Marked Its Trade Secret

#### 1.  *Teradata marked Batched Merge confidential*

The MNDA imposes straightforward requirements to designate confidential materials.  Section 2 requires that written "information" be "clearly identified as confidential or proprietary at the time of disclosure marked with an appropriate legend." Appx457.  Nothing more.

53

Teradata met this requirement. No one disputes Teradata marked "confidential" the project-design document that first identified Batched Merge as a solution to SAP's Bridge Project problem. This document explained Batched Merge's purpose, its significant characteristics, and how it could help. Every page had a "Teradata Confidential" legend. Appx14560-14578. Neither the district court nor SAP suggested these markings failed to "clearly identif[y]" Teradata's information as confidential.

This alone shows Teradata met the MNDA's marking requirement; it at least creates a jury question. Instead, the court rewrote the MNDA, holding Teradata needed to do more than "clearly identif[y]" as confidential the document discussing Batched Merge. Appx11-12. The court apparently believed the document must teach how Batched Merge worked with some unstated specificity. Quoting Graas, the court noted the document lacked "'the entire explanation of the batched merge method,'" comparing it to later versions "convey[ing] *how* the Batched Merge Method was implemented," which it said would have satisfied the MNDA. Appx11-12 (quoting Appx14396; emphasis added). This rationale fails for two reasons.

*First*, the MNDA imposes no requirement that a marked document must fully describe trade secrets to protect them. The marking provision requires particular specificity only for the "legend indicating that the information is deemed

confidential." Appx457. That "legend" must "clearly identif[y]" the information as confidential. Appx457. Nothing says the information itself must be explained in any particular level of detail to be confidential. Appx457.

The MNDA's marking provision thus simply requires notice of confidentiality. Teradata provided that: Teradata informed SAP it had a tool—Batched Merge—that could solve a Bridge Project problem, and Teradata notified SAP that tool was confidential by marking the document identifying it. For that reason, whether Teradata's design document "contain[s] the details of the overall batched merge" does not matter. *Contra* Appx11 (quoting Appx14400). SAP had notice Batched Merge was confidential. And when Teradata gave further details, it made clear it referred to the marked-confidential design document that first identified Batched Merge. Appx15211; Appx15856-15857; Appx14400.

Other provisions confirm this reading. Under the MNDA, when a party first discloses confidential information "orally or visually," that party need only "*summarize* the Confidential Information in writing" within a specified time. Appx457 (emphasis added). It would make little sense for the MNDA to require only notice (a summary) for the written record of oral confidential information but all the details (the "how") for written confidential information. *Compare Summarize*, Oxford English Dictionary (3d ed. 2019) ("to state or express (something) briefly or concisely"), *with* Appx11 (court faulting lack of "'the entire

55

explanation of the Batched Merge method'"").  And it would violate basic contract-law principles:  New York law, which governs the MNDA (Appx460), dictates that "contract[s] should be interpreted to avoid inconsistencies." *Zullo v. Varley*, 57 A.D.3d 536, 537 (N.Y. App. Div. 2008).

Even were the MNDA ambiguous about the requisite level of detail, a fact dispute would exist.  Under New York law, "the jury may consider extrinsic evidence such as the parties' course of conduct throughout the life of the contract" to determine a contract's meaning.  *Hoyt v. Andreucci*, 433 F.3d 320, 332 (2d Cir. 2006).  Not once did SAP's employees question Batched Merge's confidentiality. To the contrary, they knew Batched Merge should not be shared outside the Bridge Project.  For example, after receiving the confidential design document with Batched Merge, one SAP engineer emailed another, describing Batched Merge's optimization steps involving " procedure " into a  procedure  and " procedure " between the  procedure  and the  procedure ."  Appx15595; Appx15202, Appx15208.  The sender told the recipient not to "forward this email," because SAP was "not allowed to pass on any internal information of [Teradata]."  Appx15595. Despite this warning, SAP forwarded Batched Merge outside the Bridge Project team (Appx15284-15285), as part of SAP's plan "to get as much as we can out of the relationship" with Teradata before cancelling the Bridge Project (Appx15488).

From this, a jury could find SAP understood Batched Merge was confidential but stole it anyway. *Hoyt*, 433 F.3d at 331-32.

The district court's only support for departing from the MNDA's plain text was *Convolve, Inc. v. Compaq Computer Corp.*, 527 F. App'x 910 (Fed. Cir. 2013). Appx14. But that fact-specific, non-precedential ruling cannot control here. *Convolve* held the plaintiff failed to comply with its non-disclosure agreement by not providing a timely written summary after an oral trade-secret disclosure. 527 F. App'x at 916-18, 923. But unlike here, the *Convolve* plaintiff pointed this Court to no written document previously marking its trade secret. And SAP disclaimed any argument that the MNDA "require[s] marking subsequent oral discussions of confidential information already marked as confidential." Appx12 (citing Appx21952).

*Second*, even if the MNDA required some level of detail, Teradata's marked design document identifying Batched Merge contained those details. The document stated Batched Merge: could "optimiz[e]" SAP's existing "query access methods"; involved "replac[ing] the 'either [procedure] or [procedure]' processing' with a [procedure] [procedure]"; and would be "[b]est … to accomplish the [procedure] [procedure] [procedure] via a [procedure] that processes [procedure] for a [procedure] via [procedure] [procedure]." Appx14570. The document's embedded spreadsheet noted that performance of SAP's proposed querying step would "suffer due to … the [procedure]

CONFIDENTIAL MATERIAL OMITTED

████ of the ███ within the ███ (no █████ ),” which was "equivalent to █████ procedure █████"; suggested "a change to █████ the █████"; and remarked: "BEST IS TO USE BATCHED MERGE to █████ the █████ then █████ or █████ process design."  Appx15525.

As Teradata's expert explained, the document and spreadsheet thus "disclosed solving [SAP's] problems using Teradata's Batched Merge method" and "expanded on Batched Merge."   Appx15237-15239.   Whether these details would have conveyed to engineers the basic characteristics of "how" Batched Merge worked is a disputed fact.  *Contra* Appx12.  Nor does it matter that some Batched Merge discussions were not under the "Batched Merge" subheading.  What matters is the document was marked.  And any dispute about whether those discussions related to Batched Merge is a jury question.  Appx15236-15239.

### 2.   *SAP waived any "details" requirement*

Independently, a material factual dispute exists about whether SAP waived any requirement that the marked document contain some greater detail to protect Batched Merge.   Under New York law, a party waives contractual rights by "evinc[ing] an intent not to claim a purported advantage" through its "affirmative conduct or by failure to act."  *Gen. Motors Acceptance Corp. v. Clifton-Fine Cent. Sch. Dist.*, 647 N.E.2d 1329, 1331 (N.Y. 1995).  Waiver is an "issue[] of fact."  *Id.*

Were the district court right that Teradata never adequately marked Batched Merge, SAP would have had no reason to treat it as confidential under the MNDA. Yet SAP's employees did so. Appx15595 (SAP employee warning another not to forward Batched Merge outside Bridge Project); Appx17199 (SAP executive agreeing Teradata's materials were confidential because Bridge Project was "under NDA"). From this conduct, a jury could infer SAP waived any requirement that a marked document contain some level of detail. *Gen. Motors*, 647 N.E.2d at 1330-31 ("issues of fact exist as to whether plaintiff waived its rights" to receive payments under assignment based on "failure of plaintiff to protest" when defendant made payments to assignor).

The district court held otherwise by misapplying New York law and resolving factual disputes. It emphasized "waiver should not be lightly presumed and must be based on 'a clear manifestation of intent to relinquish a contractual protection.'" Appx12. But a "clear manifestation" can be shown by conduct from which an "intent … to relinquish the protection of the contractual" protection "could be reasonably inferred." *Natale v. Ernst*, 63 A.D.3d 1406, 1408 (N.Y. App. Div. 2009); *Christian Dior-N.Y., Inc. v. Koret, Inc.*, 792 F.2d 34, 39-40 (2d Cir. 1986) (party "should have been given a chance to convince a trier of fact of [other party's] intent to waive" where parties' actions permitted different inferences).

59

The court also relied on the MNDA's no-waiver provision. Appx12; Appx460 ("No amendment or modification of this Agreement shall be valid or binding on the parties unless made in writing."). But under New York law, "even where a contract provides that there shall be no waiver or amendment not evidenced by a writing," that provision "may itself be waived." *Christian Dior*, 792 F.2d at 39.

Nor does *Convolve* support the court's ruling. *Contra* Appx14. Addressing both waiver and contract modification, this Court found "the testimony of a single [defendant] employee" created no triable dispute, because under California law, "the subjective intent of one of the parties is not indicative of the mutual intent of both parties." 527 F. App'x at 924. But here, Teradata raises only waiver, and New York waiver law has no mutual-intent requirement. *Natale*, 63 A.D.3d at 1408 (contract term waived by "manifestation of intent by defendant").

## B.    The Agreements Protect Teradata's Rights To Batched Merge

A straightforward reading of the SDCA also debunks the district court's conclusion that Teradata gave away Batched Merge for use on a competing database. At a minimum, material factual disputes exist.

### 1.    *SAP obtained no broad license to use Teradata's trade secrets for a competing database*

The SDCA expressly provides, with narrow exceptions, that Teradata exclusively retained its intellectual property after the Bridge Project ended. "Intellectual Property Rights" broadly include "trade secret or confidential rights."

60

Appx468-469. Section 10.2 makes clear those rights remain Teradata's unless "expressly granted" to SAP. Appx476 (Teradata's performance under agreement "does not grant SAP any Intellectual Property rights of Partner, except to the extent SAP is expressly granted such rights under this Agreement"). The agreement singles out key intellectual property (called "Partner Materials" (Appx476)) related to the Teradata Database (called the "Partner Solution" (Appx469, Appx482)) and states that this property remains solely Teradata's at the Bridge Project's conclusion: "Subject to any rights expressly granted to SAP hereunder, any and all Intellectual Property Rights in any programs, tools, systems, data or materials utilized or made available by Partner [Teradata] in the course of the performance under this Agreement (collectively, 'Partner Materials') shall remain vested exclusively in Partner." Appx476; *see* Appx476 (same for "software code that is necessary to adapt" SAP's application to the Teradata Database).

Section 9.2 confirms Teradata's broad retention of rights, giving SAP only limited rights to Partner Materials. Appx474. It grants SAP a license to use "the Partner Solution, related Documentation, and any other programs, tools, or other materials provided by Partner to SAP." Appx474. But the agreement limits that license in scope and duration. SAP could use Partner Materials for just five "purposes"—all specifically tied to the Bridge Project, such as "developing SAP's deliverables under the Project Plan." Appx474. And SAP could do so only "during

61

the Term" of the agreement (Appx474), which ended when SAP terminated the Bridge Project (Appx15520).[3]

Similarly, Section 9.4 provided SAP certain rights to Teradata knowledge and expertise.  Appx475.  It gave SAP a "worldwide, nonexclusive, royalty-free fully paid up, perpetual and irrevocable license" to any "Input submitted by Partner [Teradata] to SAP with respect to any deliverables or other items that SAP provides or shall provide to the Partner under any Project Plan."  Appx475.  The SDCA defines "Input" as "suggestions, comments, and feedback (whether in oral or written form), including any included ideas and know-how, voluntarily provided by one Party to the other Party with respect to the work performed under this Agreement."  Appx468.  What constitutes "Input" has no overlap with "Partner Materials"—for which Teradata expressly reserved its rights.  For example, "programs" and "tools" (which are "Partner Materials") are not anywhere in the definition of "Input." *Compare* Appx468 ("Input"), *with* Appx476 ("Partner Materials").  Thus, New York law presumes "Input" and "Partner Materials" cover different things.  *NFL Enters. v. Comcast Cable Commc'ns, LLC*, 51 A.D.3d 52, 60-61 (N.Y. App. Div. 2008)

---

[3] Not at issue here, Section 10.4 gives SAP a limited license to modifications to certain Teradata intellectual property, including Partner Materials, with prior written consent but only during the Bridge Project.  Appx476.

("The use of different terms in the same agreement strongly implies that the terms are to be accorded different meanings.").

Thus, SAP obtained no license to use Batched Merge outside the Bridge Project. Batched Merge fell squarely within "Partner Materials." It is a proprietary trade secret Teradata developed decades before the Bridge Project. Appx15395-15398; Appx15213-15220; Appx15239-15272, Appx15275-15280. Teradata's expert explained Batched Merge was a "tool" for "external software to interact with a database." Appx15332; Appx15278-15279. As such a "tool," Batched Merge was "Partner Material[]" used for "performing under the Project Plan and developing SAP's deliverables under the Project Plan." Appx474-475. Nor could Batched Merge be considered "Input." Batched Merge was no mere "suggestion[], comment[]," or "feedback." Appx475. And if any ambiguity exists about whether Batched Merge is "Partner Materials" or "Input," that "poses factual issues for trial." *Rogath v. Siebenmann*, 129 F.3d 261, 267 (2d Cir. 1997) (so holding about whether statement was "challenge" to painting's authenticity within contract's meaning).

**2.    *The district court misread the agreement and found facts in giving SAP a license to Batched Merge***

**a.    *The district court's interpretation makes other provisions superfluous***

In apparently concluding that Batched Merge was Input and not Partner Materials (Appx15-16), the district court misread the SDCA and disregarded factual disputes.

The court misconstrued Section 9.2, which governs Partner Materials.   It stated that Section 9.2 merely "prevent[ed] SAP from using Teradata's Database itself."  Appx16.  Not so:  far from just limiting SAP's use of "the Partner Solution" (defined as Teradata Database), Section 9.2 restricts use of "any other programs, tools, or other materials" Teradata provided SAP.   Appx474-475.   Although the court purported to find Batched Merge "not a program and not a tool" (Appx16), nothing in the SDCA precludes Batched Merge from being either (Appx468-469).  As Teradata's expert explained (and SAP produced no evidence disputing), Batched Merge was a "tool."  Appx15332; Appx15278-15279.  The court had no basis to find otherwise.

The court compounded its error by misreading what constitutes "Input" under Section 9.4.  Appx16-18.  The court stated "Input" covers all "conversation[s] with SAP employees" and "changes made to SAP software."  Appx16-17.  That reading would expand "Input" far beyond the contractual definition.  The SDCA limits Input

to tips—"suggestions, comments, and feedback (whether in oral or written form), including any included ideas and know-how." Appx468. Those terms do not encompass everything exchanged in the parties' conversations, much less all changes SAP makes to its software.

More importantly, that reading would make superfluous all the contractual provisions protecting Teradata's intellectual property. An essential point of the Bridge Project was for Teradata to share its expertise so SAP could overcome the technical obstacles it faced in integrating SAP's application with the Teradata Database. Appx468-469, Appx471, Appx486. And the SDCA sought to preserve Teradata's intellectual property when the Bridge Project ended. Appx474-476. To that end, the agreement expressly stated that the Partner Solution (Teradata Database) and Partner Materials (such as "programs" and "tools" used to integrate SAP's application to the Teradata Database) remained exclusively Teradata's. *Supra* p.61; Appx476.

None of those provisions would have meaning if SAP obtained a license to information exchanged in all "conversation[s] with SAP employees" or "changes made to SAP software." Appx16-17. That would mean *all* Teradata intellectual property disclosed in the Bridge Project would become SAP's. Such an unthinkable reading both defies common sense and contradicts basic contract-law principles.

*Ajdler v. Province of Mendoza*, 890 F.3d 95, 100 (2d Cir. 2018) (rejecting interpretation that "would render [another] provision superfluous").

The district court's interpretation of the SDCA also cannot be reconciled with New York's implied covenant of good faith and fair dealing: "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Lowy & Donnath, Inc. v. City of N.Y.*, 98 A.D.2d 42, 45, (N.Y. App. Div. 1983). This covenant precludes interpretations that "would make the contract unreasonable." *In re Friedman*, 64 A.D.2d 70, 82 (N.Y. App. Div. 1978).

The court thought the covenant inapplicable because Teradata knew SAP might make additional software changes outside the Bridge Project. Appx18. But Teradata did not know SAP was developing a competing database product. Appx20722. Even so, Teradata was entitled to the benefits of its bargain. The SDCA's stated purpose was to jointly develop and promote an integrated solution between the parties' flagship products—not for SAP to pilfer Teradata's technology for a competing database. Appx468-469. But that is what the court's interpretation allows, permitting SAP to take Teradata's trade secrets, use them to develop a competing product, and unilaterally terminate the Bridge Project. The implied covenant precludes such an unreasonable, one-sided interpretation. *Friedman*, 64 A.D.2d at 82.

The parties' conduct confirms the court misread the SDCA. *Hoyt*, 433 F.3d at 332. If SAP could use as "Input" any Bridge Project information (Appx16), SAP employees would have had no restrictions on using Teradata's confidential information. But SAP's employees understood otherwise. *E.g.*, Appx16142 (SAP engineer "understood that it was not permissible to use Teradata confidential information from the Bridge Project for HANA development"); Appx16217-16218 (SAP engineer "ha[d] to separate between … working on MaxDB Bridge" and "working on HANA"); Appx16157 (SAP's board chairman instructed SAP "to separate the [HANA and Bridge Project] teams"). Teradata's employees had the same understanding. *E.g.*, Appx15693-15694.

### b.      *No other provision gives SAP a license to Batched Merge*

No other provision gives SAP a perpetual license to use Batched Merge.

*First*, the district court quoted MNDA Section 7 when discussing the SDCA's "Input" provision. Appx17. Section 7 gives SAP a perpetual license to use "Company Feedback" for any purpose, defining it as "comments or suggestions" from Teradata "regarding the possible creation, modification, correction, improvement or enhancement of SAP Software." Appx458. But Batched Merge is not "Company Feedback" for the same reasons it is not "Input." *Supra* pp.62-65. Regardless, the SDCA's "Partner Materials" provision would "control" even were

there "any conflict between the intellectual property ownership and/or licensing terms of the MNDA." Appx478.

*Second*, the court cited Section 10.1. Appx14. But Section 10.1 simply reserves SAP's intellectual property rights, stating that the agreement "and SAP's performance hereunder does not grant *to Partner* any Intellectual Property Rights *of SAP*" unless expressly provided. Appx476 (emphases added). It grants SAP no rights to Teradata's intellectual property.

*Third*, the court cited SDCA Section 10.3 (Appx15), which specifies that "any and all Intellectual Property Rights to or arising out of any Newly Developed Materials shall belong to SAP." Appx476. "Newly Developed Materials" are defined as "any software, systems, tools, data, specifications, documentation or other material developed by SAP and/or Partner in connection with or as a result of a party's interaction with the other party within the context of this Agreement." Appx469. But Teradata developed the Batched Merge method long before the Bridge Project. Appx15395-15401; Appx15202. Section 10.3 grants no license to preexisting intellectual property incorporated into Newly Developed Materials. If it did, SAP's limited right under Section 9.2 to use Teradata's intellectual property would be superfluous.

In short, Batched Merge was Partner Materials that remained exclusively Teradata property when SAP terminated the Bridge Project. At a minimum, factual disputes require a trial.

\* \* \* \* \*

For these reasons, summary judgment on Teradata's trade-secret claim should be reversed and the case remanded for trial.

## III.    THIS COURT HAS JURISDICTION

This Court has appellate jurisdiction because SAP "has asserted a compulsory counterclaim arising under" federal patent law. 28 U.S.C. § 1295(a)(1). A counterclaim is compulsory if, "at the time of filing," it "'arises out of the transaction or occurrence that is the subject matter of the opposing party's claim.'" *In re Rearden LLC*, 841 F.3d 1327, 1332 & n.2 (Fed. Cir. 2016) (quoting Fed. R. Civ. P. 13(a)(1)(A)).

SAP's patent counterclaims satisfy that "liberally" interpreted standard. *Id.* (citation omitted); *see* ECF 10 at 8-21. SAP pleaded them as the logical counterpart to Teradata's trade-secret claims, alleging it patented what Teradata claims as trade secrets and that events Teradata uses to show trade-secret misappropriation actually show patent infringement. Appx2846, Appx2875-2876; Appx8879-8882. The claims and counterclaims also raise common issues, arising from common events, with common witnesses and evidence about ownership over common technology.

Appx8879-8882; ECF 10 at 10-14. That is what SAP—master of its counterclaims—successfully argued below: the district court agreed that "SAP's counterclaims arise out of the same transaction or occurrence as" Teradata's claims. Appx9523; *see* Appx8879-8882.

## CONCLUSION

Summary judgment should be reversed or vacated and the case remanded for trial.

Respectfully submitted,

/s/ Deanne E. Maynard

| | |
|---|---|
| JAMES R. SIGEL | DEANNE E. MAYNARD |
| MORRISON & FOERSTER LLP | BRIAN R. MATSUI |
| 425 Market Street | MARK L. WHITAKER |
| San Francisco, CA 94105 | DAVID D. CROSS |
| | MARY PRENDERGAST |
| | MICHAEL F. QIAN |
| | SAMUEL B. GOLDSTEIN |
| | MORRISON & FOERSTER LLP |
| | 2100 L Street NW, Suite 900 |
| | Washington, DC 20037 |
| | Telephone: (202) 887-8740 |
| | DMaynard@mofo.com |

*Counsel for Plaintiffs-Appellants Teradata Corporation, Teradata US, Inc., and Teradata Operations, Inc.*

# NON-CONFIDENTIAL ADDENDUM

**TERADATA CORPORATION, TERADATA US, INC.,
TERADATA OPERATIONS, INC.,**

v.

**SAP SE, SAP AMERICA, INC., SAP LABS LLC**

**No. 22-1286 (Fed. Cir.)**

**APPELLANTS' NON-CONFIDENTIAL ADDENDUM
TABLE OF CONTENTS**

| Date | Document | Page |
|------|----------|------|
| 11/8/2021 | Order re: Motions for Summary Judgment and Motions to Exclude Expert Testimony, D. Ct. Dkt. 604 (Redacted) | Appx1 |
| 11/22/2021 | Stipulation and Order to Certify Judgment Under Fed. R. Civ. P. 54(b) and to Stay Case Pending Appeal, D. Ct. Dkt. 608 | Appx69 |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

TERADATA CORPORATION, et al.,

               Plaintiffs,

      v.

SAP SE, et al.,

               Defendants.

Case No. 18-cv-03670-WHO

**FILED UNDER SEAL – ORDER RE MOTIONS FOR SUMMARY JUDGMENT AND MOTIONS TO EXCLUDE EXPERT TESTIMONY**

Re: Dkt. Nos. 466, 467, 470, 472, 474, 476, 480, 495

Defendants SAP SE, SAP America, Inc., and SAP Labs, LLC (collectively "SAP") move for summary judgment on plaintiffs Teradata Corporation, Teradata US, Inc., and Teradata Operations, Inc.'s (collectively "Teradata") technical trade secret claims, business trade secret claims, and tying claim. Teradata also moves for summary judgment and argues that counterclaim-plaintiff SAP SE's U.S. Patent No. 8,214,321 ("'321 Patent") is invalid under 35 U.S.C. § 101. It argues that SAP is not entitled to damages for the alleged infringement of U.S. Patent Nos. 7,617,179 ("'179 Patent"), and 9,626,421 ("'421 Patent") before May 19, 2019. Teradata also moves to exclude portions of four of SAP's expert's opinions: Tim Kraska, Stephen Horn, Gregory Leonard and Ouri Wolfson, and Sharad Mehrotra. SAP moves to exclude portions of one of Teradata's expert's opinions, John Asker.

For the reasons explained below, SAP's motion for summary judgment on Teradata's technical trade secret claims and tying claim is GRANTED. Its motion related to Teradata's business trade secret claims under the DTSA is DENIED as moot. Its motion to exclude portions of Asker's report is GRANTED in part and DENIED in part. Teradata's motion for summary judgment on the invalidity of the '321 Patent is GRANTED. Its motion for partial summary judgment against an award of damages for infringement of the '179 and '421 Patents before May 21, 2019, is also GRANTED. Its motion to exclude portions of Kraska's expert report is DENIED as moot. Its motion to exclude portions of Horn's report is GRANTED in part and DENIED in part. Its motion to exclude portions of the Leonard and Wolfson reports is DENIED in part as

United States District Court
Northern District of California

moot and DENIED in part on the merits.  Its motion to exclude portions of Mehrotra's report is

DENIED.[1]

**BACKGROUND**

**I.    FACTUAL HISTORY**

Teradata conducts research, development, engineering, and other technical operations

related to its Enterprise Data Analytics and Warehousing ("EDAW" or "EDW") products.  *See*

Dkt. No. 67 ("SAC") ¶ 4.  Teradata's flagship product is the Teradata Database, a relational

database management system designed for EDW.  SAC ¶ 16.  Teradata was the first commercial

EDW vendor to utilize massively parallel processing ("MPP") through Teradata Database to

execute high volumes of analytical queries on massive amounts of data for EDAW customers.

