No. 22-1286

# United States Court of Appeals for the Federal Circuit

TERADATA CORPORATION, TERADATA US, INC., TERADATA OPERATIONS, INC.,

*Plaintiffs-Appellants*,

v.

SAP SE, SAP AMERICA, INC., SAP LABS LLC,

*Defendants-Appellees*.

Appeal From The United States District Court for the Northern District of California, Case No. 3:18-cv-03670, Hon. William H. Orrick

## APPELLEES' NON-CONFIDENTIAL ANSWERING BRIEF

Joshua L. Fuchs
Joseph M. Beauchamp
JONES DAY
717 Texas St., Suite 3300
Houston, TX 77002

Gregory A. Castanias
JONES DAY
51 Louisiana Ave., N.W.
Washington, DC 20001

Tharan Gregory Lanier
Nathaniel P. Garrett
Catherine T. Zeng
JONES DAY
1755 Embarcadero Road
Palo Alto, CA 94903
(650) 739-3939

*Counsel for Defendants-Appellees
SAP SE, SAP AMERICA, INC., and
SAP LABS LLC*

*[Additional counsel on inside cover]*

Kenneth A. Gallo
J. Steven Baughman
Paul, Weiss, Rifkind, Wharton &
Garrison LLP
2001 K Street, NW
Washington, D.C. 20006-1047
(202) 223-7356

*Counsel for Defendants-Appellees*
*SAP SE, SAP AMERICA, INC., and*
*SAP LABS LLC*

FORM 9. Certificate of Interest

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2022-1286 |
| **Short Case Caption** | Teradata Corporation v. SAP SE |
| **Filing Party/Entity** | SAP SE, SAP America, Inc. and SAP Labs, LLC |

> **Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 08/26/2022

Signature: /s/ Tharan Gregory Lanier

Name: Tharan Gregory Lanier

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☐ None/Not Applicable |
| SAP SE | | Not Applicable |
| SAP America, Inc. | | SAP SE |
| SAP Labs, LLC | | SAP SE |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐     Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable                ☑   Additional pages attached

| | | |
|---|---|---|
| H. Albert Liou<br>Jones Day | Justin White<br>Jones Day | Geoffrey D. Oliver<br>Jones Day |
| Kelly C. Holt<br>Jones Day | Madeline Lansky<br>Jones Day | Kristin L. Cleveland<br>Klarquist Sparkman, LLP |
| Kyle B. Rinehart<br>Klarquist Sparkman, LLP | J. Christopher Carraway<br>Klarquist Sparkman, LLP | Klaus H. Hamm<br>Klarquist Sparkman, LLP |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑   None/Not Applicable                ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable                ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

## 4. Legal Representatives

John D. Vandenberg
Klarquist Sparkman, LLP

Roy Chamcharas
Klarquist Sparkman, LLP

Mark W. Wilson
Klarquist Sparkman, LLP

Garth A. Winn
Klarquist Sparkman, LLP

David J. Ball, Jr.
Paul, Weiss, Rifkind, Wharton & Garrison LLP

Stefan Geirhofer
Paul, Weiss, Rifkind, Wharton & Garrison LLP

Crystal M. Johnson
Paul, Weiss, Rifkind, Wharton & Garrison LLP

William Michael
Paul, Weiss, Rifkind, Wharton & Garrison LLP

Megan F. Raymond
Paul, Weiss, Rifkind, Wharton & Garrison LLP

# TABLE OF CONTENTS

**Page**

STATEMENT OF RELATED CASES ................................................................1

JURISDICTIONAL STATEMENT ...............................................................1

STATEMENT OF THE ISSUES ...................................................................1

INTRODUCTION ........................................................................................2

STATEMENT OF THE CASE........................................................................5

I.    FACTUAL BACKGROUND.................................................................5

    A. The Business Software at Issue. .............................................5

    B. SAP is an Innovator in Vertically-Integrated ERP
       Application-Translytical Database Products. ......................6

    C. Teradata Competes in a Separate Market for Analytical
       Databases....................................................................................8

    D. There Are Technological and Licensing Reasons Why
       Customers Do Not Use HANA as an Enterprise Data
       Warehouse..................................................................................9

    E. The Parties Enter into the Bridge Project to Modify SAP
       Products to Operate on Teradata's Database.....................10

       1.  The Software Development Cooperation Agreement................11

       2.  Mutual Nondisclosure Agreements.............................................12

II.   PROCEDURAL BACKGROUND. ..............................................13

    A. Teradata Sues, Alleging SAP Built HANA on Teradata Trade
       Secrets and Antitrust Violations. .........................................13

    B. Teradata Narrows Its Trade-Secret Claim to the "Batched
       Merge Method." .....................................................................14

# TABLE OF CONTENTS
## (continued)

Page

    C.  Teradata Changes Its Tying Theory at Summary Judgment...........15

    D.  The District Court Grants Summary Judgment to SAP. .................16

STANDARD OF REVIEW ...............................................................18

SUMMARY OF ARGUMENT .........................................................18

ARGUMENT ...................................................................................21

I.    THE DISTRICT COURT CORRECTLY GRANTED SUMMARY
    JUDGMENT ON TERADATA'S TYING CLAIM. ................................21

    A.  Teradata's Claim Must be Assessed Under the Rule of
        Reason.....................................................................................21

        1.  Cases Involving Technological Innovation Require
           Application of the Rule of Reason...................................21

        2.  Teradata's Arguments Regarding the Hois Declaration
           Are Incorrect and Do Not Justify *Per Se* Illegality. .....................26

    B.  Summary Judgment was Warranted Because Teradata's
        Tying Claim is Predicated Upon Unreliable Expert Opinions........28

        1.  Product Market Definition Is Essential. ........................28

        2.  The District Court Properly Exercised Its Discretion By
           Excluding Asker's Unreliable Product-Market Definitions. .....31

           a.  Asker's "Qualitative" Approach to Defining Markets
               Was Not Based on Any Reliable Methodology....................31

               (1)  Asker Failed to Explain the Methodology That Led
                    to His "Large Enterprises" Definition.............................31

               (2)  Teradata's Counter-Arguments Are Unpersuasive. .......34

# TABLE OF CONTENTS
## (continued)

(3) Asker's Price Discrimination Opinion Cannot Salvage His "Large Enterprises" Definition....................38

b. Asker's "Quantitative" ADR Method Was Not Based on Sufficient Data and Was Not Reliably Applied...............39

(1) ADR Was Not a Reliable Methodology in This Case.........................................................................40

(2) Asker's ADR Analysis Lacked Adequate Factual Foundation. ..........................................................42

(3) Asker Applied His ADR Methodology Inconsistently to Reach His Predetermined Results. .....44

C. No Reasonable Juror Could Conclude that SAP's Conduct Produced Significant Anticompetitive Effects in the Enterprise Database Warehouse Market. ..........................................45

1. There is No Evidence Customers Have Used HANA, Tied with S/4HANA, as an Enterprise Data Warehouse..................46

a. Asker Failed to Distinguish Between Tied and Non-Tied Sales, and Between Impacts Within the Tied Market and Impacts Outside the Tied Market......................47

b. Teradata's Other Evidence Likewise Fails to Distinguish Between Tied and Non-Tied Sales. ..................51

2. Teradata Failed to Prove Substantial Market Foreclosure. .......54

II. THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT ON TERADATA'S TRADE-SECRET CLAIM. .................60

A. Teradata Never Marked Its Supposed Trade Secret as Confidential. ..........................................................60

# TABLE OF CONTENTS
## (continued)

**Page**

1. The Design Document Does Not Reduce the Claimed Trade Secret to Writing. ..................................................................61

2. SAP Never Waived Teradata's Obligation to Comply with the Marking Requirement. ............................................................65

B. The Bridge Project Agreements Granted SAP the Right to Use Modifications to Its Own Software in Any SAP Product. ...............67

1. SAP Owns the Interface, and Modifications Thereto, that Implemented the Supposed Batched Merge Method.................67

2. The SDCA and MNDA Licensed Teradata's Suggestions to SAP. ...............................................................................69

3. Teradata's Contrary Interpretation Does Not Accord with the Plain Language of the Bridge Project Agreements. .............72

4. Teradata's Interpretation Contravenes Both Parties' Contemporaneous Intent. ............................................................75

CONCLUSION ..................................................................................76

# TABLE OF AUTHORITIES

**Page**

### Cases

*Anheuser-Busch, Inc. v. Nat. Beverage Distribs.,*
  69 F.3d 337 (9th Cir. 1995) ...............................................................52

*Ashwood Cap., Inc. v. OTG Mgmt., Inc.,*
  99 A.D.3d 1 (N.Y. App. Div. 2012) ..................................................64

*Austin v. McNamara,*
  979 F.2d 728 (9th Cir. 1992) .............................................................59

*Aylward v. SelectHealth, Inc.,*
  31 F.4th 719 (9th Cir. 2022) ..............................................................18

*Bailey v. Allgas, Inc.,*
  284 F.3d 1237 (11th Cir. 2002) .........................................................56

*Bhan v. NME Hosps., Inc.,*
  929 F.2d 1404 (9th Cir. 1991) ...........................................................46

*Blough v. Holland Realty, Inc.,*
  574 F.3d 1084 (9th Cir. 2009) ...........................................................46

*Brad H. v. City of New York,*
  17 N.Y.3d 180 (2011) ........................................................................60

*Brantley v. NBC Universal, Inc.,*
  2009 WL 10671189 (C.D. Cal. Oct. 15, 2009)...................................54

*Brantley v. NBC Universal, Inc.,*
  675 F.3d 1192 (9th Cir. 2012) ....................................... 21, 54, 56, 57

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.,*
  441 U.S. 1 (1979) ...............................................................................23

*Brown Shoe Co. v. United States,*
  370 U.S. 294 (1962) ..................................................................... 35, 37

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Bruno v. Bozzuto's, Inc.,*
311 F.R.D. 124 (M.D. Pa. 2015) ...........................................................43

*Cascade Health Sols. v. PeaceHealth,*
515 F.3d 883 (9th Cir. 2008) ......................................................... 24, 29, 54, 59

*Christian Dior-New York, Inc. v. Koret, Inc.,*
792 F.2d 34 (2d Cir. 1986)..................................................................67

*Church & Dwight Co. v. Mayer Labs.,*
2011 WL 1225912 (N.D. Cal. Apr. 1, 2011) ....................................................55

*Claar v. Burlington N. R.R. Co.,*
29 F.3d 499 (9th Cir. 1994) ......................................................... 32, 44

*Cmty. Counseling & Mediation Servs. v. Chera,*
95 A.D.3d 639 (N.Y. App. Div. 2012) ..............................................................65

*Cnty. of Tuolumne v. Sonora Cmty. Hosp.,*
236 F.3d 1148 (9th Cir. 2001) ...........................................................55

*Concord Boat Corp. v. Brunswick Corp.,*
207 F.3d 1039 (8th Cir. 2000) ...........................................................47

*Convolve, Inc. v. Compaq Comput. Corp.,*
527 F. App'x 910 (Fed. Cir. 2013).....................................................61

*Digidyne Corp. v. Data Gen. Corp.,*
734 F.2d 1336 (9th Cir. 1984) ...........................................................24

*Domingo ex rel. Domingo v. T.K.,*
289 F.3d 600 (9th Cir. 2002) ......................................................... 32, 39

*EchoStar Satellite L.L.C. v. ESPN, Inc.,*
79 A.D.3d 614 (N.Y. App. Div. 2010) ......................................................... 65, 66

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Fed. Trade Comm'n  v. Wilh. Wilhelmsen Holding ASA,*
341 F. Supp. 3d 27 (D.D.C. 2018) ........................................................43

*Fed. Trade Comm'n v. Qualcomm Inc.,*
969 F.3d 974 (9th Cir. 2020) ................................................ 22, 24, 29

*Fed. Trade Comm'n v. Sysco Corp.,*
113 F. Supp. 3d 1 (D.D.C. 2015) ................................................ 42, 43

*Fount-Wip, Inc. v. Reddi-Wip, Inc.,*
568 F.2d 1296 (9th Cir. 1978) ..........................................................33

*Gen. Elec. Co. v. Joiner,*
522 U.S. 136 (1997) .........................................................................38

*Gen. Motors Acceptance Corp. v. Clifton-Fine Cent. Sch. Dist.,*
647 N.E.2d 1329 (N.Y. 1995) ..........................................................67

*Great Am. All. Ins. Co. v. Sir Columbia Knoll Assocs. Ltd.,*
484 F. Supp. 3d 946 (D. Or. 2020)....................................................42

*Image Tech. Serv. v. Eastman Kodak Co.,*
903 F.2d 612 (9th Cir. 1990) ...................................................... 29, 73

*Image Tech. Servs., Inc. v. Eastman Kodak Co.,*
125 F.3d 1195 (9th Cir. 1997) ..........................................................29

*In re Cox Enters., Inc.,*
871 F.3d 1093 (10th Cir. 2017) .........................................................22

*In re Incretin-Based Therapies Prods. Liab. Litig.,*
2022 WL 898595 (9th Cir. Mar. 28, 2022) ........................................34

