No. 22-1286

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

TERADATA CORPORATION, TERADATA US, INC., and TERADATA OPERATIONS, INC.,

*Plaintiffs-Appellants*,

v.

SAP SE, SAP AMERICA, INC., and SAP LABS LLC,

*Defendants-Appellees.*

Appeal from the United States District Court for the Northern District of California, Case No. 3:18-cv-03670, Hon. William H. Orrick

## TERADATA CORPORATION, TERADATA US, INC., AND TERADATA OPERATIONS, INC.'S NON-CONFIDENTIAL REPLY BRIEF

JAMES R. SIGEL
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105

DEANNE E. MAYNARD
BRIAN R. MATSUI
MARK L. WHITAKER
DAVID D. CROSS
MARY PRENDERGAST
SAMUEL B. GOLDSTEIN
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Telephone:  (202) 887-8740
DMaynard@mofo.com

*Counsel for Plaintiffs-Appellants Teradata Corporation,*
*Teradata US, Inc., and Teradata Operations, Inc.*

NOVEMBER 15, 2022

# CERTIFICATE OF INTEREST

Counsel for Teradata Corporation, Teradata US, Inc., and Teradata Operations, Inc. certify under Federal Circuit Rule 47.4 that the following information is accurate and complete to the best of their knowledge:

1.     **Represented Entities.** Provide the full names of all entities represented by undersigned counsel in this case.

Teradata Corporation; Teradata US, Inc.; Teradata Operations, Inc.

2.     **Real Parties in Interest.** Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.

None.

3.     **Parent Corporations and Stockholders.** Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

Teradata Corporation has no parent corporation, and no publicly-held corporation owns 10% or more of its stock.  Teradata US, Inc. and Teradata Operations, Inc. are wholly-owned subsidiaries of Teradata Corporation.

4.     **Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court.

MORRISON & FOERSTER LLP:  Corinna J. Alanis*; Christian G. Andreu-von Euw*; Shouvik Biswas; Aaron David Dakin Bray; Eileen M. Brogan*; G. Brian Busey; Jayson L. Cohen*; Fitz B. Collings; James R. Hancock; Brian L. Hazen*; Mary G. Kaiser; Sean W. Kang*; Jack W. Londen; Bradley S. Lui; Robert W. Manoso; Natasha G. Menell*; Daniel P. Muino; Erik J. Olson; Wesley E. Overson, Jr.*; Fahd H. Patel; Aaron D. Rauh*; Wendy J. Ray; Mathieu Swiderski*; Roman A. Swoopes; Bryan J. Wilson; Michelle L. Yocum
*(no longer with firm)

CHARIS LEX P.C.:  Sean P. Gates

Todd B. Carver, Attorney at Law:  Todd B. Carver

5.     **Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case.

None.

6.     **Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).

Not applicable.

Dated:  November 15, 2022

/s/ Deanne E. Maynard

Deanne E. Maynard

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST .............................................................. i

TABLE OF CONTENTS ..................................................................... iii

TABLE OF AUTHORITIES .................................................................v

INTRODUCTION ..............................................................................1

ARGUMENT ....................................................................................2

I.    SAP'S RESPONSE CONFIRMS FACTUAL DISPUTES REQUIRE
REVERSAL ON TERADATA'S ANTITRUST CLAIM ...........................2

    A.    SAP Cannot Justify The Exclusion Of Asker's Testimony .................2

        1.    Asker's tying-market-definition testimony is admissible..........2

            a.    Asker's qualitative analysis is reliable ............................2

                i.    SAP cannot defend rejection of Asker's
large-enterprises conclusion....................................3

                ii.    SAP cannot dispute that Asker's qualitative
methodology is well-established ...........................5

            b.    Asker's quantitative analyses are reliable .......................7

                i.    SAP offers no defense of overlooking the
CRM analysis .....................................................7

                ii.    SAP cannot defend exclusion of the
aggregate-diversion-ratio analysis ........................7

                iii.    SAP repeats the district court's price-
discrimination error .............................................11

        2.    SAP effectively concedes Asker's tied-market-definition
testimony is admissible ...........................................................11

        3.    SAP cannot defend exclusion of Asker's harm-to-
competition testimony by arguing disputed facts ....................13

    B.    With Or Without Asker's Testimony, SAP's Arguments Cannot
Support The Judgment .......................................................................18

1.    SAP's tie violates the per se rule ...............................................18

2.    SAP cannot escape the per se rule ...........................................20

3.    SAP cannot defend summary judgment even under the rule of reason.................................................................................24

II.   SAP'S RESPONSE CONFIRMS THE DISTRICT COURT MISREAD THE AGREEMENTS AND RESOLVED DISPUTED FACTS ON TERADATA'S TRADE-SECRETS CLAIM ..........................27

A.    SAP's Marking Arguments Respond To A Strawman And Depend On Disputed Facts.................................................................27

B.    SAP Concedes It Has No License If Batched Merge Is A "Tool," Confirming Factual Disputes Exist .....................................................30

CONCLUSION .........................................................................................34

## CONFIDENTIAL MATERIAL OMITTED

In the non-confidential version of this reply brief, pages 9 and 14 omit material describing SAP's competitive and financial information.  Page 31 omits material describing Teradata's Batched Merge trade secret.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ajdler v. Province of Mendoza,*
  890 F.3d 95 (2d Cir. 2018) ................................................................31

*Am. Ad Mgmt., Inc. v. GTE Corp.,*
  92 F.3d 781 (9th Cir. 1996) ..............................................................27

*Brantley v. NBC Universal, Inc.,*
  675 F.3d 1192 (9th Cir. 2012) ..........................................................26

*Brown Shoe Co. v. United States,*
  370 U.S. 294 (1962).......................................................................5, 6

*Cascade Health Sols. v. PeaceHealth,*
  515 F.3d 883 (9th Cir. 2008) ......................................................18, 20

*In re Cox Enters., Inc.,*
  871 F.3d 1093 (10th Cir. 2017) ........................................................21

*Datagate, Inc. v. Hewlett-Packard Co.,*
  60 F.3d 1421 (9th Cir. 1995) ............................................................18

*Elosu v. Middlefork Ranch Inc.,*
  26 F.4th 1017 (9th Cir. 2022) ........................................3, 10, 13, 16

*Federal Trade Commission v. Qualcomm Inc.,*
  969 F.3d 974 (9th Cir. 2020) ......................................................20, 21

*Foremost Pro Color, Inc. v. Eastman Kodak Co.,*
  703 F.2d 534 (9th Cir. 1983) ............................................................21

*Gen. Motors Acceptance Corp. v. Clifton-Fine Cent. Sch. Dist.,*
  647 N.E.2d 1329 (N.Y. 1995).............................................................30

*Hasbrouck v. Texaco, Inc.,*
  842 F.2d 1034 (9th Cir. 1987) ..........................................................18

*Hoyt v. Andreucci,*
  433 F.3d 320 (2d Cir. 2006) .............................................................28

*Image Tech. Serv., Inc. v. Eastman Kodak Co.*,
  903 F.2d 612 (9th Cir. 1990) ...................................................................19

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
  125 F.3d 1195 (9th Cir. 1997) .................................................................20

*Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elecs. Corp.*,
  518 F.2d 913 (9th Cir. 1975) ...............................................................6, 7

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
  466 U.S. 2 (1984) ............................................................................2, 20, 21

*JL Bev. Co. v. Jim Beam Brands Co.*,
  828 F.3d 1098 (9th Cir. 2016) .............................................................6, 32

*Marx v. Loral Corp.*,
  87 F.3d 1049 (9th Cir. 1996) .....................................................................8

*Ohio v. American Express Co.*,
  138 S. Ct. 2274 (2018).............................................................................19

*Oltz v. St. Peter's Cmty. Hosp.*,
  861 F.2d 1440 (9th Cir. 1988) ...................................................................4

*Paladin Associates, Inc. v. Montana Power Co.*,
  328 F.3d 1145 (9th Cir. 2003) ...........................................................23, 24

*PLS.com, LLC v. Nat'l Ass'n of Realtors*,
  32 F.4th 824 (9th Cir. 2022) ....................................................................20

*Tampa Elec. Co. v. Nashville Coal Co.*,
  365 U.S. 320 (1961)..................................................................................26

*Times-Picayune Publ'g Co. v. United States*,
  345 U.S. 594 (1953)..................................................................................19

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001)................................... 14, 21, 22, 23, 24, 26

*United States v. Phila. Nat'l Bank*,
  374 U.S. 321 (1963)....................................................................................3

*Wendell v. GlaxoSmithKline LLC*,
　858 F.3d 1227 (9th Cir. 2017) ..........................................................3, 13

## Other Authorities

Areeda & Hovenkamp, *Antitrust Law* (5th ed.).......................................21

Farrell & Shapiro, *Improving Critical Loss Analysis*,
　THE ANTITRUST SOURCE (2008)..............................................................9

Katz & Shapiro, *Critical Loss: Let's Tell the Whole Story*,
　ANTITRUST (Spring 2003) .......................................................................8

Kintner et al., *Federal Antitrust Law* (2021) .............................................9

Moresi et al., 1 *Antitrust Economics for Lawyers* (2021).........................9

Shapiro, *The 2010 Horizontal Merger Guidelines: From Hedgehog to
　Fox in Forty Years*, 77 ANTITRUST L.J. 49 (2010) ............................10

*Tool*, Oxford English Dictionary ............................................................32

U.S. Dep't of Justice & FTC, *Horizontal Merger Guidelines*
　(2010)...............................................................................4, 5, 8, 11, 12

# INTRODUCTION

SAP forces purchasers of its dominant ERP software to also purchase HANA. That is a per se violation of the antitrust laws that necessarily distorts competition. Yet the district court, having erroneously excluded testimony from Teradata's expert, refused to let a jury decide Teradata's tying claim.  In amici briefs, the United States and the Federal Trade Commission ("FTC"), along with numerous economists, have joined Teradata in detailing the district court's many departures from settled principles of antitrust law and economics.  SAP does not deny the court committed multiple legal errors.

Instead, SAP largely attempts to defend summary judgment with factual arguments based on skewed interpretations of the evidence.  That just confirms the need for trial.  SAP's primary remaining legal argument—that it can evade the per se rule because of the tie's supposed procompetitive benefits—contradicts decades of Supreme Court and Ninth Circuit precedent.  It is even inconsistent with the noncontrolling decision SAP invokes.  And whatever the legal standard, SAP cannot show the absence of material factual disputes.

On Teradata's trade-secrets claim, SAP contorts what the MNDA requires and what Teradata says.  Nothing in the MNDA requires reducing a trade secret to writing to protect it, and Teradata never suggests merely marking a "term" suffices. In a document "clearly identified" as confidential, Teradata described Batched

Merge, explained its key characteristics in technical terms, and suggested how to use

it. No more was required, and a jury should resolve any dispute.

On licensing, SAP makes a concession that dooms its summary-judgment

defense: Batched Merge cannot be both a "tool" (and thus Partner Materials) and

"input." But as SAP's verbal gymnastics show, determining whether Batched Merge

is a "tool" or "input" requires resolving disputed facts.

This case should be remanded for trial.

## ARGUMENT

## I.    SAP'S RESPONSE CONFIRMS FACTUAL DISPUTES REQUIRE REVERSAL ON TERADATA'S ANTITRUST CLAIM

When sellers use their power over one product to force purchases of a second,

"competition on the merits in the market for the tied item is restrained and the

Sherman Act is violated." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2,

12 (1984). SAP cannot brush aside the ample evidence showing it imposes such a

forbidden tie.

### A.    SAP Cannot Justify The Exclusion Of Asker's Testimony

#### 1.    *Asker's tying-market-definition testimony is admissible*

##### a.    *Asker's qualitative analysis is reliable*

The district court rejected only the "large enterprises" aspect of Asker's tying-

market definition of a "core ERP products for large enterprises" market. Appx26-28.

It offered two rationales: (1) while some "SAP documents" supported Asker's large-

enterprises conclusion, others purportedly contradicted it; and (2) no "clear line" separated large enterprises from smaller ones. Appx28. As Teradata explained, both rationales are legally erroneous. Teradata.Br.22-24. In rejecting Asker's large-enterprises conclusion notwithstanding the acknowledged supporting evidence—and despite accepting Asker's core-ERP conclusion based on the same methodology—the district court failed to focus "'solely on principles and methodology, not on the conclusions that they generate.'" *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017). And in requiring a definitive cutoff for "large" enterprises, the court misapplied antitrust law: clear lines are unnecessary for defining markets. *E.g.*, *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 360 n.37 (1963). SAP never disputes that those rationales are erroneous.

### i. SAP cannot defend rejection of Asker's large-enterprises conclusion

Instead, SAP insists the district court found Asker failed to provide a "recognizable methodology" not for defining *antitrust markets*, but for purportedly defining "large enterprises" as "companies with '1,000 to 1,500 employees and over 125 users.'" SAP.Br.32. But the court said nothing about Asker's "methodology" for defining large enterprises. Appx28. SAP cannot salvage the court's decision with never-provided reasoning. *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017,

1020, 1027 (9th Cir. 2022) (reversing where district court's "plain text" showed it "discredited" expert's "ultimate conclusions").

Even had the district court adopted that rationale, it would be legal error. SAP faults Asker for "fail[ing] to identify any methodology … for adopting one definition of large enterprises over another." SAP.Br.34. But Asker never adopted one definition over another. Instead, he defined the tying market around "large enterprises"—"those with high annual revenues, a large number of staff, high data volume and complexity, and many ERP users"—while recognizing the "exact definition" of companies falling within this category "varies." Appx13882, Appx13912. This general definition was appropriate because, as Asker explained, "'[r]elevant markets need not have precise metes and bounds.'" Appx13906 (quoting U.S. Dep't of Justice & FTC, *Horizontal Merger Guidelines* ("Guidelines") §4 (2010)).

