NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**TERADATA CORPORATION, TERADATA US, INC., TERADATA OPERATIONS, INC.,**
*Plaintiffs-Appellants*

**v.**

**SAP SE, SAP AMERICA, INC., SAP LABS LLC,**
*Defendants-Appellees*

---

2022-1286

---

Appeal from the United States District Court for the Northern District of California in No. 3:18-cv-03670-WHO, Judge William H. Orrick, III.

---

Decided: August 1, 2023

---

DEANNE MAYNARD, Morrison & Foerster LLP, Washington, DC, argued for plaintiffs-appellants. Also represented by DAVID D. CROSS, SAMUEL BENJAMIN GOLDSTEIN, BRIAN ROBERT MATSUI, MARY PRENDERGAST, MARK L. WHITAKER; JAMES SIGEL, San Francisco, CA.

KANNON K. SHANMUGAM, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Washington, DC, argued for defendants-appellees. Also represented by KENNETH A. GALLO;

JOSEPH BEAUCHAMP, JOSH LEE FUCHS, Jones Day, Houston, TX; GREGORY A. CASTANIAS, Washington, DC; NATHANIEL GARRETT, San Francisco, CA; THARAN GREGORY LANIER, CATHERINE TARA ZENG, Palo Alto, CA.

PATRICK MICHAEL KUHLMANN, Antitrust Division, United States Department of Justice, Washington, DC, argued for amicus curiae United States. Also represented by DANIEL EDWARD HAAR, NICKOLAI LEVIN.

CORY A. TALBOT, Holland & Hart LLP, Salt Lake City, UT, for amici curiae Heski Bar-Isaac, Gary Biglaiser, Timothy Bresnahan, Sylvain Chassang, Allan Collard-Wexler, Jesse David, Michael Dinerstein, Martin Gaynor, Matthew Grennan, Joseph Harrington, Jakub Kastl, George Korenko, Fernando Luco, Aviv Nevo, Stephen Ryan, Andrew Sweeting, Steve Tadelis, Jonathan Williams, Thomas Wollmann, Mo Xiao, Jidong Zhou. Also represented by ANNA C. VAN DE STOUWE, Denver, CO.

BRADLEY GROSSMAN, Office of General Counsel, United States Federal Trade Commission, for amicus curiae Federal Trade Commission. Also represented by ANISHA S. DASGUPTA, JOEL MARCUS.

––––––––––––

Before LOURIE, TARANTO, and HUGHES, *Circuit Judges*.

TARANTO, *Circuit Judge*.

Teradata Corp., Teradata Operations, Inc., and Teradata US, Inc. (collectively, Teradata) brought the present action against SAP America, Inc., SAP Labs LLC, and SAP SE (collectively, SAP) in the U.S. District Court for the Northern District of California. Teradata's allegations, as it ultimately narrowed them, were that SAP (1) tied the offering of two of its products together in violation of antitrust laws, *see* 15 U.S.C. §§ 1, 14, and (2) misappropriated Teradata's technical trade secrets relating to its "batched

merge" method and certain business trade secrets, action-able under 18 U.S.C. § 1836 et seq. and California Civil Code § 3426 et seq. SAP was permitted to file counter-claims asserting, as ultimately narrowed by SAP, that Te-radata infringed SAP's U.S. Patent Nos. 9,626,421, 8,214,321, and 7,617,179. Eventually, as relevant here, the district court granted summary judgment in favor of SAP on Teradata's tying claim and technical-trade-secret claim and entered final judgment under Federal Rule of Civil Procedure 54(b) on those claims (while staying proceedings on Teradata's business-trade-secret claim and SAP's pa-tent counterclaims, having partially addressed the latter). Teradata timely appealed.

We decide only the issue of this court's jurisdiction un-der 28 U.S.C. § 1295(a)(1), which, as the parties agree, de-pends on whether SAP's patent-infringement counterclaims arise out of the same transaction or occur-rence as Teradata's relevant technical-trade-secret claims so that they are compulsory counterclaims. We answer that question in the negative. Holding that we lack juris-diction, we transfer this appeal to the U.S. Court of Appeals for the Ninth Circuit, where appellate jurisdiction lies.

## I

## A

SAP produces and sells enterprise resource planning (ERP) software. ERP applications generally "deliver an in-tegrated suite of business applications" covering infor-mation about finance, human resources, distribution, manufacturing, service, supply chains, and other topics. J.A. 15367–68; *see* J.A. 11418–19. An ERP application re-quires a "transactional" database (also called an online transaction processing [OLTP] database) that "store[s] the data directly inputted or created by business application transactions" and provides the stored "data back to the ap-plication for reporting." J.A. 10173. Transactional systems are used for, *e.g.*, the processing of banking, airline-

reservation, retail-sale, phone-call, and credit-card-payment transactions. J.A. 10189. Such transactional databases may, "[a]t any instant," run "thousands (if not tens of thousands) of transactions . . . simultaneously . . . , some of which read or write exactly the same data." *Id.* Each database use is characteristically small in data size, but a "response time in milliseconds" is often required. J.A. 10190.

Teradata, on the other hand, produces and sells analytical enterprise data warehouse (EDW) systems and services based on such systems. EDW systems call for analytical databases (also called online analytical processing [OLAP] databases). Analytical systems "are designed to gain insight from data for the purposes of improv[ing] decision making and business intelligence." J.A. 10189. By way of example, "a retail store, such as Home Depot," may "analyze[] its sales records over a certain time period to understand buying habits of individuals based on the location and/or the different days of the week." J.A. 10191. Such "analytical queries may involve a small number of queries with a large number of complex records," and "complex analytical queries . . . may take several hours to execute." J.A. 10191–92. Transactional systems and analytical systems thus "serve very different needs of organizations" and involve databases that often are structured differently. J.A. 10192–93. But if an EDW is to "serve[] the needs of the entire enterprise," J.A. 10486, it can be important for it to be able to pull data stored in the transactional databases of ERP systems (such as SAP's), J.A. 10190–91.

Teradata's "flagship" EDW product, Teradata Opening Br. at 4, is Teradata Database (now called Teradata Vantage). Teradata Database has a "parallel architecture," J.A. 15401, that gives it "massively parallel processing (MPP) capabilities," J.A. 15395. Teradata's narrowed technical trade secrets, as characterized by Teradata and SAP, concern a command issued by the application layer of Teradata's EDW system (the software with which the

information-seeking user directly interacts) to its underlying Teradata Database that takes advantage of the parallel-processing architecture of the underlying database.