Dkt. No. 528-9 ("Walter Decl.") ¶ 3.

SAP is best known for Enterprise Resource Planning ("ERP") software, historically

designed to run on transactional databases such as those by Oracle, IBM, and Microsoft.  Dkt. No.

462-5 ("Anicich Decl.") ¶ 39.  SAP's ERP applications do not, and have never, run on top of

Teradata's analytical database.  Dkt. No. 467-5 ("Mehrotra Decl.") ¶ 127.

ERP Applications allow companies to manage data required to conduct their day-to-day

operations across numerous aspects of the business enterprise and are typically designed around a

relational transactional database that can ensure users have access to a uniform and current set of

data.  *Id.*; Dkt. No. 452-11 ("Stiroh Rep.") ¶ 10; Anicich Decl. ¶¶ 24–28.  Transactional databases

are also known as "online transactional processing" ("OLTP") databases and are typically

"row-based," which is advantageous for processing transactions, such as pay roll data, and running

---

[1] The parties have also filed 21 motions to seal.  Dkt. Nos. 462, 465, 468, 471, 473, 475, 479, 506, 515, 518, 522, 524, 528, 531, 536, 550, 551, 554, 560, 568, 599.  I will issue a separate order addressing these motions.  Suffice it to say, the parties have sought to seal a great deal of information that does not meet the compelling interest standard that applies to dispositive motions. *See Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096–99 (9th Cir. 2016), *cert. denied sub nom. FCA U.S. LLC v. Ctr. for Auto Safety*, 137 S. Ct. 38 (2016).  While I will address all of the sealing requests in a separate order, what is not sealed in this Order does not meet the applicable standard.  Further, with respect to those portions of this Order that are sealed, the parties should not assume that I have concluded that they have provided a sufficient basis to seal the information.  These redactions are preliminary and should not be taken as an indication about the merits of sealing.

United States District Court
Northern District of California

2

Case 3:18-cv-03670-WHO    Document 604 *SEALED*    Filed 11/08/21    Page 3 of 68

1    a large number of simple transactions concurrently.  Mehrotra Decl. ¶ 53.

2        In contrast, analytical applications are designed to run on a second type of database, known

3    as an analytics or "OLAP" database.  Dkt. No. 463-15 ("Sell Depo.") at 18–19.  These databases

4    typically store data in columns to optimize the running of a small number of queries with a large

5    number of complex records.  Mehrotra Decl. ¶ 60; Dkt. No. 562-6 ("Kraska Decl.") ¶ 22.  There

6    are three different types of analytical databases:  (1) data marts; (2) enterprise data warehouses

7    ("EDWs"); and (3) data lakes.  Sell Depo. at 14.  EDWs are large-structured analytics databases

8    that draw data from different sources, e.g., transactional databases, across an enterprise.  Id. at 13.

9        In 2009, SAP and Teradata entered into a partnership referred to as the "Bridge Project" to

10   combine SAP's ERP Applications and SAP BW tool interface with Teradata's MPP architecture

11   that it uses in Teradata Database for EDW.  Kraska Decl. ¶ 161.  During the Bridge Project,

12   Teradata provided SAP with access to its confidential information.  SAC ¶ 35.  The parties

13   executed two agreements to formalize the Bridge Project, the Software Development Cooperation

14   Agreement ("SDCA") and the Technology Partner Agreement ("TPA").  SAC ¶ 32.  These

15   agreements restricted disclosures of each parties' confidential information.  Id.  The parties also

16   entered into a mutual non-disclosure agreement ("Mutual NDA") in December 2008 and June

17   2009 ("NDAs").  Id.

18       Through the Bridge Project, SAP and Teradata jointly developed "Teradata Foundation"

19   which enabled SAP's ERP applications to use Teradata for the transactional database and

20   data-analytics for EDW activities.  Dkt. No. 528-5 ("Graas Decl.") ¶¶ 6–9.  While the Bridge

21   Project was underway, SAP was developing another EDW product called SAP HANA ("HANA").

22   Dkt. No. 530-39 ("Primsch Depo.") at 362.  By June 2011, HANA was commercially available.

23   After nearly three years in the Bridge Project, and two months after HANA was made available,

24   SAP unilaterally terminated the joint venture and stopped supporting, selling, and marketing

25   Teradata Foundation.  Dkt. No. 529-25 at 068.

26       In February 2015, SAP launched its latest version of ERP Application, SAP S/4HANA and

27   combined its ERP Application and EDAW products into a single sales offering.  S/4HANA is

28   integrated to operate on top of SAP's HANA database, a translytical database with both

United States District Court
Northern District of California

3

1    transactional and analytical functionalities.  Anicich Decl. ¶ 40.  Customers can purchase HANA

2    either with a full-use license, with no restrictions on how the data within HANA can be used, or a

3    lower-cost limited-use "runtime" license, with database use limited to supporting S/4HANA.  Dkt.

4    No. 467-53 ("Zenus Depo.") at 105–115.  In other words, if customers want to export their own

5    data from HANA for use with third-party products, they must pay an additional license fee, i.e., an

6    exit fee.  Dkt. No. 532-41 at 583.

7    **II.    PROCEDURAL HISTORY**

8          On June 19, 2018, Teradata filed a complaint against SAP alleging, among other things,

9    misappropriation of its trade secrets and violation of antitrust laws.[2]  Dkt. No. 1.  On December

10   12, 2018, I granted in part and dismissed in part SAP's motion to dismiss.  Dkt. No. 65 ("MTD

11   Order").  On December 21, 2018, Teradata filed a second amended complaint alleging that SAP

12   disingenuously entered a joint venture with it to steal its trade secrets and develop a competing

13   product, HANA, misappropriating trade secrets, and violating antitrust laws in the process.  *See*

14   Dkt. No. 67 ("SAC").  The following claims remain at issue:  whether SAP misappropriated

15   Teradata's trade secrets related to the Batched Merge method and whether SAP unlawfully tied its

16   ERP applications to its HANA product.[3]  SAP answered on January 11, 2019 and filed

17   counterclaims related to five of its patents on May 29, 2019.  *See* Dkt. Nos. 72, 106.  SAP's

18   remaining patent infringement counterclaims concern the following patents:  the '421 Patent, the

19   '321 Patent, and the '179 Patent.  On June 12, 2020, I held a claims construction hearing, and

20   issued an order on July 15, 2020.  Dkt. No. 279 ("Claim Construction Order").  On August 25,

21   2021, Teradata and SAP filed all of the motions at issue.

22                              **LEGAL STANDARD**

23   **I.    SUMMARY JUDGMENT**

24         A party is entitled to summary judgment where it "shows that there is no genuine dispute

25

26   [2] This case is related to *Teradata v. SAP*, No. 20-CV-06127-WHO.

27   [3] The parties dispute whether Teradata asserted a new tying theory during the summary judgment
     briefing, i.e., that SAP unlawfully tied S/4HANA to HANA's analytical capabilities through
28   licensing.  *See infra* Part I.B.3.

*United States District Court*
*Northern District of California*

1    as to any material fact and [it] is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A

2    dispute is genuine if it could reasonably be resolved in favor of the nonmoving party.  *Anderson v.*

3    *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is material where it could affect the

4    outcome of the case.  *Id.*

5         The moving party has the initial burden of informing the court of the basis for its motion

6    and identifying those portions of the record that demonstrate the absence of a genuine dispute of

7    material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  Once the movant has

8    made this showing, the burden shifts to the nonmoving party to identify specific evidence showing

9    that a material factual issue remains for trial.  *Id.*  The nonmoving party may not rest on mere

10   allegations or denials from its pleadings but must "cit[e] to particular parts of materials in the

11   record" demonstrating the presence of a material factual dispute.  FED. R. CIV. P. 56(c)(1)(A); *see*

12   *also Liberty Lobby*, 477 U.S. at 248.  The nonmoving party need not show that the issue will be

13   conclusively resolved in its favor.  *Id.* at 248–49.  All that is required is the identification of

14   sufficient evidence to create a genuine dispute of material fact, thereby "requir[ing] a jury or judge

15   to resolve the parties' differing versions of the truth at trial."  *Id.* (internal quotation marks

16   omitted).  If the nonmoving party cannot produce such evidence, the movant "is entitled

17   to . . . judgment as a matter of law because the nonmoving party has failed to make a sufficient

18   showing on an essential element of her case."  *Celotex*, 477 U.S. at 323.

19        On summary judgment, the court draws all reasonable factual inferences in favor of the

20   nonmoving party.  *Liberty Lobby*, 477 U.S. at 255.  "Credibility determinations, the weighing of

21   the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those

22   of a judge."  *Id.*  However, conclusory and speculative testimony does not raise a genuine factual

23   dispute and is insufficient to defeat summary judgment.  *See Thornhill Publ'g Co., Inc. v. GTE*

24   *Corp.*, 594 F.2d 730, 738–39 (9th Cir. 1979).

25   **II.    FEDERAL RULES**

26        Federal Rule of Evidence 702 allows a qualified expert to provide an opinion where:

27              (a) the expert's scientific, technical, or other specialized knowledge
                  will help the trier of fact to understand the evidence or to determine a
28              fact in issue;

*Left margin vertical text:* United States District Court  Northern District of California

5

1

(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

2

3

FED. R. EVID. 702.

4

5

Expert testimony is admissible under Rule 702 "if it is both relevant and reliable." *See*

6

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). "[R]elevance means that the

7

evidence will assist the trier of fact to understand or determine a fact in issue." *Cooper v. Brown*,

8

510 F.3d 870, 942 (9th Cir. 2007). Under the reliability requirement, expert testimony must

9

"relate to scientific, technical, or other specialized knowledge, which does not include

10

unsubstantiated speculation and subjective beliefs." *Id.* To ensure reliability, the court must

11

"assess the [expert's] reasoning or methodology, using as appropriate such criteria as testability,

12

publication in peer reviewed literature, and general acceptance." *Primiano v. Cook*, 598 F.3d 558,

13

565 (9th Cir. 2010). These factors are "helpful, not definitive," and a court has discretion to

14

decide how to test reliability "based on the particular circumstances of the particular case." *Id.*

15

(internal quotation marks and footnotes omitted).

16

The inquiry into the admissibility of expert testimony is "a flexible one" where "[s]haky

17

but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to

18

the burden of proof, not exclusion." *Id.* at 564. "When the methodology is sound, and the

19

evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance

20

or accuracy (above this minimum threshold) may go to the testimony's weight, but not its

21

admissibility." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010). The burden

22

is on the proponent of the expert testimony to show, by a preponderance of the evidence, that the

23

admissibility requirements are satisfied. FED. R. EVID. 702 advisory committee notes.

24

"Trial courts must exercise reasonable discretion in evaluating and in determining how to

25

evaluate the relevance and reliability of expert opinion testimony." *United States v.*

26

*Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006). A district court serves as "a gatekeeper,

27

not a factfinder." *Id.* at 654.

28

United States District Court
Northern District of California

6

**CONFIDENTIAL MATERIAL OMITTED**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**DISCUSSION**

## I.    SAP'S MOTION FOR SUMMARY JUDGMENT

SAP moves for summary judgment on Teradata's technical trade secret claims, business trade secret claims, attempted monopolization claim, and tying claim. Dkt. No. 467 ("SMSJ"). During the briefing, however, Teradata stipulated to the dismissal of its attempted monopolization claim. Dkt. No. 545. It also voluntarily dropped its federal Defend Trade Secrets Act ("DTSA") claim regarding its business trade secrets. Dkt. No. 542 ("Opp. SMSJ") at 25. It continues to assert claims related to trade secrets 54–56 under the California Uniform Trade Secrets Act ("CUTSA"). *Id.* SAP's motion for summary judgment related to Teradata's attempted monopolization claim and business trade secret claims under the DTSA is therefore DENIED as moot. Teradata opposes SAP's motion related to its technical trade secret claims and its tying claim.

### A.    Trade Secret Claim

SAP moves for summary judgment on Teradata's technical trade secret claims. SMSJ at 2–12. Over the course of this case, Teradata's trade secret allegations have significantly narrowed and now focus on only one category of technical trade secrets: the Batched Merge method ("Asserted Trade Secret"), ██████████████████████████████████ ██████████████████████████████████ Dkt. No. 528-9 ("Walter Decl.") ¶¶ 3–12. SAP asserts that Teradata does not have standing to sue, it failed to mark the Asserted Trade Secret as confidential, as required by its agreements with Teradata, and that SAP is contractually authorized to use the product that incorporates Teradata's Asserted Trade Secret. SMSJ at 2–12.

#### 1.    Standing

SAP asserts that Teradata lacks standing to assert its technical trade secret claims because Teradata assigned the claims to Marlin Equity, a third-party firm. SMSJ at 10. On April 22, 2016, Teradata sold to Marlin a portion of its assets related to its "Marketing Execution and Marketing Operations" business, or Teradata's Marketing Applications Business ("TMA Business") as defined in the Asset Purchase Agreement ("APA"). Dkt. No. 543-3 ("APA") at 15. In the APA,

United States District Court
Northern District of California

7

1   Teradata assigned to Marlin contracts that were material to the TMA Business or "Material

2   Contracts" as defined in the APA. *Id.* at 42. Teradata expressly identified the SDCA as a

3   "Material Contract." Dkt. No. 464-26 at ("APA Schedule") at 163. In addition, Teradata's

4   general counsel wrote to SAP that Teradata was assigning away "all of Teradata's rights, title and

5   interests in, to, and under the" SDCA and that it "should deal solely" with Marlin. Dkt. No. 464-1

6   ("Lanier Decl., Ex. 58"). Teradata acknowledges that it provided the Asserted Trade Secret to

7   SAP "[d]uring the Bridge Project, subject to the terms of the parties' agreements" such as the

8   SDCA. SAC ¶ 34. SAP asserts that because the SDCA is material to the TMA Business under the

9   APA, Teradata's alleged trade secrets claims are also material to the TMA Business and therefore

10   that Teradata assigned all such claims to Marlin. SMSJ at 11.

11       Teradata contends that no assignment occurred because (1) any assignment required SAP's

12   consent and SAP never consented and (2) the listing of the SDCA in the APA was a mistake and

13   not part of the assignment. Opp. SMSJ at 11. Section 14.9 of the SDCA states that "Neither party

14   may assign this Agreement . . . except with the express written consent of the other Party." SDCA

15   ¶ 14.9. Similarly, Section 5.5(b) of the APA states, "Notwithstanding anything in this Agreement

16   to the contrary, this Agreement shall not constitute an assignment, sale, transfer, conveyance etc.,

17   with respect to any Transferred Asset, or any right thereunder if an assignment, sale,

18   transfer . . . without the Third-Party Consent of, or other action by, any third party, would

19   constitute a breach or other contravention of the terms of such Transferred Asset." APA § 5.5(b);

20   Dkt. No. 596 ("Hearing Tr.") at 6.

21       It is undisputed that SAP did not consent to the assignment of the SDCA under the APA.

22   Dkt. No. 532-6 ("Weber Depo.") at 81–83. But SAP asserts that its consent is irrelevant to the

23   issue of assignment under the SDCA's choice-of-law, New York law. Reply SMSJ at 2–3. New

24   York courts have "consistently held that assignments made in contravention of a prohibition

25   clause [e.g., a contractual provision prohibiting assignments without the written consent of a

26   party] in a contract are void if the contract contains clear, definite, and appropriate language

27   declaring the invalidity of such assignments." *Sullivan v. Int'l Fid. Ins. Co.*, 465 N.Y.S.2d 235,

28   237 (1983) (collecting cases); *see also Purchase Partners, LLC v. Carver Fed. Sav. Bank*, 914 F.

8

Supp. 2d 480, 505 (S.D.N.Y. 2012), *on reconsideration in part*, 2013 WL 1499417 (S.D.N.Y. Apr. 10, 2013) (holding that a transfer was valid because even though the agreement prohibited transfers or assignment without the written consent of the other party, it did not state that "any such transfer or assignment would be invalid or void."). The SDCA does not contain clear, definite, and appropriate language declaring the invalidity of an assignment made without SAP's consent. The assignment of the SDCA to Marlin is therefore valid.

Even if SAP had consented and its claims were subject to the assignment, Teradata contends that summary judgment should be denied because whether the SDCA was listed in the APA by mistake is a disputed factual issue and that the APA should be reformed to rectify the mistake. Opp. SMSJ at 11 n.15. It argues that because the SDCA is not related to the TMA Business, its inclusion in the APA was a mistake.

The APA is governed by Delaware law. APA § 11.3(a). "Claims for contract reformation require proof by clear and convincing evidence." *Parke Bancorp Inc. v. 659 Chestnut LLC*, 217 A.3d 701, 710 (Del. 2019). In cases of unilateral mistake, reformation is permissible only when "the other party knew of the mistake but remained silent." *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Est. Fund*, 68 A.3d 665, 680 (Del. 2013). In cases of mutual mistake, reformation is permissible only if the parties "came to a specific prior understanding … that differed materially from the written agreement." *Parke Bancorp*, 217 A.3d at 710.

Teradata does not show by clear and convincing evidence that Marlin knew of Teradata's mistake and remained silent or that Marlin and Teradata expressed an intent to agree to terms that differed from the terms in the APA. Instead, it contends that Steven Weber, its Global Head of Deal Management, testified that the SDCA or the Teradata Database "does not have anything to do with the TMA products" and that the letter from Teradata's general counsel was sent in error. Opp. SMSJ at 11. But such self-serving testimony is not evidence that there was either a unilateral or mutual mistake necessary for contract reformation. Reply SMSJ at 3. The APA is unambiguous and so "the writing itself is the sole source for gaining an understanding of intent." *Penton Bus. Media Holdings, LLC v. Informa PLC*, 252 A.3d 445, 461 (Del. Ch. 2018). Because

9

Teradata fails to identify sufficient evidence to create a genuine dispute of material fact, whether the SDCA was listed in the APA by mistake cannot preclude summary judgment.

In contrast, Teradata contends that neither the APA nor the SDCA assigns Teradata's trade secrets to Marlin and "without a clear assignment of the underlying intellectual property," it cannot have assigned its trade secret claims to Marlin. *Id.* at 12. SAP asserts that the question about whether the APA assigned the Asserted Trade Secret itself is irrelevant; the relevant question is whether Teradata assigned the right to sue for misappropriation of the Asserted Trade Secret. Reply SMSJ at 3–4. It argues that Teradata did because it assigned to Marlin "[a]ll Intellectual Property that is Related to the TMA Business," e.g., "trade secrets and confidential proprietary business information" and Teradata's claim is based on trade secrets purportedly provided subject to the SDCA's terms, which is "primarily related" to the TMA business. APA § 2.1(e); APA at 8. It also assigned to Marlin "[a]ll rights to Any Actions of any nature available to or being pursued by any member of [Teradata] to the extent related to the TMA Business" and "[a]ll goodwill and the going concern value of the TMA Business or the Marks included in the Transferred IP, and the right to sue for and recover for damages and profits for past and future infringements and misappropriations by any third party of any part of any of the Transferred IP owned by any member of [Teradata]." *Id.* §§ 2.1(h), (k). Teradata responds that its trade secret claims are not primarily related to the SDCA because its claims are for misappropriation and not breach of contract. Hearing Tr. at 7–8. It also contends that no actual intellectual property was ever conveyed. *Id.*

At the very least, there is a genuine dispute of whether Teradata's trade secret claims fall outside the scope of the assignment. Teradata has standing to pursue its trade secret claims.

**2.    Marking the Asserted Trade Secret Communications as Confidential**

SAP asserts that Teradata's Batched Merge method trade secret claims also fail, however, because Teradata never marked as confidential any of the communications that purportedly disclosed the trade secrets as required by the NDAs. SMSJ at 13. The NDAs governed the sharing of confidential information during the Bridge Project and stated that "Confidential Information" shall mean the following:

10

"[A]ll information which Disclosing Party protects against unrestricted disclosure to others, furnished by the Disclosing Party . . . to the Receiving Party . . . in writing or in other tangible form and clearly identified as confidential or proprietary at the time of disclosure marked with an appropriate legend indicating that the information is deemed confidential or proprietary by the Disclosing Party . . . Where the Confidential Information has not been reduced to written or other tangible form at the time of disclosure, and such disclosure is made orally or visually, the Disclosing Party agrees to identify it as confidential or proprietary at the time of disclosure and to summarize the Confidential Information in writing and deliver such summary within thirty (30) calendar days of such oral or visual disclosure provided . . . ."

Dkt. No. 463-27 ("Mutual NDA 1") ¶ 2; Dkt. No. 463-28 ("Mutual NDA 2") ¶ 2.

There are two documents at issue, different versions of the same document created by John Graas, a Teradata employee, that were marked confidential ("Marked Document"). *See* Dkt. Nos. 464-3 (version 1), 463-24 (version 6). Teradata contends that the first version of the Marked Document from July 2008 identifies the Batched Merge method and explained how the method could resolve SAP's problems. Opp. SMSJ at 14. But its witness, Graas, concedes that the first version of the Marked Document "does not contain the details of the overall batched merge method that was conveyed – conveyed to SAP" and only "listed the batched merge method . . . as a reference." Dkt. No. 462-17 ("Graas Depo.") at 106, 109. He explained that "the entire explanation of the batched merge method . . . would not have been in writing" and that he would "have conveyed it verbally within the meeting explaining to [SAP] what I meant with the [batched merge method] and how it worked." *Id.* at 84, 105.

The sixth version from August 2010, however, explained the manner in which the Batched Merge method was implemented to address deficiencies that prevented SAP from processing large batches of data. Opp. SMSJ at 13; Dkt. No. 463-24 § 4.2. SAP does not dispute that the sixth version contains the details of the Batched Merge method but argues that there is no evidence that Graas ever sent the sixth version to SAP. Graas Depo. at 268 ("Q: Do you have any records, any evidence at all, of version 6 being shared with SAP in any way? A: I don't recall."). It relies on *Prostar Wireless Grp., LLC v. Domino's Pizza, Inc.*, 360 F. Supp. 3d 994 (N.D. Cal. 2018), to argue that because "there was *no* evidence that the defendant had access to the trade secrets" the sixth version of the Marked Document cannot be the basis for a trade secret claim. Reply SMSJ at

United States District Court
Northern District of California

United States District Court
Northern District of California

6 (citing *Prostar Wireless*, 360 F. Supp. at 1002).  Teradata objects and contends that *Prostar Wireless* is distinguishable because SAP does not dispute that it received the five prior versions of the document.  Opp. SMSJ at 13 n.17.  But Section 4.2 of the sixth version, which conveys how the Batched Merge Method was implemented, is not in any other version.  Reply SMSJ at 6 n.3; *see* Dkt. Nos. 530-19 at 224–25, 464-3, 529-27, 529-28, 529-29.  The first version of the Marked Document therefore fails to put SAP on notice about the allegedly confidential Batched Merge Method; there is no evidence that SAP received the sixth version.

The question then is whether Teradata's trade secret claims fail because of its failure to mark as confidential the communications that allegedly conveyed the Batched Merge Method.  Teradata contends that its claims do not fail because, as SAP admits, Graas testified that he conveyed the Batched Merge Method orally to SAP employees in relation to the first version of the Marked Document.  Opp. SMSJ at 15–17.  It argues that the MNDA does not require marking subsequent oral discussion of confidential information already marked as confidential and even if it did, the parties waived this requirement through their conduct.  *Id.* at 17.  SAP responds that its argument is not that the NDAs require marking subsequent oral discussions of confidential information already marked as confidential but that Graas never disclosed the claimed trade secret in a writing marked as confidential in the first place.  Reply SMSJ at 6.

It also asserts that the parties have not waived the marking requirement through their conduct.  *Id.* at 7.  The NDAs contain no-waiver provisions and therefore "Teradata must prove that SAP intentionally relinquished the marking provision and the no-waiver provision itself."  *Id.*; Mutual NDA 1 ¶ 15; Mutual NDA 2 ¶ 15.  Under New York law, waiver "'should not be lightly presumed' and must be based on 'a clear manifestation of intent' to relinquish a contractual protection."  *Kassab v. Kasab*, 195 A.D.3d 832, 838 (N.Y. App. Div. 2021).