*In re Live Concert Antitrust Litig.,*
863 F. Supp. 2d 966 (C.D. Cal. 2012) ........................................ 35, 36

# TABLE OF AUTHORITIES
## (continued)

**Page**

*In re NJOY, Inc. Consumer Class Action Litig.,*
   2016 WL 787415 (C.D. Cal. Feb. 2, 2016).........................................................42

*In re Rearden LLC,*
    841 F.3d 1327 (Fed. Cir. 2016)............................................................................1

*Indep. Towers of Wash. v. Washington,*
   350 F.3d 925 (9th Cir. 2003) ...............................................................37

*Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elecs. Corp.,*
   518 F.2d 913 (9th Cir. 1975) ...............................................................36

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde,*
   466 U.S. 2 (1984) ....................................................................... 23, 32

*Kaplan v. Burroughs Corp.,*
   611 F.2d 286 (9th Cir. 1979) ...............................................................29

*Kumho Tire Co. v. Carmichael,*
   526 U.S. 137 (1999) ............................................................................40

*Leegin Creative Leather Prod., Inc. v. PSKS, Inc.,*
   551 U.S. 877 (2007) ............................................................................21

*Matter of Apple, Inc. v. Tax Appeals Trib.,*
   204 A.D.3d 1173 (N.Y. App. Div. 2022) ..........................................74

*Mazzola v. County of Suffolk,*
   143 A.D.2d 734 (N.Y. App. Div. 1988) ............................................73

*Microsoft Corp. v. i4i Ltd.,*
   564 U.S. 91 (2011) ..............................................................................71

*Murray v. S. Route Mar. SA,*
   870 F.3d 915 (9th Cir. 2017) ...............................................................18

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Natale v. Ernst,*
  63 A.D.3d 1406 (N.Y. App. Div. 2009) ...........................................67

*Navajo Nation v. U.S. Forest Serv.,*
  535 F.3d 1058 (9th Cir. 2008) ...........................................28

*Nelson v. Pima Cmty. College,*
  83 F.3d 1075 (9th Cir. 1996) ...........................................58

*O'Bannon v. Nat'l Collegiate Athletic Ass'n,*
  802 F.3d 1049 (9th Cir. 2015) ...........................................45

*Ocean Transp. Line, Inc. v. Am. Philippine Fiber Indus., Inc.,*
  743 F.2d 85 (2d Cir. 1984)...........................................75

*Ohio v. Am. Express Co.,*
  138 S. Ct. 2274 (2018) ........................................... 21, 28, 29

*Olin Corp. v. F.T.C.,*
  986 F.2d 1295 (9th Cir. 1993) ...........................................35

*Oltz v. St. Peter's Cmty. Hosp.,*
  861 F.2d 1440 (9th Cir. 1988) ...........................................45

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.,*
  20 F.4th 466 (9th Cir. 2021) ...........................................30

*Packaging Sys., Inc. v. PRC-Desoto Int'l, Inc.,*
  268 F. Supp. 3d 1071 (C.D. Cal. 2017) ...........................................46

*Paladin Assocs., Inc. v. Montana Power Co.,*
  328 F.3d 1145 (9th Cir. 2003) ...........................................26

*Paramount Leasehold, L.P. v. 43rd St. Deli, Inc.,*
  136 A.D.3d 563 (N.Y. App. Div. 2016) ...........................................66

# TABLE OF AUTHORITIES
## (continued)

**Page**

*PLS.Com, LLC v. Nat'l Ass'n of Realtors,*
32 F.4th 824 (9th Cir. 2022) ................................................................29

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.,*
124 F.3d 430 (3d Cir. 1997)................................................................30

*Rebel Oil Co. v. Atl. Richfield Co.,*
51 F.3d 1421 (9th Cir. 1995) ....................................................... 28, 46

*Reed Const. Data Inc. v. McGraw-Hill Cos.,*
49 F. Supp. 3d 385 (S.D.N.Y. 2014) ...................................................45

*Reilly v. Apple Inc.,*
2022 WL 74162 (N.D. Cal. Jan. 7, 2022)...................................... 29, 30

*Sloan v. Gen. Motors LLC,*
2020 WL 5517244 (N.D. Cal. Sept. 14, 2020)....................................36

*Synchronoss Techs., Inc. v. Dropbox, Inc.,*
987 F.3d 1358 (Fed. Cir. 2021)..........................................................18

*Syngenta Crop Prot., LLC v. Willowood, LLC,*
944 F.3d 1344 (Fed. Cir. 2019)..........................................................18

*Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.,*
959 F.2d 468 (3d Cir. 1992)...............................................................55

*Transit Funding Assocs., LLC v. Cap. One Equip. Fin. Corp.,*
149 A.D.3d 23 (N.Y. App. Div. 2017) ................................................75

*United States v. Bilzerian,*
926 F.2d 1285 (2d Cir. 1991).............................................................74

*United States v. Kirilyuk,*
29 F.4th 1128 (9th Cir. 2022) ............................................................24

# TABLE OF AUTHORITIES
## (continued)

**Page**

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ................................................. 22, 23, 24

*United States v. Oracle Corp.*,
    331 F. Supp. 2d 1098 (N.D. Cal. 2004) ................................................38

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.*,
    395 F.3d 416 (7th Cir. 2005) ................................................32

## Statutes

18 U.S.C. § 1836 ................................................1

28 U.S.C. § 1295 ................................................1

28 U.S.C. § 1331 ................................................1

28 U.S.C. § 1337 ................................................1

28 U.S.C. § 1367 ................................................1

## Rules

Fed. R. Civ. P. 13 ................................................1

Fed. R. Civ. P. 54 ................................................1

Fed. R. Evid. 702 ................................................42

## Other Authorities

Areeda and Hovenkamp, *Antitrust Law: An Analysis of Antitrust
    Principles and Their Application* (2002) ................................................ 38, 54, 55

Joseph Farrell & Carl Shapiro, *Improving Critical Loss Analysis*, THE
    ANTITRUST SOURCE (2008) ................................................41

Serge Moresi, et al., 1 *Antitrust Economics for Lawyers* (2021) ................................................41

# TABLE OF AUTHORITIES
## (continued)

**Page**

Joseph Simons & Malcolm Coate, *United States v. H&R Block: An Illustration of the DOJ's New But Controversial Approach to Market Definition*, 10 J. OF COMPETITION LAW & ECON. 543 (2014) ...........................41

U.S. Dep't of Justice & FTC, *Horizonal Merger Guidelines* (2010) ...................38

Webster's II New College Dictionary (3d ed. 2005) .................................. 70, 73

## STATEMENT OF RELATED CASES

No appeal from this proceeding has previously been before this Court or any other court.  Counsel for Appellees know of no other cases pending in this or any other court or agency that will directly affect or be directly affected by this Court's decision in the pending appeal.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. § 1836(c) and 28 U.S.C. §§ 1331, 1337(a), and 1367.  The district court entered partial final judgment under Rule 54(b) on November 22, 2021.  Appx77.  Teradata appealed to this Court on December 17, 2021.  Appx22340.

As explained in SAP's motion to transfer (ECF 9, 11), SAP's patent counterclaims are not compulsory under Rule 13(a) and 28 U.S.C. § 1295(a)(1) because they do not arise out of the same transaction or occurrence that is the subject matter of Teradata's "batched merge method" trade-secret claim.  Accordingly, appellate jurisdiction rests exclusively in the Ninth Circuit.  *See In re Rearden LLC*, 841 F.3d 1327, 1332 (Fed. Cir. 2016).

## STATEMENT OF THE ISSUES

1.    Whether the district court properly exercised its discretion by

excluding as unreliable Teradata's expert opinions defining the tying and tied markets, compelling summary judgment on Teradata's tying claim for failure to identify viable product markets.

2.    Whether, in the alternative, the district court correctly granted summary judgment on Teradata's tying claim because no reasonable juror could conclude that SAP's conduct produced significant anticompetitive effects in the alleged tied market.

3.    Whether the district court correctly granted summary judgment on Teradata's trade-secret claim because Teradata failed to mark the "batched merge method" as confidential and, independently, because SAP is contractually entitled to use modifications to its own software in any SAP product.

## INTRODUCTION

SAP is a developer of enterprise resource planning ("ERP") software, and an innovator in the market.  In 2015, SAP released a new ERP application, "S/4HANA," designed specifically to operate on SAP's "HANA" database.  SAP's leading competitors, including Oracle and Microsoft, had vertically integrated their own ERP applications and databases years before.  By doing the same, SAP was able to streamline

-2-

S/4HANA's design and push calculations down into HANA, where they could be performed more efficiently.  But SAP did not merely follow market trends; HANA introduced one of the first databases capable of both supporting an ERP application's transactional functions and allowing limited analytics on that same dataset.

Teradata alleged that by designing S/4HANA to run on HANA, SAP practiced unlawful tying and threatened to monopolize the market for "enterprise data warehouses" ("EDW").  By summary judgment, however, evidence of robust competition and competitors' procompetitive software integration caused Teradata to dismiss its attempted monopolization claim and change its tying theory.  Even then, Teradata failed to identify any customer who purchased HANA in a "tied" sale with S/4HANA and then used its "tied" HANA installation as an EDW.

*Teradata's* database is an EDW:  it combines and integrates data from across an entire enterprise and supports tools to analyze that combined data.  But SAP barely competes in that market, let alone substantially forecloses competition in it.  There are both technological and contractual licensing reasons why few, if any, customers use HANA to store and analyze enterprise-wide data.  As the district court concluded, Teradata

lacks any evidence that SAP's conduct significantly harmed competition in the EDW market.

Teradata's tying claim failed also because its market definitions relied on a slipshod, unreliable expert opinion. For both reasons, the district court's grant of summary judgment on Teradata's tying claim should be affirmed.

Teradata also alleged that HANA was the result of misappropriated trade secrets, but that sensationalized allegation did not withstand discovery. By the time of summary judgment, Teradata maintained only that its engineer had proposed a technique for improving an *SAP* command, that SAP had adopted his suggestion, and that SAP was using the input beyond its intended purposes. But even that narrowed claim failed under the unambiguous contracts that governed the parties' relationship. The Teradata engineer who purportedly suggested the technique admitted he never marked it confidential, as the parties' governing contracts require. And even if he had, those same contracts give SAP the right to use modifications to its own software in any product. Teradata's contrary arguments defy the plain language of the parties' agreements.

-4-

# STATEMENT OF THE CASE

## I. FACTUAL BACKGROUND.

### A. The Business Software at Issue.

Teradata maintains that SAP used its position in ERP applications "to gain entrance to and quickly grab market share" in the EDW market, with a database product derived from Teradata trade secrets. Appx791. Four types of business software are relevant to Teradata's claims: (1) ERP applications; (2) transactional databases; (3) analytics applications; and (4) analytics databases.

Organizations use **ERP software** to manage day-to-day business activities like finance, accounting, human resources, project management, supply chain operations, and procurement. Appx11418-11419; Appx14258. An ERP application must operate on a **transactional database**, which serves as the data repository. Appx10173. A single company might have over 100 ERP applications from multiple vendors, running on multiple transactional databases. Appx10376-10377; Appx10178-10179.

Many companies use **analytics applications** to gain business insights. Analytics applications run on **analytical databases** (Appx10491-10492; Appx10173), which are differentiated. One type, EDWs, are large,

structured analytics databases that draw data from across an enterprise

and support the analytics requirements of an entire enterprise.  Appx10486;

Appx10516-10517; Appx11172.  Typically, companies will migrate data

from multiple transactional databases and other sources into their EDW

where the data is then restructured for analytics purposes.  Appx10190.  In

contrast, another type of analytical database, "data marts," are relatively

small to mid-sized databases that draw limited data to meet the specific

analytics requirements of a particular division or business case.

Appx10487-10488; Appx11269; Appx14598-14599.

### B. SAP is an Innovator in Vertically-Integrated ERP Application-Translytical Database Products.

SAP is a developer of ERP software.  Appx10176-10177.  Historically,

SAP designed its applications to run on several transactional databases

sold by different companies.  *Id.*; Appx10405-10406. Because each database

executes commands differently, SAP had to configure its application

commands to operate efficiently with each database.  Appx10187-10188;

Appx10196-10198; Appx14317.  This "porting" involved considerable

testing and redesign efforts to ensure optimum performance.  Appx10197-

10198; Appx10224-10225.

In the late 1990s, competing ERP vendors began designing their applications to run on a specific database. Oracle, traditionally focused on database products, vertically integrated by purchasing several ERP application vendors. Appx10174-10175. Microsoft followed suit. *Id.* Oracle and Microsoft redesigned their ERP applications to operate only with their own databases because they could then streamline their ERP products to take advantage of database-specific functionality. Appx10175-10176. With this approach, Oracle and Microsoft offered bundles that are "more stable, more secure, more scalable, more performant, easier to maintain," and cheaper. *Id.*; Appx10399-10400; Appx10406.