Ultimately, SAP's contention that Asker needed a "methodology" to precisely define "large enterprises" repackages the district court's error in requiring a "clear line" (Appx28)—a requirement SAP correctly disclaims. SAP.Br.34-35. As the government amici explain, the "primary purpose of market definition is to identify the 'locus of competition' potentially affected by the challenged practice, not to parse the outer boundaries of a market." US-FTC.Br.19; *e.g.*, *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1448 (9th Cir. 1988). Asker defined the tying market

4

to help determine whether SAP has market power over some category of purchasers. Appx13950-13956.  Contrary to SAP's suggestion that his conclusions turned on a particular large-enterprises definition (SAP.Br.33), Asker relied on sources that used various overlapping metrics.  Appx13916-13920.  He needed no specific large-enterprises definition to determine that a "hypothetical monopolist that controlled both Oracle and SAP would be able to profitably impose a small but significant and non-transitory increase in price ('SSNIP')."  Appx13920.  No clear line based on employees, revenue, or other metric was necessary.  Guidelines §4.

### ii.   SAP cannot dispute that Asker's qualitative methodology is well-established

SAP never directly contends the market-definition methodology Asker actually used—his qualitative assessment of substitutability, or the "alternative products to which buyers would switch in response to a price increase" (Appx13904-13905)—was unreliable.  That would be untenable, given the government and economist amici's comprehensive endorsement. US-FTC.Br.15-24; Economists.Br.11-14.  Indeed, SAP insists the district court did not reject this methodology.  SAP.Br.31, 35.

To the extent SAP instead suggests Teradata forfeited reliance on qualitative evidence because Asker did not expressly cite "the *Brown Shoe* indicia," SAP is wrong.  SAP.Br.36 (discussing *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962)).  Asker is an economist, and his report detailed the qualitative framework he

5

used and the economic factors he considered, citing the Horizontal Merger
Guidelines and economics literature. Appx13904-19306. Unsurprisingly, the
factors economists analyze overlap with those highlighted in qualitative-evidence
cases like *Brown Shoe*. *Compare* 370 U.S. at 325, *with, e.g.*, Economists.Br.13-14.
For example, Asker cited evidence that "SAP specifically considers some of its
products appropriate for the large enterprise market while others are targeted at
medium or small businesses" (Appx13915), and that "large enterprises tend to have
a greater focus on functionality for their specific business needs" (Appx13925)—
consistent with *Brown Shoe*'s emphasis on "the product's peculiar characteristics
and uses" and "distinct customers." 370 U.S. at 325. And when SAP moved to
exclude Asker, Teradata defended (in its opposition and oral argument) his reliance
on such qualitative factors to assess what industry participants viewed as product
substitutes. *E.g.*, Appx18620-18622; Appx22152-22153. The district court then
decided the issue on the merits. Appx23-28 & n.4. As argued and decided, it is
doubly preserved. *JL Bev. Co. v. Jim Beam Brands Co.*, 828 F.3d 1098, 1108 (9th
Cir. 2016).

SAP is likewise wrong in suggesting the Ninth Circuit has questioned market
definitions based on qualitative evidence. In the primary decision SAP cites
(SAP.Br.36n.5), the court held only that two *Brown Shoe* factors were not
economically significant there. *Int'l Tel. & Tel. Corp. v. Gen. Tel. & Elecs. Corp.*,

518 F.2d 913, 933 (9th Cir. 1975).  The court then relied on a *single* factor—industry recognition—in upholding a different aspect of the market definition.  *Id.* at 934. Here, Asker's tying-market definition relied on far more than two factors.  *Supra* pp.5-6; Teradata.Br.24-25.

### b.    *Asker's quantitative analyses are reliable*

Asker's qualitative analysis is alone sufficient to support his tying-market definition.  Teradata.Br.20-25.  Even were some quantitative confirmation necessary, Asker provided it in his aggregate-diversion-ratio ("ADR") and price-discrimination analyses, as well as his separate analysis of customer-relationship-management ("CRM") data.  SAP cannot justify exclusion of these analyses.

### i.    SAP offers no defense of overlooking the CRM analysis

SAP never disputes the district court erred in overlooking Asker's CRM analysis.  It should have been admitted, and it confirms Asker's qualitative analysis. Teradata.Br.25-26.

### ii.    SAP cannot defend exclusion of the aggregate-diversion-ratio analysis

The district court excluded Asker's ADR analysis as based on data that "does not measure customer responses to changes in price."  Appx32.  That was erroneous. As Teradata detailed (supported by the government and economist amici), ADR

analysis can be based on non-price data indicating customer substitution among products.  Teradata.Br.28-29; US-FTC.Br.26-32; Economists.Br.17-18.

SAP does not meaningfully dispute ADR is a well-recognized methodology. Rather, SAP principally argues that Asker took a methodology supposedly for candidate markets with "strong asymmetries" and "without explanation, applied it outside the context for which it was developed."  SAP.Br.41.  But again, that was not the district court's rationale, and SAP never made that argument, forfeiting it. Appx13758-13760; Appx22026-22027; *Marx v. Loral Corp.*, 87 F.3d 1049, 1055 (9th Cir. 1996).

Even if preserved, the argument fails.  The hypothetical-monopolist framework for defining antitrust markets asks whether a profit-maximizing firm controlling all products in the candidate market "likely would impose at least a small but significant and non-transitory increase in price ('SSNIP') on at least one product in the market."  Guidelines §4.1.1.  ADR analysis implements that framework by estimating the "sales actually lost by the hypothetical monopolist when raising the price of Product Z, namely the sales that are lost by Product Z and not gained by any of the other products in the candidate relevant market."  Katz & Shapiro, *Critical Loss: Let's Tell the Whole Story*, ANTITRUST, 53 (Spring 2003).  Asker followed this established approach.  Appx14004-14007.

CONFIDENTIAL MATERIAL OMITTED

Contrary to SAP's assertion (SAP.Br.40), nothing limits ADR analysis to "'candidate markets with strong asymmetries among products.'" *See, e.g.*, Katz & Shapiro, *supra*, at 53. The source SAP cites explains only that ADR is "particularly useful" for such markets. Moresi et al., 1 *Antitrust Economics for Lawyers* § 1.03[2] (2021); *accord* Farrell & Shapiro, *Improving Critical Loss Analysis*, THE ANTITRUST SOURCE, 5 n.17 (2008).

And nothing limits ADR analysis to mergers. *Contra* SAP.Br.41. As the government amici confirm, the same market-definition principles apply here. US-FTC.Br.27-32.

SAP also contends that because the CRM data Asker used reflected competitors for sales but not "actual sales transactions" or "pricing information," it "could not reveal actual diversion." SAP.Br.42-44. Yet "the question posed is whether a *hypothetical* monopolist would raise price." Kintner et al., *Federal Antitrust Law* §37.2a (2021). Addressing that question, Asker concluded, for example, that because Oracle's CRM data identified SAP as the sole competitor in %age of listed opportunities, Oracle's sales would likely be diverted to SAP. Appx14006. While data showing customers' switching between products is useful, it is not required: as the government amici explain, "data capturing alternative products perceived as competitive threats by sales personnel, as is sometimes recorded in CRM data, can illuminate *likely* responses to price changes." US-

FTC.Br.29 (emphasis added). *E.g.*, Shapiro, *The 2010 Horizontal Merger Guidelines: From Hedgehog to Fox in Forty Years*, 77 ANTITRUST L.J. 49, 80 (2010).