In part to enable Teradata's EDW systems to use the data of SAP's ERP systems, SAP and Teradata collaborated to develop "bridge" software that would enable Teradata Database (which uses one version of a structured-query language) and SAP's ERP system (which uses a different version) to interact. J.A. 15203–04. For this Bridge Project, the parties entered into two relevantly similar mutual non-disclosure agreements (collectively, MNDA) and a Software Development Cooperation Agreement (SDCA). The MNDA, effective as of June 2008, required the marking of information in order to maintain its confidentiality. The SDCA, in effect by February 2009, provided for, among other things, rights of ownership or use of particular subject matter involved in the collaboration.

When the Bridge Project began, SAP offered three products of particular relevance to this case: its ERP product; its Business Warehouse product (SAP BW); and its MaxDB product. SAP's ERP system, as already noted, did transactional processing. SAP BW, a data warehousing and reporting product, was capable of extracting data from SAP's ERP system and providing some analytical processing of that data. SAP's MaxDB was a database (described here by SAP as transactional) with which SAP BW interacted. The bridge to be created by the Bridge Project was to be from SAP BW, via MaxDB, to Teradata Database. Specifically, MaxDB was to convert commands issued from SAP BW to the language used by Teradata Database.

Early in the collaboration (seemingly around July 2008), a Teradata engineer working on the Bridge Project asked about "SAP's plan for . . . translat[ing] core database commands issued by SAP's BW application" to something usable by Teradata Database. J.A. 15205. The core database command of relevance that SAP was using to retrieve

desired data from the underlying database was called "Select for All Entries" (SFAE). *Id*.; SAP Response Br. at 14. An SAP employee working on the Bridge Project responded by explaining how SAP would translate its SFAE command for use by Teradata Database. J.A. 15205–06. But according to Teradata's characterization in this case, the Teradata engineer suggested a different approach—translating the SFAE command issued by SAP BW into what Teradata here labels a command using a "batched merge" method, J.A. 15211–12—and SAP adopted that approach when it released the result of the Bridge Project, *i.e.*, Teradata Foundation, in May 2011. *See* J.A. 15219; J.A. 15716.

Meanwhile, SAP had been developing its own next-generation database, called HANA. SAP describes HANA as a "translytical" database—structured to support transactional and analytical functions. J.A. 10204; J.A. 12191; J.A. 21277. HANA was fully released in June 2011, after an earlier version was released in 2010. J.A. 15638. Like Teradata Database, HANA has a parallel architecture. J.A. 11387. Teradata contends that SAP, to take advantage of that parallel architecture, implemented the "batched merge" method "into the interface between SAP applications and HANA." J.A. 14; *see* J.A. 15291; J.A. 16646. SAP notified Teradata that it would stop selling or supporting Teradata Foundation in an August 2011 letter, effective in February 2012. J.A. 15520.

In conjunction with its design of HANA, SAP also developed updated ERP and BW software, S/4HANA and BW/4HANA, designed to work specifically with the new HANA, taking advantage of its features. *See* J.A. 10205–17; J.A. 14137; J.A. 21107–15; J.A. 21278. SAP released S/4HANA in 2015. *See* J.A. 10241; J.A. 10475–77. SAP has asserted that, in choosing to structure its ERP application to depend on functionalities it had built into its database, it was following a course already adopted by Oracle and Microsoft, major ERP rivals of SAP. *See* J.A. 10174–

75.  Of importance in this case, SAP required customers that purchased its latest ERP software, S/4HANA, also to purchase a "runtime" license for HANA, allowing uses of the HANA database only with certain SAP products, including S/4HANA; a "full use" license to HANA (covering uses with non-SAP products) was not required, but it was separately offered as a higher-priced option.  J.A. 15928–29; J.A. 16115–16; J.A. 17698–99; *see* J.A. 13899–900.

B

Teradata's allegations of misappropriation of technical trade secrets—at the heart of the jurisdictional issue we decide here—changed over time in this action.  In its Second Amended Complaint, in December 2018, Teradata incorporated by reference "a detailed list" of alleged trade secrets allegedly misappropriated by SAP.  J.A. 801.  The list had 77 items on it.  N.D. Cal. Dkt. No. 66-3.  But Teradata amended the list several times, including in May 2019, when the list of alleged trade secrets lengthened to several hundred, *see* J.A. 2040; N.D. Cal. Dkt. No. 305-3 at 2; and by June 2020, the list stood at 146 alleged trade secrets, N.D. Cal. Dkt. No. 267; *see also* N.D. Cal. Dkt. No. 335.  Teradata's basic theory was that SAP used the Bridge Project to take Teradata trade secrets and develop HANA—including aspects of HANA's fundamental parallel architecture.  J.A. 801–02, 807–08.

In December 2020, in accordance with an agreed-to discovery schedule adopted by the court in July 2020, N.D. Cal. Dkt. No. 278, Teradata drastically narrowed its list of trade secrets to items 1.4, 1.11, 1.15, 1.16, 1.20, 24–31, 54–56, and 58–60.  N.D. Cal. Dkt. No. 364; *see also* N.D Cal. Dkt. No. 394-3.  Trade secrets 1.4, 1.11, 1.15, 1.16, 1.20, 24–31, 58, and 59, which were technical, Teradata explained, "center around . . . specific ways of selecting large volumes of data to solve problems arising in MPP [massively parallel processing] databases such as SAP HANA."

N.D. Cal. Dkt. No. 395 at 8. The few other items on the list were business-related. *Id.*

Teradata then further shortened its list of technical trade secrets. In August 2021, shortly before the parties filed motions for summary judgment, Teradata served an updated list of trade secrets on SAP that, on the technical side, included only trade secrets 24–31, 58, and 59. *See* J.A. 10139 (citing J.A. 10611–14, which is an excerpted version of N.D. Cal. Dkt. No. 464-14); J.A. 15164. Before us, in discussing jurisdiction, the parties have not differentiated among these alleged trade secrets, which they treat as a unit as setting forth the "batched merge" method, in varying language and with varying degrees of specificity.[1]

In addition to its trade-secret claims, Teradata alleged that SAP illegally tied HANA and S/4HANA. Teradata also brought an attempted-monopolization claim under Section 2 of the Sherman Act, and copyright-infringement claims, but it ultimately dropped the Section 2 claim and stipulated to dismissal of the copyright claims.