There is no clear manifestation of intent to relinquish either provision here.  Teradata contends that there is waiver based on the conduct of its and SAP's employees "that shows that the parties intended that subsequent oral discussions of information already identified as confidential would be treated confidentially."  Opp. SMSJ at 17–18.  In support, it emphasizes testimony from various SAP employees, including SAP's CTO, where they state that they were required to protect

United States District Court
Northern District of California

1    Teradata's confidential information.  *See, e.g.*, Dkt. No. 532-1 ("Sikka Depo.") at 58–59 ("Q:  So

2    if it turned out that somebody on your team took Teradata confidential information and used it in

3    the development of NewDB, would that . . . be consistent with your understanding of the

4    confidentiality obligations between SAP and Teradata?  [Objection to form]  A: No, it would not

5    be consistent with it."); Dkt. No. 530-25 ("Holetke Depo.") at 120 ("Q: So you cannot imagine

6    sharing Teradata's confidential information with other groups at SAP?  [Objection to form]  A:

7    Yes."); Dkt. No. 530-39 ("Primsch Depo.") at 354–55 ("Q: Employees working on the Bridge

8    Project would not have shared [internal] information outside of SAP or Teradata?  A:  To -- to the

9    extent, yes.").  It also emphasizes an email from an SAP employee telling colleagues not to share

10   "internal information of TD [Teradata]" with IBM.  Dkt. No. 529-30 at 437.  These are not

11   evidence of a clear manifestation of SAP's intent to relinquish either provision in the Mutual

12   NDAs.  As SAP points out, it is not apparent from the testimonies what information was

13   "confidential" under the Mutual NDAs, only that information reduced to writing and marked

14   confidential is confidential.  Reply SMSJ at 7–9.

15        SAP asserts that Teradata's trade secret claims therefore necessarily fail because Teradata

16   failed to comply with its contractual obligation to designate information as confidential when it

17   disclosed the alleged Batched Merge Method trade secret to SAP.  It requests that I reconsider my

18   analysis of *PQ Labs, Inc. v. Yang Qi*, No. 12–CV–0450–CW, 2014 WL 334453, at *4 (N.D. Cal.

19   Jan. 29, 2014) in the prior MTD Order, where I rejected SAP's arguments that failure to satisfy the

20   contractual marking requirement requires the dismissal of Teradata's claims because I concluded

21   that there may be other ways for Teradata to have disclosed its trade secrets to SAP.  MTD Order

22   at 8–9.  For example, the Mutual NDAs "were only two of four contracts involved in the Bridge

23   Project to ensure that Teradata's proprietary information would not be misappropriated or reverse

24   engineered."  *Id.* at 9.  But with the record on summary judgment, it is clear that *PQ Labs* case is

25   distinguishable from this case.

26        In *PQ Labs*, the court held that the marking requirement was irrelevant because PQ Labs

27   had "presented evidence that it used other means to notify its employees and agents that its

28   technological and customer information was confidential."  *PQ Labs*, 2014 WL 334453, at *4.

13

United States District Court
Northern District of California

1    But unlike this case, there was no contractual marking requirement in *PQ Labs;* instead, the

2    marking requirement derived from non-precedential Tenth Circuit case law.  *Id.*

3          In contrast, a case like *Convolve Inc. v. Compaq Computer Corp.,* 527 F. App'x 910 (Fed.

4    Cir. 2013) is more analogous.  In *Convolve*, there was a contractual marking requirement "to

5    confirm in writing, within twenty (20) days of the disclosure, that the information was

6    confidential." *Id. at* 923.  The Federal Circuit affirmed the district court's decision that there was

7    no misappropriation of trade secrets because the appellant had failed to protect the confidentiality

8    of its information. *Id.* at 921–22.  It also held that there was no waiver or modification of the

9    marking requirement because "the testimony of a single Seagate employee that he believed that all

10   disclosures were confidential . . . is not indicative of the mutual intent of both parties." *Id.* at 924.

11         Likewise, Teradata's technical trade secret claims fail because it failed to protect the

12   confidentiality of its information.  Even if *PQ Labs* was analogous to this case, there is no

13   evidence that Teradata notified SAP of the confidentiality of the Batched Merge method through

14   other means.  Reply SMSJ at 8–9.

15         **3.    Contractual Right to Use the Asserted Trade Secret in Any SAP
                   Product**

16

17         Even if Teradata had sufficiently protected the confidentiality of the Batched Merge

18   method, SAP asserts that it is contractually authorized to use any "Confidential Information"

19   under the NDAs in any product.  SMSJ at 16.  Teradata has sued SAP for "using the proprietary

20   information conveyed by John Graas pertaining to Teradata's batched merge method."  Dkt. No.

21   464-14 ("Lanier Decl., Ex. 72") at 8.  The Batched Merge method "is alleged to have been

22   incorporated into the Bridge Project software (the MaxDB Bridge, also called the Teradata

23   Foundation)—and then allegedly into the interface between SAP applications and HANA ("Native

24   FAE")," also known as the conceptual design. *Id.* at 17.

25          According to SAP, both the software and its conceptual design are SAP property. *Id.*

26   Section 10 of the SDCA outlines the "Proprietary Rights of the Parties."  SDCA § 10.  It states

27   that SAP owns all rights to "the Conceptual Design [and] the SAP Interface in the form originally

28   supplied by SAP as well as any modified versions," and the "software code that is necessary to

1    adapt its software to" Teradata's database, including SAP's Interface.  *Id.* § 10.1.  The

2    "Conceptual Design" is defined as "the description of the functional specifications of the SAP

3    Interface or any other architecture, guideline or specification developed by or with SAP

4    concerning or related to the integration of the [Teradata Database] with the [SAP BW product]."

5    *Id.* § 1.2.  "SAP Interface" is defined as "an application interface developed by or with SAP that

6    resides on or in the SAP Software and which, when activated will give access to the Partner's

7    Solution [i.e., Teradata's database]."  *Id.* § 1.11.  And section 10.3 states that "any and all

8    Intellectual Property Rights to or arising out of any Newly Developed Materials shall belong to

9    SAP" and "Newly Developed Materials" is defined as "any software . . . developed by SAP and/or

10   [Teradata] in connection with or as a result of a party's interaction with the other party within the

11   context of this Agreement."  *Id.* §§ 1.8, 10.3.

12        Teradata responds that SAP's arguments depend on the Batched Merge method falling

13   under certain SDCA provisions, but resolving which provision applies depends on disputed factual

14   issues.  Opp. SMSJ at 21.  It argues that the Batched Merge trade secrets are not part of SAP's

15   Interface or Conceptual Design but rather Partner Materials under the SDCA, and therefore when

16   SAP ended the Bridge Project, its license to use the Batched Merge method terminated.  *Id.*  The

17   SDCA defines "Partner Materials" as "any and all Intellectual Property Rights in any programs,

18   tools, systems, data or materials utilized or made available by Partner [Teradata] in the course of

19   the performance under this Agreement," which "shall remain vested exclusively in [Teradata]" but

20   "[s]ubject to any rights expressly granted to SAP hereunder."  SDCA § 10.2.  Section 9.2 of the

21   SDCA limits use of Teradata's Partner Materials to five specific purposes, none of which include

22   the development of SAP's HANA product; therefore, SAP was only allowed to use these materials

23   "during the Term" of the SDCA.  Opp. SMSJ at 21–22.  Section 9.2 provides SAP a limited

24   license to "the Partner Solution, related Documentation, and any other programs, tools, or other

25   materials provided by Partner to SAP under a Project Plan."  SDCA § 9.2.

26        SAP points out that Teradata does not and cannot explain how Graas's suggestions are any

27   of the above.  Reply SMSJ at 11.  Graas's suggestions are not the Partner Solution, which is

28   defined as only the Teradata Database itself, not the Database, not the documentation related to the

15

database such as manuals, not a program and not a tool.  *See* SDCA § 1.9.  As SAP asserts, Graas's suggestions do not fall under section 9.2, the purpose of which is to prevent SAP from using Teradata's Database itself.  *Id.*  Instead, section 9.4 encompasses Graas's input, as explained below.

Teradata argues that the Batched Merge method was neither developed in connection with or as a result of the parties' interactions within the context of the SDCA, nor developed by or with SAP as the Conceptual Design.  Opp. SMSJ at 22; see SDCA §10.03.  Accordingly, Section 10.3 ("Newly Developed Materials") could not apply because those intellectual property rights existed prior to the Bridge Project.  But whether Teradata owned the Batched Merge method and incorporated it into its own software before the Bridge Project is irrelevant.  SAP does not argue that it owns the Batched Merge method but rather that "it owns the new software that includes the optimizations based on SAP's interactions with Graas."  *Id.* at 10.

Section 10.2, which provides an exception to the rights expressly granted to SAP under the SDCA, does not change the fact that Section 10.1 expressly licenses to SAP the right to use Graas's input—i.e., his conversation with SAP employees—in any product.  SMSJ at 18.  Both the SDCA and the Mutual NDAs permit SAP to use any Teradata feedback or input regarding SAP's products, even if such information was marked confidential.  *Id.* (citing SDCA §§ 9.4, 12; Mutual NDA 1 § 7, Mutual NDA 2 § 7).

For example, Section 9.4 of the SDCA provides,

> "Partner [Teradata] grants to SAP a worldwide, nonexclusive, royalty-free fully paid up, perpetual and irrevocable license to use, reproduce, display, distribute, create derivative works, or sublicense any Input submitted by Partner [Teradata] to SAP with resect to any deliverables or other items that SAP provides or shall provide to the Partner . . . To the extent that any such Input is incorporated into an SAP product, any inherent disclosure of Confidential and/or trade secret Information of Partner through the exercise of the license grants set forth in this Section 9.4 shall not constitute a breach of this Agreement including, but not limited to, any agreement between the Parties with respect to such Confidential or trade secret information referenced herein."

SDCA § 9.4.  The SDCA states that "Input" means "suggestions, comments, and feedback (whether in oral or written form), including any included ideas and know-how, voluntarily

16

1    provided by one Party to the other Party with respect to the work performed under this

2    Agreement." *Id.* § 1.6.  Similarly section 7 of the Mutual NDAs state,

3        "During the course of this Agreement, Company [Teradata] may
         provide or SAP may solicit Company's input regarding SAP's
4        Software, products, services, business or technology plans, including,
         without limitation, comments or suggestions regarding the possible
5        creation, modification, correction, improvement or enhancement of
         SAP Software, products and/or services . . . (collectively, 'Company
6        Feedback') . . . In order for SAP to utilize such Company Feedback
         Company grants to SAP a non-exclusive, perpetual, irrevocable,
7        worldwide, royalty-free license . . .  SAP shall be entitled to use
         Company Feedback for any purpose without restriction or
8        remuneration of any kind with respect to Company."

9    Mutual NDA 1 § 7, Mutual NDA 2 § 7.

10        According to SAP, Graas's suggestions to SAP engineers about how to approach a

11   command/query coming from SAP applications to work more efficiently with the Teradata

12   database qualifies as "Input" under the SDCA and "Company Feedback" under the Mutual NDAs.

13   SMSJ at 18–19.  Teradata does not dispute that Graas's disclosures fall within "input," but it

14   argues that the Batched Merge method was not mere "Input."  Opp. SMSJ at 23; Reply SMSJ

15   at 10.  It argues that the trade secret is a proprietary method developed over many years, is

16   something that could not be fixed through a mere "thought" or "offhand comment," and took SAP

17   more than a year to understand that it was necessary and months more to implement it.  Opp.

18   SMSJ at 23.  As SAP points out, however, the license is not limited to thoughts or offhand

19   comments but rather distinguishes Teradata software, which SAP could only use for the purposes

20   of the Bridge Project, and changes made to SAP software, which could be used in any SAP

21   product under section 9.3 of the SDCA.  Reply SMSJS at 10–11.  As a result, SAP has the right

22   under the agreements to use the alleged Batched Merge method in its products outside of the

23   Bridge Project.  SMSJ at 19.

24        Finally, the parties dispute whether SAP's interpretation of the SDCA contradicts the

25   implied covenant of good faith and dealing.  "In every contract there is an implied

26   covenant that neither party shall do anything which will have the effect of destroying or injuring

27   the right of the other party to receive the fruits of the contract, which means that in every

28   contract." *Kirke La Shelle Co. v. Paul Armstrong Co.*, 188 N.E. 163, 164 (1933).  But it cannot be

17

United States District Court
Northern District of California

used "to add contract terms that contradict the unambiguous provisions of the written contracts." *Atlas Equity, Inc. v. Chase Bank USA, N.A.*, 403 F. App'x 190, 192 (9th Cir. 2010). Teradata contends that the SDCA's purpose was to develop a joint solution that connects its hardware and software with SAP Business solutions and jointly promote the solution. SDCA, Preamble. According to Teradata, "SAP's interpretation of SDCA's license provisions—that it could use what it took from Teradata to develop and sell a competing product simultaneously—would destroy these benefits." Opp. SMSJ at 24. SAP responds that Teradata's argument contradicts its intent when it entered into the SDCA. Reply SMSJ at 12. Teradata knew that SAP was not working exclusively with Teradata on updates to its MaxDB database and knew that under the SDCA, all developments of SAP products would be owned by SAP even if made by Teradata. *See* SDCA § 2.3 ("This Agreement is not exclusive. SAP or Partner may enter into similar agreements with other partners."); SDCA § 10.1.

Accordingly, there is no genuine dispute of fact that Teradata not only failed to protect the confidentiality of its alleged trade secrets but also that SAP has a contractual right to use the alleged Batched Merge method in its own product. SAP's motion for summary judgment on Teradata's technical trade secret claims related to the Batched Merge method are GRANTED.

### 4. Related Motions to Exclude Expert Testimony

Two of Teradata's motions to exclude expert testimony relate to its trade secret claims. The first is Teradata's motion to exclude ten paragraphs in the report of SAP's computer science expert Tim Kraska. Dkt. Nos. 466, 495 at 1. Teradata asserts that Kraska improperly offers opinions regarding his interpretation of the SDCA and the Mutual NDAs. *Id.* Because none of Teradata's technical trade secret claims survive, I DENY Teradata's motion to exclude portions of Kraska's testimony as moot.

The second motion relates to Teradata's business trade secrets and seeks to exclude certain paragraphs in the report of SAP's data management expert Stephen Horn. Dkt. No. 474 ("Horn Mot.") at 1. Horn is SAP's rebuttal expert to Teradata's damages expert, Paul Meyer. Specifically, Teradata moves to exclude Horn's opinions on whether the allegedly stolen Teradata confidential information includes trade secrets, whether use of the confidential information

18

contributed to any sales of SAP HANA, whether Teradata took reasonable measures to protect its

confidential information, and what examples are of "reasonable" measures taken by data

management companies to protect confidential information. *Id.* (citing Dkt. No. 473-4 ("Horn

Reb. Rep.") ¶¶ 19, 21, 51-57, 63-84, 97-105).

First, Teradata asserts that Horn relies in part on documents that he and SAP refuse to

produce, which Horn claims show that Teradata's trade secrets were publicly available. Horn

Mot. at 4; *see* Dkt. No. 473-5 ("Horn Tr.") at 74 ("Q:  Did you do any investigation to see if that

information was publicly available in 2011?  A: Yes.  Actually I was able to use some of my own

folders of information . . . Q: But your materials in your folders are not cited in this report; right?

A:  Correct, because I wanted to keep them confidential.").  Teradata seeks to exclude Horn's

opinions based on these documents in paragraphs 63–84.  SAP responds that Horn bases his

opinion on materials he referenced in his report as well as publicly available documents such as

articles, websites, industry reports, laws, and statutes.  Dkt. No. 523 ("Horn Opp.") at 2, 9.

Further, SAP points out that under the parties' stipulation (Dkt. No. 235 ¶ 3), the parties are only

required to produce materials underlying the expert report rather than all materials an expert ever

considered and therefore Horn is not required to produce the documents at issue.  *Id.* at 10.  It

contends that Horn does not and will not offer any opinion based on documents that are not

available to Teradata.  *Id.* at 2.  With this understanding, Teradata's motion to strike paragraphs

63–84 because they allegedly include Horn's opinions based on unproduced documents is

DENIED.   Teradata may question Horn about this issue during cross examination as it goes to the

weight of his testimony, but it is not a basis for excluding the testimony.

Second, Teradata argues that I should exclude Horn's opinions that present a legal

conclusion based on a fundamental misunderstanding of the law.  Horn Mot. at 1.  Specifically,

Teradata asserts that Horn should not be allowed to testify to what is or is not a trade secret

because his understanding of the law is incorrect and to allow his testimony would mislead the

jury and confuse the issues at trial.  *Id.*

Under the CUTSA, "[c]ombinations of public information from a variety of different

sources when combined in a novel way can be a trade secret."  *O2 Micro Int'l Ltd. v. Monolithic*

1    *Power Sys., Inc.*, 420 F. Supp. 2d 1070, 1089–90 (N.D. Cal. 2006), *aff'd*, 221 Fed. Appx. 996

2    (Fed. Cir. 2007).  When asked whether "information that's collected through public sources or is

3    otherwise public, when collected together, can still be [a] trade secret," Horn testified that this

4    standard was "totally incorrect."  Dkt. No. 473-5 ("Horn. Depo.") at 24.  As a result, Teradata

5    argues that Horn should be precluded from testifying about what types of information would be

6    considered trade secrets and that the allegedly stolen confidential Teradata information cannot be a

7    trade secret because he purportedly found snippets of information from those documents in

8    various public or customer-facing documents.  Horn Mot. at 8.

9         SAP responds that Horn does not provide any legal conclusions in his report and that he is

10   allowed to challenge the factual issue of whether or not Teradata's alleged trade secrets could be

11   ascertained by others outside Teradata.  Horn Opp. at 2.  But as Teradata points out, Horn does

12   offer legal opinions that Teradata's information are not trade secrets or proprietary to Teradata.

13   *See* Horn Reb. Rep. ¶¶ 73–74, 77, 82.  Horn can address the factual issue of whether Teradata's

14   purported trade secret information was ascertainable to others outside of Teradata, but he cannot

15   testify that Teradata allegedly stolen confidential information are not trade secrets.  Teradata's

16   motion to exclude Horn's legal conclusions is GRANTED.

17        Third, Teradata asserts that Horn's opinion that its confidential information did not lead to

18   sales of SAP HANA is insufficiently supported because he admits that he failed to conduct any

19   investigation of the sales.  Horn Mot. at 1.  SAP contends that Horn is not required to replicate

20   Meyer's investigation and that Horn properly relied on SAP's damages expert Leonard, who

21   examined each of the six sales for purposes of his damages analysis.  Horn Opp. at 2, 16.  Teradata

22   responds that Horn does not simply rely on Leonard's opinions but endorses them by opining that

23   they "are consistent with the commonly prevailing principles in the industry, and with [his]

24   experience and expertise."  Horn Reb. Rep. ¶¶ 101–02.  It asserts that in the cases on which SAP

25   relies, the "courts have been careful to either require independent investigation or to strictly limit

26   their testimony to critiquing methodology or assumptions of an opposing expert."  Horn Opp. at 7

27   (citing *TCL Comm'cns. Tech. Holdings Ltd. v. Telefonaktienbologet LM Ericsson*, 2016 WL

28   7042085, at *5 (C.D. Cal. Aug. 17, 016) (holding "it is proper for [rebuttal] experts to utilize their

United States District Court
Northern District of California

20

CONFIDENTIAL MATERIAL OMITTED

1  own independent analyses and methodologies to" rebut expert opinions); *Cmty. Ass'n for*

2  *Restoration of the Env't, Inc. v. Cow Palace, LLC*, 80 F. Supp. 3d 1180, 1215 (E.D. Wash. 2015)

3  ("recogniz[ing] the limited bases for [rebuttal expert's] rebuttal opinions" given the lack of

4  independent investigation)).  Teradata's motion to exclude paragraphs 21, 99 105 of Horn's report

5  is DENIED because Horn properly relies on Leonard's analysis, but Horn may not otherwise

6  endorse or offer any affirmative opinions about Leonard's analysis.

7         Finally, Teradata argues that Horn is not qualified to opine on industry standards regarding

8  the protection of confidential information.  Horn Mot. at 1.  According to Teradata, Horn has no

9  experience drafting or developing protocols for the protection of confidential information, and

10  therefore cannot base his opinions on what reasonable measures are taken by data management

11  companies.  *Id.* at 11.  SAP responds that Horn has decades of experience implementing, applying,

12  and working with confidentiality policies of data management companies and, based on that

13  experience, has conducted a more than sufficient review to rebut Meyer's assumptions regarding

14  the alleged confidentiality of Teradata's purported business trade secrets.  Horn Opp. at 17 18.

15  Even if Horn did not have the experience, lack of particularized expertise goes to weight rather

16  than admissibility.  Teradata's motion to exclude paragraphs 51 57 and 97 is DENIED.

17         **B.      Tying Claim**

18         SAP moves for summary judgment on Teradata's tying claim.  Before I address SAP's

19  motion, I will address two motions to exclude expert testimony and Teradata's objections to

20  SAP's reply evidence.

21             **1.      Motion to Exclude Asker Testimony**

22         SAP moves to strike the opinions of Teradata's liability and damages expert, Dr. Asker.

23  Dkt. No. 470 ("Asker Mot.") at 1.  Asker opines that the relevant product market for the tying

24  market is "core ERP products for large enterprises."  Dkt. No. 468-20 ("Asker Rep.") ¶ 46.

25  Market participants include SAP and Oracle, with Workday and Microsoft appearing as leaders of

26  a fringe of participants.  *Id.*  He defines the tied market as "EDW products with OLAP capabilities

27  for large enterprises" with market participants such as ███████████████████████████

28  *Id.* ¶ 78.  He opines that SAP has economically significant market power in the tying market, that

United States District Court
Northern District of California

SAP has caused harm to competition in the tied market, and that there are no procompetitive benefits of the alleged tie. *Id.* ¶¶ 12, 105, 171. Finally, he asserts that Teradata has lost significant profits and will experience significant future losses due to the alleged tying arrangement. *Id.* ¶¶ 181, 192.

### a.     Tying Product Market

SAP argues that Asker's methodology for defining the tying product market is unreliable because instead of showing cross-elasticity, Asker's primary methodology is "to interpret ordinary course documents produced in the case" and "buttress this qualitative approach with a quantitative 'aggregate diversion analysis'" of the Customer Relationship Management ("CRM") data from SAP and Oracle. Asker Mot. at 5–6; *see* Asker Rep. ¶¶ 63, 64, 70.

In a tying arrangement the seller conditions one product, the tying product, on the buyer's purchase of another product, the tied product, to extend its market power in a distinct product market. *See Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 912 (9th Cir. 2008). A tying arrangement is "forbidden on the theory that, if the seller has market power over the tying product, the seller can leverage this market power through tying arrangements to exclude other sellers of the tied product." *Id.*

### i.     Cross-Elasticity of Demand

First, SAP asserts that Asker's methodology is flawed because he failed to calculate the cross elasticities for demand among various ERP products. Asker Mot. at 5. As the Supreme Court has instructed, "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). The Ninth Circuit has recognized that "[t]he principle most fundamental to product market definition is 'cross-elasticity of demand' for certain products or services. Commodities which are 'reasonably interchangeable' for the same or similar uses normally should be included in the same product market for antitrust purposes." *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 291–92 (9th Cir. 1979). Cross-elasticity of demand occurs where "an increase in the price of one product leads to an

United States District Court
Northern District of California

1   increase in demand for another"; in that circumstance, "both products should be included in the

2   relevant product market." *Olin Corp. v. F.T.C.*, 986 F.2d 1295, 1298 (9th Cir. 1993). As I have

3   previously acknowledged, "[n]umerous cases have recognized the importance of cross-elasticity to

4   determining what products should be included in or excluded from the relevant antitrust market."

5   *United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare Fund v.*

6   *Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1167 (N.D. Cal. 2017) (collecting cases).

7       Teradata contends that Asker was not required to measure cross-elasticity of demand,

8   especially where, as here, it was not possible to calculate cross-elasticities. Dkt. No. 537 ("Asker

9   Opp.") at 7. It points to three district court cases where the court relied on an expert's

10   methodology that did not use cross-elasticities and instead used "practical indicia" as outlined by

11   the Supreme Court in *Brown Shoe* to determine the boundaries of a product market. *See Epic*

12   *Games, Inc. v. Apple Inc.*, No. 20-CV-05640-YGR, 2021 WL 4128925, at *85 (N.D. Cal. Sept. 10,

13   2021); *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 984–86 (C.D. Cal. 2012); *Nobody*

14   *in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1082 (D.

15   Colo. 2004). Teradata's reliance on these three cases, however, is misplaced.

16       In *Epic Games*, the court focused on practical indicia and not cross-elasticities when

17   determining the submarket. *Epic Games*, 2021 WL 4128925, at *85. This is proper under *Brown*

18   *Shoe* and Ninth Circuit precedent. "In limited settings . . . the relevant product market may be

19   narrowed beyond the boundaries of physical interchangeability and cross-price elasticity to

20   account for identifiable submarkets or product clusters." *Thurman Indus., Inc. v. Pay 'N Pak*

21   *Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989). "The boundaries of such a submarket may be

22   determined by examining such practical indicia as industry or public recognition of the submarket

23   as a separate economic entity, the product's peculiar characteristics and uses, unique production

24   facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors."