In 2006, SAP began development of HANA. When released in 2010, HANA was one of the first "translytical" databases, capable of supporting both transactional and analytics functions. Appx11387; Appx11406. In 2015, SAP introduced a vertically-integrated suite of ERP applications, S/4HANA, designed to run on HANA and to take advantage of its unique functionality. Appx10475-10477. SAP was able to simplify S/4HANA's structure by designing it to run specifically on HANA, improving performance by pushing tasks down into HANA, where they could be performed more efficiently. Appx10205-10217. In addition to supporting

S/4HANA's transactional processes, HANA's analytical capabilities enable limited real-time embedded analytics on the same set of data generated by the ERP application.  Appx10216.

As SAP has innovated, so have others.  The ERP market remains extremely competitive, and has grown more so with the emergence of cloud computing.  Appx10373-10374.  New competitors have been "extremely successful" by offering ERP applications designed to operate on cloud databases.  *Id.*  And traditional vendors have followed SAP's lead by releasing databases capable of supporting translytical workloads.  Appx10204.  SAP competes with many companies for sales of ERP applications and regularly loses sales to them.  Appx10249-10259.

## C.  Teradata Competes in a Separate Market for Analytical Databases.

Teradata's database is an EDW that lacks the functionality to support ERP applications; it is designed for use with analytical applications.  Appx22369; Appx10203-10204; Appx10241-10242.  The EDW market is "very dynamic," with "shifts and changes in position of various vendors" driven by "disruption … in the market" and "the transition to cloud."  Appx11244.  Since 2013, the marketplace has evolved rapidly, with several new entrants rising to become substantial competitors.  Appx10592;

Appx10533; Appx10610.  Teradata thus faces competition from traditional

vendors such as IBM, Oracle, and Microsoft, as well as newer entrants like

Amazon, Google, and Snowflake.  Appx14010.  The industry-wide shift to

the cloud hit Teradata hard.  Appx14507-14508.  Teradata initially

dismissed the cloud and, in its own words, "got into it late." Appx14351.

## D. There Are Technological and Licensing Reasons Why Customers Do Not Use HANA as an Enterprise Data Warehouse.

HANA has analytical capabilities, but this does not mean that

customers use HANA as an *enterprise-wide* database.  HANA stores data in

computer memory as opposed to on-disk, which greatly increases speed.

Appx11387.  But the relatively high cost of storing data in memory makes

HANA best suited for supporting transactional applications or specific

analytical inquiries on a limited dataset.  Appx11173-11174; Appx11130-

11132; Appx11406.  As Teradata's corporate witness testified, HANA "was

built for a single purpose, to really help support SAP ERP" and "was not

ever … designed to be an enterprise data warehouse."  Appx10531.

Additionally, most SAP customers purchase HANA pursuant to a

license that prohibits HANA from being used as an EDW.  Since SAP

released S/4HANA on HANA in 2015 (Appx10241), approximately 88% of

customers have purchased HANA with a "runtime license."  Appx10292.

With runtime, "HANA can be used only to support the SAP application

running on top of it; … HANA is the transactional database that supports

… S/4HANA."  Appx37; *see also* Appx10339; Appx11275; Appx11241-

11242; Appx11135; Appx11436.  In contrast, an EDW, as defined by

Teradata, must collect and format data from multiple sources across an

enterprise, and support sophisticated analytics tools using that combined

data.  Appx794-795; Appx22357; Appx10520-10521.  That is impermissible

under a HANA runtime license.  Appx11166-11167.

### E.    The Parties Enter into the Bridge Project to Modify SAP Products to Operate on Teradata's Database.

Because SAP and Teradata operate in different markets, the parties

joined together between 2008 and 2011 in a "Bridge Project" to modify

certain SAP non-ERP products to interoperate on Teradata's database.

Appx11214; Appx14317-14318; Appx10574.  At the top of the stack was

SAP BW, a product capable of extracting data from SAP ERP applications

and providing rudimentary analytical processing of that data.  Appx14313-

14316.  SAP BW, in turn, sat on SAP's MaxDB, a transactional database.

Appx14317-14318.  Teradata's database sat at the bottom of the stack.  *Id.*

The "bridge" was a component of SAP's MaxDB database designed to communicate with Teradata's database. Appx14498; Appx14501-14502. Other than the Teradata database, all components in the stack were SAP products. Appx10823.

SAP was responsible for the technical and "actual code" developments required for the products to interoperate. Appx10446; Appx10438. Teradata supported SAP by "helping define … the architecture if you will or the design of the product" so it would "work well" with Teradata's database. Appx10436-10437. To reflect these realities, the parties entered into three contracts that governed the Bridge Project: a Software Development Cooperation Agreement ("SDCA") and two non-disclosure agreements ("2008 MNDA" and "2009 MNDA").

### 1.  The Software Development Cooperation Agreement.

Under the SDCA, Teradata agreed to provide SAP "with all necessary information on the logical, process and data structures" of its database "required for the SAP Software to interconnect with the Partner Solution." Appx10563. SAP agreed to "use commercially reasonable efforts to enable the compatibility of the SAP Software … with [Teradata's Database]," but had no corresponding disclosure obligations. Appx10564.

-11-

Because SAP was responsible for all product modifications, the "bridge" was SAP property, and could be provided to other companies without limitation. Appx10568. The parties agreed that any new intellectual property developed in connection with the Bridge Project belonged to SAP. *See id.*; Appx10560-10561.

Teradata knew other database providers were working with SAP on similar projects. Appx10561. SAP was simultaneously working with Hewlett-Packard to support an HP database under the same stack of SAP software. Appx11214; Appx14480; Appx10603; Appx10607. The Bridge Project thus was just one aspect of a larger project to modify SAP products to interoperate with various analytical databases. Appx11215-11216.

Because SAP does not have a unique version of its software for each database (Appx10440-10441), the SDCA provided that any modifications to SAP software made within the context of the Bridge Project could be used outside the Bridge Project—and Teradata was well aware of this. Appx10560; Appx10567; Appx10440-10441; Appx14580; Appx11142; Appx14552.

### 2.  Mutual Nondisclosure Agreements.

The parties also entered into two MNDAs that created a framework

for identifying information as "confidential."  Appx10548; Appx10554.

Written information shared during the Bridge Project qualifies as

confidential only if it is "clearly identified as confidential or proprietary at

the time of disclosure" and "marked with an appropriate legend."

Appx10548; Appx10554.  If a party sought to maintain the confidentiality of

information that had been orally communicated, that party was obligated

to identify such information at the time of disclosure and reduce it to

writing within 30 days.  *Id.*

Like the SDCA, the MNDA emphasizes that if Teradata provided

suggestions about how to modify SAP's own products, those suggestions

could be used by SAP for any purpose and without restriction.  Appx10549;

Appx10555.

## II.  PROCEDURAL BACKGROUND.

### A.  Teradata Sues, Alleging SAP Built HANA on Teradata Trade Secrets and Antitrust Violations.

Teradata filed suit in 2018 in the Northern District of California,

alleging that SAP misappropriated 482 trade secrets during the Bridge

Project and used them to develop HANA.  Appx791; Appx801-802;

Appx893.  Teradata also alleged that SAP tied its "Top-Tier ERP

Applications" to HANA, and attempted to monopolize the EDW market. Appx822-823.  According to Teradata, SAP designed S/4HANA to be "wholly incompatible with other transactional databases," forcing customers that purchase S/4HANA to "also adopt HANA."  Appx816. Teradata alleged this product design "has no legitimate business rationale and is directly contrary to the practices of other ERP Applications and database solutions providers."  Appx818.

### B. Teradata Narrows Its Trade-Secret Claim to the "Batched Merge Method."

Despite initially alleging that that SAP misappropriated trade secrets relating to Teradata's database, Teradata narrowed its claims by summary judgment to one discrete trade secret, relating to a supposed "batched merge method."  Appx10612.

Teradata's claim focuses on a particular SAP command—called Select for All Entries ("SFAE")—designed to retrieve data from an underlying database and return it to the application.  Appx14482.  In the Bridge Project, the SFAE command was issued from SAP BW, translated into a SQL statement by SAP's MaxDB, and then passed to the Teradata database. Appx10824; Appx11217-11218; Appx14483; Appx14462-14467.

Initially, the SFAE statement that MaxDB sent to Teradata's database was responding too slowly.  Appx14465.  To improve speed, Teradata claims that its engineer, John Graas, proposed SAP modify the SQL code generated by a SFAE statement to implement a ██████████████.[1] Appx10613; Appx14434-14435; Appx16646.  SAP purportedly implemented the ████████████ in its MaxDB database.  Appx14436-14437. According to Teradata's expert, SAP then incorporated "the same basic methodology" into the interface between SAP applications and HANA. Appx14450-14452.

## C.  Teradata Changes Its Tying Theory at Summary Judgment.

Facing summary judgment, Teradata dismissed its attempted monopolization claim and abandoned the tying theory pled in its complaint.  *See* Appx21202-21204; Appx22054-22059.  Discovery revealed that S/4HANA's design has legitimate benefits and that other vendors design ERP applications for their own database.  Appx818.  So Teradata now argued that the tie was actually S/4HANA to "HANA's *analytical* database capabilities."  Appx15165-15166.

---

[1] Independent of summary judgment, SAP asserts the concept was not attributable to Graas.  Appx10140 n.2.

### D.  The District Court Grants Summary Judgment to SAP.

The district court granted SAP summary judgment on Teradata's trade-secret and tying claims, entered partial judgment, and stayed SAP's patent counterclaims.  Appx1-68; Appx77.

The district court analyzed Teradata's tying claim under the rule of reason because "there are procompetitive justifications from SAP's design of S/4HANA to run on HANA rather than on multiple databases." Appx47-48.  Whether *per se* or rule of reason, Teradata was required to define the tying and tied markets.  Appx48.  Teradata predicated its market definitions on the expert testimony of John Asker.  To manufacture a tying market in which SAP had market power, Asker opined that the market for "core ERP" products is limited to "large enterprises."  Appx26-27.  Yet Asker based that opinion on his review of SAP documents that, by Asker's admission, lacked any common definition of "large enterprises."  Appx28. And Asker identified no methodology for *how* he reconciled that inconsistent evidence to reach his opinion.  *Id.*  The absence of any identified, reliable methodology for defining "large enterprises" doomed both Asker's tying and tied market definitions.  *Id.*; Appx35.  And while purporting to "corroborate" both markets with a quantitative analysis,

Asker relied on data that he admitted was unreliable, and applied the analysis inconsistently across the tying and tied markets to reach his desired results.  Appx35.

Teradata's tying claim failed additionally because it lacked evidence that SAP's bundled sales caused actual injury to competition in the alleged market for EDWs.  Appx49 n.16.  Teradata did not analyze the impact of SAP's conduct on the major EDW vendors and, more generally, "presented no evidence of harm."  Appx35; Appx37.  Teradata did "not dispute that approximately 88% of SAP's customers have purchased HANA with a runtime license," and failed to "present any evidence that a single customer has taken S/4HANA together with HANA pursuant to a full use license and used that HANA installation as an EDW."  Appx37.  As a result, Teradata had no evidence that *it* had actually lost any sales due to the alleged tie, much less evidence capable of establishing market-wide competition was harmed.

The district court also granted summary judgment on Teradata's trade-secret claims on two grounds.  First, the court held that Teradata failed to mark the supposed "batched merge method" as confidential.  Appx10-14.  Second, even if Teradata had reduced the "batched merge

method" to writing and marked it confidential, SAP was contractually authorized to use it in any product.  Appx14-18.

## STANDARD OF REVIEW

A district court's grant of summary judgment is reviewed *de novo*. *Synchronoss Techs., Inc. v. Dropbox, Inc.*, 987 F.3d 1358, 1365 (Fed. Cir. 2021); *Aylward v. SelectHealth, Inc.*, 31 F.4th 719, 721 (9th Cir. 2022).

Under the regional law of the Ninth Circuit (*Syngenta Crop Prot., LLC v. Willowood, LLC*, 944 F.3d 1344, 1355 (Fed. Cir. 2019)), district courts "are vested with 'broad latitude' to 'decid[e] *how* to test an expert's reliability' and '*whether or not* [an] expert's relevant testimony is reliable.'"  *Murray v. S. Route Mar. SA*, 870 F.3d 915, 923 (9th Cir. 2017) (citation omitted).  Thus, the appellate court owes the district court's ruling "'the deference that is the hallmark of abuse-of-discretion review'" and "may not second-guess its sound judgments."  *Id.*

## SUMMARY OF ARGUMENT

**1.**  The district court correctly granted summary judgment to SAP on Teradata's tying claim.

**a.**  Teradata's claim that SAP violated antitrust law by designing S/4HANA to operate specifically on HANA was appropriately

analyzed under the rule of reason. *Per se* illegality is reserved for conduct that courts have concluded, based on considerable experience, has manifestly anti-competitive effects and no redeeming virtue. Neither the Supreme Court nor the Ninth Circuit has ever held that technological integration is subject to *per se* condemnation.

**b.** To sustain its claim, Teradata had to define relevant "tying" and "tied" markets. Teradata's market definitions depended on an unreliable expert opinion. Once the district court properly excluded key portions of that opinion, Teradata was left with no evidence establishing either the alleged tying or tied market. While the government and private *amici* seek to defend certain market-definition tools as a theoretical matter, neither validate the actual methodologies and data employed by Teradata's expert.