SAP highlights Asker's comments on the CRM data's limitations, asserting Asker "declined to use" other "robust data." SAP.Br.42-43. But no such robust data was attainable (Teradata.Br.21)—as SAP's expert admitted. Appx20257. SAP cannot cite anything to the contrary. And as Asker observed, the CRM data would have "to overstate aggregate diversion by a factor of 2.5 to 4.2" to invalidate his ADR analysis. Appx14120-14121. While labeling this data "unreliable," SAP provides no reason to think it overstated diversion to that degree. SAP.Br.43. Even if SAP could, exclusion of Asker's ADR analysis would still be improper. As Teradata explained (Teradata.Br.30), SAP may address any issues with the data through "'cross examination, contrary evidence, and attention to the burden of proof.'" *Elosu*, 26 F.4th at 1028; *accord* US-FTC.Br.31-32. SAP offers no response.[1]

---

[1] There is nothing "telling[]" (SAP.Br.39) about amici's not expressly approving Asker's particular application of ADR analysis; "much of Dr. Asker's expert report remains under seal" (US-FTC.Br.25n.11).

### iii. SAP repeats the district court's price-discrimination error

As Teradata detailed (Teradata.Br.31-32), the district court misapplied antitrust law by requiring evidence of "current price discrimination" (Appx32-33) rather than addressing "[t]he possibility of price discrimination." Guidelines §3; *see* Appx14116-14117. The government amici confirm "Teradata is correct that evidence of prior price discrimination is not required to establish a price-discrimination market." US-FTC.Br.24n.10.

In response, SAP argues there is no *current* price discrimination: "the data cited by Asker shows that companies of different sizes do *not* pay more for SAP products on a per-unit basis." SAP.Br.39. But SAP cannot defend the district court's misapplication of antitrust law by repeating the error.

For all these reasons, Asker's tying-market definition should have been admitted.

### 2. *SAP effectively concedes Asker's tied-market-definition testimony is admissible*

The district court excluded all of Asker's tied-market testimony solely because his confirmatory ADR analysis was supposedly unreliable. Appx35-37. As Teradata explained, that was error: Asker based his tied-market definition on multiple other methodologies. Teradata.Br.33-34. SAP never disputes that point, conceding Asker's ADR analysis "did not form the basis of his market definitions."

11

SAP.Br.39.  That alone is reason to reverse exclusion of Asker's tied-market testimony.

An independent reason to reverse is that SAP cannot defend exclusion of Asker's ADR analysis.  The district court deemed Asker's tied-market ADR analysis "inconsisten[t]" with his tying-market analysis (Appx35), and SAP calls it "outcome-driven" (SAP.Br.44).   But Asker used well-established, generally applicable market-definition principles in defining both markets.  *E.g.*, Guidelines §§4, 4.1.1.  As the government amici explain, there "could be multiple markets defined around the same product in a given case … because the market must be relevant to the particular legal issue being litigated."  US-FTC.Br.13.  For each market, Asker included the participants relevant to the pertinent economic question—for the tying market, SAP's market power; for the tied market, the competitors harmed.  Teradata.Br.34-35.

SAP contends "Asker was required to explain his methodology."  SAP.Br.45.  He did:  Asker explained that "the hypothetical monopolist test [HMT] can lead to multiple relevant markets" for a product, and the "overarching principle that guides market definition is to illuminate the evaluation of competitive effects."  Appx14139.  Thus, in defining the tied market, Asker included a broader number of "competitors in the EDW market"—a market that both "passe[d] the HMT" and was

"relevant to the theory of harm at issue." Appx14139. SAP never disputes this approach accords with established economic methodologies.

### 3. SAP cannot defend exclusion of Asker's harm-to-competition testimony by arguing disputed facts

Asker determined SAP's tie produces the sort of competitive harm one would expect from a coercive tie. Appx13967-13985, Appx13993-13997. In excluding that testimony, the district court erroneously focused on its disagreement with the conclusions Asker drew from the evidence, not his methodology. Teradata.Br.36-39; *Wendell*, 858 F.3d at 1232.

SAP doubles down on that error, insisting exclusion of Asker's testimony was correct because "no reasonable jury could find that allegedly-tied sales of HANA" harmed competition. SAP.Br.47&n.7. But SAP's highly factual arguments only confirm the district court improperly substituted itself for the jury, "select[ing] between competing versions of the evidence" and determining "the veracity of the expert's conclusions at the admissibility stage." *Elosu*, 26 F.4th at 1026.

SAP's overarching approach is two-fold: for Teradata's evidence showing SAP's tie coerced HANA sales, SAP says that evidence fails to show HANA displaced competitor EDWs; but for Teradata's evidence showing HANA *did* displace competitor EDWs, SAP says that evidence fails to demonstrate SAP's tie caused this displacement. *Compare, e.g.*, SAP.Br.49 (discussing Appx13968-13970), *and* SAP.Br.52 (discussing Appx17399), *with, e.g.*, SAP.Br.52

13

CONFIDENTIAL MATERIAL OMITTED

(discussing Appx831). But each individual piece of evidence need not prove Teradata's entire case. SAP cites no authority requiring Asker to identify specific coerced S/4HANA customers that would have otherwise purchased competitor EDWs. If (as Teradata's evidence shows) the vast majority of HANA customers are SAP ERP customers who are required to purchase HANA, and HANA competes with and takes sales from competitors in the EDW market, it follows that SAP's coercive HANA sales distort EDW competition, as Asker explained (and his regression analysis confirmed). Appx13883; *infra* pp.17-18; *e.g.*, *United States v. Microsoft Corp.*, 253 F.3d 34, 87 (D.C. Cir. 2001) (en banc per curiam) ("[D]irect competition on the merits of the tied product is foreclosed when the tying product … is sold only in a bundle with the tied product."). At least, a reasonable jury could so find.

SAP asserts Asker failed to "draw any distinction between customers who purchase HANA with S/4HANA and those who purchase HANA independently of any application." SAP.Br.48. Not so: much of Asker's analysis was devoted to determining that SAP's tie coerced customers into buying HANA when they would not have. Appx13968-13997. Among (many) other things, Asker cited evidence that HANA sold poorly to non-S/4HANA customers, and that %age of SAP's HANA revenue comes from locked-in SAP ERP customers. Appx13971-13972.

Although unclear, SAP's parentheticals suggest it contends S/4HANA customers that purchase HANA with "full-use" licenses are not subject to the tie. SAP.Br.48-49. SAP forfeited that argument. *See* Appx22033. Regardless, it defies the record (and common sense). While S/4HANA customers may choose between purchasing "full use" and "runtime" licenses, either way, SAP's tie compels the HANA purchase; just because a customer purchased a full-use license does not mean it would have purchased HANA absent the tie. Appx13979.