## C

### 1

Teradata filed its Second Amended Complaint in December 2018, J.A. 790, and in May 2019, SAP moved for

---

[1]    It appears that the August 2021 SAP filing docketed as N.D. Cal. Dkt. No. 464-14 contains only excerpts of the list of trade secrets that Teradata served in August 2021. But the March 2021 Teradata filing docketed as N.D. Cal. Dkt. No. 394-3 contains fuller excerpts of the then-operative list of asserted trade secrets, including all of items 24–31, 58, and 59. Item 59 in that list matches item 59 in Dkt No. 464-14, and the parties have not asserted that the March and August 2021 filings are different at all with respect to items 24–31, 58, and 59.

permission to file counterclaims alleging that Teradata was infringing, or inducing or contributing to the infringement of, the '421, '321, and '179 patents, along with U.S Patent Nos. 7,421,437 and 7,437,516, by making, using, selling, offering, or importing software or products containing software, including Teradata Database, Teradata Analytics for SAP Solutions, Teradata OLAP Connector, Teradata's Business Model Extensions, and Teradata Intelligent Memory. J.A. 1796–802 (motion); *see* J.A. 2843–46, 2870–76 (counterclaims); N.D. Cal. Dkt. No. 123 at 1–26 (amended answer); *id.* at 26–63 (counterclaims). SAP did not assert that the counterclaims were compulsory and so would be lost if not filed in this action. Teradata, in opposing the addition of SAP's counterclaims to the case, asserted that SAP "*can* bring those claims in a separate lawsuit." N.D. Cal. Dkt. No. 109 at 9 (emphasis added) (citing *Xyratex Technology, Ltd. v. Teradyne, Inc.*, No. 08-cv-04545, 2009 WL 10702551, at *6 (C.D. Cal. Apr. 10, 2009) (finding no prejudice to defendant to denying leave to file counterclaims because counterclaims were non-compulsory, as defendant conceded, and thus could be brought separately)). The district court allowed the filing of the counterclaims in July 2019. N.D. Cal. Dkt. No. 122.

### 2

SAP's '421 patent issued in April 2017 from a September 2008 application tracing to a September 2007 provisional application. It describes and claims a database that "is able to generate up-to-date" OLTP data without redundancy and "without the need for extraction, translation and loading procedures." *See* '421 patent, Title; *id.*, Abstract; *id.*, col. 19, line 64, through col. 20, line 30. The patent also says that one feature of an embodiment is "elimination of the traditional dichotomy between OLTP . . . systems and OLAP . . . systems," as "validated with a prototypical implementation on the basis of SAP's ERP . . . and DW (data warehouse) products." *Id.*, col. 3, lines 17–20; *id.*, col. 3, lines 40–42. The claimed and described systems include "a

relational database management system component" that "stores . . . database information in a row format." *Id.*, col. 20, lines 3–6. The systems also include "a column-oriented data processing component" that "stores . . . database information in a column format." *Id.*, col. 20, lines 7–11. In the claimed systems and methods, in response to an update request, the relational component can update the row-based database information and notify the column-based component of the update. *Id.*, col. 20, lines 12–24. The column-based component can then update the column-based database information. *Id.* Finally, the column-based component can then respond to any query requests based on the column-oriented database information. *Id.*, col. 20, lines 25–30.

Independent claim 1 of the '421 patent recites:

1. A computer system storing a computer program for processing database information for both transacting and reporting, said computer program being executed by said computer system, the computer system comprising:

a processor;

a memory;

a relational database management system component, implemented by the computer system, wherein said relational database management component stores said database information in a row format; and

a column-oriented data processing component, implemented by the computer system, wherein said column-oriented data processing component stores said database information in a column format using vertical fragmentation,

in response to a database update request, said relational database management system

component updates said database information stored in said row format, said relational database management system component notifies said column-oriented data processing component of said database update request, and said column-oriented data processing component updates said database information stored in said column format, whereby said relational database management system component and said column-oriented data processing component share a consistent view of said database information, and

in response to a query request to retrieve data, said column-oriented data processing component generates a query response based on said database information stored in said column format, wherein generating the query response accesses only one or more columns needed directly for generating the query response.

*Id.*, col. 19, line 64, through col. 20, line 30.

SAP's '321 patent issued in July 2012 from a May 2004 application tracing to a May 2003 foreign patent application. The patent "relates to ways to organize the tables and cubes used in databases so that they can be more easily and efficiently recognized and accessed." N.D. Cal. Dkt. No. 472-2 at 218 (SAP's Maier Rebuttal Expert Report); *see* N.D. Cal. Dkt. No. 472 at 1 (Teradata's brief in support of its motion for summary judgment of invalidity) ("The '321 patent is directed to the . . . idea of associating . . . database tables and . . . [OLAP] cubes with respective classes for use with application programs." (bracketed alteration in original)). As SAP's validity expert explained, "[a]t a high level[,] this organization is accomplished by assigning a table or cube to a particular class," with the "classes serv[ing] to group data structures storing related data, so an

application can access the structures together." N.D. Cal. Dkt. No. 472-2 at 218.

Independent claim 1 of the '321 patent reads:

> 1. A data processing method comprising:
>
> providing a set of database tables in a data warehouse, each database table being assigned to an entity type and storing entities of its entity type;
>
> providing a set of online analytical processing cubes in a data warehouse, each online analytical processing cube specifying a layout for transactional data storage;
>
> providing at least one application program for processing at least one class of database tables and at least one class of online analytical processing cubes;
>
> mapping a sub-set of the set of database tables to the at least one class of database tables, the sub-set of database tables comprising database tables of one or more entity types;
>
> mapping a sub-set of the set of online analytical processing cubes to the at least one class of online analytical processing cubes;
>
> invoking an online analytical processing component to fill the online analytical processing cubes with transactional data;
>
> processing the entities stored in the subset of database tables and the transactional data stored in the sub-set of online analytical processing cubes by the application program; and

> providing analysis of the entities and the transactional data processed by the application program to a user.

'321 patent, col. 7, lines 12–37.

SAP's '179 patent issued in November 2009 from an April 2004 application filed as a continuation in part of an application tracing to a June 2002 provisional application. It describes and claims methods and systems that integrate subquery optimization into a query optimizer's plan for accessing a database to execute a query. '179 patent, Abstract; *id.*, col. 38, line 47, through col. 39, line 8. The patent explains that structured query language (SQL) queries, issued to databases, "express what results are requested but do not state how the results should be obtained." *Id.*, col. 2, lines 59–60. Query optimizers perform the task of determining "the best method of accessing the data to return the result required by the SQL query." *Id.*, col. 2, lines 63–65. Query optimizers do so "by generating different join strategies" (*i.e.*, "join enumeration") "and, based on cost, choosing the best strategy." *Id.*, col. 3, lines 5–15. The patent provides that "[a] complete access plan comprises a join order for joining the relations (tables), join methods for each join operation, and an access method for each base table used in the query." *Id.*, col. 3, lines 21–24. For subqueries, though, "[a] database optimizer, in general, optimizes a subquery block separately from the rest of the query block the subquery is used in" and evaluates the subquery "when it is needed in the context in which it is used." *Id.*, col. 3, lines 28–31. The patent's systems and methods purport to integrate subquery optimization into the general optimization plan "without significantly increasing the amount of memory required, or significantly increasing the search space the optimizer is considering." *Id.*, col. 3, line 64, through col. 4, line 10.