25   *Brown Shoe*, 370 U.S. at 325. Here, Asker is not defining a submarket but the tying product

26   market. He also does not address the practical indicia under *Brown Shoe*.[4]

27   _____

28   [4] During the hearing, Teradata's counsel asserted for the first time that Asker's methodology was

1     In *In re Live Concert*, the court held that "while calculating the cross-elasticity of demand

2    (and supply) is the preferred methodology, it is not an absolute requirement" and found that "it is

3    usually necessary to consider other factors that can serve as useful surrogates for cross-elasticity

4    data" because "it is ordinarily quite difficult to measure cross-elasticities of supply and demand

5    accurately." *In re Live Concert*, 863 F. Supp. at 984.  Likewise, in *Clear Channel*, the court found

6    "that a plaintiff may, through sufficient evidence of other indicia of market definition, define a

7    relevant market without economic study of cross-elasticity of demand, especially when economic

8    analysis of cross-elasticity of demand is infeasible based on pricing data." *Clear Channel*, 311 F.

9    Supp. at 1082.  Both courts then evaluated the sufficiency of the expert's methodology that was

10   based on the *Brown Shoe* practical indicia factors.  *See, e.g.*, *Clear Channel*, 311 F. Supp. at 1083

11   (finding that the expert's methodology is sufficient).  The court in *In re Live Concert* recognized

12   that the Ninth Circuit "has never expressly held that . . . a plaintiff's expert economist[] can define

13   the relevant product market exclusively by reference to these 'practical indicia.'" *In re Live*

14   *Concert*, 863 F. Supp. at 986, 985.  But for the purposes of the motion, it assumed that an expert

15   economist could and found that the expert's purported market definition was "neither sufficiently

16   reliable nor sufficiently helpful to the trier of fact to warrant admission under Rule 702" because

17   the expert's analysis (1) fails to comport with his "chosen methodology (i.e., the "SSNIP"

18   methodology); (2) is effectively predicated on the analysis of a single *Brown Shoe* factor; and (3)

19   fails to consider the cross-elasticity of supply." *Id.* at 994.

20     Teradata contends that it was "not possible to calculate cross-elasticities" here because

21   third parties such as Oracle, IBM, and Microsoft were not "ordered to produce the type of granular

22   data required to calculate cross-elasticities of demand."  Asker Opp. at 7.  It also argues that SAP's

---

24   proper because market definition can be determined based on practical indicia.  Hearing Tr. at 31.

25   Its counsel expressly identified one factor, industry or public recognition of the market, as a
separate economic entity.  *Id.*  But the case on which Teradata relies holds that, "[t]he existence of

26   three or four of these indicia has been held 'sufficient to delineate a submarket,'" not one.  *In re*
*Live Concert Antitrust Litig.*, 863 F. Supp. at 989.  As explained in the subsequent sections, there

27   is no evidence of three or four of these practical indicia.  *See Brown Shoe*, 370 U.S. at 325
(practical indicia are "industry or public recognition of the submarket as a separate economic

28   entity, the product's peculiar characteristics and uses, unique production facilities, distinct
customers, distinct prices, sensitivity to price changes, and specialized vendors.").

1   expert, Dr. Stiroh, admits that such data is unavailable. *Id.* at 8; *see* Dkt. No. 541-33 ¶ 62

2   ("Econometric methods include the estimation of the cross-price elasticity of demand. However, I

3   have not seen data in this case that can be used to reliably estimate actual lost sales and diversion

4   ratios in response to price changes of different ERP products."). SAP responds that Teradata did

5   not request any data from third parties that would have permitted analysis of cross-elasticity of

6   demand. Dkt. No. 555 ("Asker Reply") at 2.

7         Regardless, Teradata contends that Asker does, in fact, analyze cross-elasticity of demand.

8   Hearing Tr. at 29. According to Teradata, although Asker does not have an econometric

9   estimation of cross-elasticity, he looks at cross-elasticity, i.e., substitutability, from a quantitative

10  and qualitative standpoint. *Id.*

11                        **ii.    Qualitative Analysis**

12        SAP asserts that Asker's qualitative approach is unreliable because it is based on "his own

13  subjective interpretation of ordinary course documents" and his inconsistent use of evidence.

14  Asker Mot. at 5, 7. In particular, it criticizes Asker's definition of "core ERP" and "large

15  enterprises" ("LEs") in his tying product market definition of "core ERP products for large

16  enterprises," composed of SAP and Oracle. Asker Opp. at 9.

17        For "core ERP," SAP asserts that Asker changes its definition to fit his needs. *Id.* at 7. For

18  example, Asker defines "core ERP" as products that "are identified with reference to the finance

19  modules of ERP software." Asker Rep. ¶ 9. According to Exhibit 2 in Asker's initial report,

20  however, only 30% of "core EP" is finance and the other 70% is human resources, procurement,

21  R&D sales, supply chain, and travel. *See id.* at 33, Ex. 2. But Asker mainly focuses on finance

22  when defining "core ERP." He explains that "[w]hile there are various core ERP definitions, a

23  consistent feature of core ERP is that it includes finance." *Id.* ¶ 48. And none of SAP's three

24  economic experts dispute Asker's relevant market definition. *See, e.g.*, Dkt. No. 532-3 ("Stiroh

25  Depo.") at 108–09 ("Q: And you don't dispute in your report that Dr. Asker's opinion that the

26  relevant product market for S/4HANA is limited to core ERP products; is that right? A: I don't

27  take that on. . . . The opinions that I have in my report are not dependent on a specific definition of

28  what is included or excluded in core ERP.").

United States District Court
Northern District of California

### CONFIDENTIAL MATERIAL OMITTED

United States District Court
Northern District of California

1   Moreover, Asker's focus on finance in his definition of "core ERP" is supported by SAP's

2   own witness testimony. SAP's Vice President for competitive market insights for business

3   applications and industries testified that the solutions included within "core ERP" are "general

4   ledger and some of the other financial – you know, financial close, that type of activity you start to

5   – I'd also say that master data governance types of products are – may be considered part of digital

6   core." Dkt. No. 530-16 ("Dover Depo.") at 30. Likewise, SAP's Senior Vice President of

7   S/4HANA testified that when SAP decided to build S/4HANA it "obviously started in the finance

8   area because that's the center of every ERP system." Dkt. No. 530-22 ("Grigoliet Depo.") at 24.

9   Teradata's industry expert, Paul Pinto also opined that "large enterprises build their systems

10   around their financial ERP, which is why it is often referred to as 'core ERP.'" Dkt. No. 528-8

11   ("Pinto Decl.") ¶ 31.

12   SAP also objects to Asker's use of applications such as "treasury management" "when it is

13   expedient to do so" because it is outside his definition of core finance. Asker Mot. at 7 (citing

14   Asker Rep. ¶ 122 (mentioning that SAP ███████████████████████████

15   ██████████████████████████████)). The column titled "core ERP" in Exhibit

16   2 in Asker's report does not mention "treasury management." Asker Rep. at 33, Ex. 2. Teradata's

17   own expert also testified that "treasury management" is not part of "core ERP." See Dkt. No. 555-

18   3 ("Pinto Depo.") at 83 ("Q: What about cash and treasury management, would you consider that

19   part of core ERP? A: I would not."). That said, column 1 in Exhibit 2 in Asker's report, titled

20   "Digital Core" includes "Treasury Management" under "Core Finance." Asker Rep. at 33, Ex. 2.

21   Asker also testified that he considered treasury management part of "core ERP." Dkt. No. 536-6

22   ("Asker Depo.") at 20–22 ("[T]he left-hand side column it – this is labeled . . . 'Digital Core.' It

23   says 'Core Finance plus Enterprise Risk & Compliance, Treasury Management, Real Estate

24   Management, Indirect Tax.' I interpret that as incorporating the articulation of "Core Finance"

25   that's located in the middle column."). In addition, SAP's own documents include "treasury

26   management" in its definition of "core ERP." Dkt. No. 536-12 at 69–70. As a result, contrary to

27   SAP's assertion, Asker's definition of "core ERP" is proper.

28   Next, SAP argues that Asker's definition of "large enterprises" is problematic. Asker Mot.

at 8. Asker defines "large enterprises" as "companies with over 1,000 or 1,500 employees and over 125 users of the ERP product"; his own sources, such as SAP's internal documents, show that there is no commonly accepted categorization of SAP's customers. *See, e.g.*, Asker Rep. ¶ 50 n.110–11 (SAP internal presentation defining large enterprise as "Revenue: €250 [million] + Size 250 employees"); *id.* ¶ 50 n.111 (SAP presentation defining large enterprises as companies with "over 1000, 5000, or 10K"); *id.* ¶ 38 n.84 (large enterprises:  over 500 employees, $1 billion in annual revenue, and an ERP user count of over 250); *id.* ¶ 20 n.24 (large enterprise: companies with over $1 billion in revenues in North America and over $250 million or $500 million in Latin America).

Further, according to SAP, Asker testifies that there are approximately 100,000 companies in his proposed relevant market but he does not sufficiently explain why he then focuses only on documents discussing the largest 500 or 2,000 companies in the world, e.g., companies in Forbes Global 2000, Global Fortune 500, DAX stock index, and MDAX index. Asker Mot. at 8; *see* Dkt. No. 512-2 ("Asker Depo.") at 32 ("Q: And global . . . is fewer than 100,000 companies would qualify as large enterprises? A:  It may be a little more than that . . . Q: So best estimate is, give or take, somewhere around a hundred thousand? A:  [A]s I sit here today, that would be my sense, but I want to be very clear that it may be a fair bit less, it may be somewhat more.").  Teradata responds that SAP mischaracterizes Asker's testimony and that he repeatedly testified that SAP does not count its own customers. Dkt. No. 536-6 ("Asker Depo.") at 30 ("I note that even in their own documents, SAP doesn't count customers; but, rather, they talk about total market opportunities).  It also highlights SAP's own documents to its investors, which show that SAP relies on the Forbes Global 2000 index and the DAX stock index to assess and report its market position.  *See* Dkt. No. 537-8 at 7 ("S/4 is further gaining market share, and we see positive software license growth and high double-digit cloud revenue growth.  80% of the DAX companies and 65% of the Forbes' Global 2,000 companies already rely on SAP S/4HANA.").

SAP also relies on *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098 (N.D. Cal. 2004) to argue that a product market limited to "large" ERP customers is improper.  Asker Reply at 3.  In

27

### CONFIDENTIAL MATERIAL OMITTED

1    *Oracle*, the court evaluated evidence after a two-week trial and rejected the plaintiffs' product

2    market that only included products sold by Oracle, PeopleSoft, and SAP, and did not include mid-

3    market products. *Oracle*, 331 F. Supp. at 1158. The court rejected the proposed product market

4    in part because there was "no 'quantitative metric' that could be used to determine the distinction

5    between a high function product and a mid-market product." *Id.* For example, it found that

6    Microsoft would be a viable substitute after examining its entry into the high function product

7    market. *Id.* at 1160. Today, however, Microsoft ███████████████████████████

8    ███████████████████████████. Dkt. No. 543-44 at 7. Teradata asserts that the case is

9    therefore distinguishable because the ERP market has changed since *Oracle*, e.g., mid-market

10    competitors that the *Oracle* court relied on have now been acquired by larger ERP vendors or

11    disappeared from the market. Asker Opp. at 11 (citing *Oracle*, 331 F. Supp. at 1159–61).

12        SAP contends that the case is persuasive for rejecting a proposed product market where, as

13    here, "there is no clear line separating those companies or the products they buy from others."

14    Asker Reply at 3. Despite Asker's admission that there is no common definition of "large

15    enterprises," even among SAP's own internal documents, he concludes, without further

16    explanation, that "'large enterprises' are generally companies with over 1,000 or 1,500 employees

17    and over 125 users of the ERP product." Asker Rep. ¶ 50. He bases his conclusion on two SAP

18    documents that show that it markets different ERP products based on customer size, namely

19    S/4HANA to large enterprises that have over 1,000 employees. *See* Dkt. No. 537-6 at 572. But he

20    ignores the other SAP documents that indicate otherwise. As a result, Asker's limitation of the

21    product market to "large enterprise" customers "stands on infirm ground" because Teradata

22    "makes no other effort to reconcile Dr. Asker's distinct separate market with the broad continuum

23    of customers and varied and flexible approach to customer size taken by the industry." Asker

24    Reply at 3.

### iii.    Quantitative Analysis

26        More importantly, Asker's quantitative analysis, which he uses to corroborate his

27    qualitative analysis, is flawed because contrary to his claims, Asker does not apply a "hypothetical

28    monopolist" test ("HMT") as contemplated in the Department of Justice and the Federal Trade

United States District Court
Northern District of California

28

1  Commission's ("FTC") Horizontal Merger Guidelines (the "Guidelines").[5]  Asker Mot. at 9.  This

2  test asks whether a hypothetical monopolist over a group of products could profitably impose a

3  small but significant and non-transitory increase in price ("SSNIP") of 5%; if a significant number

4  of customers respond to a SSNIP by purchasing substitute products, then the SSNIP would not be

5  profitable and the market definition must be expanded to include those substitute products.  *See*

6  *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys.*, Ltd., 778 F.3d 775, 784 (9th Cir.

7  2015).

8          Asker states that he conducts a quantitative hypothetical monopolist test using aggregate

9  diversion ("ADR") analysis of "Customer Relationship Management" ("CRM") data from SAP

10  and Oracle, based on the number of times competitors are mentioned in sales representatives' sales

11  report.[6]  Asker Rep. ¶¶ 63, 64, 71.  He opines that "CRM databases can be informative for market

12  definition to the extent that they provide some information on how frequently a business

13  encounters various potential competitors." Asker Rep. ¶ 65.  But he admits that CRM data "may

14  not always be a reliable indicator of the actual competitor faced by a company because the data is

15  often incomplete or the salesperson may have only a limited view into competition."  *Id.*  He

16  concedes that, "CRM databases may also lack detail that allow precise evaluations of specific

17  markets" and that "this is the case in this matter, where every CRM data set [he has] examined has

18  limitations."  *Id.*  As a result, he explains that he views the CRM data " as merely providing a way

19  to corroborate the patterns that are present in the deposition testimony and documentary evidence

20

21  [5] In its opposition to SAP's motion for summary judgment, Teradata asserts that SAP's

22  argument—"that a product market must include economic substitutes, i.e., products that would see
    increased demand in response to a price increase in another product"—contravenes established
    economic principles.  Dkt. No. 542 at 30.  It argues that the Guidelines "make clear that even if a

23  significant number of customers (even two thirds) would switch to other suppliers' products in
    response to a price increase, that does not require their inclusion in a properly defined relevant

24  market."  *Id.* (citing Dkt. No. 543-64 ("Guidelines") § 4.1).  But the Guidelines do not say this.
    Instead, Section 4.1 of the Guidelines make clear that although a product market need not include

25  every competitor, it must "contain enough substitute products" to satisfy the SSNIP test.
    Guidelines § 4.1; *see* Dkt. No. 552 at 20.

26  [6] "Aggregate diversion analysis finds the threshold where a hypothetical monopolist imposing a

27  [SSNIP] would lose enough sales ('actual loss') compared the "critical loss" such that the SSNIP
    would be unprofitable for the hypothetical monopolist.  When the estimated actual loss due to a

28  SSNIP is smaller than the critical loss, the candidate market is considered a relevant antitrust
    market."  Asker Rep. ¶ 71.

United States District Court
Northern District of California

29

United States District Court
Northern District of California

1    on the record" and expresses caution about using the data to form conclusions.  *Id.*  That said, he

2    concludes that the results of his analysis is "consistent with the deposition testimony and

3    documentary record that is my primary foundation for concluding that SAP and Oracle are each

4    other's primary competitors for core ERP opportunities for large enterprises.  Asker Rep. ¶ 71.

5         SAP's expert, Stiroh, asserts that the ADR analysis is flawed because "[s]uch an analysis

6    requires data and inputs that can be used to reliably estimate actual lost sales and diversion ratios

7    in response to price changes of different ERP products" but such data was not available in this

8    case.  Dkt. No. 554-9 ("Stiroh Rep.") ¶ 58.  Moreover, "[t]he CRM data that Asker uses to

9    calibrate his ADR model do not show actual diversion from one company to another, do not

10   reflect changes in purchasing patterns in response to price changes, and do not account for the

11   competitive effects of emerging competitors and technologies or potential changes to SAP's

12   expected competitive significance over the decade."  *Id.* ¶ 59.

13        Teradata contends that ADR analysis is an accepted methodology and that disputes

14   concerning an expert's decision about what data to use in their analysis "bear on the weight, not

15   the admissibility, of expert testimony."  *In re Qualcomm Antitrust Litig.*, 328 F.R.D. 280, 305

16   (N.D. Cal. 2018) (collecting cases).  Although courts often conclude that "'experts' decisions

17   about what data to use' in their analysis bear on the weight, not the admissibility, of expert

18   testimony," *id.*, ADR analysis has rarely been accepted by courts.

19        Teradata only cites to two district court cases that allowed an expert to use this

20   methodology to determine a product market.  Asker's ADR analysis, however, is distinguishable

21   because the experts in those cases relied on data sets that measured a customer's response to

22   changes in price, e.g., actual win/loss data or bidding data, when using ADR analysis.  In *Federal*

23   *Trade Commission v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015), the FTC moved to enjoin a

24   potential merger between two food distribution companies.  *Sysco*, 113 F. Supp. at 15.  FTC's

25   expert had "calculated the actual aggregate diversion based on three different data sets" and "built

26   a database for each company that tracked, for each bidding opportunity, the incumbent distributor,

27   the winning distributor, and the competing bidders."  *Id.* at 35.  Like SAP in this case, the

28   defendants had objected to the expert's methodology in part because the data on which he relied

30

did not describe whether the two companies "lost a customer for a price-based reason or some reason having nothing to do with price." *Id.* at 36.  The court expressed its hesitancy to rely on the expert's findings but concluded that "when evaluated against the record as a whole" the expert's "conclusions are more consistent with the business realities of the food distribution market than" the defendants' expert. *Id.* at 37.

Similarly, in *Federal Trade Commission v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27 (D.D.C. 2018), the FTC moved to block a potential merger between two large providers of marine water treatment chemicals. *Wilh. Wilhelmsen*, 341 F. Supp. at 39.  FTC's expert "used three kinds of data—revenue information provided by marine suppliers, [] salesforce data, and [the providers'] win-loss data." *Id.* at 57.  The court accepted the FTC expert's market definition in part because the defendants' expert did not contest that the FTC's expert's methodology was flawed, did not present any alternative calculations or HMT results, and "the gap between critical loss and aggregate diversion in every trial was so large as to ensure the stability of the HMT's qualitative result against any but the gravest of statistical errors." *Id.*

Teradata asserts that like both cases, Asker's methodology "confirmed the market realities evident in the record" and his findings ensured "the stability of the HMT's qualitative result against any but the gravest of statistical errors."  Asker Opp. at 12 (citing Dkt. No. 468-21 ("Asker Reb. Rep.") ¶ 89) (opining that "the CRM data would have to overstate aggregate diversion by a factor of 2.5 to 3.2 for the conclusions for the aggregate diversion ratio analysis to change.").  But Asker's methodology is less reliable than those of the FTC experts because unlike the FTC experts, Asker did not build a database of the type prices or rely on the price ultimately paid by the customer.  *See* Asker Depo. at 66–67 ("My recollection is that the final pricing is not available in Oracle's CRM data, and my recollection is that it's not available in SAP's CRM data.); *id.* at 67 ("Q:  And in instances in which a competitor is listed, neither SAP's nor Oracle's CRM data indicate the pricing offered by competitors; right?  A:  As I sit here today, that's my recollection of those data sets.").[7]  His evaluation of CRM data did not and cannot consider pricing because the

---

[7] In fact, as opposed to the "hundreds of thousands" of entries in the CRM data used by the expert

**CONFIDENTIAL MATERIAL OMITTED**

1   CRM data does not measure customer responses to changes in price. *Id.* at 68 ¶9. As a result,

2   Asker's ADR analysis of SAP's CRM data cannot measure the most fundamental principle in

3   defining a market: cross-elasticity of demand.[8]

4           Teradata also contends that Asker conducts a robust quantitative analysis of SAP's pricing

5   data to analyze price discrimination, which corroborates his conclusion that large enterprises form

6   a separate market. Asker Opp. at 10. As the Guidelines state, "[t]he possibility of price

7   discrimination influences market definition [], the measurement of market shares [], and the

8   evaluation of competitive effects." Guidelines at 6. Teradata argues that even SAP's expert

9   admits that there is price discrimination between large and small enterprises. *Id.* For pricing

10  discrimination to exist there must be (1) differential pricing; and (2) limited arbitrage. Guidelines

11  at 6. According to Teradata, Stiroh's pricing analyses ██████████████████████████

12  ███████████████████████████████████████████, and she does not dispute

13  that there is limited arbitrage. Asker Rep. ¶ 79; Dkt. No. 532-3 ("Stiroh Depo.") at 109. But SAP

14  points out that its differential pricing is unrelated to customer size. Asker Reply at 4. "Per-unit

15  and per-user pricing confirm that SAP charges equivalent prices for large, mid-sized, and small

16  companies."[9] *Id.* (citing Stiroh Rep. ¶¶ 48 57). Further, Teradata's argument that Asker does not

17  need to demonstrate that SAP currently charges higher prices of large customers and only needs to

---

19  in Sysco, Asker relied on fewer than 7,700 entries in SAP's CRM data because almost 85% of the
20  data lacked any competitor information. Asker Rep. at 46, Exhibit 14; *see Sysco*, 113 F. Supp.
   at 35.

21  [8] Teradata contends that SAP's expert, Murphy confirmed the proprietary of Asker's
22  methodology. Asker Opp. at 3 n.9; Hearing Tr. at 29. But Asker relied on CRM data, which
   addresses the "relative frequency with which those firms compete for Core ERP sales
   opportunities," whereas Murphy confirmed the methodology of looking at "win/loss" data to
23  indicate substitutability. Asker Opp. at 3; see Dkt. No. 530-36 ("Murphy Depo.") at 44-45. SAP
   also points out that Murphy does not use the CRM data to define any antitrust markets. Hearing
24  Tr. at 56.

25  [9] SAP points out that in his initial report, Asker also analyzes "per-unit prices" for large
   customers, based on the "'size' of installation (number of users)," and concludes that they vary.
26  *See* Asker Rep. ¶ 76; *id.*, Ex. 7. Stiroh responded that the per user prices paid by small and
   mid-sized customers also vary, but tend to be higher than those paid by large customers, and
27  therefore there is no evidence of price discrimination against large customers. Stiroh Rep. ¶¶ 51
   57. In his reply report, Asker criticizes Dr. Stiroh for using "per-user" prices and claims that the
28  appropriate measure is "total spend." Asker Reb. Rep. ¶ 77. According to SAP, "neither Dr.
   Asker nor Teradata explain this flip-flop." Asker Reply at 5.

CONFIDENTIAL MATERIAL OMITTED

United States District Court
Northern District of California

1    demonstrate that future price discrimination is "feasible" and "reasonably likely" undermines its

2    argument. Asker Reply at 4. If SAP can charge higher prices to larger customers in the future

3    because SAP negotiated different prices with customers in the past, it could also charge higher

4    prices to small customers. *Id.* But this does not make them antitrust markets; in the absence of

5    evidence of actual current price discrimination against large customers there is no basis to assume

6    that future price discrimination is feasible or likely. Stiroh Rep. ¶ 57.

7           Asker's methodology in defining the tying market is unreliable. Contrary to Teradata's

8    assertion, he does not measure the cross-elasticity of demand or the substitutability of products

9    based on reliable quantitative and qualitative analyses. Because his methodology for defining the

10   relevant tying market is unreliable, his conclusions that SAP has market power in his proposed

11   market should also be excluded.

12                      **b.    Tied Product Market**

13          Asker's proposed tied market is "EDW products with OLAP capabilities for large

14   enterprises." Asker Rep. ¶ 10. For the same reasons as above, SAP objects to this definition; his

15   qualitative analysis fails to consider the appropriate universe of documents and his quantitative

16   analysis is not a result of any reliable methodology. Asker Mot. at 14.

17          First, SAP asserts that Asker fails to consider all of the relevant documents when

18   determining the tied market. *Id.* For example, Asker excludes an EDW vendor Snowflake from

19   the market because he found it did not compete for EDW use cases for large enterprises. Asker

20   Rep. ¶ 91. But Teradata's documents show that Snowflake was one of Teradata's primary

21   competitors, if not the largest competitor, in 2019. *See* Dkt. No. 468-22 at 8-9

22   ; Dkt. No. 468-23 at 4, 5  7

23   . But to claim that Asker ignored evidence regarding Snowflake is incorrect. Teradata

24   responds that this one document is contrary to the testimony of SAP's competitive intelligence

25   team and SAP documents which characterize Snowflake as a

26   Opp. Asker at 17 (citing Dkt. No. 536-10 at 548; Dkt. No. 530-46 at

27   147–48 (

28   ). Asker also analyzed the CRM data

33

United States District Court
Northern District of California

1    himself and recognized that Snowflake was not a significant competitor.  Asker Depo. at 97–100.