**c.** Teradata's tying claim also fails because Teradata failed to present evidence of substantial anticompetitive effects within the "tied" market. Teradata presented no evidence that SAP's conduct even partially foreclosed any competitor in the EDW market, or that a single customer purchased HANA in a tied sale and used that HANA installation as an

EDW.  Thus, Teradata presented no evidence of substantial harm to market-wide competition.

**2.**  The district court also correctly granted summary judgment to SAP on Teradata's trade-secret claim.

**a.**  Teradata failed to comply with the confidentiality provisions in the Bridge Project agreements.  Teradata argues that it disclosed the supposed "batched merge method" in a design document marked confidential.  But that document merely contains the words "batched Merge"; as the document's author unambiguously testified, it does *not* disclose the information claimed to constitute a trade secret.

**b.**  The district court independently (and correctly) held that the Bridge Project agreements authorize SAP to use the supposed "batched merge method" in any product.  At most, Teradata suggested to SAP's engineers how to modify *SAP* software; the governing agreements entitle SAP to use modifications made to its own software during the Bridge Project in any SAP product.

# ARGUMENT

## I. THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT ON TERADATA'S TYING CLAIM.

### A. Teradata's Claim Must be Assessed Under the Rule of Reason.

Teradata claims that SAP's design of S/4HANA to improve performance by using HANA's analytical functionality constitutes unlawful tying, in violation of Section 1 of the Sherman Act, and Section 3 of the Clayton Act. Appx822. Federal antitrust law forbids restraints of trade, such as tying arrangements, only if "unreasonable." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283 (2018). Most restraints—including "nearly every [] vertical restraint"—are judged under the "rule of reason." *Id.* at 2284. Tying is a vertical restraint. *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1198-99 (9th Cir. 2012). The *per se* framework is reserved for conduct that courts' "considerable experience" has revealed to have "manifestly anti-competitive effects," and no "redeeming virtue." *Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) (citations omitted).

### 1. Cases Involving Technological Innovation Require Application of the Rule of Reason.

Application of the *per se* rule is particularly inappropriate in cases involving "novel business practices—*especially* in technology markets."

*Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 990-91 (9th Cir. 2020).

Where a tying claim is predicated on innovative conduct within a

technology market, courts cannot confidently state that such conduct "'has

so little redeeming virtue, and that there would be so very little loss to

society from its ban, that an inquiry into its costs in the individual case [can

be] considered [] unnecessary.'"  Appx47-48 (quoting *United States v.*

*Microsoft Corp.*, 253 F.3d 34, 94 (D.C. Cir. 2001)); *see also In re Cox Enters.,*

*Inc.*, 871 F.3d 1093, 1102 (10th Cir. 2017) (*per se* treatment is inappropriate in

"the world of technology").

In *Microsoft*, for example, the court observed that integration of

software was common, even among firms without market power,

indicating "efficiency gains from doing so."  253 F.3d at 93.  The court need

not "pass judgment on Microsoft's claims regarding the benefits from

integration" to conclude that application of the *per se* test was inconsistent

with Supreme Court precedent; it sufficed that these "purported

efficiencies suggest that judicial 'experience' provides little basis for

believing that" Microsoft's integration lacked any possibility of redeeming

virtue.  *Id.* at 90-91.

Similar considerations preclude application of the *per se* rule here.

SAP, like other leading vendors, improved efficiency by designing S/4HANA to interoperate specifically with HANA. Appx48; Appx10208. As the district court correctly held, "these 'purported efficiencies suggest that judicial "experience" provides little basis for believing'" that SAP's conduct should be "'presumed unreasonable.'" Appx48 (quoting *Microsoft*, 253 F.3d at 90-91).

Teradata offers several reasons why the district court erred by invoking *Microsoft*. None is persuasive. *First*, Teradata claims that *Microsoft* contravenes binding precedent. TeradataBr. 44. But as *Microsoft* explained, Supreme Court precedent permits application of the *per se* rule "'only after considerable experience,'" meaning it is inapplicable where the particular "sort of tying arrangement attacked is unlike any the Supreme Court has considered." *Microsoft*, 253 F.3d at 89-90 (quoting *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 9 (1979)).

Under Supreme Court precedent, only "*certain* tying arrangements pose an unacceptable risk of stifling competition and therefore are unreasonable '*per se*.'" *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 9 (1984) (emphasis added). Teradata fails to cite any case from either the Ninth Circuit or the Supreme Court that applied the *per se* rule to a case

-23-

involving technologically-integrated software products[2]; doing so would "create[] undue risks of error and of deterring welfare-enhancing innovation." *Microsoft*, 253 F.3d at 89-90.

*Second*, Teradata argues *Microsoft* is limited to its facts. TeradataBr. 44-45. However, *Qualcomm*—which Teradata fails to cite—adopted the underlying reasoning of *Microsoft* outside its specific facts. 969 F.3d at 991. It has long been the rule in the Ninth Circuit that "the *per se* rule does not logically fit and should not be applied" to technological-tying cases because "[p]roduct innovation, particularly in … technologically advancing industries … is in many cases the essence of competitive conduct." *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 542 (9th Cir. 1983).

Even if Teradata were correct that *Microsoft* is limited to cases involving "software that serves as a platform" for applications (*Microsoft*, 253 F.3d at 89), this case satisfies that standard. "[P]latform software"

---

[2] Neither *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883 (9th Cir. 2008) nor *Digidyne Corp. v. Data Gen. Corp.*, 734 F.2d 1336 (9th Cir. 1984) involved software integration. *See Microsoft*, 253 F.3d at 91 (distinguishing *Digidyne* on that basis). And in neither case did the defendant contest application of the *per se* rule; cases are not precedential for propositions not considered. *United States v. Kirilyuk*, 29 F.4th 1128, 1134 (9th Cir. 2022).

makes available to applications "routines or protocols that perform certain widely-used functions." *Id.* at 53. Databases such as HANA make available to ERP applications thousands of functions, which control everything from data storage and retrieval to mathematical computations. *See* Appx10754-10757; Appx10772-10779; Appx9703-9710. This is a procompetitive benefit because application developers "wishing to include [such a] function in an application need not duplicate it in their own code"; instead, they can "call" or "use" the platform function. *Microsoft*, 253 F.3d at 53; *see* Appx9712-9742.

*Third*, Teradata argues that unlike in *Microsoft*, SAP's integration lacks procompetitive justification. TeradataBr. 46-47. Nonsense. SAP relied on HANA's unique functionalities and SAP's control of the design of both application and database layers to improve system performance by pushing tasks and calculations down to the database layer. Appx10205-10217. And by not porting S/4HANA to other databases, SAP reduced development and testing costs, and accelerated S/4HANA's design, completion, and release. Appx10224-10225. Teradata's contention (TeradataBr. 46) that any procompetitive advantages were limited to S/4HANA's integration with HANA's *transactional* capabilities misstates

the record.  *See, e.g.*, Appx10215-10216 (supporting "real-time analytics" by integrating S/4HANA and HANA); Appx10216 (integration allowed customers "to run real-time embedded analytics on the same set of data generated by the application"); Appx12198 (S/4HANA on HANA "support[s] high-speed analytical queries").

Critically, this Court need not accept SAP's asserted procompetitive justifications to apply the rule of reason.  Where there are "plausible arguments" that SAP's conduct is procompetitive, SAP's conduct should not be deemed *per se* unreasonable without *consideration* of the benefits of integrating S/4HANA with HANA.  *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1155 (9th Cir. 2003).

### 2.  Teradata's Arguments Regarding the Hois Declaration Are Incorrect and Do Not Justify *Per Se* Illegality.

Teradata argues that even if the rule of reason otherwise controls, SAP improperly introduced evidence of procompetitive justifications only on reply.  TeradataBr. 46-49.  Teradata is wrong.

Teradata, not SAP, belatedly introduced a new theory to the case.  Its operative complaint alleged that SAP made S/4HANA "wholly incompatible with other transactional databases" without any

"technological or other justification" (Appx816), and "contrary to the

practices of other ERP Applications and database solutions providers"

(Appx818).  Discovery revealed that other leading vendors do integrate

their ERP applications and databases, and that SAP's integration achieved

considerable technological advantages.  SAP submitted this evidence with

its opening memorandum in support of summary judgment.  *See* Appx48;

Appx10182-10234.

Instead of confronting this evidence, Teradata changed its legal

theory.  Teradata now argued that the tie is S/4HANA to HANA's

*analytical* capabilities (Appx15150); that the mechanism of the tie is

licensing terms (Appx15195); and that SAP should license HANA's

transactional and analytical capabilities separately (Appx15199).

To rebut this new theory, SAP submitted a declaration from

developer Rudolph Hois confirming that S/4HANA's integration with

HANA's analytical capabilities improves performance, but also explaining

that SAP had no way of tracking which HANA functionalities a customer

uses, and thus no way of separately licensing and auditing transactional vs.

analytical use.  Appx21277-21278.

Rejecting Teradata's *post hoc* assertion that its tying theory remained

consistent from complaint through summary judgment, the district court

properly exercised its discretion to admit the Hois declaration.[3]  Appx45-

46.  Indeed, the district court could have granted summary judgment to

SAP based on Teradata's gamesmanship alone.  *See Navajo Nation v. U.S.*

*Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008).

### B.  Summary Judgment was Warranted Because Teradata's Tying Claim is Predicated Upon Unreliable Expert Opinions.

To establish its tying claim, Teradata was required to "first define[]

the relevant market[s]."  *Am. Express*, 138 S. Ct. at 2285 n.7.  The district

court was well within its discretion to exclude Asker's unreliable market

definitions (Appx22-38), and to grant summary judgment on that basis.

Appx48-49 (citing *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1435-36

(9th Cir. 1995)).

### 1.  Product Market Definition Is Essential.

"A threshold step in any antitrust case is to accurately define the

relevant market, which refers to 'the area of effective competition.'"

---

[3] Teradata's complaint referenced SAP's licensing (TeradataBr. 48), but SAP's alleged licensing restriction on moving data from HANA into an EDW (Appx816), was part of Teradata's now-dismissed monopolization count (Appx824).

*Qualcomm*, 969 F.3d at 992 (citation omitted).  In vertical restraint cases, "[m]arket definition is an essential predicate to the entire case."  *Reilly v. Apple Inc.*, 2022 WL 74162, at *4 (N.D. Cal. Jan. 7, 2022) (citing *Am. Express*, 138 S. Ct. at 2285).

Teradata cites two cases for the proposition that a plaintiff who relies on "direct evidence" of coercion need not "precisely define the tying market."  TeradataBr. 42 (citing *Cascade*, 515 F.3d at 913); *see also* TeradataBr. 18 (citing *Image Tech. Serv. v. Eastman Kodak Co.*, 903 F.2d 612 (9th Cir. 1990)).  But the Supreme Court expressly rejected that notion.  *Am. Express*, 138 S. Ct. at 2285 n.7; *see also PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 838 n.7 (9th Cir. 2022).  Regardless, neither of Teradata's cited cases held that a plaintiff may forego market definition.  To the contrary, the same *Image Technical* panel later held that a plaintiff "must … define the relevant market."  *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997).

"The principle most fundamental to product market definition is 'cross-elasticity of demand,'" a measure of interchangeability or substitutability of related products.  *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 291-92 (9th Cir. 1979).  If the plaintiff fails to define the product market

"with reference to the rule of reasonable interchangeability and cross-elasticity of demand," "the relevant market is legally insufficient." *Reilly*, 2022 WL 74162, at *6; *see also Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997) (same).[4]

Teradata's economic expert opined that the relevant tying product market is "core ERP products for large enterprises," a market whose participants he limited to SAP and Oracle. Appx21. He defined the tied market as "EDW products with [analytical] capabilities for large enterprises," with market participants such as Teradata, SAP, Oracle, IBM, and Microsoft. *Id.*

---

[4] Contrary to the government's implication (USBr. 20), *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466 (9th Cir. 2021), did not overrule long-established precedent that cross-elasticity is the fundamental principle in market definition. *Optronic* held plaintiffs need not "use any specific methodology in defining the relevant market." *Id.* at 482. But flexibility in *methodology* does not permit an expert to eschew the basic principles of market definition. Cross-elasticity was not determinative in *Optronic* only because the economist defined the market to include "all … potentially substituted" products, concluding the defendant had monopoly power even if the market was defined as broadly as possible. *Id.* at 482-83. Teradata, by contrast, declined to define the tying and tied markets to include *all* "potentially substituted products," because that approach would have resulted in a tying market where SAP lacks power and a tied market that does not include SAP.

### 2. The District Court Properly Exercised Its Discretion By Excluding Asker's Unreliable Product-Market Definitions.

### a. Asker's "Qualitative" Approach to Defining Markets Was Not Based on Any Reliable Methodology.

Asker based his market definitions on "market realities" he identified in a "qualitative" review of documents and deposition testimony. Appx14120-14121; Appx18621.