SAP also asserts Asker "failed to demonstrate that any of SAP's sales affected the tied market" because no evidence shows HANA "actually" takes sales away from EDWs like Teradata's. SAP.Br.49-51. But SAP cannot dispute it sought to take sales from EDW competitors. *E.g.*, Appx21116-21130 (SAP textbook explaining using HANA as EDW); Appx13974-13975 & n.344 (SAP's "Teradata Surround" campaign); Appx14105 (effort "'to replace Oracle'" for "'Data Warehousing'"). So SAP's argument depends on its tie having failed completely. SAP.Br.50-51, 57-58. In support, it offers self-serving spin on cherrypicked evidence.[2] But a jury must

---

[2] *E.g.*, SAP.Br.52 (describing slide containing instructions to "use the S/4HANA strategy" to "surround" Teradata, Appx18405, as involving "non-tied 'new use cases' on HANA"); SAP.Br.52 (characterizing email recounting customer complaint about "HANA EDW['s]" performance and price compared to Teradata, Appx17427, as involving "pricing of non-tied sales"); SAP.Br.51, 53 (characterizing expert's general admission that the tie would limit Oracle's ability to "sell their database," Appx16126, as limited to "Oracle runtime sales under SAP ERP" and Oracle's "transactional database").

15

consider Teradata's competing evidence and inferences.  For example, SAP makes no attempt to reconcile its arguments with its own documents proclaiming SAP's "'considerable experience in supporting and executing Teradata to HANA migration'" (Appx14089 n.75), or its admission that HANA "is successfully competing against product offerings from Teradata" (Appx831).

SAP likewise cannot demonstrate that no "competing version[] of the evidence" (*Elosu*, 26 F.4th at 1026) supports Asker's conclusion that HANA without a "full-use" license competes with EDWs.  SAP acknowledges that, even with a "runtime license[]," HANA provides the "analytical *functionality*" of an EDW. SAP.Br.50.  It contests only whether HANA "permit[s] data to be imported … from other sources" or supports other "analytical applications."  SAP.Br.50.  Although SAP asserts a cited document is "unrelated to runtime licenses" (SAP.Br.50), that SAP document explains customers can use SAP's BW application in combination with HANA to "deliver[] traditional data warehousing" and "enterprise-wide analytics."  Appx21109-22010; Teradata.Br.38.  Because BW allows "[a]ll data sources"—"including SAP and non-SAP data sources"—to be "connected" while in their "silos," this use accords with the runtime license's data-importation restrictions.  Appx21110; *see* Appx21121-21125 (discussing use of HANA as EDW with BW); Appx17763 (HANA runtime allows "[d]ata loading from non-SAP solutions" "via application layer"); Appx21097 (data used for analytics need not be

16

stored directly in HANA). Thus, while inferior to products like Teradata's, HANA can be used as an EDW with a runtime license. Appx14137-14138. Again, the competing evidence creates a triable dispute.

The flaws in SAP's argument are apparent in its response to Asker's regression analysis, which showed SAP's tie caused Teradata to lose sales. Without questioning Asker's use or application of this methodology, SAP insists it measured only "*correlation*." SAP.Br.58. But Asker performed a differences-in-differences regression, comparing the changes in Teradata spending among customers affected by SAP's tie with a control group of unaffected customers—a well-established methodology for assessing causation. Appx13994 & n.421. SAP responds with its expert's "doubt" that the tie caused ten identified Teradata customers "to decrease their Teradata spend." Appx12843; *see* SAP.Br.59&n.10. That is a disputed fact. *E.g.*, Appx16079-16082. More importantly, individual counterexamples cannot undermine regression analysis on a 536-customer dataset: as Asker noted, while "customers' spending varies and their decisions are made at different times for idiosyncratic reasons," "a regression model separates the signal pattern of the effect of SAP's tying conduct from the noise." Appx14158.

SAP also argues the regression analysis did not directly assess harm to EDW competitors besides Teradata. SAP.Br.59. But Asker found no reason to conclude SAP's tie would harm Teradata alone. Appx14108. SAP offers none. And

"[c]learly, injury to competitors may be probative of harm to competition." *Hasbrouck v. Texaco, Inc.*, 842 F.2d 1034, 1040 (9th Cir. 1987).

## B. With Or Without Asker's Testimony, SAP's Arguments Cannot Support The Judgment

### 1. *SAP's tie violates the per se rule*

Teradata raised triable factual issues on the sole contested element of tying's per se rule—SAP's market power "to coerce its customers into purchasing" HANA. *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 912 (9th Cir. 2008).[3]   As Teradata explained, Asker's erroneously excluded tying-market definition suffices. Teradata.Br.40.  SAP never disputes that.  So reversal of that exclusion would alone require remand for trial under the per se rule.

Independently, triable disputes on market power exist because (1) evidence besides Asker's testimony supported Teradata's tying-market definition, and (2) regardless, direct evidence showed SAP's market power.  Teradata.Br.41-43. SAP never contests Teradata presented direct evidence of coercion.  Instead, SAP contends only:  (1) the evidence besides Asker's testimony could not support a

---

[3] If SAP now questions (SAP.Br.46-47) whether its tie "affects a 'not insubstantial volume of commerce'" (*Cascade*, 515 F.3d at 912), Teradata's competitive-harm evidence easily clears that threshold.  *Supra* pp.13-18; *infra* pp.25-27; *e.g.*, *Datagate, Inc. v. Hewlett-Packard Co.*, 60 F.3d 1421, 1426 (9th Cir. 1995) ("approximately $100,000" annual foreclosure sufficient).

market definition, and (2) market definition is required.  SAP.Br.28-29; 37-38.  SAP is wrong.

*First*, SAP cannot dismiss Teradata's market-definition evidence by asserting "Asker was the only source of Teradata's definition of 'large enterprises' as companies with '1,000 to 1,500 employees and over 125 users.'"  SAP.Br.37.  That simply repeats SAP's erroneous argument that a specific definition of "large enterprises" is necessary.  *Supra* pp.4-5.  Again, as the government amici confirm, markets need not be measured by precise "metes and bounds."  *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 611 (1953); US-FTC.Br.18-19.  Teradata provided ample evidence demonstrating a distinct ERP market for large enterprises, however that term is defined.  Teradata.Br.41-42.

*Second*, and regardless, no market definition is required:  the Supreme Court has not "expressly rejected" (SAP.Br.29) the Ninth Circuit precedent holding market definition may be unnecessary in tying cases.  *E.g.*, *Image Tech. Serv., Inc. v. Eastman Kodak Co.*, 903 F.2d 612, 617 (9th Cir. 1990).  SAP cites *Ohio v. American Express Co.*, but the Court stated only that market definition is usually required in rule-of-reason cases.   138 S. Ct. 2274, 2285 & n.7 (2018); Teradata.Br.51n.2.  Indeed, the post-*American Express* Ninth Circuit decision cited by SAP expressly confirms that plaintiffs are "not required to define a particular market for a *per se* claim" or where there is "evidence of the actual anticompetitive impact of the

challenged practice." *PLS.com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 838 (9th Cir. 2022). Or as another decision SAP cites puts it, while "a plaintiff must … 'define the relevant market'" to "demonstrate market power by circumstantial evidence," "[m]arket power can be proven by either direct or circumstantial evidence." *Image Tech. Servs., Inc. v. Eastman Kodak Co*., 125 F.3d 1195, 1202 (9th Cir. 1997). Teradata provided direct evidence. Teradata.Br.42-43.