Independent claim 1 of the '179 patent reads:

1. In a database system, a method for optimizing a database query for execution by a processor, the method comprising:

receiving a database query including at least one subquery;

building a query optimization graph for each query block of the database query, the query optimization graph including plan nodes representing subqueries of each query block;

prior to optimization of a query block, identifying alternative strategies for evaluation of a subquery plan node of the query block based on subquery type and semantic properties of the database query;

for each alternative strategy, pre-computing a subquery access method and subquery join method for use during optimization of the query block, wherein the subquery access method includes an estimate of execution costs;

generating a set of access methods and join methods for other plan nodes of the query block;

optimizing each query block to determine an optimal access plan for the query block based upon selecting pre-computed subquery access methods and join methods for subquery plan nodes of the query block as well as access methods, join methods, and join order for other plan nodes of the query block having favorable execution costs, wherein each query block is optimized without transformation of the subqueries using the pre-computed access methods and join methods; and

> constructing a detailed access plan for ex-
> ecution of the database query based upon the
> optimal access plan determined for each query
> block.

*Id.*, col. 38, line 47, through col. 39, line 8.[2]

3

Both before and after the allowance and filing of the counterclaims, Teradata, citing Federal Rule of Civil Procedure 21, requested that the district court sever SAP's counterclaims from Teradata's affirmative claims. *See, e.g.*, N.D. Cal. Dkt. Nos. 109 (June 2019), 174 (September 2019), 395 (March 2021). SAP opposed that request. *See, e.g.*, J.A. 2041–42 (June 2019); J.A. 4092–96 (September 2019); N.D. Cal. Dkt. No. 175-4 (SAP's September 2019 "statement of common issues of fact between Teradata's trade secret claims and SAP's patent counterclaims" (capitalization altered)); J.A. 8878–86 (March 2021).

In May 2021, following Teradata's last severance motion, the district court severed SAP's '437 patent-infringement counterclaim from this case but declined to do so at that time for the three other remaining counterclaims—asserting infringement of the '421, '321, and '179 patents. J.A. 9523. Specifically, the court said that "[t]he record would benefit from the testimony of the experts and

---

[2]     We omit descriptions of the '516 patent and the '437 patent. In February 2021, upon stipulation of the parties, the court dismissed the counterclaim involving the '516 patent without prejudice. J.A. 144; N.D. Cal. Dkt. No. 391. The '437 patent concerns certain uses of a data dictionary cache, and the counterclaim asserting infringement of that patent was severed from the case in May 2021 (as noted *infra*). Neither patent plays a material role, if any role, in the resolution of the compulsory-counterclaim issue now before us.

briefing on motions for summary judgment," which would occur soon, but that "[i]t appears from the argument presented at this juncture that SAP's counterclaims arise out of the same transaction or occurrence as Teradata's trade secret and antitrust claims, the development of SAP's product HANA"; that "[t]here are common questions of fact between both sets of claims, except for SAP's '437 patent infringement counterclaim, such as what the technological process entails and who invented the technology first"; and that "[t]he interests of judicial economy and the overlap between witnesses and documentary evidence[] weigh against severance" except for the '437 patent. *Id.* The court reiterated the preliminary nature of its determination, stating that it "may reconsider these issues as part of case/trial management after the dispositive motions." *Id.*

### D

In November 2021, the district court granted SAP summary judgment on Teradata's remaining antitrust claim, namely, its tying claim, a ruling based to a large extent on the court's exclusion of several aspects of the opinion of Teradata's economic expert. J.A. 1–2, 21–38, 46–49. The district court also granted SAP summary judgment on Teradata's technical-trade-secret claims, which had been "narrowed and now focus[ed] on only one category of technical trade secrets: the Batched Merge method," J.A. 7, referring to trade secrets 24–31, 58, and 59. *See* J.A. 7–21. The district court rested that ruling on determinations that Teradata did not adequately mark the method confidential under the MNDA when disclosing it to SAP during the Bridge Project and that, at any rate, Teradata irrevocably

licensed SAP the method to use in any SAP product under the SDCA.  J.A. 10–18.[3]

Two weeks later, the district court entered an agreed-to final judgment on those claims under Rule 54(b), while staying further proceedings on the business-trade-secret claim and the patent counterclaims.  J.A. 69–77.  After Teradata appealed to this court, SAP moved to transfer the appeal to the Ninth Circuit, a motion that Teradata opposed.  We denied the motion and directed the parties to address the jurisdictional issue in their merits briefs.

## II

"We must . . . fulfill our obligation to satisfy ourselves of our jurisdiction over any appeal," *Vermont v. MPHJ Technology Investments, LLC*, 803 F.3d 635, 642 n.1 (Fed. Cir. 2015), while bearing in "mind[] that the burden of persuasion falls on the appellant to establish that we indeed possess the jurisdiction [that the appellant] seeks to invoke," *Palmer v. Barram*, 184 F.3d 1373, 1377 (Fed. Cir. 1999).  We apply Federal Circuit law when determining whether we have jurisdiction under the relevant statute, 28 U.S.C. § 1295(a)(1).  *In re Rearden LLC*, 841 F.3d 1327, 1331 (Fed. Cir. 2016).

Under 28 U.S.C. § 1295(a)(1), we have

> exclusive jurisdiction . . . of an appeal from a final decision of a district court of the United States . . . in any civil action arising under, or in any civil

---

[3]     The district court also granted Teradata's motion for summary judgment on two issues involving the three remaining patents: ineligibility, under 35 U.S.C. § 101, of the claims of the '321 patent (which SAP contested); and unavailability, under 35 U.S.C. § 287, of damages for infringement of the '179 and '421 patents before May 21, 2019 (which SAP did not contest).  J.A. 49–64, 68.

action in which a party has asserted a compulsory
counterclaim arising under, any Act of Congress
relating to patents or plant variety protection.[4]

Our jurisdiction in this appeal turns on the applicability of
the "compulsory counterclaim" clause. Congress added
that clause to § 1295(a)(1) through the America Invents Act
in 2011, abrogating the Supreme Court's holding in *Holmes
Group, Inc. v. Vornado Air Circulation Systems, Inc.*, 535
U.S. 826 (2002), that a compulsory patent-infringement
counterclaim did not bring a case within § 1295(a)(1) as
then written. The 2011 Congress limited the extension to
cases in which the patent-law-based counterclaim was
compulsory, in contrast to a 2006 bill addressing *Holmes
Group*—referred to in the discussions of the 2011 bill that
was enacted—that had more broadly extended § 1295(a)(1)
to cases in which any party asserted a patent-law-based
claim. *See* Joe Matal, *A Guide to the Legislative History of
the America Invents Act: Part II of II*, 21 Fed. Cir. Bar J.
539, 539–40 (2012) (discussing Senator Kyl's recognition of
departure from earlier, broader 2006 bill); H.R. Rep. No.
112-98 at 54, 81 (2011) (referring to 2006 bill).