2        SAP also asserts that Asker's conclusion that SAP's HANA is in his tied market is

3    inconsistent with Teradata's own admissions.  *Id.* at 15.  Its Senior Vice President of Global

4    Marketing, Chris Twogood, testified that Teradata does not compete frequently against HANA for

5    sales of EDW because HANA was not "designed to be an enterprise data warehouse," and

6    Teradata does not consider SAP to be a primary competitor in the EDW space.  Dkt. No. 468-17

7    ("Twogood Depo.") at 20–22.  Teradata points out that Twogood clarified, however, that once

8    SAP tied HANA to S/4HANA, SAP was able to "leverage[] all their ERP customers to grow

9    market share."  Dkt. No. 543-38 ("Twogood Depo.") at 312, 315–16.  But Twogood's testimony

10    describes HANA being used as a transactional database under SAP ERP applications and

11    S/4HANA, not as an EDW.  Twogood Depo. at 314–15 ("[T]hey weren't successful with HANA

12    only or HANA alone in the marketplace.  So they bundled it in with their ERP solution and to

13    really ride a leverage for (verbatim) install base and force people to the HANA platform.").

14        Teradata also emphasizes that SAP omits the testimony of Teradata witnesses and ordinary

15    course documents identifying SAP as a key EDW competitor.  *See, e.g.*, Dkt. No. 530-9 ("Boerger

16    Depo.") at 303 ("IBM, Oracle, and SAP HANA compete for large enterprise data warehousing

17    types of customers"); Dkt. No. 543-26 ("Lea Depo.") at 59 ("Q: Who are the primary competitors

18    to Teradata Vantage, based on your experience today, with large enough customers looking for an

19    EDW solution?  A: It is more our traditional vendors, Oracle, IBM with Netezza and with Db2,

20    and HANA"); Dkt. No. 543-37 ("Susag Depo.") at 20 ("Q: Who do you consider to be Teradata's

21    main competitors in the enterprise data warehouse space?  A: IBM, Oracle, SAP, Microsoft at the

22    lower end of the enterprise data warehouse space.").  As a result, Asker's conclusions are not

23    inconsistent with Teradata's own admissions.[10]

24

25    —————————

25    [10] Further, Teradata asserts that SAP's contention that HANA does not compete with Teradata

26    contradicts its prior statements.  Hearing Tr. at 38–39; see, e.g., Dkt. No. 543-54 at 367 (a
technical textbook explaining to customers how to use HANA as an EDW).  SAP responds that

27    the relevant question is not whether SAP tried to sell HANA as an EDW but whether customers
purchase and use HANA for this purpose.  It asserts that Asker's "false assumption that, because

28    SAP tried to market SAP as an EDW, customers necessarily use it as an EDW, runs throughout
Asker's EDW-related opinions and renders them unreliable."  Reply at 8.

CONFIDENTIAL MATERIAL OMITTED

1    Asker's methodology is once again unreliable because he conducts an ADR analysis on

2    CRM data. Asker Rep. ¶ 95. His methodology is further problematic because it is inconsistent

3    with his methodology when defining the relevant ERP market. Asker Reply at 8. For the ERP

4    market, Asker applied his ADR analysis to determine the minimum number of market participants

5    and concluded that the relevant market consisted of only Oracle and SAP. *Id.* But under this

6    same approach, the tied market would have excluded SAP and therefore Asker included more than

7    the minimum number of participants to bring SAP into the market definition. As a result, and for

8    the same reasons above, Asker's testimony regarding the tied market should be excluded as

9    unreliable and unhelpful to a jury.[11]

10                    c.    **Alleged Harm to Competition and Benefits of Tie**

11    Finally, SAP opposes Asker's claims that its alleged conduct caused harm to competition

12    in his proposed tied market because it lacks support in the record and is based on a series of

13    unwarranted assumptions. Asker Mot. at 16. Asker's opinion is the following: "In this case, the

14    data and documents indicate that SAP's tie is causing sales of HANA that otherwise would not

15    have occurred. That is, SAP's conduct distorts purchasers' choices of EDW products, which

16    harms purchasers and competitors competing for those sales." Asker Rep. ¶ 12.

17    First, SAP asserts that Asker presents no evidence of harm to competition. *Id.* Notably, he

18    has not analyzed the impact of SAP's alleged conduct on the major competitors in his purported

19    market for EDW products with OLAP capabilities. *Id.* at 17. He ignores the issue of harm to

20    competition generally. He does not dispute that Oracle accounts for ▮▮▮ of database sales,

21    Microsoft accounts for about ▮▮, IBM accounts for ▮▮▮, and Amazon accounts for ▮▮

22    Asker Reply at 10. In other words, despite the undisputed fact that ▮▮▮▮▮▮▮▮▮▮▮▮

23    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25

26    [11] Teradata cites two internal SAP documents but neither suggests Dr. Asker's proposed
market is properly limited to just SAP and one competitor. Asker Reply at 20; *see, e.g.*, Dkt.
27    539-5 at 688 90 (concerns cloud competition and shows that while SAP considers Oracle its
"main" competitor, it also loses business to Microsoft and Workday); Dkt. 543–44 at 7 (includes
28    additional competitors like Infor, Sage, and Microsoft on the slide).

United States District Court
Northern District of California

35

CONFIDENTIAL MATERIAL OMITTED

1    ████████ " Asker Mot. at 17.

2    Teradata responds that Asker is not required to quantify damages for every participant in

3    the relevant market in order to opine that there are anticompetitive effects due to the tie. Asker

4    Opp. at 21 22. It points to SAP's own economist, Murphy, who admits that database vendors like

5    Oracle and IBM are losing sales for database products that include OLAP/EDW capabilities as a

6    result of SAP's tie and that SAP's licensing restrictions have an anticompetitive effect, as they

7    reduce customers' demand for using Teradata. Dkt. No. 530-36 ("Murphy Depo.") at 145–46;

8    Dkt. No. 541-31 ("Murphy Rep.") ¶ 224. But Murphy's statement concerned transactional

9    databases, not products that include OLAP/EDW capabilities. Asker Reply at 11.

10    Teradata asserts that "Tying arrangements are forbidden on the theory that, if the seller has

11    market power over the tying product, the seller can leverage this market power through tying

12    arrangements to exclude other sellers of the tied product." *Cascade Health Sols. v. PeaceHealth*,

13    515 F.3d 883, 912 (9th Cir. 2008). It argues that "the injury caused by an unlawful tying

14    arrangement is 'whether a total amount of business, substantial enough in terms of dollar-volume

15    so as not to be merely *de minimis*, is foreclosed to competitors by the tie.'" *Datagate, Inc. v.*

16    *Hewlett-Packard Co.*, 60 F.3d 1421, 1425 (9th Cir. 1995) (internal citations omitted). For

17    example, Asker relies on SAP revenue data ████████████████████████████

18    ████████████████████████████████████████ as evidence of a

19    distortion due to a tie and "not simply the result of competition on the merits. Asker Rep. ¶¶

20    145,147. Asker reviewed evidence that also showed that customers are not allowed "to use

21    S/4HANA and a third-party EDW without also purchasing HANA. In particular, the customer

22    must still purchase the 'full use' HANA license in order for it to use a competing third-party

23    EDW." *Id.* ¶ 158. He opined: "If a condition of purchasing a product is the simultaneous

24    purchase of a product of a competitor, economic reasoning indicates that the product's competitive

25    position is weakened." *Id.* Teradata therefore argues that Asker's opinions about the alleged harm

26    to competition are proper.

27    There needs to be a showing of "substantial" harm; de minimis harm is not enough under

28

36

United States District Court
Northern District of California

1    rule of reason analysis.[12]  *See Qualcomm*, 969 F.3d at 991 (Under § 1, "the plaintiff has the initial

2    burden to prove that the challenged restraint has a substantial anticompetitive effect that harms

3    consumers in the relevant market.").  Asker failed to show this; he presented no evidence of harm.

4           In addition, SAP asserts that Asker relies on a series of unwarranted assumptions,

5    specifically that because HANA has OLAP capabilities, it is necessarily always sold as an EDW.

6    Asker Reb. Rep. ¶ 127.  When HANA is "sold together with S/4HANA, [it] is almost always

7    bundled with S/4HANA under a runtime license," which precludes use of HANA as an EDW.

8    SMSJ at 28.  With a runtime license, HANA can be used only to support the SAP application

9    running on top of it; in other words HANA is the transactional database that supports the

10   application, S/4HANA.  Stiroh Decl. ¶ 176.  It cannot be an EDW, as defined by Teradata,

11   because it does not bring data from multiple sources across an enterprise and then use

12   sophisticated analytics tools to conduct analysis of that combined data.  *See* SAC ¶ 16.

13          Teradata does not dispute that approximately 88% of SAP's customers have purchased

14   HANA with a runtime license.  SMSJ at 29.  And it does not present any evidence that a single

15   customer has taken S/4HANA together with HANA pursuant to a full use license and used that

16   HANA installation as an EDW.  *Id.*  Teradata does not provide any instance where a customer

17   who used Teradata Database replaced it with HANA for the same purpose.  Because these

18   undisputed facts render Asker's opinion unreasonable and because Teradata's opposition is based

19   on an incorrect legal standard, SAP's motion to exclude portions of Asker's opinions related to

20   alleged harm to competition is GRANTED.

21          SAP also objects to Asker's opinions that HANA's adoption is not being driven by any

22   procompetitive benefits of the alleged tie.  Asker Mot. at 4.  According to SAP, Asker lacks the

23   expertise necessary to evaluate evidence of the design benefits of S/4HANA and admits that he

24   did not understand much of the relevant evidence.  *Id.*; *see* Asker Rep. ¶ 171 ("I do not have the

25   expertise to evaluate whether there is a technical benefit from combining S/4HANA with

26   HANA.").  Teradata responds that Asker is not opining that there are no technical benefits for the

27   _____

28   [12] *See infra* Part I.B.4.a for discussion on the application of either the rule of reason or per se
     analysis to this case.

United States District Court
Northern District of California

1  integration of S/4HANA and HANA but rather that the "documentary and deposition evidence

2  indicates that there is no technical reason for the tie and that the decision to tie was made by

3  SAP's board of directors on business grounds." Asker Opp. at 22–23. SAP replies that this

4  distinction is nonsensical because if S/4HANA is designed to work with HANA such that

5  S/4HANA "is wholly incompatible with other transactional databases" as Teradata alleges, then

6  this is the technical reason why customers must license S/4HANA and HANA together. Asker

7  Reply at 12.

8      Teradata asserts that no SAP witness or expert has provided a technical justification—or

9  any justification—for tying S/3HANA to HANA's analytical capabilities.[13] Asker is qualified to

10  assess the economic realities of SAP's business decisions to tie S/4HANA to the OLAP

11  capabilities of HANA. Asker Depo. at 226. His testimony related to the alleged lack of

12  procompetitive benefits should not be excluded.[14]

13              **2.      Motion to Exclude Mehrotra Testimony**

14      Teradata's moved to exclude three out of four of SAP's expert, Dr. Sharad Mehrotra's

15  opinions in sections VI and VII of his report, which rebut the opinions of Teradata's technical

16  expert Hosagrahar Jagadish: (1) that SAP could achieve significant benefits by designing

17  S/4HANA for its HANA database product; (2) that SAP could not have achieved these same or

18  similar benefits by designing S/4HANA to run on other databases; and (3) that "porting"

19  S/4HANA to third-party databases would be challenging. Dkt. No. 472 ("Mehrotra Mot.") at 1. It

20  contends that Mehrotra lacks the necessary factual foundation for these opinions and that he did

21  not follow any reliable methodology in reaching them. *Id.* It argues that Mehrotra never reviewed

22  any of the source code for S/4HANA or HANA, has never used or examined the products, has

23  never used or examined the third-party database products he compares to HANA, disregarded

24  testimony from SAP executives, and relies on cherry-picked documents for sweeping conclusions.

25

26  _____

27  [13] The reason for this lack of evidence, however, is Teradata's allegation of a new tying theory during the summary judgment briefing. *See infra* Part I.B.3.

28  [14] Because Teradata's tying claim fails, *see infra* Part I.B.4, I will not address SAP's motion to exclude Asker's analysis of lost profits due to the alleged tying arrangement.

United States District Court
Northern District of California

1    *Id.* at 2.  SAP responds that Mehrotra's methodology is reliable, and that the rest of Teradata's

2    arguments go to the weight and not the admissibility of evidence.  Dkt. No. 533 ("Mehrotra

3    Opp.") at 1.

4          First, Teradata argues that Mehrotra's opinion in section VI of his report—that SAP was

5    able to realize multiple technical and practical benefits by designing S/4HANA to work closely

6    with HANA—should be excluded because it is unsupported and unreliable.  Mehrotra Mot. at 2.

7    Mehrotra admits that he has never used or even examined the S/4HANA or HANA software, any

8    SAP ERP applications, or source code.  Dkt. No. 483-4 ("Mehrotra Depo.") at 42–44 ("Q: Have

9    you ever used S/4 Hana?  A: Personally, no . . . Q: Have you ever used any part of SAP's Business

10   Suite?  A: No, I have not.  Q: Have you ever used SAP's HANA database?  A: I have personally

11   not used SAP HANA database.  It's not an open source database.  So it's not free.").  When asked

12   whether he had ever used any SAP ERP software, he responded, "No. I am an academic.  We

13   normally do not deal with the operational aspect of the problem, so where companies sort of run

14   these things."  *Id.* at 43–44.   Teradata contends that SAP "is silent on the issue" and "cites no case

15   where an expert was allowed to opine on the design, capabilities, performance, and compatibility

16   of products without ever having even looked at them."  Dkt. No. 551-4 ("Mehrotra Reply") at 1.

17         SAP does not respond directly to the argument that Mehrotra did not use any of the SAP

18   products.  It does assert, however, that Mehrotra reviewed the architecture and design of

19   S/4HANA, relying on a series of 28 architectural guidelines of all of the versions starting with the

20   first in May 2014 through March 2019.  Mehrotra Opp. at 18.  It also asserts that it was unfeasible

21   and not useful for Mehrotra to review all 300 million lines of source code.  *Id.* at 10.  Teradata

22   responds that the argument that Mehrotra "cannot look at everything does not mean it is proper to

23   look at little to nothing" and at the very least, he "should have identified some representative

24   queries in S/4HANA that would require porting to third-party database."  Mehrotra Reply at 1.

25         Mehrotra did not have to review the source code because he reviewed the architecture and

26   design of S/4HANA instead.  Mehrotra Depo. at 147.  For example, he stated that he is "intimately

27   aware" of the "architectural aspects of things, but [] not [as] aware of the exact software

28   implementation."  *Id.*  But he testified that source code is simply "one aspect of the system

United States District Court
Northern District of California

39

United States District Court
Northern District of California

1    analysis" and that he understood "the system and its properties" by the architectural diagrams.  *Id.*

2    SAP contends that reviewing S/4HANA and HANA at a design and architectural level is "a

3    common and accepted method of software analysis," as evidenced by the academic and expert

4    works that Mehrotra cites in Appendix B of his report, which "rely on exactly this architectural

5    level of analysis."  Mehrotra Opp. at 11 (citing Dkt. No. 483-3 ("Mehrotra Rep."), Appendix B).

6    Teradata responds that SAP does not point to any specific methodologies that are supposedly

7    found in any of these works.  Mehrotra Reply at 2.  It asserts that "[t]he reality is that the cited

8    works provide only general software background, not any methodology for the sort of software

9    analysis required in this case."  *Id.*  SAP also, however, contends that Mehrotra's reliance on the

10   architecture and design of S/4HANA is proper as evidenced by Teradata's expert Jagadish also

11   relying on architecture-level analyses.  Mehrotra Opp. at 11 (citing Dkt. No. 531-21 ("Jagadish

12   Rep.") ns. 290–92, 306, 319–33, 336, 341–45, 357–60, 365–70).  Teradata does not respond to

13   this argument.[15]

14          The following cases provide a helpful analysis of whether Mehrotra's approach is proper.

15   Teradata relies on a Seventh Circuit case in support of its argument that Mehrotra's approach is

16   flawed, but the case is distinguishable.  In *Autotech Tech. Ltd. P'ship v. Automationdirect.com*,

17   471 F.3d 745 (7th Cir. 2006), an expert testified "[b]ased on his 26 years of experience in software

18   development, review of the EZTouch software, and review of advertisements about C–More . . .

19   that the features of C–More could not be developed independently of EZTouch" but he had "never

20   conducted tests on the product."  *Autotech*, 471 F.3d at 749.  The Seventh Circuit affirmed the

21   district court's decision that this methodology was unreliable because "computer experts must do

22   more than read advertisements."  *Id.*  The court held that "[t]o qualify as an expert on software, an

23   expert should, at a minimum, examine the product and software upon which the expert bases his

24   opinion."  *Id.*  In this case, while Mehrotra did not use the product or examine the source code, he

25

26   ───────────────
     [15] Teradata does assert that unlike Mehrotra, Jagadish examined the source code and software.
     Mehrotra Mot. at 10.  SAP responds that nowhere in the sections of Jagadish's report, to which
27   Mehrotra responds, does Jagadish refer to S/4HANA source code.  Mehrotra Opp. at 13–14.
     Instead, Jagadish discusses the source code only in relation to trade secrets.  *Compare* Jagadish
28   Rep. § X.C ¶¶ 247–75 (discussing trade secrets) *with* Jagadish Rep. § X.E ¶¶ 336–77 (discussing
     antitrust opinions).

1    reviewed the architecture and design of S/4HANA over the course of five years.

2        *Iconics, Inc. v. Massaro*, 266 F. Supp. 3d 461 (D. Mass. 2017) is more factually analogous

3    to the case here.  In *Iconics*, the court declined to exclude the expert's testimony regarding the

4    "core architecture" of the software products, which was based on "three architectural diagrams,"

5    even though the expert failed to inspect the software code or review technical documents.  *Iconics*,

6    266 F. Supp. at 470.  The court held that because the expert "illuminates aspects of the core

7    architecture trade secret" any challenge went to the credibility of the testimony and not

8    admissibility.  *Id.*  Teradata contends that *Iconics* is distinguishable because there the expert relied

9    on the same architecture documents that the plaintiff cited to whereas here Mehrotra relies on

10   "hand-selected" documents by SAP's counsel and not Teradata's materials.  Mehrotra Mot. at 4–5.

11   But in *Iconics* the product at issue belonged to the plaintiff whereas here the S/4HANA product

12   belongs to SAP.  It is unclear why it is improper for Mehrotra to rely on technical documents from

13   SAP itself when reviewing its product.  Mehrotra Opp. at 18.  As the *Iconics* court held,

14   "[r]egardless of the benefits of any alternative approaches," for example those found in Jagadish's

15   report, Mehrotra's opinion is sufficiently reliable.  *Iconics*, 266 F. Supp. at 470.  "Any questions

16   on the comparative weight or credibility of these two analyses are questions for a jury to resolve."

17   *Id.*

18       As for Teradata's other objections—"that Mehrotra could not identify with sufficient

19   specificity the academic literature he relied on, did not cite to the particular documents that

20   Teradata thinks he should have, and did not interview the individuals that Teradata thinks he

21   should have"—all go to the weight of his testimony are not grounds for excluding his opinions.

22   Mehrotra Opp. at 16; *In re Korean Ramen Antitrust Litig.*, 281 F. Supp. 3d 892, 931 (N.D. Cal.

23   2017) (holding that an expert's failure to "address (or review) deposition testimony where

24   defendants' employees testified to matters that purportedly undermine some of his opinions or

25   assumptions does not make his testimony excludable.  Those are grounds for cross-examination.").

26   For example, Teradata asserts that Mehrotra's opinions are flawed in part because he did not

27   interview the SAP employees that Rudolf Hois spoke with in preparation for his 30(b)(6)

28   deposition.  Mehrotra Mot. at 4.  SAP responds that Mehrotra did not have to speak with the

CONFIDENTIAL MATERIAL OMITTED

1   individuals that Hois spoke with because Hois's experience is in the area of ERP applications
2   whereas Mehrotra's experience is in databases. Mehrotra Opp. at 23. SAP also points out that
3   Mehrotra had the deposition transcripts of Hois and other SAP employees related to the interface
4   of S/4HANA with HANA. *Id.* (citing Mehrotra Rep., Appendix B). Its argument is well-taken:
5   Teradata's motion to exclude Section VI of Mehrotra's expert report is DENIED.

6          Finally, Teradata moves to exclude section VII of Mehrotra's report which opines that
7   SAP could not have realized the same benefits by designing S/4 for multiple databases and that
8   porting S/4HANA to another database would be challenging and unpredictable because it is
9   unsupported and unreliable. Mehrotra Mot. at 8. Teradata asserts that in support of his opinions,
10  Mehrotra could and should have reviewed some of the analytical queries in S/4HANA in order to
11  provide at least one specific example of a query that purportedly requires the use of HANA, and
12  not another database. Mehrotra Reply at 5 6.

13         SAP contends that it is unclear how Mehrotra was supposed to do this or what purpose it
14  would serve. Mehrotra Opp. at 14. Mehrotra and Jagadish do not dispute that
15  ██████████████████████████████████████████████. *Id.* at 7;
16  Mehrotra Reply at 5. But ███████████████████████████████████████
17  ████████████████████████████████████████████████████████████
18  ████████████████████████████████████████████████████████████
19  ████████████████████████████████████████████████████████
20  ████████████████████████████████████████████████████████
21  ██████████████████████████ Mehrotra Opp. at 14 (citing Dkt. No. 531-8 ("Hois Depo.") at
22  14–16, 70–74. ██████████████████████████████████████████████████████
23  ████████████████████████████████████████████████████████
24  ██████████ Mehrotra Depo at 131 32. SAP points out that review of this code is unnecessary
25  because both Jagadish and Mehrotra agree that the key issue is not how much code must be ported
26  to another database but how difficult it would be. Mehrotra Opp. at 16 (citing Mehrotra Depo. at
27  186–88; Dkt. No. 531-14 ("Jagadish Depo.") at 227).

28         To determine how difficult porting would be, Mehrotra relies on "SAP's past experience

42

United States District Court
Northern District of California

**CONFIDENTIAL MATERIAL OMITTED**

1  porting Business Suite optimizations to Oracle and IBM databases, the more integrated design and

2  architecture of S/4HANA on HANA compared to Business Suite on HANA, and the differences in

3  the architectures and technologies of other databases" such as those of Oracle and IBM, to

4  conclude that trying to port S/4HANA to a database other than HANA would be difficult,

5  time-consuming, and unpredictable. Mehrotra Opp. at 7 (citing Mehrotra Rep. ¶¶ 177 98).

6  Teradata objects to Mehrotra's reliance on SAP documents and testimony, arguing that SAP's

7  counsel "cherry-picked" these documents for him. Mehrotra Reply at 7. But Teradata "provides

8  no basis for its insinuation that the SAP documents upon which Dr. Mehrotra relied are in any way

9  biased." Mehrotra Opp. at 18. Mehrotra explained that he relied primarily on technical

10  documents, not marketing documents. Mehrotra Depo. at 153 54, 156 57. Teradata responds

11  that SAP's technical documents "can be biased or inaccurate" but such arguments go to weight

12  and not admissibility of the opinions.

13  Teradata also asserts that Mehrotra's analysis is flawed because he improperly relied on

14  "SAP's alleged experience porting its prior ERP applications (not S/4HANA) to databases prior to

15  2015 (not databases that exist today or even in the last five years)." *Id.* (citing Mehrotra Rep.

16  ¶¶ 168, 177 78). Mehrotra admits that he has not used IBM's or Oracle's database software since

17  2006 and 1998 respectively and that he has not examined the current database products. Mehrotra

18  Depo. at 44, 45, 47. According to Teradata, he also misunderstood capabilities of these third-party

19  databases, e.g., misstating that HANA ██████████████████████████████████████

20  ██████████████████████████████████████████████ and wrongly assuming

21  that IBM and Oracle's products were released after the development of S/4HANA. Mehrotra Rep.