### (1) Asker Failed to Explain the Methodology That Led to His "Large Enterprises" Definition.

Teradata and its *amici* argue the use of qualitative evidence is routine and should have been accepted by the district court. TeradataBr. 20-21; EconomistsBr. 11. But the district court did not adopt a blanket prohibition on "qualitative" methods. It *admitted* portions of Asker's testimony where he applied a reliable qualitative methodology that led to the relevant conclusions. *See, e.g.*, Appx25 (admitting Asker's "core ERP" criterion). Yet Asker identified no methodology for parsing through inconsistent evidence to reach the "large enterprises" portion of his tying and tied market definitions.

An expert must "explain[] precisely how [he] went about reaching [his] conclusions" and "point to some objective source" to support the reliability of his methodology. *Domingo ex rel. Domingo v. T.K.*, 289 F.3d

600, 605-06 (9th Cir. 2002).  Absent such an explanation and objective grounding, a court cannot ensure the expert's "conclusions were not mere subjective beliefs or unsupported speculation." *Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994).  Expert methodology "must be testable," meaning that "[s]omeone else using the same data and methods must be able to replicate the result." *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005).  "[E]xpert intuition" and "conclusions that are not falsifiable" are not "testable." *Id.*

Consistent, reliable industry sources confirm that SAP has shares of ███ or less in finance ERP applications (regardless of customer size), well below the threshold for market power.  Appx21443-21444; *see Jefferson Parish*, 466 U.S. at 26-27.  Asker reached his market power opinion by (a) ignoring these industry sources; (b) opining that both the tying and tied markets are limited to companies with "1,000 to 1,500 employees and over 125 users"; and (c) unilaterally proclaiming that, other than Oracle, none of the numerous vendors that industry sources recognize as SAP competitors "significant[ly]" compete for "large enterprises," as he defined them.  Appx28; Appx13954-13956.  Yet Asker applied no recognizable methodology to reconcile the conflicting evidence and determine his "large

enterprises" threshold.  Appx28.

Asker acknowledged the documents he reviewed contain no common definition for "large enterprises." Appx13904 n.84.  Some documents defined large enterprises according to varying levels of revenue (from €250 million, to $1 billion, to $250 million in Latin America).  *See* Appx13912 n.110-111; Appx13887 n.24; Appx13903 n.84.  Others defined large enterprises according to varying numbers of employees (anywhere from 250 to upwards of 1500).  *See* Appx13912 n.110; *see also* Appx13903 n.84 (over 500).  And still others defined large enterprises by number of ERP users.  *See* Appx13903 n.84.  Despite bearing the burden of establishing the relevant product market (*Fount-Wip, Inc. v. Reddi-Wip, Inc.*, 568 F.2d 1296, 1302 (9th Cir. 1978)), Asker never testified that his opinions about market power and harm to competition would hold true if any of these other metrics were used to define "large enterprises" in lieu of those he adopted.

Asker cited two documents (an SAP internal presentation and an email) to justify his definition.  Appx28 (citing Appx13912).  Neither supports his opinion:  one defines large enterprises by revenue (a metric Asker abandoned entirely); the other defines large enterprises without

reference to ERP users (a metric Asker elected to use).  *See* Appx13912 n.110.  So, how did Asker reach his opinion?  Asker provided no "explanation," let alone a reliable, "testable" methodology.  Appx28.  The district court was fully within its discretion to exclude Asker's opinion when he failed to provide "meaningful methodological explanation."  *In re Incretin-Based Therapies Prods. Liab. Litig.*, 2022 WL 898595, at *1 (9th Cir. Mar. 28, 2022).

### (2)    Teradata's Counter-Arguments Are Unpersuasive.

Teradata's arguments to the contrary lack merit.  *First*, Teradata argues the district court evaluated Asker's conclusion, rather than his methodology, as evidenced by its acceptance of Asker's "core ERP" opinion.  TeradataBr. 22.  But that opinion was based on "consistent" evidence that core ERP "includes finance."  Appx25.  By contrast, the industry uses many inconsistent groupings of customer size depending on the circumstances and purpose.  Appx27; Appx13903 n.84.  Asker fails to identify any methodology—other than his own intuition or desire for a particular outcome—for adopting one definition of large enterprises over another.

*Second*, Teradata and the government complain the district court

"appeared" to require Asker to define the product markets by "precise metes and bounds." TeradataBr. 23; USBr. 18. Not so. The court excluded Asker's market opinions not for lack of *precision*, but lack of *methodology* in setting his cutoff for "large enterprises."

*Third*, Teradata argues the court misapplied governing principles "to the extent" it required Asker to empirically calculate cross-elasticities of demand, rather than allow Asker to define a product market according to the Supreme Court's *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) factors. TeradataBr. 24 (citing Appx22). But the district court did not require a quantitative evaluation of cross-elasticity; it found that Asker failed to define the relevant market by reference to the principle of "cross-elasticity of demand or the substitutability of products based on reliable quantitative and *qualitative* analysis." Appx33 (emphasis added).

*Brown Shoe*'s practical indicia can be "relevant" to the process of defining a product market. *Olin Corp. v. F.T.C.*, 986 F.2d 1295, 1299 (9th Cir. 1993). But the Ninth Circuit has never "held that a plaintiff (and, more specifically, a plaintiff's expert economist) can define the relevant product market *exclusively* by reference to these 'practical indicia.'" *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 985 (C.D. Cal. 2012).

In any event, Asker never referenced the *Brown Shoe* indicia. Teradata's counsel raised practical indicia for the first time during oral argument—and identified only one of the seven *Brown Shoe* indicia. Appx23-24 n.4. An argument raised for the first time at a hearing is not properly before the Court. *Sloan v. Gen. Motors LLC*, 2020 WL 5517244, at *5 (N.D. Cal. Sept. 14, 2020). Furthermore, a product market "cannot be defined solely by reference to a single *Brown Shoe* factor." *Live Concert.*, 863 F. Supp. 2d at 993.[5] Nevertheless, the district court carefully considered the evidence identified by Teradata, and concluded "there is no evidence" of *Brown Shoe*'s practical indicia. Appx23-24 n.4.

Teradata belatedly tries to identify bits of Asker's report that might be shoehorned into *Brown Shoe*'s framework. TeradataBr. 24. But "judges are not like pigs, hunting for truffles," and the district court had no obligation to construct a coherent *Brown Shoe* analysis out of snippets of

---

[5] The government argues (without citation) that in "the right circumstances, evidence of one or two factors might be probative." USBr. 20 n.8. But the government fails to identify those circumstances (much less establish they are present here), and its position contradicts Ninth Circuit precedent. *See Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elecs. Corp.*, 518 F.2d 913, 932 (9th Cir. 1975) (district court erred in finding a submarket based on only two *Brown Shoe* indicia).

Asker's reports. *Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003). Regardless, Teradata's *post hoc* contention that Asker's opinions bear on *Brown Shoe*'s indicia is unpersuasive. For example, Teradata cites Asker's opinion that customers individually negotiate the price of SAP products (Appx13925-13927), not any opinion that "large enterprises" (as Asker defined them) pay "distinct prices" compared to other customers. *Brown Shoe*, 370 U.S. at 325.

*Fourth*, Teradata argues that even if Asker's opinion is excluded, other evidence supports a market for "large enterprises." TeradataBr. 41. But Asker was the only source of Teradata's definition of "large enterprises" as companies with "1,000 to 1,500 employees and over 125 users."[6] Appx28. The documents Teradata cites either are inconsistent with Asker's definition (Appx19359 [companies over 5000 employees]); do not attempt to define large enterprises (Appx15367-15384; Appx19244; Appx20895); or do not concern Asker's tying market (Appx19636 [human resources and procurement applications]). These documents, like Asker himself, may suggest that ERP vendors generally "differentiate between"

---

[6] Indeed, Teradata's complaint defined large enterprises based on revenues and company characteristics, not employees/users. Appx809.

mid-market and large customers, but they fail to show that "ERP vendors

distinguish mid-market customers from large customers" according to the

"basis on which plaintiffs attempted to quantify" the distinction. *United

States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1103-04 (N.D. Cal. 2004).

### (3)    Asker's Price Discrimination Opinion Cannot Salvage His "Large Enterprises" Definition.

Finally, Teradata claims that Asker "confirmed" his "large

enterprises" definition with a "price discrimination" analysis. TeradataBr.

30-33. But "there is simply too great an analytical gap between the data"

Asker used "and the [price discrimination] opinion proffered." *Gen. Elec.

Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see* Appx32-33.

In theory, separate product markets might exist if a hypothetical

monopolist "could profitably target a subset of customers for price

increases," with "a realistic prospect of an adverse competitive effect on

[the] group of targeted customers." U.S. Dep't of Justice & FTC, *Horizonal

Merger Guidelines* § 4.1.4 (2010). Price discrimination consists of variations

in a seller's price *per unit* from one purchaser to another. *See* Areeda and

Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their

Application* ¶ 721b (2002).

Here, the data cited by Asker shows that companies of different sizes do *not* pay more for SAP products on a per-unit basis.  Appx21440-21442. In his reply report, Asker retreated to the pedestrian observation that larger enterprises, which purchase more units (*i.e.*, user licenses) than smaller enterprises, spend more in total.  Appx14115.  That, however, is not price discrimination.  Because Asker's underlying data contradicted his price discrimination opinion, the district court properly excluded it.  *Domingo*, 289 F.3d at 607.

### b. Asker's "Quantitative" ADR Method Was Not Based on Sufficient Data and Was Not Reliably Applied.

Asker purported to "corroborate" his qualitative review through a "quantitative" Aggregate Diversion Ratio ("ADR") analysis.  *See* Appx28-35.  But Asker disclaimed that he "relied on" his ADR analysis to define product markets.  Appx14121.  Thus, any district court error in excluding Asker's ADR analysis would not matter; by Asker's own admission, it did not form the basis of his market definitions.

The government and private *amici* nevertheless offer academic arguments about the propriety of ADR analysis writ large.  Tellingly, both *amici* argue only in the abstract—arguing why hypothetical strawman

holdings, which the district court did not make, would have been

erroneous.  Neither attempts to defend what Asker actually did in this case.

Unlike the *amici*, the district court was required to "determine reliability in

light of the particular facts and circumstances of the particular case."

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 158 (1999).  And under the

particular facts of this case, the district court properly excluded an ADR

opinion that Asker acknowledged was based on unreliable data, and that

Asker gerrymandered to reach his desired results.  Appx28-35.

### (1)    ADR Was Not a Reliable Methodology in This Case.

Rather than apply a "small but significant and non-transitory price"

("SSNIP") increase across all products in his candidate markets and test the

amount of diversion to products outside the candidate markets (the

traditional and widely-accepted hypothetical monopolist test), Asker

applied a price increase to only *some* products in his candidate markets.

Appx14006-14007.

ADR was adopted as a tool by U.S. antitrust agencies to analyze

mergers.  It was intended "for candidate markets with strong asymmetries

among products," thus justifying application of a SSNIP to only some

products in a candidate market.  Serge Moresi, et al., 1 *Antitrust Economics*

*for Lawyers* § 1.03[2] (2021); *see also* Joseph Farrell & Carl Shapiro, *Improving Critical Loss Analysis*, THE ANTITRUST SOURCE at 5, 5 n.17 (2008) (SSNIP test varies for "symmetric" and "asymmetric" cases). Even with strong product asymmetries, ADR proved controversial because it leads "to narrow markets where anticompetitive effects appear unlikely." Joseph Simons & Malcolm Coate, *United States v. H&R Block: An Illustration of the DOJ's New But Controversial Approach to Market Definition*, 10 J. OF COMPETITION LAW & ECON. 543, 557 (2014). Federal courts have accepted ADR analysis in only a handful of cases—mostly bench trials for preliminary injunctions to enjoin mergers, a context in which the court's gatekeeping duty is less pressing.

The Ninth Circuit has never approved of ADR as a methodology for defining a product market, let alone in a jury trial of a non-merger case. And Asker provided no justification for its application here. He identified no "strong asymmetries," nor any other reason to jettison the traditional SSNIP test. Exclusion was appropriate where Asker took an already-controversial test and, without explanation, applied it outside the context for which it was developed. *See, e.g., Great Am. All. Ins. Co. v. Sir Columbia*

-41-

*Knoll Assocs. Ltd.*, 484 F. Supp. 3d 946, 955 (D. Or. 2020); *In re NJOY, Inc.*

*Consumer Class Action Litig.*, 2016 WL 787415, at *8 (C.D. Cal. Feb. 2, 2016).

> **(2)    Asker's ADR Analysis Lacked Adequate Factual Foundation.**

Regardless whether ADR analysis was appropriate for this case, the

district court properly found that Asker did not apply it reliably because he

violated the requirement that expert testimony rest on "sufficient facts or

data." Fed. R. Evid. 702(b).

In the rare occasions when a court has accepted ADR analysis, it has

been based on either extensive and reliable transactional data, or other data

that reflects price-driven product switching. *See, e.g.*, *Fed. Trade Comm'n v.*

*Sysco Corp.*, 113 F. Supp. 3d 1, 35 (D.D.C. 2015) (expert used actual bidding

information). Although the parties produced transactional data, and

respected third parties publish detailed analyses of the application and

database markets, Asker declined to use any of this robust data. Instead,

Asker relied exclusively on customer relationship management ("CRM")

data that do not reflect actual sales transactions or contain any pricing

information, let alone customer responses to price changes. Appx13788-

13791; *see also* Appx31-32.