## 2. *SAP cannot escape the per se rule*

Because summary judgment cannot be sustained under the per se rule, SAP attempts to avoid it (SAP.Br.23), saying only "certain tying arrangements … are unreasonable 'per se.'" *Jefferson Parish*, 466 U.S. at 9. But the Supreme Court has specified precisely *which* tying arrangements those are: ones, like here, where a defendant with market power over the tying product ties it to a distinct product, thereby affecting a "substantial volume of commerce." *Id.* at 15-16; *see Cascade*, 515 F.3d at 913 (applying this "unique per se rule for illegal tying arrangements"). The per-se rule's very purpose is to avoid the kind of detailed case-by-case inquiry into efficiencies that SAP seeks. *Jefferson Parish*, 466 U.S. at 15-18 & n.25.

The Ninth Circuit consistently adheres to this binding precedent. Contending otherwise (SAP.Br.22-24), SAP primarily relies on a non-tying case, *Federal Trade Commission v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020). While *Qualcomm* invoked the general principle that courts should not readily condemn "novel business

practices," it nowhere suggested that long-condemned coercive ties are "novel." *Id.* at 990. Nor is this a "technological-tying case[]" (SAP.Br.24) like *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, where one product was merely designed to work with another, with no contractual tie. 703 F.2d 534, 542 (9th Cir. 1983); *see* 5 Areeda & Hovenkamp, *Antitrust Law*, ¶1757a (5th ed.) ("Areeda") (explaining mere "product interdependence" cannot be challenged as tie). SAP contractually requires all purchasers of S/4HANA to license all aspects of HANA. Appx17640-17641; Appx13895. Where "'a product [is] sold on the condition that the buyer also purchase a different or tied product,'" the "coercion essential to a *per se* unlawful tying arrangement" is present. *Foremost*, 703 F.2d at 451-52.[4]

SAP also points to *Microsoft*, but cannot reconcile that nonbinding decision with *Jefferson Parish* or the Ninth Circuit precedent adhering to it. While the Supreme Court subjects restraints to per se condemnation "'only after considerable experience'" (SAP.Br.23), *Jefferson Parish* expressly relied on the considerable experience condemning coercive tying arrangements. 466 U.S. at 9-15; *see* Areeda ¶1720b6 (criticizing *Jefferson Parish* but observing that *Microsoft*'s "articulation of a rule of reason for ties in th[at] particular case is perverse").

---

[4] The cited Tenth Circuit decision (SAP.Br.22) merely applied *Jefferson Parish*, holding its "volume of commerce" requirement unsatisfied. *In re Cox Enters., Inc.*, 871 F.3d 1093, 1104 (10th Cir. 2017).

Even were *Microsoft* persuasive, it would be inapplicable. This case involves neither a "tied good physically and technologically integrated with the tying good" nor a tie that "improve[s] the value of the tying product … to makers of complementary goods." *Microsoft*, 253 F.3d at 90. *Microsoft* expressly "confined" its holding to arrangements "where the tying product is software whose major purpose is to serve as a platform for third-party applications and the tied product is complementary software functionality." *Id.* at 95. The court reasoned that requiring purchasers of Microsoft's platform—its dominant operating system Windows—to purchase Microsoft's Internet Explorer browser could increase the value of third-party software applications running on Windows by allowing them to take advantage of Internet Explorer's programming. *Id.*

Straining to fit into *Microsoft*'s narrow holding, SAP insists (for the first time on appeal) that HANA is similarly "'software that serves as a platform.'" SAP.Br.24-25. But *first*, HANA is not the "tying product" (*Microsoft*, 253 F.3d at 95); it is the tied product SAP forces S/4HANA customers to purchase. While platform software might be useful (SAP.Br.25), that does not justify forcing customers to purchase SAP's so-called "platform" rather than a competing platform. *Second*, far from a general "platform for third-party applications" (*Microsoft*, 253 F.3d at 95), HANA can be used with non-SAP applications only if customers purchase the exorbitant full-use license rather than the "runtime" license most

purchase.  SAP.Br.50.  *Third*, to the extent HANA is a platform for non-SAP products, SAP cannot explain or cite evidence showing how its combination with S/4HANA would benefit "makers of complementary goods."  *Microsoft*, 253 F.3d at 90, 95.

Even were *Microsoft* extended beyond its express limits, SAP identifies no relevant procompetitive justification for its tie.  SAP invokes the purported benefits of designing S/4HANA to work on HANA.  *E.g.*, SAP.Br.2-3, 23, 25.  But that is no justification for requiring S/4HANA customers to license not only the aspects of HANA needed to run S/4HANA, but also HANA's *analytical* capabilities—which no competing provider requires.  Appx20748-20749.  Citing isolated snippets of one expert's reports, SAP suggests benefits from having S/4HANA run on HANA's analytical capabilities.  SAP.Br.26.  But the same expert admitted he did not know whether HANA's analytical "modules" supported S/4HANA (Appx12324-12328), and SAP's industry expert confirmed "the transaction capabilities in HANA are what support … the ERP application that it sits under."  Appx15650-15651.

Rudolph Hois's belated declaration cannot establish procompetitive justifications, either.  *Contra* SAP.Br.26-28.  SAP never denies that other evidence contradicted the declaration's conclusory assertions about HANA and SAP's auditing capabilities—thereby creating a factual dispute.  Teradata.Br.46-47. Instead, SAP argues "plausible arguments" suffice (SAP.Br.26), citing *Paladin*

*Associates, Inc. v. Montana Power Co.*, 328 F.3d 1145, 1155 (9th Cir. 2003). But *Paladin* relied on "persuasive" justifications not turning on disputed facts. *Id.*

The belated declaration should have been excluded anyway because Teradata never changed its tying theory. *Contra* Appx44-46. SAP suggests, without explanation, that Teradata's complaint alleged no tie with "HANA's *analytical* capabilities." SAP.Br.27. But SAP makes no effort to reconcile that assertion with the complaint's many allegations challenging the tie between "SAP Top-Tier ERP Applications and EDAW [Enterprise Data Analytics and Warehousing] Products." Appx822; Teradata.Br.47-48 (detailing allegations). And SAP acknowledges Teradata challenged SAP's new "sales practice" of combining S/4HANA and HANA "into a single offering" (Appx816) but asserts these allegations pertained only to Teradata's monopolization claim. SAP.Br.28n.3. Not so: Teradata's tying count incorporated these sales-practice allegations while expressly alleging SAP was "coercing" HANA purchases "through a previously undisclosed reversal in practice [of] conditioning upgrades of SAP's ERP Applications on customers' adoption of HANA." Appx823.

### 3.    *SAP cannot defend summary judgment even under the rule of reason*

Reversal is required even if the rule of reason applies. The district court granted summary judgment because Teradata purportedly had not (1) defined the tied market or (2) demonstrated substantial injury to competition. Appx48-49. But

SAP never defends the exclusion of Asker's tied-market definition. *Supra* pp.11-12. And as explained, SAP cannot justify the conclusion that Teradata identified no competitive harm. *Supra* pp.13-18.

SAP is also wrong that this competitive harm is insufficiently "substantial" for rule-of-reason condemnation. SAP.Br.54-60. Asker's testimony creates a material dispute on the tie's substantial anticompetitive effects. SAP acknowledges that foreclosure of 30% of the relevant EDW market would satisfy any possible standard. SAP.Br.55. Asker found even more: he estimated SAP's tie would foreclose "48–73 percent of the relevant EDW market." Appx14097.