We look to Federal Rule of Civil Procedure 13(a) for
what constitutes a compulsory counterclaim. *Rearden*, 841
F.3d at 1332. Subject to certain exceptions not relevant
here, Rule 13(a) deems a counterclaim "compulsory" if it
"arises out of the transaction or occurrence that is the sub-
ject matter of the opposing party's claim." A defendant that
fails to assert a counterclaim in the action where it is

---

4    Under 28 U.S.C. § 1291, the Ninth Circuit has ju-
risdiction over this appeal if we do not. Under 28 U.S.C.
§ 1631, if we conclude that we lack jurisdiction, we "shall,
if it is in the interest of justice, transfer such action or ap-
peal to any other such court . . . in which the . . . appeal
could have been brought at the time it was filed or noticed
. . . ," here, the Ninth Circuit.

"compulsory" cannot assert it (even as a "claim") in a separate action. *See* Rule 13, 1937 Adv. Comm. Note 7; *Baker v. Gold Seal Liquors, Inc.*, 417 U.S. 467, 469 (1974); *American Mills Co. v. American Surety Co.*, 260 U.S. 360 (1922). Deeming a counterclaim compulsory thus has a significant assert-now-or-lose consequence.

Teradata contends now that SAP's patent-infringement counterclaims—specifically, those involving SAP's '421, '321, and '179 patents—are compulsory because, Teradata urges, they arise out of the same transaction or occurrence that is the subject matter of Teradata's technical-trade-secret claims.[5] As we explain below, the relevant trade-secret claims are only Teradata's enumerated "batched merge method" alleged trade secrets. Those trade secrets remain secret, so details are not recited in this opinion. But having examined them, and having conducted the required case-specific analysis, we conclude that SAP's '421, '321, and '179 patent-infringement counterclaims are not compulsory and thus cannot support our jurisdiction.

## A

Noting courts' general agreement that Rule 13(a)'s "transaction or occurrence" "words should be interpreted liberally in order to further the general policies of the federal rules," we have explained that, to implement that approach, we have identified our use of

> three tests to determine whether the transaction or occurrence test of Rule 13(a) is met: (1) whether the legal and factual issues raised by the claim and

---

[5]    Teradata does not invoke its other claims, including its antitrust or business-related trade-secret claims, as making SAP's remaining counterclaims compulsory. And Teradata does not assert that the severed '437 patent-infringement claim or the dismissed-without-prejudice '516 patent-infringement claim support our jurisdiction.

counterclaim are largely the same; (2) whether substantially the same evidence supports or refutes both the claim and the counterclaim; and (3) whether there is a logical relationship between the claim and the counterclaim.

*Rearden*, 841 F.3d at 1332 (internal quotation marks omitted) (quoting *Nasalok Coating Corp. v. Nylok Corp.*, 522 F.3d 1320, 1325 (Fed. Cir. 2008)).[6] At least as a general matter, the application of these standards to particular cases presents a question of law. *See Anza Technology, Inc. v. Mushkin, Inc.*, 934 F.3d 1359, 1367 (Fed. Cir. 2019) (discussing related Rule 15 issue). Regardless, the parties have not urged or supported an exception to that review standard that would make any difference here.

When performing this analysis, we "look to the plaintiff's operative complaint and the counterclaims at the time of filing to determine jurisdiction." *Rearden*, 841 F.3d at 1333 n.2 (citing *Jang v. Boston Scientific Corp.*, 767 F.3d 1334, 1338 (Fed. Cir. 2014)). At that time, "no one can be certain what the issues" in the case will be, Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1410 (3d ed. updated Apr. 2023), so we decline to consider "[t]he mere possibility that, as a result of affirmative defenses, the first suit might involve additional issues,"

---

[6] Whether the counterclaim could not separately be asserted in another action (if not presented in the action at issue) is a prescribed consequence of the "compulsory" analysis, as noted *supra*, not a separate factor in the analysis. Similarly, we have declined to consider in the analysis whether res judicata would bar a subsequent action on the counterclaim if not asserted in the first action (once the first action has gone to judgment), deeming such consideration circular. *Nasalok*, 522 F.3d at 1326 & n.4 (citing 6 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1410 & n.8 (3d ed. updated Apr. 2023)).

*Nasalok*, 522 F.3d at 1326.  Instead, "[i]n each of the three tests[,] . . . the question is the extent of factual overlap between what the plaintiff *must* establish to prove its claim and what the defendant *must* establish to prove its counterclaim." *Nasalok*, 522 F.3d at 1326.

Of relevance here, for jurisdictional purposes, the operative complaint is not necessarily the original complaint. Our jurisdiction depends on the complaint *as amended*. *See Chamberlain Group, Inc. v. Skylink Technologies, Inc.*, 381 F.3d 1178, 1189 (Fed. Cir. 2004); *Rearden*, 841 F.3d at 1333 n.2 (same for counterclaim-based § 1295 analysis). When a plaintiff drops certain claims by amending its complaint or voluntarily dismissing them without prejudice (effectively amending the complaint), the required analysis treats the case as if the dropped ones had never been brought, focusing just on the (formally or effectively) amended complaint.  *See Chamberlain*, 381 F.3d at 1189; *Gronholz v. Sears, Roebuck & Co.*, 836 F.2d 515, 516–19 (Fed. Cir. 1987) (concluding that we lack jurisdiction over an appeal in which the plaintiff voluntarily dismissed without prejudice all patent-infringement claims prior to the appeal).  As we explained in *Chamberlain*, "[d]ismissals *without prejudice* are de facto amendments to the complaint," and "we do not differentiate between actual and constructive amendments; both divest us of jurisdiction if they eliminate all issues of patent law." 381 F.3d at 1189. In contrast, "[d]ismissals *with prejudice* are adjudications on the merits, and not constructive amendments to the complaint."  *Id.* at 1189–90 (citing *Zenith Electronics Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1346 (Fed. Cir. 1999)).