22  ¶ 9.c. SAP responds that Mehrotra correctly testified about the dates on which the IBM and

23  Oracle databases were released because it is undisputed that Oracle did not release its database

24  until six months after SAP began development of S/4HANA. Mehrotra Opp. at 20. Although

25  IBM released a version of its database in the summer of 2013, Mehrotra relied on SAP documents

26  that explained that ██████████████████████████████████████

27  ██████████████████████████████████. *Id.* at 21. Teradata makes the

28  same objection that I rejected above that this "is not Mehrotra's conclusion but SAP's allegation,

43

## CONFIDENTIAL MATERIAL OMITTED

1    parroted from SAP documents selected by SAP's counsel." Mehrotra Reply at 12. It also points

2    out that Mehrotra failed to reconcile this allegation with results of ███████████ as noted in

3    Jagadish's opening report. *Id.* (citing Jagadish Rep. ¶¶ 342, 372). But again, Mehrotra's failure to

4    consider contrary evidence goes to weight and not admissibility. Teradata's motion to exclude

5    portions of Mehrotra's expert report is therefore DENIED.

### 3.    Teradata's Objections to SAP's Reply Evidence

7         The final preliminary matter I must address is Teradata's objections to SAP's reply

8    evidence, namely its declaration of Rudolph Hois, Dkt. No. 552-1 ("Hois Declaration"). Dkt. No.

9    568-4 at 1. Teradata asserts that I should strike the declaration because it is impermissible and

10   highly prejudicial. *Id.* The Hois Declaration concerns a key issue underlying Teradata's theory

11   that SAP's requirement that S/4HANA customers license HANA's analytical capabilities violates

12   federal antitrust law. *Id.* Teradata argues that even if it were true that SAP first heard of this

13   theory from Asker's reply report, as it claims, SAP should have submitted the Hois declaration

14   with its motion, a full month after Asker's reply report. *Id.* Instead, it asserts that SAP improperly

15   waited until its reply brief to submit the evidence. *Id.*

16        SAP responds that the Hois Declaration was necessary because it was not aware of

17   Teradata's new theory until its opposition to SAP's summary judgment motion. Dkt. No. 585 at 1.

18   There, Teradata abandoned the tying theory pleaded in its complaint and asserted a new one, after

19   the close of fact discovery. Dkt. No. 585 at 1. In the SAC, Teradata alleged that SAP tied

20   S/4HANA to HANA by making it "wholly incompatible with other transactional databases,"

21   forcing customers that purchase S/4HANA to also adopt HANA. SAC ¶¶ 89, 132. But in SAP's

22   summary judgment motion, SAP showed how it and other leading vendors achieved

23   procompetitive benefits by integrating their ERP applications with their databases. Dkt. No. 585

24   at 1. Then, in its opposition, Teradata argued that the tie was different; it was between S/4HANA

25   and HANA's analytical capabilities, which offer EDW functions. Dkt. No. 542 at 26. As a result,

26   the mechanism at issue is no longer a technological incompatibility but licensing terms that SAP

27   allegedly forces upon its customers. *Id.* at 31. Teradata asserts that SAP has failed to show

28   procompetitive justifications for the licensing practices that tie S/4HANA to HANA's analytical

44

1    capacities.  *Id.* at 27.

2          In support of its argument that Teradata changed its tying theory, SAP points to Asker's

3    opening expert report that expressly and repeatedly defined the "tied product" to mean HANA, not

4    its analytical capabilities.  Asker Rep. ¶¶ 5–6, 35.  But in his reply report, Asker suggests that SAP

5    should have to justify the tie of S/4HANA to the EDW capabilities of its HANA database.  Asker

6    Reb. Rep. ¶ 4.  SAP contends that "this shift did not put SAP on notice that Teradata had changed

7    its legal theory regarding the alleged tie" and therefore it did not file the Hois Declaration with its

8    summary judgment motion.  Dkt. No. 585 at 2.

9          Teradata maintains that its theory has not changed.  It emphasizes paragraph 95 of the

10   SAC, which states:

> "SAP's Top-Tier ERP Applications customers were free to choose
> how to manage their data needs, those locked-in customers will now
> be forced to adopt HANA.   Given the costs of licensing,
> implementing, and maintaining EDAW products, the vast majority of
> large-scale customers will have no choice but to abandon their prior
> EDAW providers because they cannot support dual EDAW providers.
> Thus, because *HANA purports to offer some or all of the functionality
> offered by Teradata*, SAP is effectively coercing its customers into
> leaving Teradata and adopting the full stack of SAP products
> (including HANA)."

17   Dkt. No. 599 (quoting SAC ¶ 95) at 1.  Teradata explains that throughout its complaint, the

18   "functionality offered by Teradata" that HANA purports to offer to replace Teradata's products is

19   HANA's *analytical* (or EDAW) functionality.  *Id.*; *see, e.g.*, SAC ¶ 45 (HANA purports to provide

20   "EDAW functionality that SAP claims can enable enterprise analytics similar to those offered by

21   Teradata" and "[t]hus, with HANA . . . SAP now positions itself as a direct competitor in the

22   EDAW market").  It contends that it has never alleged that HANA's transactional functionality

23   competes with EDAW products.  Dkt. No. 467 at 4.

24         Teradata's arguments do not address SAP's point—that Teradata initially challenged the

25   technological integration of the ERP application and HANA, not the licensing practice.  Teradata

26   asserts that its allegation that SAP's "sales practice" is "directly contrary to the practices of other

27   ERP applications" is regarding its licensing.  But in actuality, the alleged "sales practice" in the

28   SAC does not refer to licensing but a design change, i.e., "tying upgrades of customers' ERP

United States District Court
Northern District of California

45

Applications to customers' adoption of HANA (while ending support for older versions of ERP Applications)."  SAC ¶ 58.  Furthermore, references to "licensing" in the SAC concern the exit fee, not the licensing of HANA's analytical capabilities.  *See, e.g.*, SAC ¶ 90 ("SAP's licensing agreements further restrict the ability of customers to read and copy S/4HANA ERP data to any other database); *id.* ¶ 151 ("This rate will only rise more rapidly as more customers upgrade to S/4HANA and are foreclosed from either licensing alternative EDAW products or accessing their SAP ERP data for use with Teradata's EDAW products.").

Teradata also claims that Hois Declaration contradicts his deposition as a corporate witness and should be struck as undisclosed expert testimony.  Dkt. No. 568-4 at 3–5.  It asserts that in his declaration, Hois explains HANA's capabilities as unique and opines about the comparisons between HANA and other databases.  Hois Decl. ¶¶ 4–6.  But during his deposition he repeatedly claimed that he lacked the requisite knowledge or expertise to compare the databases and deferred to other experts.  Dkt. No. 568-6 ("Hois Depo.") at 64; Dkt. No. 568-8 ("Hois Depo.") at 12, 14, 18.  In the his declaration, however, Hois is not comparing databases; instead, he explains a feature of Oracle databases in a manner that is consistent with his deposition testimony.  *Compare* Hois Decl. ¶ 6 *with* Hois Depo. at 34–35.  Moreover, Hois's high-level opinions are based on his personal knowledge and therefore are proper.  Hois Decl. ¶¶ 2–3.

SAP contends that "Teradata cannot oppose summary judgment on the basis of an unpled, and prejudicially-late change in theory."  Dkt. No. 552 at 13 (citing *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008) ("where . . . the complaint does not include the necessary factual allegations . . . raising such a claim in a summary judgment motion is insufficient to present the claim to the district court")).  I agree.  The Hois Declaration is proper, even though it is new evidence, as a "reasonable response to the opposition."  *Hodges v. Hertz Corp.*, 351 F. Supp. 3d 1227, 1249 (N.D. Cal. 2018).

### 4.    Motion for Summary Judgment

I will now turn to SAP's motion for summary judgment on Teradata's tying claim.  To state a sufficient tying claim under Section 1 of the Sherman Act, Teradata must prove: (1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2)

46

by which the persons or entities intended to harm or restrain trade or commerce []; (3) which

actually injures competition." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008).

### a.    Per Se or Rule of Reason Analysis

The first dispute between the parties is whether the per se rule or rule of reason test applies

in this case.  To determine whether a practice unreasonably restrains trade, courts sometimes apply

a "rule of reason" analysis.  *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1410 (9th Cir. 1991).

Under the rule of reason test, courts "analyze the degree of harm to competition along with any

justifications or pro-competitive effects to determine whether the practice is unreasonable on

balance.  The focus is on the actual effects that the challenged restraint has had on competition in a

relevant market." *Id.*  "Some practices, however, are so likely to interfere with competition that

they violate the Sherman Act per se.  In these cases, [courts] do not require evidence of any actual

effects on competition because [they] consider the potential for harm to be so clear and so great."

*Id.*  Under the per se test, Teradata must prove: (1) that the defendant tied together the sale of two

distinct products or services; (2) that the defendant possesses enough economic power in the tying

product market to coerce its customers into purchasing the tied product; and (3) that the tying

arrangement affects a "not insubstantial volume of commerce" in the tied product market.

*Cascade Health*, 515 F.3d at 913.

"Restraints that are not unreasonable per se are judged under the 'rule of reason.'" *Fed.*

*Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 989 (9th Cir. 2020).  "[N]ovel business

practices—especially in technology markets—should not be conclusively presumed to be

unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have

caused or the business excuse for their use." *Id.* at 990–91 (internal quotation marks omitted).

"Because innovation involves new products and business practices, courts['] and economists'

initial understanding of these practices will skew initial likelihoods that innovation is

anticompetitive and the proper subject of antitrust scrutiny." *Id.* at 991.  In this case, the rule of

reason applies because this is not a case that "has so little redeeming virtue, and that there would

be so very little loss to society from its ban, that an inquiry into its costs in the individual case [can

be] considered [] unnecessary." *United States v. Microsoft Corp.*, 253 F.3d 34, 94 (D.C. Cir.

47

1     2001) (internal quotation marks and citations omitted).

2          Contrary to Teradata's argument, there are procompetitive justifications from SAP's

3     design of S/4HANA to run on HANA rather than on multiple databases.  Reply SMSJ at 14.  For

4     example, under Teradata's original theory, SAP's expert, Mehrotra, explains how SAP achieved

5     efficiency gains such as improved performance and functionality with S/4HANA by designing it

6     for only HANA.  Mehrotra Rep. ¶¶ 138–98.  Under its new theory, Teradata implies that there is

7     no reason SAP could not separately license HANA's analytical capabilities, SMSJ Opp. at 35, but

8     SAP explains that unlike Oracle and Microsoft, SAP lacks the ability to license analytical and

9     transactional functionalities separately because they operate on the same set of data and are

10     intertwined.  Hois Decl. ¶¶ 5–6.  It asserts that SAP "achieved procompetitive benefits by

11     designing S/4HANA to run on all of HANA, including its analytical capabilities."  SMSJ Reply at

12     15.  That Teradata contends that the design of S/4HANA has no efficiency gains is irrelevant to

13     the question of whether the rule of reason applies.  Instead, these "purported efficiencies suggest

14     that judicial 'experience' provides little basis for believing that" SAP's S/4HANA "lacked any

15     redeeming virtue and therefore should be presumed unreasonable."  *Microsoft*, 253 F.3d at 90–91.

16     Rule of reason applies in this case.

17                         **b.      Failure to Properly Define a Tied or Tying Market**

18          That said, under either test, Teradata's tying claim fails.  As established above, because

19     Teradata has failed to properly define a tied market, there is no triable issue of fact whether the

20     alleged tying arrangement harmed competition in the tied market under the rule of reason analysis.

21     Likewise, because Teradata has failed to properly define a tying market, there is no triable issue of

22     fact whether SAP has market power in a properly-defined tying market.  *See Truck-Rail Handling*

23     *Inc. v. BNSF Ry. Co.*, 2005 WL 8178364, at *8 (N.D. Cal. Mar. 8, 2005) (granting defendants'

24     motion for summary judgment on market definition because plaintiff's evidence did not "assist in

25     evaluating cross-elasticity of supply and demand").

26          Teradata contends that the issue of market definition should be decided by a jury.  Opp.

27     SMSJ at 32; *see High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993)

28     ("The process of defining the relevant market is a factual inquiry for the jury.").  But where there

United States District Court
Northern District of California

48

is an absence of evidence to support Teradata's claim that SAP competes in the purported tying or tied market, summary judgment is appropriate.  In *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995), the Ninth Circuit acknowledged "that the definition of the relevant market is a factual inquiry for the jury, and the court may not weigh evidence or judge witness credibility." *Rebel Oil*, 996 F.2d at 1435.  It held, however, "that an issue is factual does not necessarily preclude summary judgment.  If the moving party shows that there is an absence of evidence to support the plaintiff's case, the nonmoving party bears the burden of producing evidence sufficient to sustain a jury verdict on those issues for which it bears the burden at trial." *Id.*  It also noted that when, as here, "an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict" and therefore summary judgment is appropriate. *Id.* at 1436 (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993)).  Accordingly, SAP's motion for summary judgment on Teradata's tying claim is GRANTED.[16]

## II.     TERADATA'S MOTION FOR SUMMARY JUDGMENT

Teradata moves for summary judgment against SAP's counterclaims, which contend that Teradata infringes its '321 Patent, '179 Patent, and '421 Patent.  Dkt. No. 472 ("TMSJ") at 1. Teradata asserts that the claims of the '321 Patent are invalid because they are directed to patent-ineligible subject matter under 35 U.S.C. § 101.  *Id.*  Teradata also asserts that SAP is not entitled to damages for the alleged infringement of the '179 and '421 Patents before May 19, 2019, when it first informed Teradata of its infringement allegations because SAP had failed to give notice to the public that its products practice the claims of these patents prior to then.  *Id.*; *see* 35 USC § 287.  SAP does not oppose Teradata's motion for summary judgment against an award of damages for infringement of the '179 and '421 Patents before May 21, 2019.  Dkt. No. 520 ("Opp. TMSJ") at 1.  SAP does, however, contend that the '321 Patent is valid.  *Id.*

---

[16] Moreover, even if the tied market definition was proper, summary judgment would still be appropriate because Teradata cannot show that SAP has caused actual injury to competition in a market for "EDW products with OLAP capabilities for large enterprises."  *See supra* Part I.B.1.b.

**A.      Legal Standard**

Under Section 101 of the Patent Act, "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor . . . . ." 35 U.S.C. § 101.  The Supreme Court "has long held that this provision contains an important implicit exception:  Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014).  The reason for the exception is clear enough—"such discoveries are manifestations of . . . nature, free to all men and reserved exclusively to none." *Mayo Collaborative Servs. v. Vometheus Labs., Inc.*, 566 U.S. 66, 71 (2012) (internal quotation marks and citations omitted).  The boundaries of the exception, however, are not so clear.

The *Alice* court highlighted "the concern that drives this exclusionary principle as one of pre-emption." *Alice*, 573 U.S. at 216 (noting the delicate balance inherent in promoting progress, the primary object of patent law, and granting a monopoly, the means for accomplishing that goal).  In other words, patents that seek to wholly preempt others from using a law of nature or an abstract idea—"the basic tools of scientific and technological work"—are invalid.  *Id.* "Accordingly, in applying the § 101 exception, we must distinguish between patents that claim the buildin[g] block[s] of human ingenuity and those that integrate the building blocks into something more, thereby transform[ing] them into a patent-eligible invention."  *Id.* at 217 (internal quotation marks and citations omitted).

In evaluating whether claims are patent-eligible, I must first "determine whether the claims at issue are directed to one of those patent-ineligible concepts." *Alice*, 573 U.S. at 217.  "[T]he 'directed to' inquiry applies a stage-one filter to claims, considered in light of the specification, based on whether their character as a whole is directed to excluded subject matter." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016) (internal quotation marks omitted). Although there is no bright-line rule for determining whether a claim is directed to an abstract idea, courts have articulated some guiding principles.  When evaluating computer-related claims, courts look to whether the claims "improve the functioning of the computer itself," *Alice*, 573 U.S. at 225, or whether "computers are invoked merely as a tool" to implement an abstract process.

50

1   *Enfish*, 822 F.3d at 1336.

2       If the claims are directed to a patent-ineligible concept, I must then "consider the elements

3   of each claim both individually and 'as an ordered combination' to determine whether the

4   additional elements 'transform the nature of the claim' into a patent-eligible application." *Id.* at

5   1334 (internal citations omitted).  This step entails the "search for an inventive concept—i.e., an

6   element or combination of elements that is sufficient to ensure that the patent in practice amounts

7   to significantly more than a patent upon the [ineligible concept] itself." *Alice*, 573 U.S. at 217–18

8   (internal quotation marks and citations omitted).  An inventive concept "cannot simply be an

9   instruction to implement or apply the abstract idea on a computer" and "must be significantly

10  more than the abstract idea itself." *BASCOM Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,

11  827 F.3d 1341, 1350 (Fed. Cir. 2016).

12      "For the role of a computer in a computer-implemented invention to be deemed

13  meaningful in the context of this analysis, it must involve more than performance of

14  well-understood, routine, [and] conventional activities previously known to the industry." *Content*

15  *Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1347–48 (Fed. Cir.

16  2014).  "[T]he mere recitation of a generic computer cannot transform a patent-ineligible abstract

17  idea into a patent-eligible invention." *Id.* at 1348.  However, "an inventive concept can be found

18  in the non-conventional and non-generic arrangement of known, conventional pieces." *BASCOM*,

19  827 F.3d at 1350.

20      **B.    Whether the '321 Patent Is Invalid Under 35 U.S.C. § 101**

21      The '321 Patent is titled "Systems and Methods for Data Processing."  Dkt. No. 124-1

22  ("'321 Patent").  SAP alleges that Teradata infringes at claims 1, 2, and 4 of the '321 Patent.  Dkt.

23  No. 461 at 1.  Independent claim 1 and dependent claim 2 recite:

24      "**1.** A data processing method comprising:
        providing a set of database tables in a data warehouse, each
25          database table being assigned to an entity type and storing
            entities of its entity type;
26      providing a set of online analytical processing cubes in a data
            warehouse, each online analytical processing cube specifying a
27          layout for transactional data storage;
        providing at least one application program for processing at least
28          one class of database tables and at least one class of online

51

Appx51

United States District Court<br>Northern District of California

> analytical processing cubes;
> mapping a sub-set of the set of database tables to the at least one
>   class of database tables, the sub-set of database tables
>   comprising database tables of one or more entity types;
> mapping a sub-set of the set of online analytical processing cubes
>   to the at least one class of online analytical processing cubes;
> invoking an online analytical processing component to fill the
>   online analytical processing cubes with transactional data;
> processing the entities stored in the sub-set of database tables and
>   the transactional data stored in the sub-set of online analytical
>   processing cubes by the application program; and
> providing analysis of the entities and the transactional data
>   the application program to a user.
>
> **2.** The method of claim 1, comprising providing a set of application
> programs, whereby each application program of the set of application
> programs is adapted to process a set of classes of database tables and
> online analytical processing cubes."

'321 Patent at 7:12-42.

Independent claim 4 is a system claim that is similar to claim 1:

> "**4.** A data processing system comprising:
> a relational database of a data warehouse for storing a set of
>   database tables, each database table being assigned to an entity
>   type and storing entities of its entity type;
> a relational database of a data warehouse for storing a set of online
>   analytical processing cubes, each online analytical processing
>   cube specifying a layout for transactional data storage;
> at least one application program for processing at least one class of
>   database tables and at least one class of online analytical
>   processing cubes;
> a mapping table for mapping a sub-set of the set of database tables
>   to the at least one class of database tables, the sub-set of
>   database tables comprising database tables of one or more entity
>   types;
> a mapping table for mapping a sub-set of the set of online
>   analytical processing cubes to the at least one class of online
>   analytical processing cubes;
> means for invoking an online analytical processing component to
>   fill the online analytical processing cubes with transactional
>   data;
> means for processing the entities stored in the sub-set of database
>   tables and the transactional data stored in the sub-set of online
>   analytical processing cubes with the application program; and
> means for providing analysis of the entities and the transactional
>   data processed by the application program to a user."

*Id.* at 7:46–8:18. Claim 1 is representative because it is "substantially similar" to claim 4. TMSJ at 5; *see Content Extraction*, 776 F.3d at 1348 (concluding that a claim is representative of other claims when they are "substantially similar and linked to the same abstract idea"). SAP does not oppose that claim 1 is representative.

52

United States District Court
Northern District of California

**1.    The '321 Patent Is Directed to the Abstract Idea of "Organizing Information into Logical Groups"**

Teradata asserts that the '321 Patent is directed to the abstract idea of "associating ('mapping') database tables and OLAP cubes with respective classes for use with application programs."[17]  TMSJ at 7.  When evaluating computer-related claims, the first step in the *Alice* inquiry "asks whether the focus of the claims is on the specific asserted improvement in computer capabilities" or "instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool."  *Enfish*, 822 F.3d at 1335–36.  Teradata argues that the "'mapping' to classes at the heart of the '321 patent is simply a practice of organizing information, a type of activity that courts have held to be abstract and ineligible for patent protection."  TMSJ at 7.  For example, even SAP's expert, Dr. David Maier, explains,

> "The '321 patent relates to ways to organize the tables and cubes used in databases so that they can be more easily and efficiently recognized and accessed.  At a high level this organization is accomplished by assigning a table or cube to a particular class.  These classes serve to group data structures storing related data, so an application can access the structures together."

Dkt. No. 472-2 ("Maier Reb. Rep.") ¶ 683.

SAP contends that "if there is an abstract idea, it is organizing information into logical groups."  Opp. TMSJ at 3–6.  Although its opposition assumes *arguendo* that the claims are directed to an abstract idea, SAP does not dispute that the claims are directed to an abstract idea.  It "does not contest that the claims are directed to this idea of 'organizing information into logical groups' and that it is abstract."  *Id.* at 4.  Instead, it disputes Teradata's assertion that the claims are directed to the narrower abstract idea of "associating ('mapping') database tables and OLAP cubes with respective classes for use with application programs."  TMSJ at 7.

SAP takes the unusual position as a patentee of asserting a broader definition of the abstract idea in order to contend that the physical-realm claim elements—i.e., database tables, OLAP cubes, application programs, and mapping—and their combination should be analyzed

---

[17] In the Claim Construction Order, I rejected Teradata's proposal to construe "mapping" as "associating or assigning."  Claim Construction Order at 14–15.  Instead I construed "mapping" as "[c]reating and storing, in computer system memory or secondary storage for a computer system, an association between data elements in the computer system such that a computer can locate a data element using that association."  *Id.*

United States District Court
Northern District of California

1    under *Alice* step two to determine that there is an inventive concept.  *See* Opp. TMSJ at 6; Hearing

2    Tr. at 60–61.  An inventive concept "reflects something more than the application of an abstract

3    idea using well-understood, routine, and conventional activities previously known to the industry.

4    It must be enough to transform an abstract idea into a patent-eligible invention."  *Cellspin Soft,*

5    *Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1316 (Fed. Cir. 2019), *cert. denied sub nom. Garmin USA, Inc.*

6    *v. Cellspin Soft, Inc.*, 140 S. Ct. 907 (2020) (internal quotation marks and citations omitted).

7        In *Berkheimer v. HP Inc.*, 881 F.3d 1360 (Fed. Cir. 2018), the Federal Circuit held that

8    "[w]hether something is well-understood, routine, and conventional to a skilled artisan at the time

9    of the patent is a factual determination."  *Berkheimer*, 881 F.3d at 1369.  The court held that the

10   claims at issue were directed to the abstract ideas of parsing, comparing, storing, and editing data.

11   *Id.* at 1366.  The patentee argued that the specification described "an inventive feature that stores

12   parsed data in a purportedly unconventional manner" which "eliminates redundancies, improves

13   system efficiency, [and] reduces storage requirements" among other things.  *Id.* at 1369.  The

14   Federal Circuit therefore held that the "improvements in the specification, to the extent they are

15   captured in the claims, create a factual dispute regarding whether the invention describes well-

16   understood, routine, and conventional activities."  *Id.*

17       In contrast, in *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281 (Fed. Cir. 2018), the

18   Federal Circuit held that the dispute about whether the claims recited "unconventional features

19   that provides benefits over conventional prior art databases" was irrelevant because "a claimed

20   invention's use of the ineligible concept to which it is directed cannot supply the inventive concept

21   that renders the invention 'significantly more' than that ineligible concept."  *BSG*, 899 F.3d at

22   1289–91.  The court held that the claims at issue were directed to the abstract idea of "considering

23   historical usage information while inputting data."  *Id.* at 1286.  The only alleged unconventional

24   feature of the claims was "the requirement that users are guided by summary comparison usage

25   information or relative historical usage information."  *Id.* at 1291.  The Federal Circuit held that

26   "this simply restate[d]" what it had already determined was an abstract idea and therefore the

27   question about whether this requirement was non-routine or unconventional was irrelevant.  *Id.*

28   "As a matter of law, narrowing or reformulating an abstract idea does not add 'significantly more'

1    to it." *Id.* The Federal Circuit affirmed the district court's determination that the asserted claims

2    lacked an inventive concept. *Id.*

3        In this case, Teradata asserts that the abstract idea is "associating ('mapping') database

4    tables and OLAP cubes with respective classes for use with application programs" because then

5    SAP's purported inventive concept is simply a restatement of the abstract idea and arguably fails.

6    In contrast, SAP contends that the abstract idea is "organizing information into logical groups"

7    because then the combined elements of the database, OLAP cubes, application programs, and

8    mapping arguably create an inventive concept and a genuine dispute of fact of whether the

9    combination of these elements is non-routine or unconventional.  I will now address which

10    abstract idea the claims are directed towards.