Asker admitted the CRM data he used was "incomplete" and maybe

not a "reliable indicator" of competition (Appx13920-13921), "often missing

information on competitors" (Appx13942), and lacking "detail that allow[s]

precise evaluations of specific markets" (Appx13921).  The district court

properly refused to credit a quantitative approach predicated on unreliable

data; use of unreliable data is just as inadmissible under *Daubert* as an

unreliable methodology.  *E.g.*, *Bruno v. Bozzuto's, Inc.*, 311 F.R.D. 124, 143

(M.D. Pa. 2015) ("garbage in, garbage out").

Relying on *Fed. Trade Comm'n v. Wilh. Wilhelmsen Holding ASA*, 341 F.

Supp. 3d 27 (D.D.C. 2018) and *Sysco Corp.*, 113 F. Supp. at 35, the

government argues that CRM data can "illuminate" possible responses to

price changes.  USBr. 29.  But that is not the case here.  In the government's

cited cases, the experts relied on multiple data sets that included actual

win/loss data.  Appx30-31; *Sysco*, 113 F. Supp. 3d at 35 (bidding

information contained "the incumbent distributor, the winning distributor,

and the competing bidders"); *Wilhelmsen*, 341 F. Supp. 3d at 57 (using

"three kinds of data" including "win-loss" data).  Asker, by contrast,

admitted that incumbents and winning vendors were "not something I

took into account"; thus, his analysis could not reveal actual diversion. Appx13788-13789.

### (3)    Asker Applied His ADR Methodology Inconsistently to Reach His Predetermined Results.

The district court was rightfully troubled by Asker's "inconsistent" application of his ADR methodology.  Appx35.  Asker could define a tying market in which SAP ostensibly has market power, and a tied market in which SAP is a participant, only by gerrymandering his ADR methodology differently for each market.  Such results-driven gerrymandering alone provides sufficient basis for excluding an expert's opinion.  *Claar*, 29 F.3d at 502-03.

To "corroborate" his *tying* market, Asker identified the smallest number of competitors satisfying his criteria (just SAP and Oracle), which allowed Asker to claim that SAP has market power.  Appx13920-13921; Appx13956.  But applying those same criteria to the *tied* market would exclude SAP.  Appx14008-14010.  To prevent this result, Asker arbitrarily expanded the number of competitors in the tied market to also include SAP.  Appx13928.  Courts have rightly excluded such outcome-driven analyses as unscientific and unreliable.  *See, e.g.*, *Reed Const. Data Inc. v.*

*McGraw-Hill Cos.*, 49 F. Supp. 3d 385, 407 (S.D.N.Y. 2014).

Teradata argues tying markets ought to be defined narrowly; the tied market need not be. TeradataBr. 35 (citing *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1448 (9th Cir. 1988)). But Asker was required to explain his methodology; Teradata cannot provide him after-the-fact cover via lawyer argument. Furthermore, *Oltz* was not a tying case and held nothing of the sort. Teradata fails to identify a single case permitting an expert to change quantitative methodology between tying and tied markets to fit the desired outcome. The district court did not abuse its discretion by declining to be the first.

### C. No Reasonable Juror Could Conclude that SAP's Conduct Produced Significant Anticompetitive Effects in the Enterprise Database Warehouse Market.

Under the rule of reason, Teradata also was required to prove that SAP's conduct "produces significant anticompetitive effects within a relevant market." *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1070 (9th Cir. 2015) (cleaned up). Even if Teradata's tied-market definition had been legally viable, Teradata "cannot show that SAP has caused actual injury to competition" in that market. Appx49 n.16.

### 1. There is No Evidence Customers Have Used HANA, Tied with S/4HANA, as an Enterprise Data Warehouse.

Teradata failed to point to any evidence that HANA, when sold with S/4HANA, "plays enough of a role in [the EDW] market to impair competition significantly." *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1413 (9th Cir. 1991). Indeed, as the district court concluded, Teradata failed to identify a single instance where a customer used HANA sold with S/4HANA as an EDW. Appx37.

To prove harm to competition, Teradata bore the burden of distinguishing harm caused by allegedly unlawful tied sales from the consequences of non-tied sales. *Rebel Oil*, 51 F.3d at 1433. Teradata further had to establish harm to competition *in* the tied market, not harm *outside* the alleged market. *See Packaging Sys., Inc. v. PRC-Desoto Int'l, Inc.*, 268 F. Supp. 3d 1071, 1086 (C.D. Cal. 2017) (citing *Blough v. Holland Realty, Inc.*, 574 F.3d 1084, 1089 (9th Cir. 2009)).

However, as SAP predicted it would (Appx10156-10158), Teradata presented an undifferentiated soup of alleged harm caused by *non-tied* sales of HANA, and harm allegedly caused by tied sales of HANA as a *transactional* database or otherwise outside an EDW market. Teradata

presented no evidence of sales of an allegedly-tied product in the allegedly-tied market.  Appx37.  On this record, no reasonable jury could find that allegedly-tied sales of HANA caused harm to competition in a market for EDW products.[7]

> ### a. Asker Failed to Distinguish Between Tied and Non-Tied Sales, and Between Impacts Within the Tied Market and Impacts Outside the Tied Market.

HANA is sold both as a standalone database and as a database to support S/4HANA.  It also is sold pursuant to a runtime license that allows only limited analytics to the transactional data generated by S/4HANA, or under a full-use license that permits analysis of other data.

---

[7] The district court properly excluded Asker's harm-to-competition opinion under *Daubert* for the same reason.  Appx37; *see Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000) (expert opinion inadmissible because "it did not separate lawful from unlawful conduct").

Thus, HANA sales can be conceptualized as follows:



Asker failed to draw any distinction between customers who purchase HANA with S/4HANA and those who purchase HANA independently of any application. SAP began selling HANA as a stand-alone database in 2010, five years before introducing S/4HANA. Appx10292. Although these sales continue today, Asker never differentiated between the purported tied and non-tied sales. Appx13978 (full-use licenses are "option[al]," not compelled, thus not tied); Appx13981 (non-tied "upsell" to full-use licenses); Appx13982 (discussing pricing of non-tied full-use HANA sales); Appx13985 (calculating SAP's share of overall database market at 11% based on tied, non-tied, *and* non-EDW

-48-

sales); *see also* Appx14008-14009 (failing to separate allegedly-tied sales from non-tied and non-EDW sales in SAP's CRM data).

Asker also failed to demonstrate that any of SAP's sales affected the tied market. In certain instances, Asker examined SAP's supposed use of S/4HANA as "leverage" to substitute HANA for *transactional* databases underlying prior ERP applications. *See* TeradataBr. 35; Appx13968-13970 ("convert Oracle database to HANA runtime"); Appx13978 (discussion of non-EDW runtime licenses); Appx13985 (see above); *see also* Appx14008-14009. That opinion, of course, does not measure exclusion of *EDW* vendors.

Asker simply assumed that because HANA contains analytical functionality, all customers use HANA as an EDW. But the vast majority of HANA customers are contractually prohibited from using HANA as an EDW. Approximately 88% of customers purchase HANA with a runtime license, which does not allow a customer to use HANA to import data from multiple sources across an enterprise. Appx10292. The district court thus correctly concluded that HANA runtime "cannot be an EDW, as defined by Teradata, because it does not bring data from multiple sources across an enterprise and then use sophisticated analytics tools to conduct analysis of

that combined data." Appx37.

Teradata now claims this is a contested factual question, arguing (citing Asker and one document) that customers with runtime licenses "could" use HANA to analyze enterprise-wide data. TeradataBr. 38. But Asker discusses analytical *functionality*, not sources of data: he confirms "the use case under S/4HANA is a *transactional* database" and runtime HANA can "run analytical queries on the *transactional* data in the HANA database." Appx14080-14081 (emphasis added). This does not permit data to be imported into runtime HANA from other sources, nor does it permit runtime HANA to support independent analytical applications and function as an EDW. The document Teradata cites discusses SAP BW/4HANA's technical capabilities, and is unrelated to runtime licenses. Appx21110.

Even as to the 12% of HANA customers with a full-use license, Teradata simply *assumed* that SAP customers actually use HANA as an EDW. Teradata claims that whether "HANA is an EDW … is a hotly disputed factual issue." TeradataBr. 37. But the issue is whether HANA, *when bundled with S/4HANA*, is *actually used* as an EDW. As the district court noted, neither Asker nor Teradata provided evidence on this

question.[8]  Appx37.  Teradata adds that "HANA's analytical capabilities

allow use as an EDW competing with Teradata."  TeradataBr. 37.  But

HANA's mere *capability* to support analytical queries is beside the point.

*See* Appx13929.  The issue is whether customers *actually* use HANA—when

sold with S/4HANA—to collect and store large amounts of data from

across an entire enterprise, despite the cost of storing data in memory.

Teradata failed to present evidence that they do.  Appx11173-11174;

Appx37.

### b. Teradata's Other Evidence Likewise Fails to Distinguish Between Tied and Non-Tied Sales.

Teradata also claims to present evidence of harm to competition

independent of Asker's opinion.  TeradataBr. 50-53.  But none of Teradata's

cited evidence demonstrates that allegedly-tied sales of HANA harm

competition in the EDW market.

Teradata relies on documents regarding non-EDW sales of HANA.

Appx20052 ("HANA runtime" sales); Appx17698 (runtime license "For

ONLY SAP Applications"); Appx16126 (Oracle runtime sales under SAP

---

[8] In fact, a 2018 Teradata partnership proposal to SAP identifies an EDW "gap" in SAP's product lineup.  Appx22390.

ERP). It relies on documents discussing HANA's theoretical use as an EDW without any evidence of actual use. Appx21116-21130. It relies on documents discussing non-tied sales of HANA. Appx831; Appx19140 (pricing of non-tied sales); Appx17427 (same); Appx18405 (non-tied "new use cases" on HANA); Appx17441-17444 (performance of non-tied sales of independent vendor's applications on HANA); Appx17399 (issues regarding non-tied full-use growth); Appx20459 (focus on "non-S/4" HANA sales). And it misleadingly refers to a portion of SAP's expert report, in which the expert discussed the potential impact of a data-use licensing restriction (not the purported *tie*) on sales of Teradata's database (not *competition* as a whole). Appx20220.

Teradata also cites employee testimony that another Teradata employee expressed concern ███████ might question its use of Teradata because of the cost of transitioning to S/4HANA on HANA. Appx16083-16084. This speculation concerns Teradata's potential loss of a sale due to S/4HANA's *cost*, not due to use of HANA as an EDW. It proves nothing about harm to market-wide *competition*. And in any event, a plaintiff cannot defeat summary judgment with naked hearsay. *See Anheuser-Busch, Inc. v. Nat. Beverage Distribs.*, 69 F.3d 337, 345 n.4 (9th Cir. 1995).

-52-

As supposed evidence that SAP's S/4HANA-HANA bundle caused Teradata and Oracle to lose sales, Teradata cites a single email. TeradataBr. 52; Appx18560. But the email states that Oracle database growth stalled, with "in particular Microsoft and Amazon, picking up this growth." Appx18560. The email mentions S/4HANA only in passing, in relation to a decline in Oracle's "enterprise application" usage—*i.e.*, usage as a *transactional* database under ERP applications. *Id*. The email does not quantify the supposed impact on Oracle—much less competition as a whole—other than to note that Oracle still "leads in overall database revenue." *Id*.

Teradata also cites a supposed "admission" by SAP's expert that Oracle lost database sales. TeradataBr. 52 (citing Appx16126). SAP's expert testified merely that Oracle "would want" an additional opportunity to sell its transactional database under S/4HANA, but that opportunity would come "at a cost" to S/4HANA customers. Appx16126. His testimony did not concern EDWs at all. Appx36.

In sum, Teradata's evidence does not establish harm to competition, let alone harm to competition caused *by tying* in a market for *EDWs*. Teradata's mishmash of evidence regarding non-tied and non-EDW sales

of HANA would provide a jury no basis to distinguish lawful from allegedly unlawful sales, or to determine that sales of HANA—when bundled with S/4HANA—caused harm to competition in a market for EDW products.

### 2. Teradata Failed to Prove Substantial Market Foreclosure.

Even if Teradata had adduced *some* evidence that HANA, when tied to S/4HANA, is used as an EDW, summary judgment still would have been appropriate because no reasonable juror could conclude that SAP's tying conduct *foreclosed competition* from a *substantial share* of the tied market.

"Tying arrangements are forbidden on the theory that, if the seller has market power over the tying product, the seller can leverage this market power through tying arrangements to exclude other sellers of the tied product." *Cascade*, 515 F.3d at 912. Thus, "any claim of tying or bundling requires foreclosure of actual or potential competition" in the tied product market. *Brantley v. NBC Universal, Inc.*, 2009 WL 10671189, at *7 (C.D. Cal. Oct. 15, 2009). Absent evidence of market foreclosure, a rule-of-reason tying claim necessarily fails. *Brantley*, 675 F.3d at 1201 & n.9; *see also* Areeda ¶ 1729a ("tying is usually lawful unless it forecloses a substantial

share of a tied market that is highly concentrated or is likely to become so").