SAP protests Asker's assessment was (1) derived from Teradata-specific data, (2) assumed SAP ERP customers would cease using Teradata's EDW, and (3) estimated foreclosure "in the future." SAP.Br.58 (emphasis omitted). But *first*, Asker could extrapolate harm to other EDW competitors from harm to Teradata (*supra* pp.17-18); regardless, Asker separately concluded from industrywide data that 65% foreclosure was likely. Appx14096-14097. *Second*, Asker did not "speculat[e]" SAP's ERP customers would adopt HANA (SAP.Br.58)—he cited evidence showing the vast majority of SAP ERP customers are "locked in" and would eventually migrate to S/4HANA. Appx14097 & n.107 (citing, *e.g.*, survey that "'did not show a single customer with no plan to migrate to SAP S/4HANA'"). If SAP is suggesting no foreclosure occurs as long as some HANA customers might

still purchase other EDWs, SAP is mistaken: competitors are foreclosed when they must make sales to customers already coerced into purchasing competing products. Appx14094-14095; *e.g.*, Areeda ¶1729h ("[a]ll of a defendant's tied-product sales covered by tying arrangements should be deemed foreclosed"). *Third*, while some portion of this foreclosure might occur only as SAP's ERP customers continue shifting to S4/HANA, the antitrust laws are concerned with both "probable immediate and future effects." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 329 (1961).

Finally, with or without this testimony, Teradata's competitive-harm evidence sufficed. SAP attempts to dismiss individual pieces of evidence, arguing high prices or reduced consumer choice do not necessarily prove competitive harm. SAP.Br.55-56. Again, the evidence cannot be considered in isolation. Although high prices may not establish competitive harm where they do not result from a distortion of the competitive process (*e.g.*, *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1201 (9th Cir. 2012)), the evidence here shows SAP's tie produced the distortion associated with coercive ties (*e.g.*, *Microsoft*, 253 F.3d at 87). After HANA sold poorly (Appx15652-15653), SAP coerced its locked-in ERP customers to purchase HANA by tying it to S/4HANA (*e.g.*, Appx19676; Appx13970-13976), hobbling EDW competitors like Teradata (*supra* pp.13-18). HANA sales then increased notwithstanding its high price and continuing performance issues. *E.g.*,

Appx19676; Appx20459; Appx17427.  SAP offers no explanation for that increase. That is precisely the sort of substantial competitive harm the antitrust laws are intended to prevent.  *Am. Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 791 (9th Cir. 1996).

*****

Teradata's tying claim should be remanded for trial.

## II.  SAP'S RESPONSE CONFIRMS THE DISTRICT COURT MISREAD THE AGREEMENTS AND RESOLVED DISPUTED FACTS ON TERADATA'S TRADE-SECRETS CLAIM

### A.  SAP's Marking Arguments Respond To A Strawman And Depend On Disputed Facts

The MNDA imposes a simple marking requirement:  "Confidential Information" must be "clearly identified" with a legend.  Appx457.  Teradata met this requirement by describing Batched Merge and its properties in a project-design document with a "clearly identified" "Teradata Confidential" legend on every page.

SAP never disputes that Teradata "clearly identified" with a legend that Teradata considered the disclosed information confidential.  SAP instead faults Teradata for "not reduc[ing] the claimed trade secret to writing."  SAP.Br.61 (capitalization omitted); Appx11-12 (same).  But no provision of the MNDA requires information to be "reduce[d] … to writing" to be protected.  The MNDA says nothing about specificity for the confidential information itself; it defines "'Confidential Information'" as "all information which Disclosing Party protects

27

against unrestricted disclosure to others," including "trade secrets." Appx457. And it contemplates not all details will be memorialized, as a party need only "summarize" in writing information disclosed orally or visually. Appx457; Teradata.Br.56. Instead, the MNDA imposes specificity only on the "legend"—the marking itself—which must "clearly identif[y]" the information as confidential. Appx457. Teradata did that.

SAP attacks a strawman, arguing that "[w]ritten disclosure of the *term* 'batched Merge' does not satisfy the MNDA" marking requirement. SAP.Br.61. Teradata never suggested otherwise. Far from disclosing a mere "term," the design document and embedded spreadsheet explained, in highly technical terms, Batched Merge's purpose, key characteristics, and potential use. Teradata.Br.54, 57-58; Appx14570; Appx15525. The sufficiency of these disclosures is a jury question.

Indeed, the summary-judgment record shows SAP employees knew that specific Batched Merge steps were confidential and that they were "not allowed to pass on any internal information of [Teradata]." Appx15596; Appx15202, Appx15208; Teradata.Br.56. Teradata was entitled to have a jury determine whether Batched Merge was adequately marked given "the parties' course of conduct." *See Hoyt v. Andreucci*, 433 F.3d 320, 332 (2d Cir. 2006). Citing no supporting evidence, SAP responds those employees just "*assumed*" information was confidential and "a bevy of employees … understood it was not." SAP.Br.64. Attorney argument

cannot counter Teradata's evidence, much less create an undisputed fact in SAP's favor.

SAP's remaining points argue disputed facts.  SAP dismisses the technical details about Batched Merge's characteristics and purpose—disclosed in the design document and embedded spreadsheet—as "cobble[d] together" and contends the spreadsheet is unmarked.  SAP.Br.64-65.  But Teradata's expert explained the document "disclosed solving [Bridge Project] problems using Teradata's Batched Merge method" and "expanded on Batched Merge."    Appx15237-15239; Teradata.Br.57-58.  And the spreadsheet was marked:  it was embedded within the design-document's last page, which has a "Teradata Confidential" legend. Appx14578.  Any dispute about that is for the jury.

Although SAP repeatedly invokes Graas's testimony (SAP.Br.62, 63, 65), it shows (at most) that Graas did not reduce *all* of Batched Merge's details to writing in that document.  But Teradata never asserted the document disclosed everything about Batched Merge, and SAP's arguments assume the entire trade secret had to be reduced to writing.  Regardless, contrary to SAP's assertions, Graas never "admitted that the document does not disclose Teradata's purported trade secret."  SAP.Br.62. Although he acknowledged he "did not go through the entire explanation" of the technical details, he made clear that "[i]n writing, [he] conveyed elements of the batched merge method."  Appx14396; *see* Appx21978 (explained "details" later);

Appx14398 (further explained "what I meant" and "how it worked"). From what was in writing, SAP knew Batched Merge was "Confidential Information"—at least a jury could so find.

Independently, SAP waived any requirement of more written detail. Teradata.Br.58-60. SAP never disputes that waiver is a factual question. *Gen. Motors Acceptance Corp. v. Clifton-Fine Cent. Sch. Dist.*, 647 N.E.2d 1329, 1331 (N.Y. 1995). Instead, SAP offers its gloss on the waiver evidence. But that evidence shows SAP "evince[d] an intent not to claim a purported advantage" through "affirmative conduct or by failure to act." *Id.*; Teradata.Br.59. And inferences must be drawn in Teradata's favor, not SAP's. Whether SAP's internal email was merely stating an "assumption" or whether SAP's executive was talking "*in general*" (SAP.Br.66)—neither is clear from the documents—is a jury question. SAP's examples of what would suffice to waive (such as "written authorization," SAP.Br.67) are just that, examples; New York law permits waiver through affirmative conduct *or* failure to act. *Gen. Motors*, 647 N.E.2d at 1331.