*Chamberlain* itself involved the amendment or constructive amendment of a complaint to remove patent claims, where the complaint itself (*e.g.*, asserting claims under patent law) was the direct basis for § 1295 jurisdiction.  But the *Chamberlain* analysis should apply also where it is the counterclaims (because of their relation to the claims) that must support any § 1295 jurisdiction.  We

still "look to the plaintiff's *operative* complaint"—*i.e.*, the amended one—"and the *counterclaims* at the time of filing to determine jurisdiction." *Rearden*, 841 F.3d at 1333 n.2 (emphasis added)). Whether claims or counterclaims are the direct basis for § 1295 jurisdiction, an amendment of the complaint to drop claims (expressly or in effect) renders the dropped claims "as if . . . never . . . filed." *Chamberlain*, 381 F.3d at 1190; *see also Nilssen v. Motorola, Inc.*, 203 F.3d 782, 785 (Fed. Cir. 2000) ("[R]egardless whether the patent claims were dismissed without prejudice or extinguished by amendment, the effect is the same. The parties were left in the same legal position with respect to the patent claims as if they had never been filed.").

A plaintiff may amend its complaint "as a matter of course" before the defendant answers and later "with the opposing party's written consent or the court's leave." Federal Rule of Civil Procedure Rule 15(a)(1), (2); *see* Wright & Miller § 1479. Here, when Teradata amended its list of asserted trade secrets, incorporated into the Second Amended Complaint, after SAP answered, Teradata had both SAP's consent and the court's leave. The parties stipulated that Teradata would narrow its trade secret claims to no more than 25 by December 15, 2020, and no more than 15 by the close of expert discovery. N.D. Cal. Dkt. No. 278. The stipulation provided similarly for SAP's patent claims, and the court entered the stipulation. *Id.*

Teradata's first narrowing under the stipulated order occurred when Teradata amended its list, on December 15, 2020, to assert trade secrets 1.4, 1.11, 1.15, 1.16, 1.20, 24–31, 54–56, and 58–60. N.D. Cal. Dkt. No. 364; *see also* N.D Cal. Dkt. No. 394-3. And following an extension of the deadline for the close of expert discovery to August 13, 2021, N.D. Cal. Dkt. No. 393, Teradata, on August 13, 2021, served its second and final narrowing under the stipulated order, leaving us with the operative list asserting, on the technical side, trade secrets 24–31, 58, and 59 and dropping trade secrets 1.4, 1.11, 1.15, 1.16, and 1.20. *See*

J.A. 10139 (citing J.A. 10611–14). Those trade secrets, the parties agree, are narrowed down to the above-described batched merge method. *See* J.A. 10139; J.A. 15164. And the narrowing in both instances occurred without prejudice. *See Hells Canyon Preservation Council v. U.S. Forest Service*, 403 F.3d 683, 690 (9th Cir. 2005) ("It is axiomatic that prejudice does not attach to a claim that is properly dropped from a complaint under Rule 15(a) prior to final judgment.").

## B

The jurisdictional question before us is thus whether SAP's claims for infringement of the '421, '321, and '179 patents arise out of the same transaction or occurrence that is the subject matter of Teradata's claims for misappropriation of its trade secrets 24–31, 58, and 59 so that SAP would lose its ability to bring these claims (against the accused products) if it did not press them in this action initiated by Teradata. "[T]he question is the extent of factual overlap between what the plaintiff *must* establish to prove its claim and what the defendant *must* establish to prove its counterclaim." *Nasalok*, 522 F.3d at 1326. Affirmative defenses that the opposing party might raise to the claims or counterclaims are not part of that comparison. *Id.*

To prevail on any of its patent-infringement counterclaims as presented, SAP must demonstrate that an accused Teradata product satisfies all limitations of an asserted patent claim. *See, e.g., SIMO Holdings Inc. v. Hong Kong uCloudlink Network Technology Ltd.*, 983 F.3d 1367, 1380 (Fed. Cir. 2021).[7] That showing turns on the

---

[7]    The phrase in text is an appropriate shorthand here, as no argument has been made based on differences, *e.g.*, between product and method claims, between making or selling or using or other direct-infringement acts, or between direct or indirect infringement.

scope of the patent claims, on one hand, and the composition of Teradata's accused products, on the other. Patent validity is not among the required showings, but one accused of infringement, like Teradata, may put patent invalidity in issue in response. *See Nasalok*, 522 F.3d at 1326–27 (discussing invalidity defenses in trademark and patent contexts).

To prevail on its trade-secret claims under the federal Defend Trade Secrets Act, codified at 18 U.S.C. § 1836 et seq., and under California Civil Code § 3426 et seq., Teradata must show the existence and misappropriation of an asserted trade secret.[8] *See Olaplex, Inc. v. L'Oreal USA, Inc.*, 855 F. App'x 701, 705 n.2 (Fed. Cir. 2021) (citations omitted). A trade secret is information that "(A) the owner thereof has taken reasonable measures to keep . . . secret; and (B) . . . derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3); *see* Cal. Civ. Code § 3426.1(d) (similar). Misappropriation includes, subject to certain specific limitations, "disclosure or use of a trade secret of another without express or implied consent." 18 U.S.C. § 1839(5)(B); Cal. Civ. Code § 3426.1(b)(2) (same). As presented to us, Teradata's claim depends on the scope of the marking requirements and license

---

[8] "California has adopted without significant change the Uniform Trade Secrets Act (UTSA)." *DVD Copy Control Association, Inc. v. Bunner*, 75 P.3d 1, 9 (Cal. Aug. 25, 2003), *as modified* (Cal. Oct. 15, 2003) (citing *Cadence Design Systems, Inc. v. Avant! Corp.*, 57 P.3d 647 (Cal. 2002)). Neither SAP nor Teradata suggests a difference material to this case between the federal and state standards.

provisions of the Teradata-SAP agreements, on one hand, and the composition of SAP's products, on the other.

As this description indicates, the first two of the three "tests" we have used for the compulsory-counterclaim inquiry, *see Rearden*, 841 F.3d at 1332; *Nasalok*, 522 F.3d at 1325, point against Teradata's suggested affirmative answer to that inquiry. The "legal and factual issues raised by the claim" are not "largely the same"; and "substantially the same evidence" does not "support[] or refute[] both the claim and the counterclaim." Indeed, the district court, in its preliminary severance ruling, J.A. 9523, did not conclude otherwise. There is undisputedly some overlap in evidence; after all, understanding the different accused products and the asserted trade secrets and asserted patent claims will call for explanations of various database-structure-and-access technologies. But such same-field overlap does not make the issues "largely the same" or make the evidence supporting or refuting the particular claims and counterclaims "substantially the same." And here, the elements of trade-secret misappropriation and infringement of specific patent claims containing multiple limitations, applied to the different parties' products, mean that proof of the claim and proof of the counterclaim would not rely on substantially the same evidence.