11        SAP argues that "mapping" database tables and OLAP cubes with respective classes for

12    use with application programs is not an abstract idea because database tables, OLAP cubes, and

13    application programs are computer structures, not mere concepts, and "mapping" requires the

14    creation of computer data structures.  Opp. TMSJ at 4.  Teradata cites no precedent holding that a

15    database, OLAP cube, or application program is an abstract idea.  *See id.*  For "mapping,"

16    however, Teradata points to *Autodesk*, where the district court held that "it would be difficult to

17    conceive of a more abstract concept than 'mapping,' when that concept is not tied to any particular

18    object or method."  *East Coast Sheet Metal Fabricating Corp. v. Autodesk, Inc.*, 2015 WL

19    226084, at *6 (D.N.H. Jan. 15, 2015), *amended in part*, 2015 WL 925614 (D.N.H. Mar. 3, 2015),

20    *and aff'd*, 645 F. App'x 992 (Fed. Cir. 2016).  Although SAP does not directly address *Autodesk*, it

21    contends that "mapping" as construed by the Claim Construction Order is not abstract because it

22    requires the creation of computer data structures:  "[c]reating and storing, in computer system

23    memory or secondary storage for a computer system, an association between data elements in the

24    computer system such that a computer can locate a data element using that association."  Claim

25    Construction Order at 15.  According to SAP, "[t]here is nothing abstract about a data structure

26    that an application program running on a computer uses to locate particular data stored in other

27    data structures in the computer system."  Opp. TMSJ at 4.

28        Teradata responds that despite the claim construction, "mapping" is an abstract idea

United States District Court
Northern District of California

55

because "there is nothing in the claim language or specification that would materially distinguish a computerized mapping table from one that could be created with a pen and paper." TMSJ at 11. I agree. In *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307 (Fed. Cir. 2016), the Federal Circuit held that the patent at issue was directed to the abstract idea of "receiving e-mail (and other data file) identifiers, characterizing e-mail based on the identifiers, and communicating the characterization—in other words, filtering files/e-mail." *Symantec Corp.*, 848 F.3d at 1313. It held that the patent was invalid because "with the exception of generic computer-implemented steps, there is nothing in the claims themselves that foreclose them from being performed by a human, mentally or with pen and paper." *Id.* at 1318. In this case, SAP's expert, Maier, opined that "[a] folder or directory structure stored on a computer system [that] groups objects and allows them to be located . . . can be considered a mapping table." Dkt. No. 472-3 ("Appendix 3 to Maier Report") at 32. Because a computer folder "originated as a metaphor for paper folders," "mapping" is an abstract idea. TMSJ at 12.

Moreover, the claims are not focused on how "mapping" improves computer functionality. SAP's expert explains that the "ways to organize the tables and cubes used in databases," e.g., "assigning a table or cube to a particular class," makes the database tables and OLAP cubes "more easily and efficiently recognized and accessed." Maier Reb. Rep. ¶ 683. But the specification expressly states that the improvement is simplifying the "selection of database tables as input parameters and the selection of OLAP cubes" to make it "more *user* friendly." '321 Patent at 5:63-65 (emphasis added); *see also id.* at 2:40-44; 3:61-64; 4:8-19; 5:27-30; 5:35-44; 6:11-16 (references to how the value from "mapping" is a result of a human's choice to associate particular tables or cubes with classes, not from a new data structure or technological improvement). Further, neither the claims nor the specification recites any specific algorithms for mapping tables and cubes to classes, collecting data into OLAP cubes, processing the data, or analyzing the data. TMSJ at 14. Consequently, SAP only "conclusorily claims an improvement, but never identifies what the specific improvement is, despite the Federal Circuit's requirement that claims assert a 'specific asserted improvement.'" *MyMail, Ltd. v. OoVoo, LLC*, No. 17-CV-04487-LHK, 2020 WL 2219036, at *15 (N.D. Cal. May 7, 2020), *aff'd*, 2021 WL 3671364 (Fed. Cir. Aug. 19, 2021)

United States District Court
Northern District of California

56

1    (quoting *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314–15 (Fed. Cir.

2    2016)).  As a result, "mapping" is an abstraction.

3    Teradata also asserts that the presence of physical components—i.e., the computer data

4    structures composed of the database, OLAP cubes, and application programs—do not save the

5    claims from being directed to an abstract idea.  Dkt. No. 559 ("Reply TMSJ") at 5–6.  For

6    example, in *In re TLI Commc'ns LLC Pat. Litig.*, 823 F.3d 607 (Fed. Cir. 2016), the Federal

7    Circuit determined that the claim at issue was directed to an abstract idea even though the claims

8    required "concrete, tangible components such as 'a telephone unit' and a 'server,'" because "the

9    specification makes clear that the recited physical components merely provide a generic

10    environment in which to carry out the abstract idea."  *TLI*, 823 F.3d at 611.

11    But SAP does not dispute that the claims are directed to an abstract idea; instead it disputes

12    the scope of the abstract idea.  SAP persuasively contends that, contrary to Teradata's narrow

13    characterization of multiple Federal Circuit decisions, the Federal Circuit "resists conflating a

14    claim's abstract idea with its physical-realm elements."  Opp. TMSJ at 6.  For example, Teradata

15    characterized the Federal Circuit's conclusion in *Capital One* as stating that the claims were

16    directed to the abstract idea of "[s]ystems for manipulating XML documents by organizing data

17    components into data objects and records and responding to modifications of the data."  TMSJ at

18    8.  Instead, the Federal Circuit concluded that "the patent claims are, at their core, directed to the

19    abstract idea of collecting, displaying, and manipulating data."  *Capital One*, 850 F.3d at 1340.

20    Similarly, Teradata characterized the decision in *Electric Power Group* to hold that the claims at

21    issue were directed to the abstract idea of "[s]ystems and methods for performing real-time

22    monitoring of an electric power grid by collecting data from multiple data sources, analyzing the

23    data, and displaying the results."  TMSJ at 8.  But the Federal Circuit held that the claims were

24    focused on the following abstract idea:  "a process of gathering and analyzing information of a

25    specified content, then displaying the results."  *Elec. Power Grp.*, 830 F.3d at 1354.

26    Teradata points to *Intellectual Ventures I LLC v. Erie Indemnity Co.*, 850 F.3d 1315 (Fed.

27    Cir. 2017) as an example of the Federal Circuit including a physical-realm element in its

28    articulation of the abstract idea.  Reply TSMJ at 4.  There, the Federal Circuit held that "the

United States District Court
Northern District of California

57

1   invention is drawn to the abstract idea of 'creating an index and using that index to search for and

2   retrieve data.'" *Erie*, 850 F.3d at 1327.  An "index" was a known structure in the field of database

3   technology.  The Federal Circuit, however, was not discussing the specific index in the field of

4   database technology in its definition of the abstract idea, but indexes generally.  *See id.* (explaining

5   that "[t]his type of activity, i.e., organizing and accessing records through the creation of an

6   index-searchable database, includes longstanding conduct that existed well before the advent of

7   computers and the Internet.  For example, a hardcopy-based classification system (such as

8   library-indexing system) employs a similar concept as the one recited by" the patent).

9        Accordingly, I agree with SAP that the claims are directed to the abstract idea of

10   "organizing information into logical groups".[18]  But for the reasons explained below, the claims

11   are patent-ineligible because they fail to encompass an inventive concept.

## 2. The '321 Patent Does Not Contain an Inventive Concept

13        Teradata asserts that the '321 Patent lacks an inventive concept because it "recites

14   well-known, routine, and conventional database elements" and "uses these elements to perform

15   well-understood, routine, and conventional functions of collecting, organizing, processing, or

16   analyzing data."  TMSJ at 13.  An inventive concept "cannot simply be an instruction to

17   implement or apply the abstract idea on a computer" and "must be significantly more than the

18   abstract idea itself."  *BASCOM*, 827 F.3d at 1350.  "If a claim's only 'inventive concept' is the

19   application of an abstract idea using conventional and well-understood techniques, the claim has

20   not been transformed into a patent-eligible application of an abstract idea."  *BSG*, 899 F.3d at

21   1290–91 (Fed. Cir. 2018).  But "an inventive concept can be found in the non-conventional and

22   non-generic arrangement of known, conventional pieces."  *BASCOM*, 827 F.3d at 1350.

23        At the summary judgment stage, Teradata, as the movant, has the burden of showing that

24   there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of

25   law.  FED. R. CIV. P. 56(a).  "[W]hether a claim limitation or combination of limitations is

---

[18] Teradata asserts that whether I adopt SAP's or its articulation of the abstract idea, the Section 101 analysis does not change because its articulation "is simply a form of organizing information into logical groups."  Reply TMSJ at 7.

United States District Court
Northern District of California

1    well-understood, routine, and conventional is a factual question." *BSG*, 899 F.3d at 1290.

2    Because such a fact is "pertinent to the invalidity conclusion" it "must be proven by clear and

3    convincing evidence." *Berkheimer*, 881 F.3d at 1368.  "When there is no genuine issue of

4    material fact regarding whether the claim element or claimed combination is well-understood,

5    routine, conventional to a skilled artisan in the relevant field, this issue can be decided on

6    summary judgment as a matter of law." *Id.*  And if the only alleged unconventional feature is the

7    abstract idea itself, summary judgment is appropriate.  *BSG*, 899 F.3d at 1291.

8                         a.      **Inventive Concept Identified During the Hearing**

9          Notably, SAP did not assert what the inventive concept is in its opposition.  When asked

10   during the hearing, its counsel explained that the inventive concept is composed of three elements

11   in claim 4:[19]  (1) a relational database that stores both database tables and OLAP cubes ('321

12   Patent at 7:47-53); (2) an application program that accesses and processes those database tables

13   and OLAP cubes, not individually, but as a class ('321 Patent at 7:54-56); and (3) the two

14   mapping tables, which are data structures inside the computer, which associate the database tables

15   and the OLAP cubes with a particular class ('321 Patent at 8:1-7).  Hearing Tr. at 60–61.  Its

16   counsel contended that combining these elements constituted an improved database technique that

17   simplified "the selection of database tables as input parameters and the selection of OLAP cubes"

18   and made it "more user friendly."  *Id.* at 62 (citing '321 Patent at 5:63-67).  According to the '321

19   Patent, the improved database technique also "may enable non-expert users to perform complex

20   transactional data processing and to integrate expert knowledge in the class definitions."  *Id.*

21         Teradata's counsel responded that these elements do not create an inventive concept.  For

22   the first element, under the agreed claim construction, "a relational database of a data warehouse

23   for storing a set of [OLAP] cubes" is "a database that stores information in tables of rows and

24   columns of data located in a data warehouse that can store at least one [OLAP] cube."  Dkt. No.

25   206 ("Joint Claim Construction Statement") at 2.  In other words, the OLAP cube is not stored in

26   the relational database as SAP's counsel explained, but in the data warehouse.  Hearing Tr. at 64;

27

28   _____
     [19] SAP only addresses claim 4 but Teradata addresses the parallel elements of claims 1 and 4
     together.  Reply TMSJ at 9.

*United States District Court*
*Northern District of California*

1    *see also* '321 Patent at 4:58-60, Fig. 3 (showing that the data warehouse contains a set of OLAP

2    cubes and not a relational database).  And the specification admits that the storage of OLAP cubes

3    in data warehouse systems is well-understood, routine, and conventional.  *Id.* at 1:26-27 ("An

4    OLAP cube is a multi-dimensional representation of a set of data.  Such a cube is the basis for

5    transaction data storage in prior art data warehouse systems.").

6          For the second element, Teradata's counsel pointed out that SAP admitted that application

7    programs were well-known in the prior art.  *See* Dkt. No. 211 ("SAP Opening Claim Construction

8    Brief") at 20 ("Application programs were well-known to the POSITA at the time the '321 patent

9    was filed.").  And for the third element, Teradata's counsel asserted that "mapping" is "merely an

10   abstraction" for the reasons explained above, e.g., there is nothing in the specification that would

11   distinguish the mapping tables from what a person could do on pen and paper.  Hearing Tr. at 66;

12   *see supra* Part II.B.1.

13         SAP's counsel conceded that application programs, database tables, and OLAP cubes were

14   well-known.  Hearing Tr. at 68.  But he argued that nothing in the specification or the record

15   suggested that any of the three elements it identified were well-known or conventional in 2003, the

16   patent's effective filing date.  *Id.*  This does not address, however, Teradata's argument that

17   "mapping" is an abstraction.  Because "mapping" simply restates what I have determined is an

18   abstract idea, i.e., organizing information into logical groups, the question of whether the claim

19   element is well-understood, routine, and conventional, is irrelevant.  *BSG*, 899 F.3d at 1291.

20         SAP's response also does not address Teradata's argument that application programs,

21   database tables, and OLAP cubes are generic software components that cannot supply an inventive

22   concept.  Reply TMSJ at 11; *see Content Extraction*, 776 F. at 1348 ("[T]he mere recitation of a

23   generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible

24   invention.").  The specification does not identify any specific advancement over prior art.  Instead,

25   it explains that these physical elements were well-understood, routine, and conventional features

26   of databases.  As SAP's counsel explained, "mapping" is how the application program accesses

27   the data in the database tables and OLAP cubes as a class and therefore because "mapping" is an

28   abstraction, none of these elements can provide an inventive concept.  *See* Hearing Tr. at 60–61.

United States District Court
Northern District of California

Even though the question of conventionality is irrelevant, Teradata also points to examples in the prior art to argue that "mapping" is a well-understood, routine, and conventional element. *Id.* at 14–15. Some prior art patent applications contained the same process of classifying or assigning tables or cubes to logical groupings or classes, each associated with applications for processing. *See, e.g.*, Dkt. No. 472-4 ("'061 Colossi Reference") (U.S. Patent Application Publication No. US 2004/0139061) (Figure 3 showing a grouping of tables related to the measurement of sales by time, product, and region); Dkt. No. 472-5 ("Bakalash Reference") (U.S. Patent No. 6,385,604") (Figure 4A showing a grouping of tables by supplier, time period, part, and supplied parts); Dkt. No. 472-6 ("Colossi Article" or "Colossi Reference") (Figure 1 showing a class of OLAP cubes related to finance, market share, employees, and customers).

SAP contends that Teradata has not shown an absence of a genuine dispute of material fact because "[w]hether a particular technology is well-understood, routine, and conventional goes beyond what was simply known in the prior art. The mere fact that something is disclosed in a piece of prior art, for example, does not mean it was well-understood, routine, and conventional." *Berkheimer*, 881 F.3d at 1369. It argues that the prior art references do not support Teradata's argument because Teradata "cites no evidence that these references were widely read and understood by 2003, or adopted by others so widely that they became routine and conventional." Opp. TMSJ at 10. For example, the Colossi '061 reference was not published until 2004, after the '321 Patent's effective filing date and therefore "it cannot possibly show that others adopted its teachings to such an extent that they became conventional in 2003." *Id.* As for the other Colossi reference, it contends that Figure 1 of the 2002 Colossi article was simply a proposal and Teradata cites to no evidence showing that anyone adopted the proposal so that it became routine and conventional by 2003. *Id.* Similarly, it argues that there is no evidence that the Bakalash reference was widely read or understood by 2003. *Id.*

Further, SAP contends that Teradata has not met its burden of showing that the patent claims' combination of physical-realm elements was conventional, routine, and well-understood. *Id.* at 11. According to SAP, the prior art references show different claimed inventions than the one at issue in the '321 Patent. *Id.* For example, both the Colossi '061 reference and the Bakalash

61

1    reference describe the claimed invention as a "star schema," a way to represent the logical

2    structure of a relational base, which is not the claimed invention at issue here. *Id.* at 17; *see*

3    Bakalash Reference at 3:54-57 ("An exemplary star schema is illustrated in FIG. 4A"); '061

4    Colossi Reference ¶ 0075 ("FIG. 3 illustrates a sample star-join schema"). Teradata does not

5    contend that either reference shows any of the other '321 claim elements, e.g., any system in

6    which both tables and cubes are mapped to classes, as required by the '321 Patent. *Id.* at 11–12.

7    Similarly, SAP's expert opines that Figure 1 in the Colossi Reference describes cubes that are

8    different from the construed definition of OLAP cubes in this case. Dkt. No. 520-2 ("Maier Reb.

9    Rep.") ¶¶ 746–48.

10        These arguments are irrelevant, however, because under a Section 101 analysis, as opposed

11    to a Section 102 or 103 analysis, Teradata does not have to compare each '321 claim to the prior

12    art. Reply TMSJ at 10. As the Federal Circuit has explained,

13            "The appropriate question is not whether the entire claim as a whole
             was 'well-understood, routine [and] conventional' to a skilled artisan
14           (i.e., whether it lacks novelty), but rather, there are two distinct
             questions: (1) whether each of the [elements] in the claimed [product]
15           (apart from the natural laws themselves) involve well-understood,
             routine, conventional activity previously engaged in by researchers in
16           the field, and (2) whether all of the steps as an ordered combination
             add[ ] nothing to the laws of nature that is not already present when
17           the steps are considered separately."

18    *Chamberlain Grp., Inc. v. Techtronic Indus. Co.*, 935 F.3d 1341, 1348–49 (Fed. Cir. 2019), *cert.*

19    *denied*, 141 S. Ct. 241 (2020) (internal citations and quotation marks omitted). Teradata explains

20    that it was relying on the prior art references to show that "mapping" and "mapping tables," under

21    my construction and as interpreted by SAP's expert, were well-known in the art. Reply TMSJ at

22    10–11. SAP does not address Teradata's arguments that the Colossi '061 and Bakalash references

23    show mappings of tables to classes. Further, SAP's expert undermines its argument that there is

24    no clear and convincing evidence that the Colossi and Bakalash references were widely circulated

25    or understood by 2003; Maier opines that a POSITA would have understood how to implement

26    certain claim elements at the time based on these three references. *See infra* Part II.B.2.b; *see*

27    Maier Reb. Rep. ¶¶ 704, 715. SAP's argument that these three elements create an inventive

28    concept fails.

### b.     Remaining Claim Elements

SAP's counsel clarified that SAP was not abandoning the seven physical-realm elements outlined in its opposition by focusing on the elements above.  Hearing Tr. at 63.  According to SAP, "even if each of the [] seven claim elements individually were known, Teradata submits no clear and convincing evidence that this particular combination of structural, physical-realm elements was conventional by 2003":  the elements above and (1) "an OLAP component filling the OLAP cubes with transactional data and [a particular] means for invoking that component to perform that function; (2) "a [particular] means for processing with the application program the entities stored in the sub-set of database tables and the transactional data stored in the sub-set of OLAP cubes; and (3) "a [particular] means for providing analysis of those entities and transactional data processed by the application program." Opp. TMSJ at 9.

But these remaining claim limitations—"filling cubes with data, processing data, and providing analysis"—are also abstract and cannot provide an inventive concept.  TMSJ at 14. Contrary to SAP's addition of the word "[particular]" in the elements,[20] these limitations are purely functional because the claims do not recite any specific algorithms for performing these steps; instead they simply claim a result and reflect abstract ideas.  TMSJ at 14; *see Affinity Labs of Texas, LLC v. Amazon.com Inc.*, 838 F.3d 1266, 1269 (Fed. Cir. 2016) ("The purely functional nature of the claim confirms that it is directed to an abstract idea, not to a concrete embodiment of that idea.").  SAP does not respond to this argument.  The question of whether these elements are well-understood, routine, and conventional is therefore irrelevant because these elements are abstract ideas and therefore cannot supply an inventive concept.  *See BSG*, 899 F.3d at 1290–91.

In any event, Teradata argues that all of these steps are also well-understood, routine, and conventional, as SAP admits.  *Id.*  SAP's expert admits that filling cubes with data, processing data, and providing analysis are all well-known elements and would be familiar to a skilled artisan.  *See, e.g.*, Maier Reb. Rep. ¶ 704 (arguing that the "Colossi and Colossi '061

---

[20] Teradata asserts that SAP's rewriting of claim 4 underscores that the ordered "combination" of elements in claim 4 cannot survive *Alice* step two.  Reply TMSJ at 9.  It argues that SAP (1) combines the first two elements; (2) moves the "mapping" limitations to follow the filling, processing, and providing analysis limitations; and (3) adds the word "[particular]" to make three claim elements seem less generic.  *Id.*

63

1  references . . . further demonstrate that a POSITA would have been well aware of applications that

2  utilized RDBMS components to fill OLAP cubes."); *id.* ¶ 715 (arguing that the "Colossi

3  reference . . . further demonstrate[s] that a POSITA would have been well aware of applications

4  that processed the entities stored in the sub-set of database tables and the transactional data stored

5  in the sub-set of online and analytical processing cubes with the application program."); *id.* ¶ 719

6  (arguing that the structures for "providing analysis of the entities and the transaction data

7  processed by the application program to a user" were "familiar to a skilled artisan").  Maier

8  pointed to business intelligence tools such as "Microsoft Excel, BusinessObjects and Tableau" as

9  examples of applications that were well-known that filled cubes with data, processed data, and

10  provided analysis of data.  *Id.* ¶¶ 701, 712, 719.

11         Furthermore, the specification is silent as to any purported improvement provided by the

12  claimed combination.  *See MyMail*, 2020 WL 2219036, at *19 (invalidating claims under § 101 in

13  part because the specification was "entirely silent as to . . . how any inventive feature, alone or in

14  an ordered combination, is used in an unconventional manner.") (internal quotation marks

15  omitted).  Because the claim elements simply apply the abstract idea of organizing information

16  into logical groups using well-understood, routine, and conventional activities previously known

17  to the industry, the claims do not make the abstract idea patent eligible.  *Cellspin Soft*, 927 F.3d at

18  1316.[21]  SAP's claims are directed to the abstract idea of organizing data into logical groups.

19  There is no inventive concept that provides something more than the abstract idea itself.

20  Teradata's motion for summary judgment is GRANTED.

21  **III.    MOTION TO EXCLUDE LEONARD AND WOLFSON TESTIMONY**

22         Teradata's final motion to exclude expert testimony seeks to exclude portions of Dr.

23  Wolfson and Dr. Leonard's reports.  Dkt. No. 480 ("L&W Mot.") at 1.  Teradata asserts that I

24  should exclude Wolfson's apportionment opinions because they do not satisfy Rule 702 and

___

[21] SAP also contends that Teradata has not shown a lack of genuine dispute that there are no other ways to implement the alleged abstract idea.  Opp. TMSJ at 15–16.  But Teradata does not have to show that SAP has preempted an entire idea for the '321 claims to be patent-ineligible.  "While preemption may signal patent ineligible subject matter, the absence of complete preemption does not demonstrate patent eligibility."  *FairWarning IP, LLC v. Iatric Systems, Inc.*, 839 F.3d 1089, 1098 (Fed. Cir. 2016) (citation omitted).

64

1    Leonard's Profit Apportionment Method with respect to the '321 Patent, which relies on

2    Wolfson's apportionment factors. *Id.* Because I conclude that the '321 Patent is invalid, any

3    arguments related to it are DENIED as moot. Teradata also moves to exclude certain alternative

4    calculations for reasonable royalties, such as damages before May 21, 2019 for the '421 and '179

5    Patents and damages related to an exhibit labeled as "Scenario 2." *Id.* SAP does not dispute these

6    issues and therefore Teradata's motion in relation to these is GRANTED. *See* Dkt. No. 525

7    ("L&W Opp.") at 12, 15. As for the antitrust damages, Teradata moves to exclude Leonard's

8    opinion that certain Teradata business decisions caused the damages. L&W Mot. at 2. Because I

9    conclude that Teradata's tying claim fails, any argument about antitrust damages is DENIED as

10   moot. The remaining issues, then, are whether Wolfson's apportionment analysis of the '421 and

11   '179 Patents is unreliable and therefore whether Leonard's Profit Apportionment Method for the

12   '421 and '179 Patents is unreliable.

13        Teradata asserts that Wolfson's apportionment analysis is flawed. *Id.* at 5. SAP explains

14   that Wolfson "was tasked with estimating the value of Teradata's infringing technology by

15   drawing on his more than 35 years of experience as a computer science professor and the president

16   of a startup company in the data science field." L&W Opp. at 1 (citing Dkt. No. 488-6 ("Wolfson

17   Rep.") ¶¶ 4–18). Teradata points out that Wolfson admits that he has never conducted an

18   apportionment analysis before, and he could not provide examples of others apportioning revenues

19   in the manner he did or any third-party resources that could guide his efforts. Dkt. No. 488

20   ("Wolfson Depo.") at 42–43, 46, 77–78.