As importantly, any market foreclosure must be *significant*. *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1159 (9th Cir. 2001). Teradata must prove EDW vendors "'are excluded from a substantial share of the relevant market because that portion of the market is controlled by' the vertical restraint at issue." *Church & Dwight Co. v. Mayer Labs.*, 2011 WL 1225912, at *6 (N.D. Cal. Apr. 1, 2011) (citation omitted); *see also Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 482-85, 493 n.35 (3d Cir. 1992) (requiring substantial foreclosure in tied market under rule of reason). Authorities agree that market foreclosure of 10% or less of the tied market is insufficiently "substantial" to raise a triable issue of fact. *E.g., Town Sound*, 959 F.2d at 482, 494; *see also* Areeda ¶ 1729a ("tying is usually lawful" unless it forecloses at least 30% of the tied market; ties foreclosing less than 10% are so unlikely to cause harm that they can be considered "harmless").

Most of Asker's opinions do not speak to foreclosure at all. For example, Teradata relies on Asker's opinion that SAP "maintains high prices on HANA," and "has substantial and increasing profit margins on

-55-

HANA." TeradataBr. 50; Appx14096. But "higher consumer prices can result from pro-competitive conduct" and are not evidence of anticompetitive harm. *Brantley*, 675 F.3d at 1202. Likewise, even supracompetitive profit margins can "easily be obtained as a result of good management, superior efficiency, or differences in accounting, none of which is inconsistent with an efficient market." *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1252 (11th Cir. 2002). Because "high" profit margins are consistent with procompetitive behavior, they are not evidence of anticompetitive harm.[9] *Brantley*, 675 F.3d at 1202.

Likewise immaterial is Asker's opinion that SAP distorts consumer choice by "forcing" S/4HANA customers to purchase HANA. *See* TeradataBr. 36 (citing Appx13883). By definition, product integration (although usually procompetitive) reduces customer choice. S/4HANA is integrated with HANA, so a customer cannot operate S/4HANA on another transactional database. But evidence that tying "has the effect of reducing consumers' choices," absent evidence of significant *foreclosure* in

---

[9] SAP's margins are in line with those of other leading ERP vendors, and *lower* than Teradata's own profit margins. Appx14284-14286; Appx21483.

the tied market, does not establish harm to competition. *Brantley*, 675 F.3d at 1202.

Teradata lacks any evidence that SAP foreclosed a significant portion of the tied market. Teradata's expert failed to proffer any evidence about competitors' market shares in the EDW market. Appx13669. The only relevant evidence in Asker's report is that SAP's share of overall database sales was 11% in 2018, whereas Oracle accounts for 35-37% of database sales, Microsoft accounts for about 24%, IBM accounts for 11-14%, and Amazon accounts for about 11%. Appx35; Appx13678-13679. But Teradata lacks evidence that any of these vendors lost EDW sales due to the alleged tie. Appx14610. As the district court explained, Asker failed to "analyze[] the impact of SAP's alleged conduct on the major competitors in his purported market for EDW products with [analytical] capabilities." Appx35.

Teradata's argument that Asker "*did* identify evidence of harm" to other EDW providers misstates the evidence. TeradataBr. 39. Asker relied on documents indicating a "strategy" whereby SAP "sought to" compete, not actual results. Appx13981-13982. And SAP acknowledged that its goal of replacing vendors as an EDW would be "difficult" and require

"surround[ing]" a single EDW with multiple HANA data marts, sales that

would be neither tied to S/4HANA nor within Teradata's tied market of

EDWs.  Appx18405.

Teradata mistakenly claims that Asker estimated that SAP's

purported tie would foreclose competition in "48-73 percent of the relevant

EDW market."  TeradataBr. 50 (quoting Appx14097).  What Asker instead

opined is that because ███ of Teradata's revenue is attributable to

customers that use S/4HANA among their various ERP applications—and

███ to customers who use S/4HANA or another SAP ERP application—

one can infer ███ of Teradata's sales to customers will be foreclosed *in

the future*, if one *assumes* that every customer who uses a SAP ERP

application eventually ceases using Teradata's database.  Appx14097.  But

Teradata lacks any evidence of such a causal connection, and Asker's

speculative opinion is insufficient to create a factual dispute.  *Nelson v. Pima

Cmty. College*, 83 F.3d 1075, 1081-82 (9th Cir. 1996).

Teradata also cites Asker's regression analysis, which purported to

measure lost sales to Teradata caused by SAP's tie.  Appx13993.  But

Asker's analysis does not measure *causation*; it measures *correlation* (*i.e.*, the

number of customers who, after reassessing their software needs, replaced

-58-

their ERP systems with S/4HANA and may have reduced their additional purchases of Teradata products).[10]  Appx12840-12848.

What's more, Asker's opinion and regression analysis is limited to the overlap between S/4HANA and *Teradata* customers.  His opinion thus concerns, at most, the "failure of [an] individual competitor[]," not harm to "the competitive process."  *Cascade*, 515 F.3d at 902; *see also Austin v. McNamara*, 979 F.2d 728, 739 (9th Cir. 1992) (plaintiff is "required to show not merely injury to himself as a competitor, but rather injury to competition").  And even if accepted on its face, no reasonable jury could conclude from Asker's opinion regarding partial foreclosure of Teradata—which accounts for *less* than 10% of database sales (Appx13679)—that SAP's alleged tied sales have foreclosed *more* than 10% of the EDW market.

In sum, in opposition to summary judgment, Teradata submitted no legally-sufficient evidence establishing either the alleged tying or tied

---

[10] Teradata's argument that Asker's regression analysis proves customers were "substituting HANA for Teradata's EDW products" misstates the record.  TeradataBr. 39 (citing Appx13993-13997).  Teradata initially identified sixteen customers whom it claimed reduced spending on Teradata products due to the alleged tie.  Appx12842.  But these customers reduced their Teradata spend for reasons unrelated to any purchase of S/4HANA and HANA.  Appx12840-12848.

market, and no probative evidence of either tied sales in the alleged tied

market or harm to competition in that market caused by a tied sale.

## II.  THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT ON TERADATA'S TRADE-SECRET CLAIM.

The district court also properly granted summary judgment on

Teradata's trade-secret claim.  Teradata maintains SAP misappropriated

Teradata's supposed "batched merge method" during the Bridge Project.

Under New York law, which controls the contracts governing the Bridge

Project, a written agreement must be enforced according to its plain

meaning at summary judgment if clear, complete, and subject to only one

reasonable interpretation.  *Brad H. v. City of New York*, 17 N.Y.3d 180, 186

(2011).  Here, the plain meaning of the Bridge Project agreements defeats

Teradata's trade-secret claim for two independently-sufficient reasons.

### A.  Teradata Never Marked Its Supposed Trade Secret as Confidential.

Teradata's trade-secret claim falters first because Teradata never

marked confidential any communication disclosing its purported "batched

merge method" trade secret.  Where, as here, a trade-secret disclosure

occurs pursuant to a non-disclosure agreement, failure to mark alleged

trade-secret information as required by the agreement is fatal.  *Convolve,*

-60-

*Inc. v. Compaq Comput. Corp.*, 527 F. App'x 910, 925 (Fed. Cir. 2013).

### 1. The Design Document Does Not Reduce the Claimed Trade Secret to Writing.

Under the MNDA, written information qualifies as confidential only if it is "marked with an appropriate legend indicating that the information is deemed confidential or proprietary" at the time of disclosure. Appx10548; Appx10554. Teradata never complied with this requirement with respect to the information it now claims as confidential.

Teradata contends it disclosed the "batched merge method" by using the term "batched Merge" in a project-design document that bore a "confidentiality" marker on each page—including pages containing *SAP* proprietary information. TeradataBr. 53 (citing Appx14560-14578); *see also* Appx14484-14485. Teradata's argument is mere word play.

Written disclosure of the *term* "batched Merge" does not satisfy the MNDA requirement that Teradata furnish in writing and mark confidential the "*information*" it seeks to protect as a trade secret. Appx10547; Appx10553. The term "batched Merge" is not the asserted trade secret; the supposed ██████ "batched merge method" is. *See* Appx10613. And, as the district court concluded, Teradata never marked confidential any

writing conveying that information to SAP.  Appx12.

There is no jury question regarding whether Teradata met the marking requirement.  The author of the project-design document, John Graas, admitted that the document does not disclose Teradata's purported trade secret.  Appx21972-21980.  The design document merely states "batched Merge" (Appx14570); it "does not contain the details of the overall batched merge method."  Appx21974; Appx21977.  Any such details "would have been explained verbally," not in writing.  Appx21977; *accord* Appx21973-21975.

Teradata first argues that it had to provide only "notice of confidentiality" and did not have to "fully describe [its] trade secrets to protect them."  TeradataBr. 54-55.  But the MNDA is clear:  Only "information" furnished "in writing" and "clearly identified as confidential or proprietary at the time of disclosure" puts a party on notice of confidentiality.  Appx10548; Appx10554.  Teradata is thus wrong that it could protect its purported trade secret by mentioning the *name* of the *undisclosed* trade secret and later disclosing the trade secret orally with no confidentiality designation.  Because the ███████ trade secret is the "information" Teradata seeks to protect, the MNDA required that Teradata

furnish *that information* in a writing marked confidential.  It is no answer to

say that the MNDA does not "require marking subsequent oral discussions

of confidential information already marked as confidential," TeradataBr. 57

(alteration omitted), where Teradata never marked the information

confidential in the first place.

Teradata argues that requiring it to disclose more than the term

"batched Merge" creates a conflict between the MNDA procedures for

information furnished in writing and information disclosed "orally or

visually," as the latter need only be "summarize[d]" — *i.e.*, concisely

"state[d] or express[ed]" — in writing.  TeradataBr. 55.  The problem for

Teradata is that it did not even summarize the "batched merge method."

Embedding the term "batched Merge" in a larger document marked

confidential does not "state or express" the method "briefly or concisely;"

indeed, as Graas confirmed, the design document does not "state or

express" the method at all.  *E.g.*, Appx21978 ("I don't believe I ever said

that I conveyed the batched merge method in this document.").

Teradata's interpretation of the MNDA lays a trap for the unwary.

According to Teradata, a disclosing party could litter undefined terms

throughout a document marked "confidential" and then sue for trade-

secret misappropriation on the ground that it later disclosed the trade secret orally.  This approach contradicts the MNDA's clear language, and would undermine the certainty provided by its carefully-constructed framework.

Even if the MNDA were ambiguous about how to identify confidential information (and it is not), Teradata points to no relevant course of conduct supporting its argument that it complied with the MNDA by merely including the term "batched Merge" in the design document.  Teradata cites no other examples of either party identifying confidential information in this manner.  Instead, Teradata identifies one SAP employee who *assumed* that information conveyed during the Bridge Project was confidential (alongside a bevy of employees who understood it was not).  TeradataBr. 56 (citing Appx15595).  This subjective understanding of one employee does not control over the agreement's "objective meaning."  *Ashwood Cap., Inc. v. OTG Mgmt., Inc.*, 99 A.D.3d 1, 6 (N.Y. App. Div. 2012).

Teradata's second argument is no more persuasive.  Armed with a patchwork of quotations from the design document and a reference to an embedded spreadsheet (which itself bore no confidentiality marking),

Teradata attempts to cobble together a sufficient trade-secret disclosure.  At

most, the design document and spreadsheet disclose that Teradata thought

something called "batched Merge" could help SAP; they do not divulge the

method itself.  Again, Graas disclaimed that either the design document or

spreadsheet contains a trade secret, explaining that he conveyed the

batched merge method to SAP in oral conversations not reduced to writing

and marked confidential.  *E.g.*, Appx14398 ("I would have conveyed it

verbally"); Appx21970-21971 (confirming the spreadsheet did not "explain

the method").  Teradata's expert likewise did no more than opine that the

design document "references" the batched merge method.  Appx15238.

### 2.  SAP Never Waived Teradata's Obligation to Comply with the Marking Requirement.

Teradata next argues that SAP waived any requirement that the

marked document "contain some greater detail" than it did "to protect

Batched Merge."  TeradataBr. 58.  Waiver must be based on a party's

"unmistakable, unequivocal intention to relinquish its known right," *Cmty.*

*Counseling & Mediation Servs. v. Chera*, 95 A.D.3d 639, 640 (N.Y. App. Div.

2012), and "should not be lightly presumed," *EchoStar Satellite L.L.C. v.*

*ESPN, Inc.*, 79 A.D.3d 614, 617 (N.Y. App. Div. 2010)  Because the MNDA

contains a no-waiver provision (Appx10551; Appx10557), Teradata must

establish SAP intentionally relinquished *both* the marking requirement *and*

the no-waiver provision. *Paramount Leasehold, L.P. v. 43rd St. Deli, Inc.*, 136

A.D.3d 563, 568 (N.Y. App. Div. 2016).