### B. SAP Concedes It Has No License If Batched Merge Is A "Tool," Confirming Factual Disputes Exist

Like the district court, SAP posits Teradata did the unthinkable: give SAP a perpetual license to use Teradata's trade secrets like Batched Merge in any competing product. But SAP agrees the licensing issue boils down to one question: is Batched Merge a "tool," which by definition is "Partner Materials" under the

CONFIDENTIAL MATERIAL OMITTED

SDCA?  If so, SAP has no license to Batched Merge, because it concedes "Teradata is correct that under the SDCA, Graas's suggestions cannot both qualify as 'input' under Section 9.2 and a 'tool' under Section 9.4."  SAP.Br.74; Teradata.Br.61-62 (discussing Partner Materials, for which SAP's limited license ended with Bridge Project).  SAP thus acknowledges that, if Batched Merge is a "tool"—and therefore Partner Materials—SAP has no license to use it.  SAP.Br.74.

The record shows Batched Merge is a tool.  Teradata developed it long before the Bridge Project as a tool to help external software interact with a database.  Teradata.Br.63;  Appx15213-15220;  Appx15239-15272,  Appx15275-15280;  Appx15332; Appx15395-15398.  Despite Teradata's expert calling it a "tool" and a "technique," SAP says he actually meant only "technique" and that ODBC Array Insert is ███████ of ███████ .  SAP.Br.74.  At most, that means the jury should decide whether Batched Merge (or ███████ ) is a "tool" and whether a "technique" is a "tool."  Drawing all reasonable inferences in Teradata's favor, a triable dispute exists.

For the first time, SAP argues "tool" means "application program," citing a dictionary.  SAP.Br.73.  Even if not forfeited, that argument provides no alternative basis to affirm.  If "tool" meant "application program," the SDCA would list "program" twice, as Partner Materials expressly include "*programs*, *tools*, systems, data or materials."  Appx476 (emphasis added); *see Ajdler v. Province of Mendoza*,

890 F.3d 95, 100 (2d Cir. 2018) (cautioning against construing provisions as superfluous). If a definition is needed, a "tool" is something to accomplish a particular task. *Tool*, Oxford English Dictionary ("tool" includes "a thing (concrete or abstract) with which some operation is performed; a means of effecting something"). Batched Merge—a thing that allows software to interact with a database—falls squarely within this definition.

Contrary to SAP's assertion (SAP.Br.73), Teradata preserved the argument that Batched Merge is a "tool." The issue was pressed and decided in district court; either preserves it. *JL Bev.*, 828 F.3d at 1108. In briefing and oral argument, Teradata explained Batched Merge was Partner Materials, including a "tool." Appx15185 (explaining that Partner Materials include "any programs, tools, systems, data, or materials" and Batched Merge is Partner Materials); Appx22136-22137. SAP first argued that Batched Merge was not "a program or tool" in its summary-judgment reply. Appx21957. Teradata responded during oral argument: "Teradata's witnesses will explain that Batched Merge is a tool for facilitating improved processing of the parallel processing environment of Teradata Database. You can see in the contract that partner materials includes tools." Appx22136; *see* Appx22137 (granting summary judgment would require a "factual determination[]" that "Batched Merge is not a tool"). And the district court decided

32

this issue, purporting to find that "Graas's suggestions are … not a program and not a tool." Appx15-16.

Nor is SAP helped by Section 10.1, a provision the district court mentioned in passing. *Contra* SAP.Br.67-69. Section 10.1 allows SAP to "retain[]" certain defined *SAP* software, including modifications—not Teradata's property. Appx476, Appx482 (listing "SAP Software"). Nothing in Section 10.1 gives SAP rights to modifications to *other* software, such as using Teradata Partner Materials to develop a competing database. Appx476. Regardless, the provision is "[s]ubject to any rights expressly granted to [Teradata]." Appx476. Teradata expressly retained Partner Materials like Batched Merge in Section 10.2 (Appx476), and Teradata expressly limited SAP's use of those Partner Materials to the Bridge Project's term in Section 9.2 (Appx474). Any other reading defies common sense: SAP could terminate the collaboration on the joint product (the only reason Teradata shared Batched Merge), forever use Batched Merge to develop competing products, and leave Teradata worse off than before. That one-sided interpretation would violate the good-faith-and-fair-dealing covenant. Teradata.Br.65-66.

Teradata's employees had no different understanding. *Contra* SAP.Br.75-76. The "Approval and Review Routing Sheet" just summarized the SDCA and, consistent with Section 10.1, stated SAP would own its products' modifications. Appx22394-22395. Similarly, the cited emails and testimony merely show SAP

could use Partner Materials during the Bridge Project's term.  They nowhere suggest

SAP could use Batched Merge after the Bridge Project ended.   Appx22395;

Appx14552; Appx14580.  In any event, these are jury questions.

## CONCLUSION

The judgment should be reversed or vacated and the case remanded for trial.

Respectfully submitted,

/s/ Deanne E. Maynard

JAMES R. SIGEL                    DEANNE E. MAYNARD
MORRISON & FOERSTER LLP           BRIAN R. MATSUI
425 Market Street                 MARK L. WHITAKER
San Francisco, CA 94105           DAVID D. CROSS
                                  MARY PRENDERGAST
                                  SAMUEL B. GOLDSTEIN
                                  MORRISON & FOERSTER LLP
                                  2100 L Street NW, Suite 900
                                  Washington, DC 20037
                                  Telephone:  (202) 887-8740
                                  DMaynard@mofo.com

*Counsel for Plaintiffs-Appellants Teradata Corporation,*
*Teradata US, Inc., and Teradata Operations, Inc.*

## CERTIFICATE OF CONFIDENTIAL MATERIAL

This brief contains 3 unique words (including numbers) marked confidential, excluding words and numbers previously marked confidential pursuant to Federal Circuit Rule 25.1(d)(1)(C).  This number does not exceed the maximum of 15 words permitted by Federal Circuit Rule 25.1(d)(1)(A).


Dated:  November 15, 2022                    _____/s/ Deanne E. Maynard_____
                                                                     Deanne E. Maynard

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the

Court for the United States Court of Appeals for the Federal Circuit by using the

CM/ECF system on November 15, 2022.

I certify that on November 15, 2022, I served the confidential version of this

brief via email and U.S. Mail on all counsel of record.


Dated:  November 15, 2022                          /s/ Deanne E. Maynard
                                                 Deanne E. Maynard

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Circuit Rules 28.1(b) and 32(b) because it contains 6,997 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Federal Circuit Rule 32(b)(2), as determined by the word-counting feature of Microsoft Word.

This brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface, including serifs, using Microsoft Word 2016 in Times New Roman 14-point font.

Dated:  November 15, 2022                          /s/ Deanne E. Maynard
                                                   Deanne E. Maynard