The third "test" is whether "there is a logical relationship between the claim and the counterclaim." *Rearden*, 841 F.3d at 1332; *Nasalok*, 522 F.3d at 1325. That test should be of a piece with (though not be entirely redundant of) the first two tests, reflecting the significant assert-or-lose consequence of a "compulsory" characterization and the results reached in various judicial decisions (some of them precedential for us, others not). *See Nasalok*, 522 F.3d at 1326 ("In *each* of the three tests for what constitutes the same 'transaction or occurrence,' the question is the extent of factual overlap between what the plaintiff *must* establish to prove its claim and what the defendant *must* establish to prove its counterclaim." (first emphasis

added)); *cf. ABS Global, Inc. v. Inguran, LLC*, 914 F.3d 1054, 1063–64 (7th Cir. 2019) (concluding that particular antitrust and patent claims were "quite different," stating that "patent counterclaims are frequently permissive in antitrust cases," and noting risk of too broad a concept of "logical relationship" where patents are concerned). We do not think that the test, which is to a large extent circumstance-specific, is met here.

An important consideration is that different parties' different products are the direct subjects of Teradata's claims (addressing SAP products), on one hand, and SAP's counterclaims (addressing Teradata products), on the other. This fact makes the present case materially different from *Holmes Group* (the case whose result Congress was abrogating by amending § 1295(a) in 2011), the Supreme Court case to which the "logical relationship" formulation traces, and most, if not all, of the cases on which Teradata relies for its position on appeal. Without suggesting that this difference is always critical in a compulsory-counterclaim analysis, we conclude that it is important in the circumstances of this case.

In *Holmes Group*, the declaratory-judgment plaintiff's own product was the subject of the plaintiff's claim (seeking a declaration that it did not infringe the defendant's trade dress rights) and also of the defendant's counterclaim (asserting that the plaintiff's product infringed defendant's patent)—which the Supreme Court noted was a compulsory counterclaim. 535 U.S. at 828. In *Moore v. New York Cotton Exchange*, 270 U.S. 593 (1926), which used the "logical relationship" language, *id.* at 610, the defendant's price quotations (regarding cotton contracts) were the subject of the plaintiff's antitrust claim (challenging the defendant's refusal to provide the plaintiff the quotations) and also of the defendant's counterclaim asserting that the plaintiff and his company were "purloining" the defendant's price information. *Id.* at 609–10. In *Rearden*, the plaintiff sought a declaratory judgment that it owned certain

patents, and the defendants counterclaimed for a declaratory judgment that it owned the same patents and also sued for infringement, proof of which itself required establishment of defendants' ownership. 841 F.3d at 1330–31, 1332. And in *Mopex, Inc. v. American Stock Exchange, LLC*, No. 02 CIV. 1656 (SAS), 2002 WL 342522 (S.D.N.Y. Mar. 5, 2002), the American Stock Exchange sought a declaratory judgment that certain of its own products (exchange-traded funds) did not infringe Mopex's patents, and the court held that Mopex's charge of trade-secret misappropriation involving the American Stock Exchange products was a compulsory counterclaim, noting that Mopex essentially conceded that the opposing claims involved essentially same subject matter and were logically related for Rule 13(a) purposes. *Id.* at *2, *6. And though not relied on by Teradata, in *Vermont*, we determined that a counterclaim was "compulsory" when a patent owner's communications to potential infringers were the subject of both the plaintiff's state-law claims (alleging that the communications were deceptive) and the defendant's counterclaim seeking a judgment that the state law applied to those same communications was preempted by federal patent law. 803 F.3d at 644–45. The present case does not involve shared direct subject matter of claim and counterclaim of the sorts involved in the foregoing cases.[9]

---

[9]    Teradata has not cited authority for resting a compulsory-counterclaim conclusion on the fact that *competing* products are the subject of claims and counterclaims. *See Mattel, Inc. v. MGA Entertainment, Inc.*, 705 F.3d 1108 (9th Cir. 2013) (holding trade-secret counterclaim not compulsory where plaintiff's claim was also a trade-secret claim and the accused products—Barbie and Bratz dolls— were competing products).

Other decisions relied on by Teradata are likewise materially different from the present case and themselves underscore the significance of the same product or property being at issue. In *Anza*, we addressed the provision of Rule 15 that governs relation back of amended complaints for statute-of-limitations purposes (an issue whose analysis was informed by Rule 13 standards). We held that the patents newly asserted in an amended complaint met the Rule 15 test insofar as the very same products were accused—where the new and original patents involved sufficiently similar technology that proof of infringement would not be substantially different—while requiring a remand for consideration of the allegation against products different from those initially accused. 934 F.3d at 1370–71. In *In re EMC Corp.*, 677 F.3d 1351 (Fed. Cir. 2012), we addressed joinder of patent claims against different defendants under Rule 20 (an issue whose analysis was informed by Rule 13 standards). We emphasized the importance of whether "substantially the same" evidence was involved in the claims against the different defendants and remanded for application of the clarified standard to the infringement claims accusing different defendants' products (which may well have been qualitatively similar). *Id.* at 1357–59.

A nonprecedential decision of this court, not relied on by Teradata, illustrates that even shared specific subject matter of a claim and counterclaim, though significant, is not always sufficient to make the latter compulsory. In *University of Florida Research Foundation, Inc. v. Medtronic PLC*, No. 2016-2422, 2017 WL 6210801 (Fed. Cir. Jan. 27, 2017), the plaintiff Foundation sought an accounting from Medtronic under a license to the Foundation's patents, and Medtronic counterclaimed for a declaration of noninfringement (by various Medtronic products) and invalidity (of the patents). We held that the counterclaim was not compulsory because all the Foundation had sought in its claim (so far) was an audit that would produce Medtronic's product records, even though the plaintiff's audit

claim was likely a prelude to a demand from the Foundation for payment under the license, whose coverage was tied to infringement of the patents by Medtronic products. *Id.* at *2.

Teradata relies on *Leap Wireless International, Inc. v. MetroPCS Communications, Inc.*, No. 2:06-CV-240, 2007 WL 541428 (E.D. Tex. Feb. 15, 2007), to support its contention. The plaintiff Leap Wireless sued the defendant for patent infringement, and the defendant filed a counterclaim/cross-claim seeking a declaratory judgment of invalidity of the patent because it was allegedly obtained based on trade-secret misappropriation, with this charge naming Leap Wireless and also naming new (cross-claim) defendants. As to the newly added (cross-claim) defendants, the district court addressed an issue of "ancillary venue" and concluded that the charge was a compulsory counterclaim because it was logically related to Leap Wireless's infringement claim, noting that the patent and the alleged trade secret involved "the same underlying design concept." *Id.* at *3–5.