21        Wolfson's analysis follows the same methodology affirmed by the Federal Circuit in

22   *Summit 6, LLC v. Samsung Elecs. Co. Ltd.*, 802 F.3d 1283, 1296–98 (Fed. Cir. 2015). *Id.* at 2–3.

23   There, the expert determined the smallest salable patent-practicing unit for which revenue data is

24   available and further apportioned the value of the claimed invention to take into account only

25   those features that infringed. *Summit 6*, 802 F. 3d at 1297. In this case, Wolfson identified the

26   smallest salable unit for each patent, e.g., the Teradata Columnar feature for the '421 Patent and

27   the Teradata Database for the '179 Patent, and then undertook a "multi-step, quantitative

28   apportionment specific to each patent." *Id.* at 1297. Teradata asserts that *Summit* 6 is

1   distinguishable because there, an economist, not a technical expert, made opinions based on his

2   careful quantitative review of objective financial and customer usage data. Dkt No. 561 ("L&W

3   Reply") at 4. Here, Wolfson repeatedly confirmed that he had no data on customers' usage of the

4   specific features. *See* Dkt. No. 560-6 ("Wolfson Depo.") at 98–110.

5          But Wolfson explains that he does not use such data because Teradata claims that it does

6   not possess or maintain information about how its customers deploy or configure features such as

7   the Teradata Columnar, for example. Wolfson Rep. ¶ 49. Instead, Wolfson "had information

8   about how certain Teradata employees who are in direct contact with customers value various

9   features that are related to '421 . . . ." Wolfson Depo. at 110. Like the expert in *Summit 6*, for the

10  '421 Patent he determined the proportion of customers who would be expected to configure

11  Teradata Columnar in an infringing manner based on Teradata's documentation and publications

12  and then subtracted non-infringing configuration options. Wolfson Rep. ¶¶ 48–69. For the '179

13  Patent, he approximated the value of Teradata's "complex query" processing components of the

14  Teradata Database based on Teradata's internal spreadsheets. *Id.* ¶¶ 97–108. Wolfson then

15  excluded use cases that do not involve the infringing subquery processing. *Id.* ¶¶119–22. His

16  methodology is proper.

17         Teradata asserts that when asked how he came to determine or know what the alleged

18  infringing conduct was, Wolfson responded that he did not "exactly recall how" he identified the

19  exact piece that infringes and that "some of it is a hunch." Wolfson Depo. at 77–78. But the full

20  context of his statement was that apportionment is not an "exact science," which has been

21  acknowledged by courts. L&W Opp. at 4; *see Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1315,

22  1319 (Fed. Cir. 2014), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d

23  1339 (Fed. Cir. 2015) (recognizing that estimating a "reasonable royalty" for example "is not an

24  exact science" and holding that an expert's method of apportionment was admissible even if other

25  reliable methods of estimating a reasonable royalty existed). Wolfson testified that he did not

26  analyze the infringement, or the claim construction order himself and he never spoke to SAP's

27  expert on infringement, Dr. Maier. *Id.* at 34, 84. But his analysis of the relative value of the

28  infringing technology relies on Maier's opinions on patent infringement, which is common and

United States District Court
Northern District of California

66

1    appropriate. *Fujifilm Corp. v. Motorola Mobility LLC*, No. 12-cv-03587-WHO, 2015 WL

2    1737951, at *4 (N.D. Cal. Apr. 8, 2015) (It is "reasonable to expect that experts will rely on the

3    opinion of experts in other fields as background material for arriving at an opinion."). When

4    asked when he received Maier's report, he stated that the earliest copy he had was from the same

5    day that he signed his own report, but he testified that it was his impression that he had received

6    something similar beforehand. *Id.* at 162–63. In addition, Wolfson testified that he relied upon

7    SAP's infringement contentions, which were the basis of Maier's report, before finalizing his

8    report. *See* Wolfson Depo. at 67–68, 157–61.

9         Teradata also emphasizes that "Wolfson's views on the patents are confused and plainly

10   omit key elements of the claimed invention." L&W Mot. at 7. According to Teradata, he ignored

11   the existence of a limitation in the '179 Patent that subqueries be optimized "without

12   transformation" and only focused on whether there were subqueries to the queries being processed.

13   *See* Dkt. No. 491-15 ("'179 Patent") at 39:3–5; *see* Wolfson Depo. at 126–27 (stating that he

14   believed the question of "transformation" was "completely tangential" to his report and confirming

15   that the word "transformation" was "not even in" his report). Because Wolfson "values only the

16   prevalence of subqueries rather than subqueries that are optimized 'without transformation,'"

17   Teradata asserts that his approach is inappropriate. L&W Mot. at 7. SAP responds that it is

18   appropriate that Wolfson only considered the prevalence of subqueries because according to Maier,

19   the "without transformation" limitation is met when a query contains a subquery. L&W Opp. at 5

20   (citing Dkt. No. 524-11 ("Appendix 4 of the Maier Expert Rep.") at 82–84). It contends that

21   Teradata has cited no evidence otherwise and therefore Wolfson did not need to account for the

22   "without transformation" limitation. *Id.* These arguments go to the weight and not the admissibility

23   of Wolfson's opinions.

24        Finally, Teradata asserts that Wolfson's calculations "reflect a host of allegedly quantitative

25   assumptions that do not connect to the qualitative documents on which he relies." L&W Mot. at 8.

26   For example, Teradata argues that he assumes that 50–100% of Teradata's customers use a certain

27   configuration of Columnar solely because Teradata "recommends" the configuration, but he has no

28   basis for this assumption. *Id.* SAP points out that this is a rational analysis given that some

United States District Court
Northern District of California

67

1    customers may not follow Teradata's recommendation and therefore would be expected to choose

2    both options equally (the 50% endpoint of the range). *Id.* at 5. And because customers are likely to

3    follow a manufacturer's recommendation, this would result in the upper endpoint of the range

4    (100%). *Id.* Teradata also argues that with the '179 Patent, Wolfson relied on a 50% estimate for

5    the prevalence of queries containing subqueries "solely on a third-party paper," but SAP contends

6    that the paper "analyzed a well-established industry performance benchmark, was peer-reviewed, []

7    was presented at a prestigious computer science conference," and Wolfson analyzed the benchmark

8    independently. L&W Mot. at 8–9; L&W Opp. at 5–6; *see* Wolfson Rep. ¶ 121. These arguments

9    go to the weight and not the admissibility of Wolfson's opinions.

10        Wolfson's apportionment analysis was based on reliable principles and guided by Federal

11   Circuit case law. Leonard's Profit Apportionment Approach for the '421 and '179 Patents should

12   not be excluded either.

13                                        **CONCLUSION**

14        For the reasons above, SAP's motion for summary judgment on Teradata's trade secret

15   claims is GRANTED. Its motion related to Teradata's business trade secret claims under the

16   DTSA is DENIED as moot. Its motion related to Teradata's tying claim is GRANTED.

17   Teradata's motion for summary judgment on the invalidity of the '321 Patent is GRANTED. Its

18   motion for partial summary judgment against an award of damages for infringement of the '179

19   and '421 Patents before May 21, 2019, is GRANTED. Its motion to exclude portions of Kraska's

20   expert report is DENIED as moot. Its motion to exclude portions of Horn's report is GRANTED

21   in part and DENIED in part. Its motion to exclude portions of the Leonard and Wolfson reports is

22   DENIED in part as moot and DENIED in part on the merits. Its motion to exclude portions of

23   Mehrotra's report is DENIED. SAP's motion to exclude portions of Asker's report is GRANTED

24   in part and DENIED in part.

25        **IT IS SO ORDERED.**

26   Dated: November 8, 2021

27   _____

28                                        William H. Orrick
                                          United States District Judge

68

| | |
|---|---|
| 1 | MARK L. WHITAKER (admitted *Pro Hac Vice*) |
| | MWhitaker@mofo.com |
| 2 | DAVID D. CROSS (admitted *Pro Hac Vice*) |
| | DCross@mofo.com |
| 3 | DANIEL P. MUINO (CA BAR NO. 209624) |
| | DMuino@mofo.com |
| 4 | BRADLEY S. LUI (CA BAR NO. 143088) |
| | BLui@mofo.com |
| 5 | MARY PRENDERGAST (CA BAR NO. 272737) |
| | MPrendergast@mofo.com |
| 6 | FAHD H. PATEL (admitted *Pro Hac Vice*) |
| | FPatel@mofo.com |
| 7 | MORRISON & FOERSTER LLP |
| | 2100 L Street, NW, Suite 900 |
| 8 | Washington, District of Columbia 20037 |
| | Telephone:    (202) 887-1500 |
| 9 | Facsimile:    (202) 887-0763 |

BRYAN WILSON (CA BAR NO. 138842)
BWilson@mofo.com
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, California 94304-1018
Telephone:    (650) 813-5600
Facsimile:    (650) 494-0792

WENDY RAY (CA BAR NO. 226269)
WRay@mofo.com
MORRISON & FOERSTER LLP
707 Wilshire Boulevard, Suite 6000
Los Angeles, California  90017-3543
Telephone:    (213) 892-5200
Facsimile:    (213) 892-5454

JACK W. LONDEN (CA BAR NO. 85776)
JLonden@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105
Telephone:    (415) 268-7000
Facsimile:    (415) 268-7522

Attorneys for Plaintiffs
TERADATA CORPORATION,
TERADATA US, INC., and
TERADATA OPERATIONS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| TERADATA US, INC., | Case No. 3:18-cv-03670-WHO (JCS) |
| Plaintiff, | **STIPULATION AND [~~PROPOSED~~] ORDER TO CERTIFY JUDGMENT UNDER FEDERAL RULE OF CIVIL PROCEDURE 54(b) AND TO STAY CASE PENDING APPEAL** |
| and | |
| TERADATA CORPORATION and TERADATA OPERATIONS, INC., | |
| Plaintiffs/Counterclaim-Defendants, | |
| v. | |
| SAP SE, | |
| Defendant/Counterclaim-Plaintiff, | |
| and | |
| SAP AMERICA, INC. and SAP LABS, LLC, | |
| Defendants. | |

Plaintiffs/Counterclaim-Defendants Teradata Corporation and Teradata Operations, Inc. and Plaintiff Teradata US, Inc. (collectively, "Teradata") and Defendants/Counterclaim-Plaintiffs SAP SE and Defendants SAP America, Inc. and SAP Labs, LLC (collectively, "SAP") hereby jointly request and stipulate to the following: (1) entry of judgment under Federal Rule of Civil Procedure 54(b) on Teradata's technical trade secret claims and tying claims; and (2) stay of Teradata's business trade secret claims and SAP's patent counterclaims pending resolution of Teradata's appeal on the technical trade secret and tying claims.

When an action involves multiple claims, Rule 54(b) authorizes district courts to enter judgment on finally adjudicated claims when there is no just reason to delay appellate review of those claims. Those circumstances are present here. And a stay of Teradata's business trade secret claims and SAP's patent counterclaims pending resolution of Teradata's appeal of the Rule 54(b) judgment will avoid the need for two separate jury trials in this action if the court of appeals reverses the summary judgment decision, conserving judicial and party resources.

## I.    BACKGROUND

Teradata sued SAP, asserting claims for trade secret misappropriation and violations of the Sherman and Clayton Acts, among others. Dkt. No. 67 at 28-36. SAP counterclaimed for alleged infringement of certain of its patents. Dkt. No. 104 at 34-64. After three years of litigation, including many interlocutory rulings by the Court, the following claims remained:

Teradata's technical trade secret claims: These claims center on SAP's alleged misappropriation of Teradata's technical trade secrets, which concern database features such as specific ways of selecting large volumes of data to solve problems arising in massively parallel processing ("MPP") databases. *See, e.g.*, Dkt. No. 259-3 at 79-86.

Teradata's business trade secret claims: These claims relate to SAP's alleged misappropriation of Teradata's business trade secrets, which concern Teradata's allegedly competitive information, pricing, and customer-specific information that several former Teradata employees allegedly provided to their SAP colleagues. Dkt. No. 464-14 at 10-13.

Teradata's tying claim: This claim concerns SAP's allegedly unlawful tie of its HANA database to its S/4HANA Enterprise Resource Planning application. *E.g.*, Dkt. No. 67 at 18-28,

1  32-36.

2      SAP's patent infringement counterclaims:  These counterclaims allege that certain

3  Teradata products, including Teradata Database, infringe U.S. Patent Nos. 9,626,421; 8,214,321;

4  and 7,617,179, which generally relate to database technology.  Dkt. No. 123 at 33-34, 40, 54; Dkt.

5  Nos. 124, 124-1, 124-3.

6      On November 8, 2021, this Court issued an order on the parties' summary judgment

7  motions and motions to exclude expert testimony.  Dkt. No. 603.  Among other rulings, the Court

8  granted SAP's motion for summary judgment on Teradata's technical trade secret claims and on

9  Teradata's tying claim after excluding portions of Teradata's expert testimony.  The Court also

10 granted Teradata's motion for summary judgment on one of SAP's counterclaims for patent

11 infringement, holding the asserted claims of the '321 patent invalid.  *Id.* at 64.

12     As a result of that order, the claims remaining in this litigation are Teradata's business

13 trade secret claims and SAP's other counterclaims for patent infringement.  Trial on those claims

14 is scheduled to begin on January 31, 2022.  Dkt. No. 402 at 1.

15 **II.    ARGUMENT**

16     **A.    This Court Should Enter Final Judgment Under Rule 54(b) On Teradata's
              Technical Trade Secret And Tying Claims**

17     Rule 54(b) authorizes district courts to "direct entry of a final judgment as to one or more,

18 but fewer than all, claims" if the court "determines that there is no just reason for delay."  Fed. R.

19 Civ. P. 54(b).  The rule "provide[s] a practical means of permitting an appeal to be taken from

20 one or more final decisions on individual claims, in multiple claims actions, without waiting for

21 final decisions to be rendered on all the claims in the case."  *Sears, Roebuck & Co. v. Mackey*,

22 351 U.S. 427, 435 (1956).  The requirements of Rule 54(b) are met here.

23     *First*, this Court's grant of summary judgment on Teradata's technical trade secret and

24 tying claims is an "ultimate disposition" of "individual claim[s]" in a multi-claim action.  *Curtiss-*

25 *Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 7 (1980).  There is "no question" that an order

26 granting summary judgment on a claim is a "final" disposition of that claim under Rule 54(b).

27 *Wood v. GCC Bend, LLC*, 422 F.3d 873, 879 (9th Cir. 2005).  And Teradata's tying and technical

28

1    trade secret claims are "individual claim[s]" that are "separate and distinct" from the remaining

2    claims. *Ariz. State Carpenters Pension Tr. Fund v. Miller*, 938 F.2d 1038, 1040 (9th Cir. 1991).

3    An "individual claim" is one that arises from a particular "set of facts giving rise to legal rights in

4    the claimant," even if "some facts are common to" other, still-pending claims. *Pakootas v. Teck*

5    *Cominco Metals, Ltd.*, 905 F.3d 565, 575 (9th Cir. 2018) (quotation marks omitted). While

6    Teradata's technical and business trade secret claims both involve alleged trade secrets, they are

7    based on distinct factual allegations. Teradata's technical trade secret claims arise from SAP's

8    alleged misappropriation of Teradata's database features that SAP allegedly learned during the

9    parties' Bridge Project. By contrast, the business trade secret claims are based on SAP's alleged

10   use of Teradata's allegedly confidential competitive information allegedly obtained from former

11   Teradata employees who took jobs at SAP.

12       *Second*, there are no "reasons to delay the appeal of" Teradata's technical trade secret and

13   tying claims. *Curtiss-Wright*, 446 U.S. at 8. In making this determination, courts consider

14   "judicial administrative interests" such as "whether the claims under review [a]re separable from

15   the others remaining to be adjudicated and whether the nature of the claims already determined

16   [is] such that no appellate court would have to decide the same issues more than once even if

17   there were subsequent appeals." *Id.* The ultimate inquiry is whether Rule 54(b) certification

18   "will aid 'expeditious decision' of the case." *Texaco, Inc. v. Ponsoldt*, 939 F.2d 794, 797 (9th

19   Cir. 1991) (quoting *Sheehan*, 812 F.2d at 468).

20       Those considerations favor an immediate appeal here. Teradata's technical trade secret

21   and tying claims are separable from the business trade secret claims or patent counterclaims

22   remaining to be tried. That trial would include issues such as whether Teradata's allegedly

23   confidential competitive information and strategies are protected trade secrets, whether SAP

24   misappropriated those alleged trade secrets, and whether Teradata's products infringe SAP's two

25   remaining patents. For much the same reasons, immediate appeal of Teradata's technical trade

26   secret and tying claims would not require the court of appeals to "decide the same issues

27   more than once" even if there were subsequent appeals. *Curtiss-Wright*, 446 U.S. at 8. Courts have

28   routinely granted Rule 54(b) certification in cases with far more overlap between the adjudicated

1    and unadjudicated claims. *See, e.g., Int'l Longshore & Warehouse Union v. ICTSI Ore., Inc.*, 863

2    F.3d 1178, 1186 (9th Cir. 2017) (affirming Rule 54(b) certification of antitrust counterclaim

3    where counterclaim "involve[d] distinct points of law" from pending labor-law claims even

4    though "the factual issues involved in [the antitrust] claim are closely tied to the factual issues in

5    the labor-law claims").

6          Good reason exists to enter partial final judgment now. An immediate appeal, along with

7    a stay of the remaining claims, will "minimize[] the likelihood of multiple trials." *Intel Corp. v.*

8    *Tela Innovations, Inc.*, No. 3:18-CV-02848-WHO, 2021 WL 783560, at *10 (N.D. Cal. Mar. 1,

9    2021). Further, if the court of appeals upholds this Court's summary judgment decision, "the

10    parties will have certainty" on the claims and issues remaining in this proceeding. *Id.* And "[i]f

11    that ruling is reversed, the case will be remanded and proceed to trial sooner than it would have if

12    the appeal were delayed pending resolution of the other issues." *Id.* Certification under Rule

13    54(b) therefore would promote judicial economy and benefit both parties.

14          **B.**    **This Court Should Stay Teradata's Business Trade Secret Claims And SAP's**
                 **Patent Counterclaims Pending Resolution Of The Rule 54(b) Appeal**

15

16          If this Court grants Rule 54(b) certification on Teradata's technical trade secret and tying

17    claims, it should also stay Teradata's business trade secret claims and SAP's remaining patent

18    counterclaims pending the outcome of that appeal.

19          A district court's "power to stay proceedings is incidental to the power inherent in every

20    court to control the disposition of the causes on its docket with economy of time and effort for

21    itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). Courts

22    regularly exercise this authority to stay proceedings on the remaining claims pending resolution

23    of an appeal under Rule 54(b). *See Doe v. Univ. of Cal.*, No. C-92-2284 SAW, 1993 WL 361540,

24    at *2 (N.D. Cal. Sept. 2, 1993). The Ninth Circuit has identified at least three factors relevant to

25    whether a stay is warranted: (1) "the possible damage which may result from the granting of a

26    stay," (2) "the hardship or inequity which a party may suffer in being required to go forward,"

27    and (3) "the orderly course of justice measured in terms of the simplifying or complicating of

28    issues, proof, and questions of law which could be expected to result from a stay." *Lockyer v.*

1    *Mirant Corp.*, 398 F.3d 1098, 1110 (9th Cir. 2005) (quoting *CMAX, Inc. v. Hall*, 300 F.2d 265,

2    268 (9th Cir. 1962)).  This third factor involves consideration of whether a stay would promote

3    "judicial economy."  *Fuller v. Amerigas Propane, Inc.*, No. 09-2616 TEH, 2009 WL 2390358, at

4    *2 (N.D. Cal. Aug. 3, 2009).

5          All three factors weigh in favor of staying Teradata's business trade secret claims and

6    SAP's patent counterclaims.  *First*, as this is a stipulation, neither party will suffer prejudice from

7    a stay while Teradata's appeal is pending.

8          *Second*, both parties will be prejudiced if they must go forward with a trial on Teradata's

9    business trade secret claims and SAP's patent counterclaims.  If those claims proceed to trial and

10   Teradata prevails in whole or in part in its Rule 54(b) appeal, the parties will have to pursue a

11   second jury trial on Teradata's technical trade secret and/or tying claims.  But if the Court stays

12   the business trade secret claims and patent counterclaims pending Teradata's appeal, at most only

13   a single jury trial will be required whatever the outcome of the appeal.  *See id.* at *11 (staying

14   claim pending Rule 54(b) appeal to avoid possible need for second jury trial).

15         *Third*, and for similar reasons, considerations of judicial economy favor a stay of

16   Teradata's business trade secret claims and SAP's patent counterclaims.  A stay would preserve

17   judicial resources by avoiding a potential second trial if Teradata's appeal is successful.  *See id.*

18   (noting that "[a] stay of all other claims pending appeal" under Rule 54(b) "minimizes the

19   probable burden for the parties, counsel, and this court" and "ensures that issues are tried in the

20   most efficient way").

21   **III.    CONCLUSION**

22         For these reasons, Teradata and SAP jointly request that the Court (1) enter final judgment

23   under Rule 54(b) on Teradata's technical trade secret and tying claims; (2) stay Teradata's

24   business trade secret claims and SAP's patent counterclaims pending Teradata's appeal; and (3)

25   stay any filing of a bill of costs or motion for award of fees based on the Rule 54(b) final

26   judgment pending Teradata's appeal and until a time set by the Court after conclusion of that

27   appeal.

28         IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.

STIPULATION AND [~~PROPOSED~~ ORDER] TO CERTIFY JUDGMENT AND STAY
CASE NO. 3:18-cv-03670-WHO (JCS)                                                                          5

1

2   Dated:  November 19, 2021                    MORRISON & FOERSTER LLP

3                                                  */s/ Mark L. Whitaker*
4                                                Mark L. Whitaker

5                                                Attorneys for Plaintiffs and Counterclaim-
                                                 Defendants TERADATA CORPORATION,
6                                                TERADATA US, INC., and TERADATA
                                                 OPERATIONS, INC.
7

8   Dated:  November 19, 2021                    JONES DAY

9                                                  */s/ Tharan Gregory Lanier*
10                                               Tharan Gregory Lanier

11                                               Attorneys for Defendant/Counterclaim Plaintiff
                                                 SAP SE and Defendants SAP AMERICA,
12                                               INC. and SAP LABS, LLC
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## ECF ATTESTATION

2          I, Mark L. Whitaker, am the ECF User whose ID and password are being used to file this

3    document.  In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that concurrence in the

4    filing of this document has been obtained from each of the other signatories.

5

6    Dated:  November 19, 2021                    MORRISON & FOERSTER LLP

7                                                      _/s/   Mark L. Whitaker_____
                                                      Mark L. Whitaker
8

9                                                    Attorneys for Plaintiffs and Counterclaim-
                                                     Defendants TERADATA CORPORATION,
10                                                   TERADATA US, INC., and TERADATA
                                                     OPERATIONS, INC.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**[~~PROPOSED~~] ORDER**

2

3          Before the Court is the parties' Stipulation to Certify Judgment Under Federal Rule of

4  Civil Procedure 54(b) and to Stay Case Pending Appeal.  The Court finds that there is a final

5  disposition on Teradata's technical trade secret and tying claims and that there is no just reason to

6  delay entry of judgment, as doing so will benefit judicial administration.  Final judgment under

7  Federal Rule of Civil Procedure 54(b) is entered on Teradata's technical trade secret and tying

8  claims.  Teradata's business trade secret claims and SAP's patent counterclaims are stayed

9  pending Teradata's appeal.  Deadlines to file any bill of costs or motions for award of fees are

10  also stayed pending Teradata's appeal. IT IS SO ORDERED.

11

12  Dated: November 22, 2021

13                                                                William H. Orrick
                                                              United States District Judge
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF CONFIDENTIAL MATERIAL**

This brief contains 43 unique words (including numbers) marked confidential.

This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Dated: May 18, 2022             _____/s/ Deanne E. Maynard_____

                                        Deanne E. Maynard

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the

Court for the United States Court of Appeals for the Federal Circuit by using the

CM/ECF system on May 18, 2022.

I certify that on May 18, 2022, I served the confidential version of this brief

via email and U.S. Mail on all counsel of record.


Dated:  May 18, 2022                    _____
                                              /s/ Deanne E. Maynard
                                              Deanne E. Maynard

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Circuit Rules 28.1(b) and 32(b) because it contains 13,988 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Federal Circuit Rule 32(b)(2), as determined by the word-counting feature of Microsoft Word.

This brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface, including serifs, using Microsoft Word 2016 in Times New Roman 14-point font.

Dated: May 18, 2022          /s/ Deanne E. Maynard
                                        Deanne E. Maynard