Teradata failed to establish its noncompliance with the marking

provision was "unequivocally referable" to any agreement by the parties to

modify the "no-waiver" clause. *Id.* Moreover, Teradata identifies no

*conduct* at all, let alone conduct from which a jury could find SAP

"unmistakably manifested" the intent to waive the marking requirement.

*Echostar*, 79 A.D.3d at 617. Teradata relies on an internal email from an

SAP employee stating his assumption that SAP could not "pass on any

internal information of" Teradata (Appx15595), and testimony from SAP's

Chief Technology Officer that *in general*, when working on joint projects

under NDAs, he has "an expectation that [his] partners would treat

confidential [his] discussions and e-mails about the technology"

(Appx17199). Neither of these statements even reference the MNDA, and

they certainly do not rise to the level of "affirmative action … from which

one can infer that [SAP] surrendered its contractual right." *Echostar*, 79

A.D.3d at 618.

Teradata's cited cases illustrate SAP did not waive the marking requirement. Teradata identifies no "assurances" from which it could infer that it need not comply with the marking requirement. *See Christian Dior-New York, Inc. v. Koret, Inc.*, 792 F.2d 34, 39 (2d Cir. 1986). No SAP representative provided Teradata with written authorization to engage in behavior inconsistent with the MNDA. *See Natale v. Ernst,* 63 A.D.3d 1406, 1408 (N.Y. App. Div. 2009). And SAP did not, on multiple occasions, fail to object to actions taken by Teradata in contravention of the marking requirement. *See Gen. Motors Acceptance Corp. v. Clifton-Fine Cent. Sch. Dist.*, 647 N.E.2d 1329, 1331 (N.Y. 1995).

## B.   The Bridge Project Agreements Granted SAP the Right to Use Modifications to Its Own Software in Any SAP Product.

Teradata's trade-secret claim also fails because, under the Bridge Project Agreements, SAP owns and has a perpetual license to use modifications to SAP software in any SAP product. Appx16-18.

### 1.   SAP Owns the Interface, and Modifications Thereto, that Implemented the Supposed Batched Merge Method.

SAP owns the purported trade secret as incorporated into the code of SAP's MaxDB software, and thus is entitled to use it in any SAP application. *See* Appx16.

According to Teradata, Graas proposed the ▮▮▮▮▮▮ "batched merge method" to SAP; SAP then implemented that suggestion by modifying the SAP SQL software layer within the MaxDB Bridge that "interface[d] with multiple back end databases," including Teradata's database.  Appx14450-14452; Appx14436-14439.  Under the plain terms of section 10.1 of the SDCA, SAP owns MaxDB (the "SAP Interface"), in its original form "*as well as any modified versions.*"  Appx476 (emphasis added).  SAP also owns the rights to the "software code that is necessary to adapt its software to" Teradata's database.  *Id.*  Thus, SAP owns the MaxDB software code that implemented the purported trade secret.

Teradata argues that section 10.1 merely reserved SAP's rights without granting SAP rights to Teradata intellectual property.  TeradataBr. 68.  That argument assumes that suggestions about how to modify SAP's software are Teradata intellectual property.  The SDCA, however, makes clear that if SAP's MaxDB needed modifications to interface with Teradata's database, those modifications are *SAP* intellectual property.  Appx476.  The SDCA included no exception for modifications suggested by Teradata.  To the contrary, the SDCA contemplated that Teradata would share information precisely so SAP could modify its own software.

Appx471.

### 2.  The SDCA and MNDA Licensed Teradata's Suggestions to SAP.

The SDCA's and MNDA's license provisions also entitle SAP to use the purported "batched merge method" in any product.  Both agreements "permit SAP to use any Teradata feedback or input regarding SAP's products, even if such information was marked confidential."  Appx16.

Teradata granted SAP a "perpetual and irrevocable license to use, reproduce, distribute, or create derivative works" of any "Input," which the SDCA defined to include "suggestions, comments, and feedback (whether in oral or written form), including any included ideas and know-how, voluntarily provided by one Party to the other Party with respect to the work performed under this Agreement."  Appx468; Appx475.  The license allows SAP to include Input "as part of any SAP product." Appx475.  The license's terms supersede any conflicting confidentiality provision.  *Id.*

The MNDA contains a corresponding license, which states that if Teradata provided "input regarding SAP's Software … including, without limitation, comments or suggestions regarding the possible creation,

-69-

modification, correction, improvement or enhancement of SAP Software,"
then SAP had a license to use, publish, and disclose that feedback "without
restriction or remuneration of any kind with respect to [Teradata]."
Appx458.

The supposed "batched merge method" falls comfortably within
these provisions. To "suggest" is "[t]o offer for action or consideration,"
*i.e.*, "propose." *Suggest*, Webster's II New College Dictionary 1128 (3d ed.
2005). Graas purportedly proposed during a back-and-forth dialogue with
SAP engineers an approach for modifying a SAP command to work more
efficiently with the Teradata database. *See* Appx10537-10552; Appx14520;
Appx14542-14546; Appx14495-14496; Appx14499-14500; Appx15214-15218;
Appx14486-14487. Or, in the language of the MNDA, Graas provided
"suggestions" regarding possible "modification[s]" to SAP software.
Appx458. SAP is entitled to use that information and sell products
embodying it without restriction or remuneration of any kind. *Id.*

Teradata complains that "Input" should not be interpreted to cover
"all" conversations with SAP employees. TeradataBr. 64. SAP has never
argued the license provision extends to *all* conversations, and the district
court did not hold it does. The district court observed the license provision

grants SAP a license to use any Teradata suggestion, including ideas and

know-how, with respect to any SAP deliverables.  Appx16.  And the court

concluded, correctly, that "Graas's suggestions to SAP engineers about

how to approach a command/query coming from SAP applications to

work more efficiently with the Teradata database" fall within the license's

terms.  Appx17.

Teradata argues that the district court's interpretation "would make

superfluous all the contractual provisions protecting Teradata's intellectual

property."  TeradataBr. 65.  But the canon against superfluity "assists only

where a competing interpretation gives effect 'to every clause and word of

a [contract].'"  *Microsoft Corp. v. i4i Ltd.*, 564 U.S. 91, 106 (2011) (citation

omitted).  Teradata does not propose an alternative interpretation that

gives effect to the license's every word; Teradata simply seeks to read the

license grant out of the SDCA.

In any event, the SDCA provisions regarding intellectual property

have ample meaning.  As SAP explains below, they reserve intellectual-

property rights in certain Teradata software and programs shared under a

project plan.  That is an altogether different kettle of fish than Teradata's

claimed rights over modifications made to *SAP*'s software.

### 3.   Teradata's Contrary Interpretation Does Not Accord with the Plain Language of the Bridge Project Agreements.

Teradata argues that SAP is not entitled to use its modified MaxDB code outside the Bridge Project because the asserted trade secret remains Teradata property under the SDCA.  TeradataBr. 60-63.  As the district court held, the supposed "batched merge method" does not fall within the unambiguous provisions upon which Teradata relies.  Appx15-16.

Teradata first directs the Court to section 10.2 of the SDCA (TeradataBr. 60-61), but that provision merely states that Teradata "does not grant to SAP any Intellectual Property Rights … except to the extent SAP is expressly granted such rights under this Agreement."  Appx476.  As just explained, the SDCA unambiguously gives SAP ownership over modifications to its MaxDB code, and expressly licenses to SAP the right to use Teradata's input in any product.

Next, Teradata argues the applicable license provision is section 9.2 of the SDCA, which grants SAP a limited license to use, for purposes of the Bridge Project, "the Partner Solution, related Documentation, and any other programs, tools, or other materials provided by Partner to SAP under a Project Plan."  Appx474.  The purported "batched merge method" does

not satisfy any of section 9.2's terms.

It is not the "Partner Solution," defined as Teradata's database product itself. *See* Appx469; Appx482. Nor is it "related Documentation," such as Teradata manuals that describe its database technology.

Teradata argues the "batched merge method" is a "tool" (TeradataBr. 63-64), but that contention fails several times over. To begin, Teradata waived the argument by failing to make it below. As the district court observed (Appx15-16), Teradata never explained how the "batched merge method" constitutes a "tool." *See* Appx15185-15186; *Image Tech.*, 903 F.2d at 615 n.1.

In any event, the plain meaning of words is determined by their dictionary definitions. *See, e.g.*, *Mazzola v. County of Suffolk*, 143 A.D.2d 734, 735 (N.Y. App. Div. 1988). In computer science, the word "tool" means "[a]n application program, often one that creates, manipulates, modifies, or analyzes other programs." *Tool*, Webster's II New College Dictionary 1189 (3d ed. 2005). The supposed "batched merge method" is not a Teradata program; it is, in Graas's own words, a "technique" that SAP implemented in its own code. Appx15202.

Moreover, "a word is known by the company it keeps." *Matter of*

*Apple, Inc. v. Tax Appeals Trib.*, 204 A.D.3d 1173, 1175-76 (N.Y. App. Div. 2022) (citation omitted).  The word "tool" in section 9.2 is surrounded by words describing tangible articles, such as software products, computer programs, and technical manuals, as opposed to ideas or know-how.  Teradata is correct that under the SDCA, Graas's suggestions cannot both qualify as "input" under section 9.2 and a "tool" under section 9.4.  TeradataBr. 62.  But as the district court correctly concluded, the know-how Graas supposedly shared with SAP constitutes the former.

Contrary to Teradata's representation (TeradataBr. 63, 64), none of its experts opined that the "batched merge method" is a tool.  One of Teradata's experts used "tool" to refer to a technique called "ODBC Array Insert."  Appx15332.  But he was not opining on the meaning of the word "tool" in the SDCA (likely because New York law prohibits experts from opining on the meaning of contract terms).  *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991).  Indeed, in the same breadth he referred to ODBC Array Insert as a "technique."  Appx15332.  Moreover, ODBC array inserts are a "readily available" data transfer technique—they are not themselves the purported secret—and were ██ of ██████████ of the ████████████████████  Appx10855; Appx15278; Appx15332.

### 4.  Teradata's Interpretation Contravenes Both Parties' Contemporaneous Intent.

Although the district court properly enforced the SDCA and MNDA according to their terms, Teradata complains that allowing SAP to use Graas's suggestions in any product contravenes the implied covenant of good faith and fair dealing.  TeradataBr. 66.

The implied covenant of good faith and fair dealing "cannot negate express provisions" in a contract.  *Transit Funding Assocs., LLC v. Cap. One Equip. Fin. Corp.*, 149 A.D.3d 23, 29 (N.Y. App. Div. 2017).  Moreover, contemporaneous documents confirm that Teradata employees knew SAP would use Graas's suggestions outside of the Bridge Project.  *See Ocean Transp. Line, Inc. v. Am. Philippine Fiber Indus., Inc.*, 743 F.2d 85, 91 (2d Cir. 1984) ("The parties' interpretation of the contract in practice, prior to litigation, is compelling evidence of the parties' intent.").  It is only in litigation that Teradata feigns surprise.

Five days before signing the SDCA, the Teradata employee responsible for managing the approval process for the Bridge Project agreements told Teradata that, under the SDCA, "all developments of SAP products" would be owned by SAP "*even if made by Teradata*."  Appx22395

-75-

(emphasis added); Appx11107.  Likewise, in January 2010, the Teradata employee "responsible for keeping the [bridge] project moving along" (Appx20801), remarked that if SAP made Graas's suggested changes to MaxDB, SAP would be "[c]ontractually … obliged" to make the changes available to other database vendors.  Appx14552.  And Graas's manager— concerned that performance issues could doom the Bridge Project entirely—suggested that Teradata persuade SAP to adopt Graas's alleged input by emphasizing how the changes would update SAP products "for all databases."  Appx14580; Appx14407-14408.  Only now does Teradata maintain that SAP's modifications to its own products cannot be used outside of the Bridge Project.

## CONCLUSION

For these reasons, the district court's order granting summary judgment to SAP should be affirmed.

August 26, 2022                         Respectfully submitted,


                                        s/ *Tharan Gregory Lanier*
                                        _____
                                        Tharan Gregory Lanier
                                        JONES DAY
                                        1755 Embarcadero Road
                                        Palo Alto, CA 94903
                                        (650) 739-3939

                                        *Counsel for Appellees SAP SE, SAP*
                                        *America, Inc., and SAP Labs LLC*

## CERTIFICATE OF CONFIDENTIAL MATERIAL

The foregoing document contains 13 unique words (including

numbers) marked confidential.  This number does not exceed the

maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

August 26, 2022                      *s/ Tharan Gregory Lanier*
                                     Tharan Gregory Lanier

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the CM/ECF system on August 26, 2022.

I certify that on August 26, 2022, I served the confidential version of this brief via email on all counsel of record.

August 26, 2022

*s/ Tharan Gregory Lanier*
Tharan Gregory Lanier

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Circuit Rules 28.1(b) and 32(b) because it contains 13,963 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Federal Circuit Rule 32(b)(2), as determined by the word-counting feature of Microsoft Word.

This brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally-spaced typeface, including serifs, using Microsoft Word in Book Antiqua 14-point font.

August 26, 2022                   *s/ Tharan Gregory Lanier*
                                  Tharan Gregory Lanier