*Leap Wireless* is not binding on this court, involved a venue issue raised by a cross-claim, and pre-dated this court's decision in *Nasalok*, which explained that a counterclaim of patent invalidity is not necessarily compulsory in a suit brought to allege infringement, 522 F.3d at 1326–27. *Leap Wireless* does, however, raise the possibility that a situation in which a defendant's ability to, *e.g.*, make, sell, or use its own product free of the plaintiff's asserted right might be viewed as the shared subject of both the plaintiff's claim and the defendant's own counterclaim to invalidate the plaintiff's asserted right. But we need not decide here if that is a proper characterization or, if so, when such an invalidity counterclaim would be compulsory.

SAP's counterclaim is a claim of infringement by Teradata's products and does not assert invalidity of Teradata's asserted trade-secret right. As *Nasalok* makes

clear, we assess the compulsory or noncompulsory nature of the counterclaim based on what the counterclaim asserts, which is, simply, infringement by Teradata's products, not invalidity of the Teradata trade secrets. In particular, SAP did not counterclaim that the asserted trade secrets are invalid because of disclosures in the patents at issue that (either publicly or in SAP's hands) predate the asserted trade-secret misappropriation. *See Atlantic Research Marketing Systems, Inc. v. Troy*, 659 F.3d 1345, 1357 (Fed. Cir. 2011) ("A trade secret is secret. A patent is not. That which is disclosed in a patent cannot be a trade secret."). Nor does the record establish that the alleged infringement of the particular patent claims at issue entails that the "batched merge method" trade secrets, with their sequences of steps identified by Teradata in its itemization of the trade secrets, cannot meet the standards for being trade secrets. More specifically, it is not established here that the patent claims, understood in light of the specifications, disclose the asserted trade secrets' particular sequences of method steps as part of the claimed inventions.[10]

The district court did make a contrary determination when it made its preliminary decision not to sever the patent counterclaims now at issue from Teradata's affirmative claims. The district court focused on severance under

---

[10]    Of course, the *Atlantic Research* principle is available for SAP to invoke, in defending against the trade-secret claim, based on temporally relevant disclosures in a published patent (or in other publications) even if the asserted trade secret is not disclosed in such a patent's claims. We also note that, even if a trade-secret-invalidity counterclaim were compulsory, it would not itself be the kind of compulsory counterclaim (involving patent or plant-variety-protection law) required for a case to come within § 1295(a)(1) based on a counterclaim.

Rule 21 (perhaps also severance for trial under Rule 42), not whether the patent counterclaims were compulsory. In any event, as indicated by the court's reference to Teradata's antitrust claims, which Teradata does not invoke for its compulsory-counterclaim argument here, the district court's decision took too general a view of what passes the same-transaction-or-occurrence test (at least for Rule 13 purposes, let alone § 1295 purposes). Insofar as the court went beyond stating its conclusion, it referred merely to "common questions of fact, . . . such as what the technological process entails and who invented the technology first" and "[t]he interests of judicial economy and the overlap between witnesses and documentary evidence." J.A. 9523. Those considerations, even the unelaborated reference to "who invented the technology first," are too general and are insufficiently focused on just what the claims and counterclaims assert.

The parties' arguments in the district court (not focused on the compulsory character of the counterclaims) do not show that the patent counterclaims at issue were compulsory. We do not read SAP's assertions supporting allowance of the filing of the counterclaims or opposing severance as doing more than responding to Teradata's pre-narrowing collection of trade secrets and, particularly as to the narrowed group of trade secrets, showing an overlap in the sense that a factfinder would have to develop an understanding of technological concepts that amount to background knowledge in the database field in order to evaluate both the trade-secret claims and the patent-infringement counterclaims. *See*, *e.g.*, N.D. Cal. Dkt. No. 106 at 5; N.D. Cal. Dkt. No. 175–4 at 5–6, 15; N.D. Cal. Dkt. No. 398 at 6–7; J.A. 8881–82. That is not enough under the case law. Teradata, for its part, did not assert the kind of connection between the patent counterclaims and its trade-secret claims that supports its present contention that the patent counterclaims are compulsory. To the contrary, Teradata asserted that SAP could bring its patent-

infringement allegations in a separate action, N.D. Cal. Dkt. No. 109 at 9, which would not be true if those allegations qualified as a compulsory counterclaim.

For these reasons, we conclude that SAP's counterclaims do not arise out of the same transaction or occurrence as the subject matter of Teradata's narrowed technical trade secret claims so as to have compelled SAP to bring its patent counterclaims in this action or, therefore, to support our jurisdiction.

## C

Having concluded that SAP's patent-infringement claims are not compulsory counterclaims in this case, we hold that we lack jurisdiction over this appeal, which instead belongs in the Ninth Circuit. Because it is plainly in the interest of justice to transfer the appeal to the Ninth Circuit, we do so under 28 U.S.C. § 1631. The appeal, based on the Rule 54(b) judgment, involves only (a subset of) Teradata's claims, not SAP's patent-law counterclaims.

We add that SAP's claims of patent infringement (currently counterclaims), if and when adjudicated in an appealable judgment, will not necessarily end up part of an eventual Ninth Circuit appeal. If SAP's patent-law counterclaims are now severed under Rule 21—the district court to date having ruled only in a preliminary manner on that issue—the effect would be to place them in a separate case. When severance occurs under Rule 21, the initial case (no longer containing the severed matter) and the new case (containing the severed matter) are separately evaluated for appeal purposes, *see, e.g.*, *Herklotz v. Parkinson*, 848 F.3d 894, 898 (9th Cir. 2017); *Rice v. Sunrise Express, Inc.*, 209 F.3d 1008, 1013–16 (7th Cir. 2000); Wright & Miller § 1689, as they are for venue-transfer purposes, *see In re Nintendo of America, Inc.*, 756 F.3d 1363, 1364–65 (Fed. Cir. 2014). Those consequences are independent of the district court's ability to hear or try separate-case claims together, or even consolidate the cases, under Rule 42(a). *See*

Wright & Miller § 1689 (noting that Rule 21 severance does not bar consolidation for trial, under Rule 42(a), of what have become separate cases); *Hall v. Hall*, 138 S. Ct. 1118 (2018) (holding that Rule 42 consolidation does not merge cases into a single case for appeal purposes).

We have no occasion to decide the issue here, but for the reasons just indicated, if the Rule 21 severance course is followed, an eventual appealable judgment on the patent-infringement allegations made by SAP might well be reviewed in this court while an appealable judgment on Teradata's non-patent claims would be reviewed in the Ninth Circuit. That end result would comport with Congress's evident general appeal policy regarding patent-law claims.

## III

For the foregoing reasons, we order this appeal transferred to the U.S. Court of Appeals for the Ninth Circuit pursuant to 28 U.S.C. § 1631.

No costs.

**TRANSFERRED**